## CASE NO. 22-4477

# IN THE
# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## FOR THE FOURTH CIRCUIT

————————————

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

ALEXANDER JUAREZ-SANCHEZ,

*Defendant - Appellant.*

————————————

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## AT BALTIMORE

————————————

## JOINT APPENDIX - VOLUME I OF II
## (Pages 1 - 424)

————————————

Alfred Guillaume, III
LAW OFFICES OF ALFRED
GUILLAUME III
6305 Ivy Lane
Suite 700
Greenbelt, MD 20770
202-321-0549
ag3law@gmail.com

Adam K. Ake
Amy L. Schwartz
OFFICE OF THE UNITED
  STATES ATTORNEY
Southern Division
6406 Ivy Lane
Greenbelt, MD 20770
301-344-4433
adam.ake@usdoj.gov
amy.schwartz@usdoj.gov

*Counsel for Defendant - Appellant*

*Counsel for Plaintiff-Appellee*

# **TABLE OF CONTENTS**

## **VOLUME I OF II**

Page

District Court Docket Sheet [1:21-cr-00174-JRR-1]................................................1

Indictment
    Filed May 19, 2021 [ECF3] ............................................................. 13

Motion to Suppress Tangible and Derivative Evidence
    Filed September 13, 2021 [ECF24] ................................................. 19

Motion to Suppress Tangible, Digital, and Derivative Evidence
    Filed September 13, 2021 [ECF25] ................................................. 23

Government's Consolidated Response in Opposition to
Defendant's Pretrial Motions to Suppress with Exhibits
    Filed April 12, 2022 [ECF49]......................................................... 27

        Ex. 1A and 1B:   Placeholder for Electronic Files [ECF49-1]..................... 54

        Ex. 2A:  Photo [ECF49-2] ......................................................... 55

        Ex. 2B:  Photo [ECF49-3] ......................................................... 56

        Ex. 2C:  Photo [ECF49-4] ......................................................... 57

        Ex. 3A:  Application and Affidavit for Search Warrant [ECF49-5] ........... 58

        Ex. 3B:  Application and Affidavit for Search Warrant [ECF49-6] ........... 65

        Ex. 4:   Maryland State Police Advice of Miranda Rights [ECF49-7]...... 72

        Ex. 5:   U.S. Dept. of Homeland Security Immigration and
                 Customs Enforcement Record of Sworn Statement [ECF49-8] ... 73

Transcript of Motions Hearing
Before the Honorable Richard D. Bennett,
    On April 25, 2022 ............................................................. 78

i

Memorandum Order
Entered April 26, 2022 [ECF57].............................................................. 158

Defendant's Motion in Limine to Exclude Evidence
    Filed May 11, 2022 [ECF60]............................................................ 173

Government's Response to Defendant's Motion in Limine
    Filed May 14, 2022 [ECF62]............................................................ 177

Transcript of a Pretrial Conference
Before the Honorable Julie R. Rubin
    On May 25, 2022 ......................................................................... 184

Transcript of Jury Trial Day 1
Before the Honorable Julie R. Rubin
    On May 25, 2022 ......................................................................... 238

    MASTER TROOPER CRAIG MILLER
        Direct Examination by Ms. Schwartz................................... 273
        Cross Examination by Mr. Guillaume.................................. 312
        Redirect Examination by Ms. Schwartz............................... 317

    SERGEANT JUN LEE
        Direct Examination by Mr. Ake ......................................... 320

## **VOLUME II OF II**

Transcript of Jury Trial Day 2
Before the Honorable Julie R. Rubin
    On May 26, 2022 ......................................................................... 425

    SERGEANT JUN LEE
        Direct Examination by Mr. Ake ......................................... 432
        Cross-examination by Mr. Guillaume .................................. 460

    MIGUEL PEREZ
        Direct Examination by Mr. Ake 473
        Cross-examination by Mr. Guillaume .................................. 478

DOMINGO RAMIREZ-ROBLERO
    Direct Examination by Mr. Ake ............................................................ 485
    Cross-examination by Mr. Guillaume .................................................... 514

Transcript of Jury Trial Day 3
Before the Honorable Julie R. Rubin
    On May 27, 2022 ................................................................................ 561

DOMINGO RAMIREZ-ROBLERO
    Cross-examination by Mr. Guillaume .................................................... 579
    Redirect Examination by Mr. Ake ........................................................ 616

MANUEL ESPARZA
    Direct Examination by Ms. Schwartz................................................... 619

DANIEL BEDARD
    Direct Examination by Ms. Schwartz................................................... 629

CRAIG MILLER
    Direct Examination by Mr. Ake ............................................................ 649
    Voir Dire Examination by Mr. Guillaume ............................................ 655
    Direct Examination by Mr. Ake ............................................................ 666
    Voir Dire Examination by Mr. Guillaume ............................................ 669
    Direct Examination by Mr. Ake ............................................................ 675

Transcript of Jury Trial Day 4
Before the Honorable Julie R. Rubin
    On May 31, 2022 ................................................................................ 694

Judgment in a Criminal Case
    Entered July 25, 2022 [ECF91] ......................................................... 819

Notice of Appeal
    Filed August 17, 2022 [ECF95]......................................................... 825

Query    Reports    Utilities    Help    Log Out

# U.S. District Court
## District of Maryland (Baltimore)
## CRIMINAL DOCKET FOR CASE #: 1:21-cr-00174-JRR-1

Case title: USA v. Juarez-Sanchez et al                    Date Filed: 05/19/2021

Magistrate judge case number: 1:21-mj-00188-TMD            Date Terminated: 07/25/2022

---

Assigned to: Judge Julie Rebecca Rubin

Appeals court case number: 22-4477
Fourth Circuit Court of Appeals

**Defendant (1)**

**Alexander Juarez-Sanchez**          represented by    **Alfred Guillaume , III**
*TERMINATED: 07/25/2022*                                Law Offices of Alfred Guillaume III LLC
                                                        1350 Connecticut Ave NW
                                                        Suite 308
                                                        Washington, DC 20036
                                                        202-321-0549
                                                        Fax: 3018124254
                                                        Email: ag3law@gmail.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*
                                                        Designation: CJA Appointment

                                                        **Jeffrey Dahlberg**
                                                        Office of the Federal Public Defender
                                                        100 S. Charles St. Tower II, 9th Fl.
                                                        Baltimore, MD 21201
                                                        410-962-3962
                                                        Fax: 410-962-3976
                                                        Email: jeff_dahlberg@fd.org
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*
                                                        Designation: Public Defender or
                                                        Community Defender Appointment

**Pending Counts**                                     **Disposition**

21:846 CONSPIRACY TO DISTRIBUTE              IMPRISONMENT for a term of 210
CONTROLLED SUBSTANCES                        months as to count 1, 210 months as to
(1)                                         count 2 to run concurrent to count 1, 120
                                            months as to count 3 to run concurrent to

**JA1**

counts 1 & 2 for a total term of 210 months, with credit for time served since August 5, 2020; SUPERVISED RELEASE for a term of 5 years as to count 1, 5 years as to count 2 to run concurrent to count 1, 3 years as to count 3 to run concurrent to counts 1 & 2 for a total term of 5 years; Total ASSESSMENT $300.00

21:841 POSSESSION WITH INTENT TO DISTRIBUTE CONTROLLED SUBSTANCES
(2)

IMPRISONMENT for a term of 210 months as to count 1, 210 months as to count 2 to run concurrent to count 1, 120 months as to count 3 to run concurrent to counts 1 & 2 for a total term of 210 months, with credit for time served since August 5, 2020; SUPERVISED RELEASE for a term of 5 years as to count 1, 5 years as to count 2 to run concurrent to count 1, 3 years as to count 3 to run concurrent to counts 1 & 2 for a total term of 5 years; Total ASSESSMENT $300.00

8:1326(a) RE-ENTRY AFTER DEPORTATION
(3)

IMPRISONMENT for a term of 210 months as to count 1, 210 months as to count 2 to run concurrent to count 1, 120 months as to count 3 to run concurrent to counts 1 & 2 for a total term of 210 months, with credit for time served since August 5, 2020; SUPERVISED RELEASE for a term of 5 years as to count 1, 5 years as to count 2 to run concurrent to count 1, 3 years as to count 3 to run concurrent to counts 1 & 2 for a total term of 5 years; Total ASSESSMENT $300.00

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                    **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                                           **Disposition**

21 U.S.C. 841(a)(1) Possession with Intent to Distribute CDS (>400g of Fentanyl)

**JA2**

**Plaintiff**

**USA**

represented by **Adam Kenneth Ake**
DOJ-USAO
6500 Cherrywood Lane
Ste 280
Greenbelt, MD 20770
301-344-4340
Email: adam.ake@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Amy L Schwartz**
United State's Attorney's Office
6406 Ivy Lane Ste 800
Greenbelt, MD 20770
3103440864
Email: Amy.Schwartz@usdoj.gov
*TERMINATED: 08/26/2022*
*Designation: Retained*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/27/2021 | 2 | COMPLAINT as to Alexander Juarez-Sanchez (1). (Attachments: # 1 Affidavit) (jws, Deputy Clerk)[1:21-mj-00188-TMD] (Entered: 01/27/2021) |
| 05/19/2021 | 3 | INDICTMENT as to Alexander Juarez-Sanchez (1) count(s) 1, 2, 3, Domingo Ramirez-Roblero (2) count(s) 1, 2, 4. (dass, Deputy Clerk) (Entered: 05/20/2021) |
| 05/24/2021 | 5 | NOTICE OF ATTORNEY APPEARANCE Adam Kenneth Ake appearing for USA.(Ake, Adam) (Entered: 05/24/2021) |
| 05/24/2021 | 6 | Initial Appearance as to Alexander Juarez-Sanchez (Defendant informed of Rights.) held on 5/24/2021 before Magistrate Judge J. Mark Coulson.(FTR-Waryu 7B) (jws, Deputy Clerk) (Entered: 05/25/2021) |
| 05/24/2021 | | Interpreter Victoria Dopazo appointed in case as to Alexander Juarez-Sanchez (jws, Deputy Clerk) (Entered: 05/25/2021) |
| 05/25/2021 | 7 | NOTICE OF ATTORNEY APPEARANCE: Jeffrey Dahlberg as Public Defender appearing for Alexander Juarez-Sanchez(Dahlberg, Jeffrey) (Entered: 05/25/2021) |
| 05/25/2021 | 8 | CJA 23 Financial Affidavit by Alexander Juarez-Sanchez. (dass, Deputy Clerk) (Entered: 05/25/2021) |
| 05/25/2021 | 9 | ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Alexander Juarez-Sanchez. Signed by Magistrate Judge J. Mark Coulson on 5/24/2021. (dass, Deputy Clerk) (Entered: 05/25/2021) |
| 05/25/2021 | 10 | ORDER OF DETENTION by Agreement as to Alexander Juarez-Sanchez. Signed by Magistrate Judge J. Mark Coulson on 5/24/2021. (dass, Deputy Clerk) (Entered: 05/25/2021) |

**JA3**

| | | |
|---|---|---|
| 05/25/2021 | 12 | ORDER pursuant to Fed R Crim P 5(f) and the Due Process Protections Act as to Alexander Juarez-Sanchez. Signed by Magistrate Judge J. Mark Coulson on 5/24/2021. (dass, Deputy Clerk) (Entered: 05/25/2021) |
| 05/28/2021 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Alexander Juarez-Sanchez. *Virtual proceeding to take place from CDF.* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 5/28/2021. An interpreter will be needed. Arraignment set for 6/4/2021 01:30 PM before Magistrate Judge Beth P. Gesner.(Ake, Adam) (Entered: 05/28/2021) |
| 06/04/2021 | 14 | Arraignment as to Alexander Juarez-Sanchez (1) Counts 1,2,3 held on 6/4/2021, Plea entered by Alexander Juarez-Sanchez of Not Guilty as to counts 1,2,3 before Magistrate Judge Beth P. Gesner.(FTR - J. Klein -7B.) (jks, Deputy Clerk) (Entered: 06/04/2021) |
| 06/04/2021 | | Interpreter Victoria Dopazo appointed in case as to Alexander Juarez-Sanchez (jks, Deputy Clerk) (Entered: 06/04/2021) |
| 06/10/2021 | 15 | Consent MOTION to Exclude *Time from Speedy Trial Act Calculations* by USA as to Alexander Juarez-Sanchez, Domingo Ramirez-Roblero. (Attachments: # 1 Text of Proposed Order)(Ake, Adam) (Entered: 06/10/2021) |
| 06/10/2021 | 16 | SCHEDULING ORDER as to Alexander Juarez-Sanchez. Signed by Judge Richard D. Bennett on 6/10/2021. (dass, Deputy Clerk) (Entered: 06/11/2021) |
| 06/11/2021 | 17 | ORDER granting 15 Motion to Exclude Time from Speedy Trial Act Calculations as to Alexander Juarez-Sanchez (1), Domingo Ramirez-Roblero (2). Signed by Judge Richard D. Bennett on 6/11/2021. (dass, Deputy Clerk) (Entered: 06/11/2021) |
| 09/13/2021 | 24 | MOTION to Suppress *Tangible and Derivative Evidence* by Alexander Juarez-Sanchez. (Dahlberg, Jeffrey) (Entered: 09/13/2021) |
| 09/13/2021 | 25 | MOTION to Suppress *Tangible, Digital, and Derivative Evidence* by Alexander Juarez-Sanchez. (Dahlberg, Jeffrey) (Entered: 09/13/2021) |
| 09/13/2021 | 26 | MOTION to Suppress *Statements* by Alexander Juarez-Sanchez. (Dahlberg, Jeffrey) (Entered: 09/13/2021) |
| 09/13/2021 | 27 | MOTION for Leave to File *Additional Pretrial Motions at a Later Date* by Alexander Juarez-Sanchez. (Dahlberg, Jeffrey) (Entered: 09/13/2021) |
| 10/22/2021 | 29 | Order confirming REVISED SCHEDULING ORDER as to Alexander Juarez-Sanchez. Signed by Judge Richard D. Bennett on 10/22/2021. (dass, Deputy Clerk) (Entered: 10/22/2021) |
| 11/29/2021 | 31 | -SEALED- MOTION to Seal by Alexander Juarez-Sanchez. (Attachments: # 1 Text of Proposed Order)(Dahlberg, Jeffrey) (Entered: 11/29/2021) |
| 11/29/2021 | 32 | SEALED DOCUMENT (Attachments: # 1 Text of Proposed Order)(Dahlberg, Jeffrey) Modified on 11/29/2021 (dass, Deputy Clerk). (Entered: 11/29/2021) |
| 11/29/2021 | 33 | -SEALED-ORDER granting 31 Motion to Seal as to 32 Proposed Sealed Document as to Alexander Juarez-Sanchez (1). Signed by Judge Richard D. Bennett on 11/29/2021. (Bennett, Richard) (Entered: 11/29/2021) |
| 11/29/2021 | 34 | Sealed Document (dass, Deputy Clerk)(c/em 11/29/21) (Entered: 11/29/2021) |

District of Maryland (CM/ECF Live NextGen 1.6)                    https://ecf.mdd.uscourts.gov/cgi-bin/DktRpt.pl?689516814789305-L_1_0-1

| 01/06/2022 | 40 | NOTICE OF ATTORNEY APPEARANCE: Alfred Guillaume, III as CJA Appointment appearing for Alexander Juarez-Sanchez(Guillaume, Alfred) (Entered: 01/06/2022) |
|---|---|---|
| 01/06/2022 | 41 | Order appointing Alfred Guillaume, III as CJA Counsel appearing for Alexander Juarez-Sanchez. Signed by Judge Richard D. Bennett on 1/5/2022. (dass, Deputy Clerk) (Entered: 01/06/2022) |
| 01/31/2022 | 42 | Consent MOTION for Extension of Time to File *Pretrial Motions* by Alexander Juarez-Sanchez. (Guillaume, Alfred) (Entered: 01/31/2022) |
| 01/31/2022 | 43 | QC NOTICE: 42 Motion for Extension of Time to File filed by Alexander Juarez-Sanchez was filed incorrectly. *\*\*The following attachment is missing - Proposed Order. To correct this problem, file Proposed Order using the event Notice (Other) and link Proposed Order to 42 Motion.* (dass, Deputy Clerk) (Entered: 01/31/2022) |
| 01/31/2022 | 44 | NOTICE re 42 Consent MOTION for Extension of Time to File *Pretrial Motions Proposed Order* (Guillaume, Alfred) (Entered: 01/31/2022) |
| 01/31/2022 | 45 | ORDER granting 42 Consent Motion for Extension of Motion Filing Deadline as to Alexander Juarez-Sanchez (1). Signed by Judge Richard D. Bennett on 1/31/2022. (dass, Deputy Clerk) (Entered: 01/31/2022) |
| 03/21/2022 | 47 | ORDER as to Alexander Juarez-Sanchez confirming revised Schedule re Motions Hearing. Signed by Judge Richard D. Bennett on 3/21/2022. (dass, Deputy Clerk) (Entered: 03/21/2022) |
| 03/21/2022 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Alexander Juarez-Sanchez. *Motions Hearing IN PERSON PROCEEDING* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 3/21/2022. An interpreter for Spanish was requested on 3/21/2022. Hearing set for 4/25/2022 11:00 AM in Courtroom 5D, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge Richard D. Bennett.(Ake, Adam) (Entered: 03/21/2022) |
| 04/04/2022 | 48 | NOTICE OF ATTORNEY APPEARANCE Amy L Schwartz appearing for USA.(Schwartz, Amy) (Entered: 04/04/2022) |
| 04/12/2022 | 49 | MEMORANDUM in Opposition by USA as to Alexander Juarez-Sanchez re 26 MOTION to Suppress *Statements*, 24 MOTION to Suppress *Tangible and Derivative Evidence*, 25 MOTION to Suppress *Tangible, Digital, and Derivative Evidence* (Attachments: # 1 Exhibit Placeholder for electronic exhibits 1A and 1B, # 2 Exhibit 2A, # 3 Exhibit 2B, # 4 Exhibit 2C, # 5 Exhibit 3A, # 6 Exhibit 3B, # 7 Exhibit 4, # 8 Exhibit 5)(Schwartz, Amy) (Entered: 04/12/2022) |
| 04/12/2022 | 50 | MOTION for Leave to File *Exhibit in Electronic Format* by USA as to Alexander Juarez-Sanchez. (Schwartz, Amy) (Entered: 04/12/2022) |
| 04/12/2022 | 51 | ORDER granting Government's 50 Motion for Leave to File Exhibit as video file as to Alexander Juarez-Sanchez (1). Signed by Judge Richard D. Bennett on 4/12/2022. (dass, Deputy Clerk) (Entered: 04/12/2022) |
| 04/25/2022 | 52 | Motions Hearing as to Alexander Juarez-Sanchez held on 4/25/2022 re 27 MOTION for Leave to File *Additional Pretrial Motions at a Later Date* filed by Alexander Juarez-Sanchez, 24 MOTION to Suppress *Tangible and Derivative Evidence* filed by |

**JA5**

| | | |
|---|---|---|
| | | Alexander Juarez-Sanchez, 25 MOTION to Suppress *Tangible, Digital, and Derivative Evidence* filed by Alexander Juarez-Sanchez, 26 MOTION to Suppress *Statements* filed by Alexander Juarez-Sanchez before Judge Richard D. Bennett. (Court Reporter: Mary Zajac) (rm2s, Deputy Clerk) (Entered: 04/25/2022) |
| 04/25/2022 | 53 | EXHIBIT LIST by USA as to Alexander Juarez-Sanchez. (rm2s, Deputy Clerk) (Entered: 04/25/2022) |
| 04/25/2022 | 54 | Stipulation re: Return of Exhibits to Government Counsel. (rm2s, Deputy Clerk) (Entered: 04/25/2022) |
| 04/25/2022 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Alexander Juarez-Sanchez. *Pretrial Conference IN PERSON PROCEEDING* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 4/25/2022. An interpreter for Spanish was requested on 4/25/2022. Hearing set for 5/17/2022 04:00 PM in Courtroom 5D, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge Richard D. Bennett.(Ake, Adam) (Entered: 04/25/2022) |
| 04/26/2022 | 55 | Order to Seal Document as to Alexander Juarez-Sanchez. Signed by Judge Richard D. Bennett on 4/25/2022. (dass, Deputy Clerk) (Entered: 04/26/2022) |
| 04/26/2022 | 56 | Sealed Document (dass, Deputy Clerk) (Entered: 04/26/2022) |
| 04/26/2022 | 57 | MEMORANDUM AND ORDER denying 24 Motion to Suppress as to Alexander Juarez-Sanchez (1); denying 25 Motion to Suppress as to Alexander Juarez-Sanchez (1); denying 26 Motion to Suppress as to Alexander Juarez-Sanchez (1); finding as moot 27 Motion for Leave to File as to Alexander Juarez-Sanchez (1). Signed by Judge Richard D. Bennett on 4/26/2022. (dass, Deputy Clerk) (Entered: 04/26/2022) |
| 04/29/2022 | | Case as to Alexander Juarez-Sanchez, Domingo Ramirez-Roblero Reassigned to Judge Julie Rebecca Rubin. Judge Richard D. Bennett no longer assigned to the case. (kns, Deputy Clerk) (Entered: 05/04/2022) |
| 05/05/2022 | 58 | MOTION for Extension of Time to File *Motions in Limine* by Alexander Juarez-Sanchez. (Guillaume, Alfred) (Entered: 05/05/2022) |
| 05/06/2022 | 59 | MARGINAL ORDER approving 58 Motion for Extension of Motion in Limine Filing Deadline as to Alexander Juarez-Sanchez (1). Signed by Judge Julie Rebecca Rubin on 5/6/2022. (dass, Deputy Clerk) (Entered: 05/06/2022) |
| 05/11/2022 | | Amended PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Alexander Juarez-Sanchez. *TIME CHANGE Pretrial Conference* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 5/11/2022. An interpreter for Spanish was requested on 5/11/2022. Hearing set for 5/17/2022 02:00 PM in Courtroom 3C, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge Julie Rebecca Rubin.(Ake, Adam) (Entered: 05/11/2022) |
| 05/11/2022 | 60 | MOTION in Limine by Alexander Juarez-Sanchez. (Guillaume, Alfred) (Entered: 05/11/2022) |
| 05/12/2022 | 61 | PAPERLESS ORDER as to Alexander Juarez-Sanchez: Pursuant to correspondence among counsel and the court of May 11, 2022, it is hereby ordered that the Pretrial Conference shall be held May 17, 2022, at 2:00 p.m. It is further Ordered that the Pretrial Conference shall be conducted in person (Courtroom 3C) per the request of the |

**JA6**

District of Maryland (CM/ECF Live NextGen 1.6)          https://ecf.mdd.uscourts.gov/cgi-bin/DktRpt.pl?689516814789305-L_1_0-1

| | | |
|---|---|---|
| | | Defendant and with the consent of the Government. Signed by Judge Julie Rebecca Rubin on 5/12/2022. (dass, Deputy Clerk) (Entered: 05/12/2022) |
| 05/14/2022 | 62 | RESPONSE in Opposition by USA as to Alexander Juarez-Sanchez re 60 MOTION in Limine (Ake, Adam) (Entered: 05/14/2022) |
| 05/16/2022 | 63 | Proposed Voir Dire by USA as to Alexander Juarez-Sanchez (Attachments: # 1 Attachment Proposed Joint Voir Dire Questions)(Schwartz, Amy) (Entered: 05/16/2022) |
| 05/17/2022 | 64 | NOTICE by USA *of Bill of Particulars for Forfeiture of Property* (Ake, Adam) (Entered: 05/17/2022) |
| 05/17/2022 | 65 | Motion Hearing as to Alexander Juarez-Sanchez held on 5/17/2022 re 60 MOTION in Limine filed by Alexander Juarez-Sanchez, Pretrial Conference as to Alexander Juarez-Sanchez held on 5/17/2022 before Judge Julie Rebecca Rubin.(Court Reporter: Ronda Thomas) (jh2s, Deputy Clerk) (Entered: 05/17/2022) |
| 05/24/2022 | 66 | Jury Trial Day 1 (Jury Selection) as to Alexander Juarez-Sanchez held on 5/24/2022 before Judge Julie Rebecca Rubin.(Court Reporter: Ronda Thomas) (jh2s, Deputy Clerk) (Entered: 05/25/2022) |
| 05/25/2022 | 67 | Jury Trial Day 2 as to Alexander Juarez-Sanchez held on 5/25/2022 before Judge Julie Rebecca Rubin.(Court Reporter: Ronda Thomas) (jh2s, Deputy Clerk) Modified on 7/12/2022 (jh2s, Deputy Clerk). Modified on 9/19/2022 (bas, Deputy Clerk). (Entered: 05/25/2022) |
| 05/26/2022 | 68 | Jury Trial Day 3 as to Alexander Juarez-Sanchez held on 5/26/2022 before Judge Julie Rebecca Rubin.(Court Reporter: Christine Asif) (jh2s, Deputy Clerk) Modified on 7/12/2022 (kns, Deputy Clerk). (Entered: 05/26/2022) |
| 05/27/2022 | 69 | Jury Trial Day 4 as to Alexander Juarez-Sanchez held on 5/27/2022 before Judge Julie Rebecca Rubin.(Court Reporter: Christine Asif) (jh2s, Deputy Clerk) (Entered: 05/27/2022) |
| 05/31/2022 | 70 | Jury Trial Day 5 VERDICT as to Alexander Juarez-Sanchez held on 5/31/2022 before Judge Julie Rebecca Rubin.(Court Reporter: Ronda Thomas) (jh2s, Deputy Clerk) (Entered: 06/01/2022) |
| 05/31/2022 | 71 | Expedited Sentencing Order as to Alexander Juarez-Sanchez. Signed by Judge Julie Rebecca Rubin on 5/31/2022. (jh2s, Deputy Clerk) (Entered: 06/01/2022) |
| 05/31/2022 | 72 | GOVERNMENT'S WITNESS LIST by USA as to Alexander Juarez-Sanchez (jh2s, Deputy Clerk) (Entered: 06/01/2022) |
| 05/31/2022 | 73 | GOVERNMENT'S EXHIBIT LIST by USA as to Alexander Juarez-Sanchez (jh2s, Deputy Clerk) (Entered: 06/01/2022) |
| 05/31/2022 | 74 | DEFENDANT'S EXHIBIT LIST by Alexander Juarez-Sanchez (jh2s, Deputy Clerk) (Entered: 06/01/2022) |
| 05/31/2022 | 75 | Stipulation re: Certification of Exhibits Submitted to the Jury (jh2s, Deputy Clerk) (Entered: 06/01/2022) |
| 05/31/2022 | 76 | Stipulation re: Return of Exhibits to Counsel (jh2s, Deputy Clerk) (Entered: 06/01/2022) |

1/6/2023, 2:49 PM

**JA7**

District of Maryland (CM/ECF Live NextGen 1.6)                    https://ecf.mdd.uscourts.gov/cgi-bin/DktRpt.pl?689516814789305-L_1_0-1

| | | |
|---|---|---|
| 05/31/2022 | 77 | COURT EXHIBIT LIST as to Alexander Juarez-Sanchez (jh2s, Deputy Clerk) (Entered: 06/01/2022) |
| 05/31/2022 | 78 | JURY VERDICT as to Alexander Juarez-Sanchez (1) Guilty on Count 1,2,3. (jh2s, Deputy Clerk) (Entered: 06/01/2022) |
| 05/31/2022 | 79 | -SEALED- JURY VERDICT Signed (jh2s, Deputy Clerk) (Entered: 06/01/2022) |
| 06/02/2022 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Alexander Juarez-Sanchez. *IN PERSON PROCEEDING* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 6/2/2022. An interpreter for Spanish was requested on 6/2/2022. Sentencing set for 7/25/2022 10:00 AM in Courtroom 3C, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge Julie Rebecca Rubin.(Ake, Adam) (Entered: 06/02/2022) |
| 07/12/2022 | 82 | SENTENCING MEMORANDUM by USA as to Alexander Juarez-Sanchez (Ake, Adam) (Entered: 07/12/2022) |
| 07/13/2022 | 83 | MOTION to Seal by Alexander Juarez-Sanchez. (Guillaume, Alfred) (Entered: 07/13/2022) |
| 07/13/2022 | 84 | SEALED DOCUMENT (Guillaume, Alfred) Modified on 7/14/2022 (dass, Deputy Clerk). (Entered: 07/13/2022) |
| 07/14/2022 | 85 | Consent MOTION for Forfeiture of Property *Preliminary Order of Forfeiture* by USA as to Alexander Juarez-Sanchez. (Attachments: # 1 Text of Proposed Order)(Ake, Adam) (Entered: 07/14/2022) |
| 07/14/2022 | 86 | RESPONSE re 83 MOTION to Seal filed by USA. (Ake, Adam) (Entered: 07/14/2022) |
| 07/14/2022 | 87 | ORDER granting 83 Motion to Seal as to 84 Proposed Sealed Document as to Alexander Juarez-Sanchez (1). Signed by Judge Julie Rebecca Rubin on 7/14/2022. (dass, Deputy Clerk) (Entered: 07/14/2022) |
| 07/21/2022 | 88 | PRELIMINARY ORDER OF FORFEITURE as to Alexander Juarez-Sanchez. Signed by Judge Julie Rebecca Rubin on 7/21/2022. (dass, Deputy Clerk) (Entered: 07/21/2022) |
| 07/25/2022 | 89 | Sentencing as to Alexander Juarez-Sanchez held on 7/25/2022 before Judge Julie Rebecca Rubin.(Court Reporter: Ronda Thomas) (jh2s, Deputy Clerk) (Entered: 07/25/2022) |
| 07/25/2022 | 91 | JUDGMENT as to Alexander Juarez-Sanchez (1), Count(s) 1, 2, 3, IMPRISONMENT for a term of 210 months as to count 1, 210 months as to count 2 to run concurrent to count 1, 120 months as to count 3 to run concurrent to counts 1 & 2 for a total term of 210 months, with credit for time served since August 5, 2020; SUPERVISED RELEASE for a term of 5 years as to count 1, 5 years as to count 2 to run concurrent to count 1, 3 years as to count 3 to run concurrent to counts 1 & 2 for a total term of 5 years; Total ASSESSMENT $300.00. Signed by Judge Julie Rebecca Rubin on 7/25/2022. (dass, Deputy Clerk) (Entered: 07/26/2022) |
| 08/02/2022 | 93 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT excerpt of proceedings as to Alexander Juarez-Sanchez held on 5/26/2022, before Judge Julie R. Rubin. Court Reporter Christine T. Asif, Telephone number 410-962-4492. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the |

**JA8**

| | | |
|---|---|---|
| | | deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 8/23/2022. Redacted Transcript Deadline set for 9/2/2022. Release of Transcript Restriction set for 10/31/2022. (cas2, Court Reporter) (Entered: 08/02/2022) |
| 08/02/2022 | 94 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of excerpted proceedings as to Alexander Juarez-Sanchez held on 5/27/2022, before Judge Julie R. Rubin. Court Reporter Christine T. Asif, Telephone number 410-962-4492. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 8/23/2022. Redacted Transcript Deadline set for 9/2/2022. Release of Transcript Restriction set for 10/31/2022. (cas2, Court Reporter) (Entered: 08/02/2022) |
| 08/17/2022 | 95 | NOTICE OF APPEAL by Alexander Juarez-Sanchez re 91 Judgment,, Fee Status: CJA. (Guillaume, Alfred) (Entered: 08/17/2022) |
| 08/17/2022 | 96 | MOTION for Extension of Time to File *Notice of Appeal* by Alexander Juarez-Sanchez. (Guillaume, Alfred) (Entered: 08/17/2022) |
| 08/18/2022 | 97 | Transmission of Notice of Appeal and Docket Sheet as to Alexander Juarez-Sanchez to US Court of Appeals re 95 Notice of Appeal - Final Judgment (slss, Deputy Clerk) (Entered: 08/18/2022) |
| 08/19/2022 | 98 | USCA Notice Re: Pending Motion in the District Court. (slss, Deputy Clerk) (Entered: 08/19/2022) |
| 08/19/2022 | 99 | PAPERLESS ORDER: Pending before the court is Defendants Motion for Extension of Time to File Notice of Appeal. (ECF No. 96.) It is this 19th day of August 2022 hereby ORDERED that the parties shall confer in good-faith as to whether the Government consents to Defendants requested relief; and it is further ORDERED that the Government shall respond to the Motion at ECF No. 96 on or before Friday, August, 26, 2022. Signed by Judge Julie Rebecca Rubin on 8/19/2022. (dass, Deputy Clerk) (c/nef usca) (Entered: 08/19/2022) |
| 08/22/2022 | 100 | RESPONSE re 99 Order, 96 MOTION for Extension of Time to File *Notice of Appeal* filed by USA. (Ake, Adam) (Entered: 08/22/2022) |
| 08/22/2022 | 101 | PAPERLESS ORDER: Upon consideration of Defendants 96 Motion for Extension of Time to File Notice of Appeal (ECF No. 96; Motion), with the 100 consent of the Government (ECF No. 100), it is this 22nd day of August 2022, hereby ORDERED that the Motion shall be, and is hereby, GRANTED; and it is further ORDERED that Defendants 95 Notice of Appeal (ECF No. 95) shall be considered timely filed; and it is further ORDERED that the Clerk is respectfully directed to forward the Notice of Appeal filed in this case to the United States Court of Appeals for the Fourth Circuit, as to Alexander Juarez-Sanchez (1). Signed by Judge Julie Rebecca Rubin on 8/22/2022. (dass, Deputy Clerk) (c/s appeals box re: directive, and c/s entry to usca via ad hoc NEF on 8/22/22) (Entered: 08/22/2022) |
| 08/25/2022 | 102 | USCA Case Number 22-4477 as to Alexander Juarez-Sanchez for 95 Notice of Appeal - Final Judgment filed by Alexander Juarez-Sanchez - Case Manager - Richard Sewell. (slss, Deputy Clerk) (Entered: 08/25/2022) |
| 08/25/2022 | 103 | ORDER of USCA (certified copy) "Appointing" Alfred Guillaume as counsel as to Alexander Juarez-Sanchez re 95 Notice of Appeal - Final Judgment. (slss, Deputy |

|  |  |  |
|---|---|---|
|  |  | Clerk) (Entered: 08/25/2022) |
| 08/25/2022 | 104 | TRANSCRIPT ORDER ACKNOWLEDGMENT by Alexander Juarez-Sanchez for proceedings held on opening Stmts, Closing Args; Opinion of Court, 5/25-27/2022 before Judge Julie Rebecca Rubin, re 95 Notice of Appeal - Final Judgment - Transcript due by 10/3/2022. (Court Reporter: Christine Asif).(slss, Deputy Clerk) (Entered: 08/25/2022) |
| 08/25/2022 | 105 | TRANSCRIPT ORDER ACKNOWLEDGMENT by Alexander Juarez-Sanchez for proceedings held on Opening Stmts; Closing Args; Opinion of Court; 5/24 & 5/31 2022 before Judge Julie Rebecca Rubin, re 95 Notice of Appeal - Final Judgment - Transcript due by 10/3/2022. (Court Reporter: Ronda J. Thomas)(slss, Deputy Clerk) (Entered: 08/25/2022) |
| 08/26/2022 | 106 | NOTICE by USA *Strike Appearance* (Schwartz, Amy) (Entered: 08/26/2022) |
| 08/26/2022 | 107 | QC NOTICE: 106 Notice (Other) filed by USA was filed incorrectly. ***Please re-file using the event "Motion" to "withdraw as attorney". It has been noted as FILED IN ERROR, and the document link has been disabled.* (dass, Deputy Clerk) (Entered: 08/26/2022) |
| 08/26/2022 |  | Attorney update in case as to Alexander Juarez-Sanchez, Domingo Ramirez-Roblero. Attorney Amy L Schwartz terminated. (jf3s, Deputy Clerk) (Entered: 08/30/2022) |
| 08/31/2022 | 108 | TRANSCRIPT ORDER ACKNOWLEDGMENT by Alexander Juarez-Sanchez for proceedings held on Jury Trial 5/31/22 all courtroom proceedings before Judge Julie Rebecca Rubin, re 95 Notice of Appeal - Final Judgment - Transcript due by 10/6/2022. (Court Reporter: Ronda Thomas)(slss, Deputy Clerk) (Entered: 08/31/2022) |
| 09/29/2022 | 113 | TRANSCRIPT ORDER ACKNOWLEDGMENT by Alexander Juarez-Sanchez for proceedings held on Motions Hrg 5/17/22; Trial Day 2 - 5/25/22; Trial day 5 - 5/31/22 before Judge Julie Rebecca Rubin, re 95 Notice of Appeal - Final Judgment - Transcript due by 11/7/2022. (Court Reporter: Ronda Thomas)(slss, Deputy Clerk) (Entered: 09/29/2022) |
| 09/29/2022 | 114 | TRANSCRIPT ORDER ACKNOWLEDGMENT by Alexander Juarez-Sanchez for proceedings held on Trial Day 3 - 5/26/22 ; Trial day 4 - 5/27/22 before Judge Julie Rebecca Rubin, re 95 Notice of Appeal - Final Judgment - Transcript due by 11/7/2022.(Court Reporter: Christine Asif) (slss, Deputy Clerk) (Entered: 09/29/2022) |
| 11/06/2022 | 124 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Alexander Juarez-Sanchez for dates of 5/17/2022 before Judge Julie R. Rubin, re 95 Notice of Appeal - Final Judgment Court Reporter Ronda Thomas, Telephone number 410-962-4504, ronda_thomas@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 11/28/2022. Redacted Transcript Deadline set for 12/7/2022. Release of Transcript Restriction set for 2/4/2023. Redaction Request due 11/28/2022. Redacted Transcript Deadline set for 12/7/2022. Release of Transcript Restriction set for 2/4/2023. (rt, Court Reporter) (Entered: 11/06/2022) |
| 11/06/2022 | 125 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Alexander Juarez-Sanchez for dates of 5/25/2022 before Judge Julie R. Rubin, re 95 Notice of Appeal - Final |

District of Maryland (CM/ECF Live NextGen 1.6)          https://ecf.mdd.uscourts.gov/cgi-bin/DktRpt.pl?689516814789305-L_1_0-1

|  |  |  |
|---|---|---|
|  |  | Judgment Court Reporter Ronda Thomas, Telephone number 410-962-4504, ronda_thomas@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 11/28/2022. Redacted Transcript Deadline set for 12/7/2022. Release of Transcript Restriction set for 2/4/2023. Redaction Request due 11/28/2022. Redacted Transcript Deadline set for 12/7/2022. Release of Transcript Restriction set for 2/4/2023. (rt, Court Reporter) (Entered: 11/06/2022) |
| 11/06/2022 | 126 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Alexander Juarez-Sanchez for dates of 5/31/2022 before Judge Julie R. Rubin, re 95 Notice of Appeal - Final Judgment Court Reporter Ronda Thomas, Telephone number 410-962-4504, ronda_thomas@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 11/28/2022. Redacted Transcript Deadline set for 12/7/2022. Release of Transcript Restriction set for 2/4/2023. Redaction Request due 11/28/2022. Redacted Transcript Deadline set for 12/7/2022. Release of Transcript Restriction set for 2/4/2023. (rt, Court Reporter) (Entered: 11/06/2022) |
| 11/07/2022 | 127 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Alexander Juarez-Sanchez for dates of 5/26/2022 before Judge Julie R. Rubin, re 95 Notice of Appeal - Final Judgment Court Reporter Christine T. Asif, Telephone number 410-962-4492. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 11/28/2022. Redacted Transcript Deadline set for 12/8/2022. Release of Transcript Restriction set for 2/5/2023. (cas2, Court Reporter) (Entered: 11/07/2022) |
| 11/07/2022 | 128 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Alexander Juarez-Sanchez for dates of 5/27/2022 before Judge Julie R. Rubin, re 95 Notice of Appeal - Final Judgment Court Reporter Christine T. Asif, Telephone number 410-962-4492. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 11/28/2022. Redacted Transcript Deadline set for 12/8/2022. Release of Transcript Restriction set for 2/5/2023. (cas2, Court Reporter) (Entered: 11/07/2022) |
| 11/16/2022 | 129 | TRANSCRIPT ORDER ACKNOWLEDGMENT by Alexander Juarez-Sanchez for proceedings held on 4/25/22 motions hearing before Judge Julie Rebecca Rubin, re 95 Notice of Appeal - Final Judgment - Transcript due by 12/27/2022. (Court Reporter: Mary Zajac)(slss, Deputy Clerk) (Entered: 11/16/2022) |
| 12/04/2022 | 130 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Alexander Juarez-Sanchez for dates of 4/25/2022 before Judge Richard D. Bennett, re 95 Notice of Appeal - Final Judgment Court Reporter/Transcriber Mary M. Zajac, Telephone number 410-215-9609/marymzajac@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court |

**JA11**

|  | Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 12/27/2022. Redacted Transcript Deadline set for 1/4/2023. Release of Transcript Restriction set for 3/6/2023. Redaction Request due 12/27/2022. Redacted Transcript Deadline set for 1/4/2023. Release of Transcript Restriction set for 3/6/2023. (Zajac, Mary) (Entered: 12/04/2022) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 01/06/2023 14:47:36 | | | |
| **PACER Login:** | Lantagne92 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cr-00174-JRR |
| **Billable Pages:** | 12 | **Cost:** | 1.20 |

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2021 MAY 19  PM 5: 41

CLERK'S OFFICE

ARA, USAO 2020R0880

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

BY _____ DEPUTY

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO.** RDB 21cr 174 |
| | * | |
| **ALEXANDER JUAREZ-SANCHEZ and** | * | **(Conspiracy to Distribute Controlled** |
| **DOMINGO RAMIREZ-ROBLERO,** | * | **Substances, 21 U.S.C. § 846; Possession** |
| | * | **with Intent to Distribute Controlled** |
| **Defendants** | * | **Substances, 21 U.S.C. § 841(a); Re-** |
| | * | **Entry After Deportation, 8 U.S.C.** |
| | * | **§ 1326(a); Forfeiture, 21 U.S.C. § 853)** |
| | * | |

*******

## INDICTMENT

### COUNT ONE
#### (Conspiracy to Distribute Controlled Substances)

The Grand Jury for the District of Maryland charges that:

Between in or about July 10 and August 5, 2020, in the District of Maryland and elsewhere,

the defendants,

### ALEXANDER JUAREZ-SANCHEZ and
### DOMINGO RAMIREZ-ROBLERO,

did knowingly and intentionally combine, conspire, confederate, and agree with others known and

unknown to the Grand Jury to distribute and possess with intent to distribute 400 grams or more

of a mixture or substance containing a detectable amount of N-phenyl-N- [1- ( 2-phenylethyl ) -4-

piperidinyl] propenamide, commonly referred to as fentanyl, a Schedule II controlled substance,

and 100 grams or more of a mixture or substance containing a detectable amount of heroin, a

Schedule I controlled substance.

21 U.S.C. § 846

**JA13**

### COUNT TWO
**(Possession with Intent to Distribute Controlled Substances)**

The Grand Jury for the District of Maryland further charges that:

On or about August 5, 2020, in the District of Maryland, the defendants,

**ALEXANDER JUAREZ-SANCHEZ and**
**DOMINGO RAMIREZ-ROBLERO,**

did knowingly and intentionally possess with the intent to distribute 400 grams or more of a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propenamide, commonly referred to as fentanyl, a Schedule II controlled substance, and 100 grams or more of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance.

21 U.S.C. § 841

**JA14**

## COUNT THREE
### (Re-Entry After Deportation)

The Grand Jury for the District of Maryland further charges that:

On or about August 5, 2020, in the District of Maryland, the defendant,

### ALEXANDER JUAREZ-SANCHEZ,

an alien who previously had been deported and removed, knowingly entered and was found in the United States of America, the said defendant having not obtained the express consent of the Attorney General of the United States or his successor, the Secretary for Homeland Security (Title 6, United States Code, Sections 202(3), 202(4) and 557), to reapply for admission into the United States as required by law.

8 U.S.C. § 1326(a)

**JA15**

## COUNT FOUR
### (Re-Entry After Deportation)

The Grand Jury for the District of Maryland further charges that:

On or about August 5, 2020, in the District of Maryland, the defendant,

### DOMINGO RAMIREZ-ROBLERO,

an alien who previously had been deported and removed, knowingly entered and was found in the United States of America, the said defendant having not obtained the express consent of the Attorney General of the United States or his successor, the Secretary for Homeland Security (Title 6, United States Code, Sections 202(3), 202(4) and 557), to reapply for admission into the United States as required by law.

8 U.S.C. § 1326(a)

**JA16**

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1.    Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with 21 U.S.C. § 853, in the event of the defendant's conviction on any of the offenses set forth in Counts One and Two of this Indictment.

2.    Pursuant to 21 U.S.C. § 853(a), upon conviction of the offenses alleged in Counts One or Two of this Indictment, the defendants,

### ALEXANDER JUAREZ-SANCHEZ and
### DOMINGO RAMIREZ-ROBLERO,

shall forfeit to the United States:

a.    any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offense; and

b.    any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, the offense.

3.    If, as a result of any act or omission of the defendants, any such property subject to forfeiture:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third person;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be subdivided without difficulty;

the United States shall be entitled to forfeiture of substitute property up to the value of the

**JA17**

forfeitable property described above pursuant to 21 U.S.C. § 853(p).

21 U.S.C. § 853

*Jonathan F. Lenzner*

Jonathan F. Lenzner
Acting United States Attorney

A TRUE BILL:

**SIGNATURE REDACTED**

5 - 19 - 21

Foreperson                              Date

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No. RDB-21-174** |
| | : | |
| **ALEXANDER JUAREZ-SANCHEZ,** | : | |
| | : | |
| **Defendant.** | : | |

## MOTION TO SUPPRESS TANGIBLE AND DERIVATIVE EVIDENCE

Alexander Juarez-Sanchez, through undersigned counsel, pursuant to Rule 12(b)(3) of the

Federal Rules of Criminal Procedure, moves to suppress illegally obtained tangible and

derivative evidence. In support of this motion, Mr. Juarez-Sanchez states the following.

1.      Mr. Juarez-Sanchez is charged in three counts of a four-count indictment with

Conspiracy to Distribute Controlled Substances (Count One), Possession with Intent to

Distribute Controlled Substances (Count Two), and Re-entry After Deportation (Count Three).

ECF No. 1.

2.      On August 5, 2020, a Maryland State Police Trooper C.W. Miller conducted a

traffic stop of a 2014 white Honda Accord vehicle traveling on Interstate 81 in Hagerstown,

Maryland. Mr. Juarez-Sanchez was seated in the front passenger seat of the vehicle and his co-

defendant, Domingo Roblez-Roblero, was in the driver's seat. The stated basis for the stop was

that the Honda Accord was following too closely behind the vehicle in front of it.

3.      After speaking with the occupants of the vehicle and asking them questions about

their destination, the trooper requested backup and a drug canine sniff of the vehicle. Based on a

positive alert from the drug canine, law enforcement searched the entirety of the vehicle and

recovered several packages of controlled substances.

4.      "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a seizure under the Fourth Amendment." *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018) (citing *Whren v. United States*, 517 U.S. 806, 809 (1996)) (internal quotation marks omitted). An officer's decision to stop an automobile is legitimate only where there is probable cause to believe a traffic violation has occurred. *Id.*

5.      Law enforcement's stop of the vehicle and detention of Mr. Juarez-Sanchez (and Mr. Roblez-Roblero) was in violation of the Fourth Amendment to the United States Constitution, because Trooper Miller did not have probable cause to believe the driver was committing a traffic infraction.

6.      Further, even if the initial stop were to be deemed lawful, law enforcement violated Mr. Juarez-Sanchez's Fourth Amendment rights by impermissibly extending his (and Mr. Roblez-Roblero's) detention beyond the point at which the tasks related to the traffic infraction reasonably should have been completed. *Rodriguez v. United States*, 575 U.S. 348, 354-55 (2015) ("[A] traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a warning ticket. . . . An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop," but "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.").

7.      Because law enforcement detained Mr. Juarez-Sanchez in violation of his Fourth Amendment rights, all evidence recovered or obtained as a result of this detention is inadmissible as a fruit of the illegal seizure. *See Wong Sun v. United States*, 371 U.S. 471 (1963).

8.      As the defense's investigation of this case is incomplete, Mr. Juarez-Sanchez reserves the right to supplement this motion with additional arguments and information.

Wherefore, as a result of the constitutional violations alleged in this motion and any other ground that may become apparent upon a hearing on the motion, Mr. Juarez-Sanchez requests that the Court enter an order suppressing any evidence seized as a result of the unlawful seizures noted above.

Dated: September 13, 2021.

Respectfully submitted,
James Wyda
Federal Public Defender
 for the District of Maryland

____/s/_____
Jeffrey S. Dahlberg, #811817
Assistant Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Phone: (410) 962-3962
Fax: (410) 962-0872
Email: jeff_dahlberg@fd.org

## **REQUEST FOR A HEARING**

Pursuant to Rule 105.6 of the Local Rules of the United States District Court for

the District of Maryland, the Defendant requests a hearing on this motion.


_____/s/_____
Jeffrey S. Dahlberg
Assistant Federal Public Defender

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No. RDB-21-174** |
| | : | |
| **ALEXANDER JUAREZ-SANCHEZ,** | : | |
| | : | |
| **Defendant.** | : | |

## MOTION TO SUPPRESS TANGIBLE, DIGITAL, AND DERIVATIVE EVIDENCE

Alexander Juarez-Sanchez, through undersigned counsel, pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure, moves to suppress evidence related to the searches of various digital devices and online accounts. He also moves to suppress any other evidence, tangible or otherwise, that is derivative of the unlawful search. In support of this motion, Mr. Juarez-Sanchez states the following.

1.    Mr. Juarez-Sanchez is charged in three counts of a four-count indictment with Conspiracy to Distribute Controlled Substances (Count One), Possession with Intent to Distribute Controlled Substances (Count Two), and Re-entry After Deportation (Count Three). ECF No. 1.

2.    Counts One and Two arose from a traffic stop on August 5, 2020 in which Mr. Juarez-Sanchez and his co-defendant, Domingo Roblez-Roblero, were detained while traveling in a Honda Accord on Interstate 81 in Hagerstown, Maryland. Mr. Juarez-Sanchez was seated in the front passenger seat and Mr. Roblez-Roblero was in the driver's seat. Law enforcement searched the vehicle and recovered several packages containing controlled substances.

3.    Law enforcement also seized three cellular phones and obtained search warrants to search those phones. The government believes two of those devices were possessed by Mr.

1

**JA23**

Juarez-Sanchez. The devices searched were (1) a Samsung Galaxy A10e, serial no.

353290113395768, (2) a Samsung A10e, serial no. 359620108730880, and (3) a white iPhone,

FCC ID no. BCG-E3091A – IC: 579C-E3091A. In authoring the search warrant applications,

law enforcement sought, *inter alia*, to search for "any voice messages, photographs or other

possible digital evidence located in said cellular phone[s]." This included all files of any type, all

communications, Internet usage and search history, all GPS location information, and all

calendar entries.

4.      The data contained on digital devices enjoy the same Fourth Amendment

protections as tangible items located in a residence. *See Riley v. California*, 134 S.Ct. 2473

(2014). Pursuant to the Fourth Amendment, a warrant shall issue only "upon probable cause,

supported by oath or affirmation, and particularly describing the place to be searched, and the

persons or things to be seized." U.S. Const. amend. IV. In order to satisfy the particularity

requirement, the warrant must identify "the items to be seized by their relation to designated

crimes" and the description of the items must leave "nothing to the discretion of the officer

executing the warrant." *United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010).

5.      The searches of the devices listed above violated the Fourth Amendment because

the affidavits underlying the warrants did not establish probable cause to believe evidence of a

crime would be found on the devices. *See Illinois v. Gates*, 462 U.S. 213, 238-39 (1983) (officer

seeking issuance of search warrant must present affidavit containing facts sufficient to "provide

the magistrate with a substantial basis for determining the existence of probable cause"; probable

cause requirement demands that officer demonstrate "fair probability" that evidence of crime

will be found at particular place); *Brinegar v. United States*, 338 U.S. 160, 175 (1949) (probable

cause means "more than bare suspicion").

6.      The warrants also violated the Fourth Amendment's particularity requirement in that they permitted the seizure of virtually everything on the devices, without limitation. Moreover, law enforced executed the warrants in a constitutionally overbroad manner by using Cellebrite software to extract all possible information and data from the phones without limitation and retaining it indefinitely.

7.      Moreover, the affidavits were so deficient that no objectively reasonable officer would have relied in good faith on the legality of the search warrants. *See United States v. Leon*, 468 U.S. 897, 923 (1984) (when warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" it cannot be relied upon in good faith).

8.      As the defense's investigation of this case is incomplete, Mr. Juarez-Sanchez reserves the right to supplement this motion with additional arguments and information.

        Wherefore, as a result of the constitutional violations alleged in this motion and any other ground that may become apparent upon a hearing on the motion, Mr. Juarez-Sanchez requests that the Court enter an order suppressing all tangible, digital, and derivative evidence recovered from the devices listed above.


Dated: September 13, 2021.

                                    Respectfully submitted,
                                    James Wyda
                                    Federal Public Defender
                                     for the District of Maryland

                                    ____/s/_____
                                    Jeffrey S. Dahlberg, #811817
                                    Assistant Federal Public Defender
                                    100 South Charles Street
                                    Tower II, 9th Floor
                                    Baltimore, Maryland 21201
                                    Phone: (410) 962-3962
                                    Fax: (410) 962-0872
                                    Email: jeff_dahlberg@fd.org

## **REQUEST FOR A HEARING**

Pursuant to Rule 105.6 of the Local Rules of the United States District Court for

the District of Maryland, the Defendant requests a hearing on this motion.


_____/s/_____
Jeffrey S. Dahlberg
Assistant Federal Public Defender

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | \* | |
| | \* | |
| **v.** | \* | |
| | \* | |
| **ALEXANDER JUAREZ-SANCHEZ,** | \* | **Crim. No. RDB-21-174** |
| | \* | |
| **Defendant** | \* | |
| | \* | |
| | \* | |
| | \*\*\*\*\*\*\* | |

## GOVERNMENT'S CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANT'S PRETRIAL MOTIONS TO SUPPRESS

**Table of Contents**

I.     INTRODUCTION AND FACTS ..................................................................... 1

    A.  THE AUGUST 5, 2020 TRAFFIC STOP .................................................. 1

    B.  CELL PHONE WARRANT ......................................................................... 7

    C.  ICE PROCESSING ...................................................................................... 7

II.    PROCEDURAL HISTORY ........................................................................... 8

    A.  THE COMPLAINT, INITIAL APPEARANCE, INDICTMENT AND ARRAIGNMENT ....................................................................................... 8

    B.  DEFENSE MOTIONS .................................................................................. 8

III.    THE COURT SHOULD DENY THE DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE SEIZED IN CONNECTION WITH THE DEFENDANT'S APPREHENSION ON AUGUST 5, 2020 ...................................................... 10

    A.  JUAREZ-SANCHEZ DOES NOT HAVE STANDING TO CHALLENGE THE SEARCH OF THE VEHICLE IN WHICH HE WAS A PASSENGER. .................. 10

    B.  THE CAR WAS VALIDLY STOPPED FOR A VIOLATION OF STATE TRAFFIC LAW. .......................................................................................................... 11

    C.  THE SEARCH WAS CONDUCTED IN FULL COMPLIANCE WITH THE FOURTH AMENDMENT .......................................................................... 12

IV.    THE COURT SHOULD DENY THE DEFENDANT'S MOTION TO SUPPRESS
       TANGIBLE AND DIGITAL EVIDENCE FROM THE SEIZED CELLULAR PHONES.
       ................................................................................................................................ 15

       A.  THE COURT SHOULD DENY THE DEFENDANT'S MOTION TO SUPPRESS
           TANGIBLE AND DIGITAL EVIDENCE FROM THE SEIZED CELLULAR
           PHONES BECAUSE THE SEARCH WARRANT WAS SUPPORTED BY
           PROBABLE CAUSE............................................................................................ 15

       B.  ASSUMING, ARGUENDO, THAT THE COURT FINDS THAT THE SEARCH
           WARRANT WAS NOT SUPPORTED BY PROBABLE CAUSE, A GOOD FAITH
           EXCEPTION APPLIES........................................................................................ 18

V.     THE COURT SHOULD DENY THE DEFENDANT'S MOTION TO SUPPRESS
       STATEMENTS......................................................................................................... 21

       A.  THERE ARE NO GROUNDS FOR SUPPRESSING THE STATEMENTS MADE
           DURING THE CAR STOP AND APPREHENSION OF THE DEFENDANT ON
           AUGUST 5, 2020. ................................................................................................ 21

       B.  THERE IS NO BASIS FOR SUPPRESSING THE STATEMENTS MADE BY
           JUAREZ-SANCHEZ TO IMMIGRATION OFFICIALS......................................... 23

VI.    CONCLUSION........................................................................................................ 24

**JA28**

I.    **INTRODUCTION AND FACTS**

The United States of America, by and through the undersigned attorneys, hereby responds in opposition to defendant Alexander Juarez-Sanchez's motions: (1) to suppress tangible evidence and derivative evidence in connection with Juarez-Sanchez's apprehension; (2) to suppress tangible evidence, digital evidence and derivative evidence in connection with the search of cellular phones seized from Juarez-Sanchez; and (3) to suppress statements made by Juarez-Sanchez at and after the time of his apprehension. The government states as follows:

A.    **THE AUGUST 5, 2020 TRAFFIC STOP**

The government expects the evidence will show that on August 5, 2020, shortly before 9:07 a.m., near mile marker five on Interstate 81 ( "I-81") in Hagerstown, Maryland, Master Trooper Craig Miller ( "M/T Miller") of the Maryland State Police ("MSP") was on duty. M/T Miller was assigned to a Pro-Active Criminal Enforcement Team (PACE), tasked with reducing the number of traffic collisions on I-81 and apprehending criminals. I-81 is a preferred trafficking route for fugitives, drug traffickers, gun smugglers, money launderers and other criminals. M/T Miller had been a Maryland state trooper for over 25 years and had extensive training in narcotics and in interdiction, and had previously been recognized as a criminal interdiction expert in the Circuit Court for Alleghany County, Maryland. MSP had specially trained PACE team members to locate criminals through diligent traffic enforcement.

That morning, M/T Miller observed a 2014 white Honda Accord travelling northbound in the right traffic lane at a distance too close to the vehicle in front of it, a gray SUV. The speed limit on that section of road is 60 miles per hour, which M/T Miller knew, based on his training and experience, calls for a following distance of approximately six car lengths. Instead, the Honda Accord was only approximately two car lengths behind the grey SUV, potentially in the blind spot of the SUV driver. MD Code Ann. Transp. § 21-310(a) prohibits any driver from "follow[ing]

**JA29**

another vehicle more closely than is reasonable and prudent, having due regard for the speed of the other vehicle and of the traffic on and the condition of the highway."

M/T Miller began catching up to the Honda Accord in order to conduct a traffic stop. As he did so, he observed that the driver of the Honda Accord began to slow down and increase the distance between the Accord and the gray SUV. M/T Miller activated the emergency equipment of MSP Patrol vehicle CE-64 and conducted a traffic stop just before the Route 144 overpass on northbound I-81 at approximately 9:07 a.m.

The white Honda Accord, which displayed Indiana registration 928TQW, pulled to the shoulder of the roadway. The ensuing stop was captured on dash camera footage. *See* Exhibits 1A and 1B. M/T Miller called in the license plate to dispatch then exited his vehicle and approached the passenger side of the car, which he considered a safe location from which to conduct the stop. (The car was stopped on the shoulder, but very close to the edge of the traffic lane.) He arrived at the passenger window at 9:08 a.m. and observed an adult male seated in the driver's seat and another adult male – later identified as the defendant – seated in the passenger seat. M/T Miller identified himself, mentioned that the stop was being recorded, and explained to the driver why the trooper had stopped him and the safe distance to follow vehicles.

M/T Miller asked the driver for his license and registration, and the driver responded that he didn't have it. He asked whose car it was. The driver hesitated, mumbled something, and after a few moments said, "a friend." M/T Miller asked whether the driver had his friend's registration, and the driver said that he did. The trooper observed that as the driver looked for documents associated with the Honda Accord, the driver's hands were visibly shaking and trembling. Meanwhile, the defendant did not look at the trooper and stared straight ahead. Once the driver found the papers he was looking for in the glove compartment, the trooper asked him if he would

**JA30**

exit the vehicle so the trooper could go over the information with him. He also asked if the driver had a wallet with an ID card, and asked him to bring that too. As the driver got out of the vehicle with the paperwork, M/T Miller told the defendant that he was fine where he was, and he asked the defendant where they were heading. The defendant responded that they were headed to New York.

The driver and then the trooper walked behind the Honda Accord and then talked at the front of the patrol vehicle, where the trooper asked the driver for his ID. It was 9:10 a.m. The driver said he didn't have any ID because he lost his passport. M/T Miller observed that the driver's wallet had nothing inside except currency, i.e., there were no visible credit cards or picture identification cards. He asked the driver where he was headed. The driver responded, "huh." The trooper restated the question, asking him where he was going. The driver pointed North and said "New York." The trooper asked him what was up there, to which the driver responded, "I'm gonna bring my cousin." M/T Miller asked the driver who owned the car and asked for that person's name.

The driver started to recount a story about how his girlfriend knows a guy who is gay, and that he is selling them the car because he is leaving for Mexico. The driver said that he was coming from Indiana and was going to New York. He lives in Indiana. The guy sold them the car, but the car was still in the guy's name. (Meanwhile, the M/T saw something under the driver's shirt and had him briefly raise his shirt so the trooper could see it was just a belt buckle.) The driver went on to say in substance that the car is going to be in the driver's girlfriend's name, but the driver was letting them have the Accord for a couple weeks, two weeks, before the title went into her name. The driver said that he had an old car, an Infiniti, and he gave it to the guy who owned the Honda to use it for two weeks and sell it, and then after they paid for the Accord, the guy would

3

**JA31**

put the Accord in the driver's girlfriend's name and then was going to Mexico.

The trooper found the account hard to follow and believed that the driver was making it up as he was saying it. Since the driver claimed that he had lost his license and his passport, M/T Miller had him write down his full name and information, which the trooper needed to complete the required traffic enforcement paperwork. The driver wrote down the name Gavino Perez Aguilar and a date of birth of 7/19/1992. (This information later proved false.) The driver said he had just moved into an apartment and could not remember his entire address, but he remembered and wrote down the street address and said he lived in Indianapolis. He did not know the zip code. At this point, it was 9:14 a.m. (Meanwhile, just after 9:14 a.m., a second officer who had been standing to the side, walked up to the passenger side of the Accord and seemed to be speaking with the defendant, who was still in the car. That conversation was not recorded.)

The trooper asked the driver who was with him. The driver held out his left hand out while snapping his fingers as if he was trying to remember, and then said "Miguel." The trooper asked the driver for the passenger's last name, and the driver said he did not know. At this point, M/T Miller got back inside his patrol vehicle; it was not yet 9:15 a.m. From his encounter with the driver, M/T Miller believed that the driver was engaged in in committing a drug crime. His suspicions were based on the totality of circumstances, including the above observations, which he found to be inconsistent with normal interstate travel and, rather, indicative of drug trafficking.

On returning to his vehicle, M/T Miller made a four or five second broadcast asking the canine team to meet him at Route 144. At 9:15 a.m., he radioed in the license plate and make and model of the Accord and its location for a traffic check. He finished providing the information just before 9:16 a.m. While M/T Miller waited for the dispatcher's response, the canine team arrived just before 9:17 a.m. The team consisted of Sergeant Christopher Shrout, Corporal David Yates,

**JA32**

and the corporal's canine partner Buster, a dog certified and trained in narcotics detection.

Once the canine team arrived, M/T Miller quickly briefed them, and at 9:18 a.m., an officer had the defendant step out of the Accord and quickly patted him down and had him wait with the driver by the police car. Still at 9:18 a.m., M/T Miller started to ask dispatch to run a 10-27 (driver's license check) and 10-29 (warrant check) by name and DOB, but before he could provide the information, the dispatcher radioed back that the vehicle tags were expired. M/T informed her that they were going to do a canine scan and to "open a card" for that. Just at 9:19 a.m., the dispatcher asked M/T Miller for the driver's information, which the trooper provided.

As M/T Miller was still communicating with the dispatcher, Corporal Yates had Buster begin a free air sniff around the back and passenger side of the Accord just before 9:20 a.m. Within a minute, Buster alerted to the passenger-side door area. Meanwhile, the dispatcher had not yet radioed back the result of the checks on the driver's information. Corporal Yates and Busher finished the canine scan before 9:21 a.m. The corporal and the dog were in the vicinity of the Accord for less than a minute before they crossed back over the guard rail and left. At 9:22 a.m., M/T Miller called in the positive canine alert by radio. An officer informed the driver of the positive alert and asked him whether there was anything illegal in the vehicle, to which the driver replied that he didn't know.

Based on the positive alert, M/T Miller and Sergeant Shrout began a warrantless search for controlled substances at 9:23 a.m. Within a minute, M/T Miller noticed that the seat bolts had been off at some point. The sergeant then noticed that the floor did not seem solid, but dipped down. Just before 9:26 a.m., M/T Miller noticed that part of a brown bag was protruding from behind the glove compartment, all the way back against the vehicle's firewall. After photographing the object (*see* Exhibit 2A), M/T Miller removed the bag and could feel that it contained a hard object. Based

5

**JA33**

on his MSP training and experience with prior narcotics arrests involving kilogram-packages of narcotics, on opening the bag, and removing its contents, he immediately recognized the package inside – a black and white brick-shaped package – as a kilogram of narcotics. At this point, the driver and passenger were handcuffed.

About three minutes later, Sergeant Shrout located another kilogram package under the rear console (*see* Exhibit 2B), and seven minutes after that, M/T Miller located a third kilogram-sized package under the front passenger seat foam padding (*see* Exhibit 2C). (Later testing revealed that the seized narcotics consisted of a net weight of 1991.88 grams of fentanyl and 995.26 grams of heroin, each package weighing just under one kilogram.) As the search progressed, the officers located several white shopping bags under the rear seat bolsters, containing a total of approximately $46,997 in United States currency. In addition, a red backpack was located inside the vehicle trunk. That backpack contained a Santa Muerte statute, which M/T Miller knew from his training and experience is considered the patron saint of drug smugglers. The knapsack also contained several pairs of vinyl gloves, which M/T Miller recognized as protective gear used by individuals who handle narcotics packages.

The driver and the defendant were taken into custody. The defendant provided his name as Juan Manuel Florez and date of birth in August of 1979, and claimed to live at 7077 DH Street, Indianapolis, IN 46067. While being interviewed by the Narcotics Task Force, the driver eventually admitted that his name was Domingo Ramirez-Roblero, with date of birth in May of 1979, and gave the same address as the defendant. He admitted that he had given a false name due to his immigration status. At 11:05 a.m. that morning, the defendant signed a Spanish language Miranda form (with the false name Juan Manuel Florez) and signed a waiver of his Miranda rights (*see* Exhibit 4), but he declined to speak to the narcotics investigators.

**JA34**

At no point has the defendant claimed any possessory interest in the Honda Accord he was riding in. Later investigation has revealed that the Honda Accord belonged to Ramirez-Roblero (though not registered in his name), and that Juarez-Sanchez had recruited Ramirez-Roblero to drive him across country to obtain drugs from California and then deliver them to buyers in Illinois, Kentucky, and New York.

**B.     CELL PHONE WARRANT**

Three cell phones were taken into evidence in connection with the arrests, two Samsung phones and one iPhone.

On August 10, 2020, M/T Miller applied to Alleghany County District Judge Erich Bean and obtained search warrants for all three phones. Judge Bean signed the warrants the same day. The affirmations and warrants for the two Samsung phones associated with Juarez-Sanchez are attached as Exhibits 3A and 3B.

**C.     ICE PROCESSING**

Later investigation revealed the defendant's name was not Juan Manuel Florez. A fingerprint examination in December 2020, revealed that the defendant's fingerprints matched fingerprint cards and other fingerprint records associated with the name Alexander Juarez-Sanchez and with proceedings connected to the voluntary departure of Juarez-Sanchez from the United States on February 10, 2015, and his subsequent deportations from the United States on May 3, 2016, August 1, 2018, and May 17, 2019.

On May 21, 2021, Juarez-Sanchez was interviewed by an Immigration and Customs Enforcement Deportation Officer in Baltimore. The officer provided him with a document setting out his rights in Spanish and he signed a document in Spanish waiving those rights and made a number of voluntary statements, which were recorded in writing. *See* Exhibit 5.

7

**JA35**

## II.    PROCEDURAL HISTORY

### A.    THE COMPLAINT, INITIAL APPEARANCE, INDICTMENT AND ARRAIGNMENT

On January 5, 2021, the defendants were each charged by complaint in the District of Maryland with re-entry after deportation, in violation of 18 U.S.C. § 1326(a).

On May 19, 2021, a grand jury sitting in the District of Maryland returned a four-count indictment against the defendant and the driver, Domingo Ramirez-Roblero. Count One charged both men with Conspiracy to Distribute Controlled Substances, in violation of 21 U.S.C. § 846, covering the time period between in or about July 10 and August 5, 2020. Count Two charged both men with Possession with Intent to Distribute Controlled Substances in Violation of 21 U.S.C. § 841(a). Both counts addressed 400 grams or more of fentanyl and 100 grams or more of a substance containing a detectible amount of heroin. Count Three charged the defendant and Count Four separately charged Ramirez-Roblero with re-entry after deportation in violation of 8 U.S.C. § 1326(a).

Juarez-Sanchez was presented for his initial appearance in this District on May 24, 2021, and on May 25, 2021, an order of detention by agreement was issued, ECF No. 10. Juarez-Sanchez was arraigned on the indictment on June 4, 2021. On September 2, 2021, Ramirez-Roblero pleaded guilty to Counts 1 and 4 of the Indictment.

### B.    DEFENSE MOTIONS

On September 13, 2021, the defendant, through prior counsel, filed: (1) a motion to suppress tangible evidence recovered during the search of his vehicle during the August 5, 2020 traffic stop and derivative evidence, ECF No. 24; (2) a motion to suppress tangible, digital, and derivative evidence related to the search of the cell phones, ECF No. 25; and (3) a motion to suppress statements, ECF No. 26. In addition, defendant, through prior counsel, filed ECF No. 27,

**JA36**

a motion for leave to file additional motions at a later time.

The motion to suppress tangible evidence recovered during the car stop alleged that M/T Miller did not have probable cause to believe the driver was committing a traffic infraction and that M/T Miller violated Juarez-Sanchez's rights by extending his (and the driver's) detention beyond the point at which the tasks related to the car stop should reasonably have been completed.

The motion to suppress evidence connected to the search of the cell phones alleges in general terms that there was no probable cause to believe that evidence of a crime would be found on the devices. The motion also claims that the search warrants for the devices were overbroad in that they "permitted the seizure of virtually everything on the devices, without limitation," ECF No. 25, at para. 6, and that the warrants were executed in an overbroad manner "by using Cellebrite software to extract all possible information and data from the phones without limitation and retaining it indefinitely." *Id.*

The motion to suppress statements addressed both statements, admissions, or confessions made during the August 5, 2020, car stop and apprehension and during the May 21, 2021 encounter with Immigration and Customers Enforcements. The motion alleged, without any supporting factual assertions, that any such statements were: (1) taken in violation of the defendant's privilege against self-incrimination and his right to counsel, as guaranteed by the Fifth and Sixth Amendments; (2) taken in violation of his *Miranda* rights; and (3) involuntary.

Current defense counsel entered the case for Juarez-Sanchez on January 6, 2022. On January 31, 2022, current counsel then filed a consent motion for extension to time to file pretrial motions, which was granted on the same date. ECF No. 45. Notwithstanding this application, additional pretrial motions have not been filed. The government is therefore responding to the original pretrial motions filed on September 13, 2021.

**JA37**

A motions hearing is scheduled for April 25, 2022.

**III.    THE COURT SHOULD DENY THE DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE SEIZED IN CONNECTION WITH THE DEFENDANT'S APPREHENSION ON AUGUST 5, 2020.**

**A.    JUAREZ-SANCHEZ DOES NOT HAVE STANDING TO CHALLENGE THE SEARCH OF THE VEHICLE IN WHICH HE WAS A PASSENGER.**

A passenger in a vehicle has standing to challenge the detention of that vehicle in the context of a car stop, in that the passenger himself is seized. *See Brendlin v. California*, 551 U.S. 249, 256-63 (2007); *United States v. Soriano-Jarquin*, 492 F.3d 495, 499-500 (4th Cir. 2007) (a passenger of a vehicle possesses the same right as the driver to challenge the constitutionality of a traffic stop). Nevertheless, in order to raise a successful Fourth Amendment challenge to a search that occurs in the course of the stop, a defendant must have a reasonable expectation of privacy in the place searched; otherwise, he cannot contest the search. *Rakas v. Illinois*, 439 U.S. 128, 148 (1978). In the context of a car stop, a defendant who is a mere passenger in someone else's vehicle does not have standing to contest a search of that vehicle. *Rakas*, at 140, 149-50 ("passengers occupying a car which they neither owned nor leased" had no "legitimate expectation of privacy in the glove compartment or area under the seat of the car in which they were merely passengers" nor does a passenger have a legitimate expectation of privacy in the trunk of an automobile). *See also United States v. Carter*, 300 F.3d 415, 421 (4th Cir. 2002) ( "A passenger in a car normally has no legitimate expectation of privacy in an automobile in which he asserts neither a property interest nor a possessory interest and where he disclaims any interest in the seized object.")

In *Rakas*, law enforcement had seized a sawed-off rifle and rifle shells from a car in which the defendants had been passengers. *Id.* at 130. The defendants neither owned the car or asserted that they owned the rifle or shells. *Id.* The car had been stopped after a robbery of a clothing store on suspicion that it was the getaway car. *Id*. The car had been occupied by the two defendants, as

**JA38**

passengers, and two female companions who were not charged. *Id*. Absent a property interest or

possessory interest in the car or the seized property, the search of the vehicle and seizure of the

rifle and ammunition did not violate any rights of the defendants. *Id*. at 148-50. *See also United*

*States v. Crawford*, 1994 WL 474898 at *2, 35 F.3d 557 (4th Cir. 1994) (per curiam);   (upholding

finding of passenger's lack of standing to suppress gun and drugs found under passenger seat in a

vehicle, driven by a co-defendant and rented by another individual); *United States v. Harriston*,

1997 WL 543375 at *1-2, 121 F.3d 701 (4th Cir. 1997) (per curiam) (holding that a passenger in

a car driven by co-defendant and owned by co-defendant's girlfriend lacked standing to contest

the search of the vehicle, even though he asserted that he had driven the car on three prior occasions

and that he had exclusive use for a 10-day period of the gun seized from the car); *United States v.*

*Brown*, No. 3:17CR25, 2017 WL 3497840 at *4-5 (E.D. Va. Aug. 15, 2017) (finding that passenger

had no standing to suppress drugs found in trunk of car stopped for "following too closely.")

"The proponent of a motion to suppress has the burden of establishing that his own Fourth

Amendment rights were violated by the challenged search or seizure." *Rakas*, 439 U.S at 130 n.1

(citing *Simmons v. United States*, 390 U.S. 377, 389–390 (1968)). Here, Juarez-Sanchez does not

allege a possessory interest in the vehicle or its contents, and as such, he lacks standing to contest

the search.

### B.    THE CAR WAS VALIDLY STOPPED FOR A VIOLATION OF STATE TRAFFIC LAW.

A "traffic stop is reasonable if (1) the stop is legitimate at its inception and (2) the officer's

actions during the stop are reasonably related in scope to the basis for the stop." *United States v.*

*Perez*, No. 20-4285, 2022 WL 1042500 at *4 (4th Cir. April 7, 2022) (footnote omitted).

"When an officer observes a traffic offense—however minor—he has probable cause to

stop the driver of the vehicle." *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993) (quoting

11

**JA39**

*United States v. Cummins*, 920 F.2d 498, 500 (8th Cir. 1990)). A determination that a car is "following too closely" the car in front of it is a legitimate basis for a traffic stop. *See, e.g., United States v. Gibbs*, 680 F. App'x 184, 185 (4th Cir. 2017) (upholding a car stop based on MD Code Ann. Transp. § 21-310(a)); *United States v. Pore*, 328 F. Supp. 2d 591, 593 (D. Md. 2004) (upholding stop for traffic violations including following too closely); *Maryland State Conf. of NAACP Branches v. Maryland State Police*, 454 F. Supp. 2d 339, 355 (D. Md. 2006) (where plaintiffs admitted that they were traveling "at or above the 65 mph speed limit only two car lengths behind the vehicle in front of them . . . a reasonable police officer in [the] Trooper['s] position could have believed that he had a legitimate reason to stop the vehicle."). *See also Brown*, No. 3:17CR25, 2017 WL 3497840 at *4 (upholding stop based on trooper's belief that driver was following too closely behind the vehicle ahead of it in violation of Virginia law).

### C.   THE SEARCH WAS CONDUCTED IN FULL COMPLIANCE WITH THE FOURTH AMENDMENT.

The car stop was objectively reasonable in scope and was not prolonged beyond the scope of what was required for a routine traffic stop prior to the discovery of the contraband. M/T Miller started with a basic routine conversation with the driver. That initial conversation took longer than it might otherwise have taken because the *driver* did not have a driver's license or even *any* identification to present to him, and was visibly shaking and trembling as he looked in the glove compartment for paperwork on the vehicle. Even so, only seven minutes elapsed between M/T Miller's activation of his emergency equipment and when he finished that initial conversation and returned to his car at 9:14 a.m. to call in the information to the dispatcher. At that time, he requested a canine unit, which arrived within two minutes and completed an initial sniff within four more minutes. At this point, there was unquestionably probable cause to search the area on which the canine had alerted, *United States v. Carter*, 300 F.3d at 422, and the ordinary steps of a car stop

were still underway, i.e., the dispatch had yet to respond to the M/T Miller's request for a license status and warrant check on the driver.

Ramirez-Roblero's extreme nervousness and his fumbling answers to M/T Miller's questions about the purpose of the trip and, even more so, his inability to identify his passenger by name, provided independent and additional grounds to prolong the stop and search the vehicle for indicia of criminal activity even had there not been a canine drug alert. *See, e.g.*, *Pore*, 328 F. Supp at 593-94 (probable cause existed to search car when driver was "highly nervous," and his hands were "shaking badly" and officer smelled strong odor of air freshener."). *See also United States v. Guevara*, 731 F.3d 824, 831 (8th Cir. 2013) (affirming a finding of probable cause to search a car in part on the basis that the defendant and her sister "gave inconsistent answers about which relative they were going to visit, and neither of them knew the address of their final destination").

Once the search began in the passenger compartment, cause to search the remainder of the car, including the trunk and in hidden compartments, grew stronger with each discovery. Initially, the trooper spotted a foreign object behind the glove compartment. There was plainly probable cause to seize and search that, and once he discovered the first kilogram of what was, given the circumstances, almost certainly a controlled substance, there was unquestionably grounds to search the entire car. Far less probable cause has supported complete vehicle searches in this Circuit. *See, e.g., United States v. Champion*, 609 Fed. App'x 122, 122-26 (4th Cir. 2015) (finding combination of marijuana smell in the car, passengers' admission that they had been smoking "weed" while driving, and inconsistent answers to travel plans together provided probable cause to search the car's trunk as well as passenger compartment).

The elapsed time between the initiation of the car stop and the canine alert was at most 13 minutes. *See* Exhibits 1A and 1B. The duration of the stop was unquestionably prolonged because

13

**JA41**

the driver provided M/T Miller with false information, which extended the time required both to elicit information and for the dispatcher to search the appropriate databases. Regardless, as in *Pore*, the canine sniff here occurred within the time otherwise required by the routine processing of the traffic stop. *See Pore*, 328 F. Supp at 593-94. Once the canine alert occurred, the search was thereafter permissible. *Cf. Wilson v. United States*, No. CR ELH-10-0488, 2016 WL 1366024, at *10 (D. Md. Apr. 6, 2016) (denying § 2255 relief and finding no Fourth Amendment violation where a canine alert occurred 11-12 minutes into a car stop for following too closely and occurred before completion of the traffic stop of a vehicle in which defendant was a passenger).

Moreover, even if the normal processing time for a traffic stop had been extended here – which it was not – such an extension was reasonable given M/T Miller's additional observations. *See United States v. Spencer*, No. CR.CCB-07-0301, 2008 WL 4370019, at *2-3 (D. Md. Sept. 18, 2008) (26 minutes to canine alert was reasonable in view of reasonable suspicion of ongoing criminal activity based, *inter alia*, on driver's nervousness, air fresheners, and dubious explanation for trip).

The facts here are similar to those in *Brown*, 2017 WL 3497840 at *1. In *Brown*, a trooper made a car stop of a Chevrolet Malibu that he had observed following within one to one- and-a-half car lengths behind another vehicle. The Malibu driver was able to provide her license and car rental paperwork – more than Ramirez-Roblero was able to do – but was shaking uncontrollably. The passenger, Brown, was breathing heavily and his chest was pounding, and he had no identification. *Id*. The trooper also observed a prepaid phone with its battery removed. *Id*. As the trooper was talking to the driver and attempting to check her license status, he asked questions about her travel and destination. *Id* at *1-2. Her answers were not entirely logical and were also not consistent with answers separately provided by Brown. The trooper decided to do a canine

**JA42**

sniff, which led to a canine alert not quite a minute before the driver's license came back as valid. *Id*. at *2. In the search that ensued, the trooper found a large amount of pre-packaged bundles of suspected heroin. In upholding the search of the car, the district court in *Brown* found that the canine sniff provided probable cause for the search of the car. *Id.* at *5-6. In any event, as noted above, the court also held that Brown lacked standing to contest the search of the trunk, where the drugs were found. *Id.* at *5.

In addition, because Ramirez-Roblero did not have a driver's license to present to M/T Miller (much less a valid one) and because the vehicle tags had expired, M/T Miller could not have simply terminated the traffic stop and allowed Ramirez-Roblero to drive away. (The defendant makes no claim that he had a valid license and could have driven were the driver disqualified.) As such, even if no contraband were ever located, the car would have to have been held at the scene (or towed by law enforcement) at minimum until a properly licensed driver came to the scene who could legally drive it away and potentially even until proper tags were obtained. Moreover, if the car were taken into police custody, an inventory search would inevitably have resulted in the discovery of the contraband and cash.

IV.    **THE COURT SHOULD DENY THE DEFENDANT'S MOTION TO SUPPRESS TANGIBLE AND DIGITAL EVIDENCE FROM THE SEIZED CELLULAR PHONES.**

    A.    **THE COURT SHOULD DENY THE DEFENDANT'S MOTION TO SUPPRESS TANGIBLE AND DIGITAL EVIDENCE FROM THE SEIZED CELLULAR PHONES BECAUSE THE SEARCH WARRANT WAS SUPPORTED BY PROBABLE CAUSE.**

There are no grounds on which to suppress the fruits of the cell phone search. Once a search warrant has been issued, review of the probable cause determination by the judicial officer is to be shown "great deference." *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990). "[T]he task of a reviewing court is not to conduct a de novo determination of probable cause, but only to

**JA43**

determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984).

"Probable cause" is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The probable cause standard does not require officials to possess an airtight case before taking action. The pieces of an investigative puzzle will often fail to fit neatly, and officers must be "given leeway to draw reasonable conclusions from confusing and contradictory information, free of the apprehension that every mistaken search or seizure will present a triable issue of probable cause." *Taylor v. Farmer*, 13 F.3d 117, 121-22 (4th Cir. 1993). An affidavit in support of a search warrant may even be based in whole or in part on hearsay information as long as there are sufficient indicia of reliability. *See, e.g., United States v. Ventresca*, 380 U.S. 102, 103-105 (1965); *United States v. Dequasie*, 373 F.3d 509, 518 (4th Cir. 2004).

Here, the affidavits supporting the applications to search the seized phones provided substantial grounds to support Judge Bean's finding that there was probable cause that investigators would discover evidence of drug trafficking communications on them. First, the affidavit sets forth reliable evidence that M/T Miller, a trooper with over a quarter century of experience with the Maryland State Police, had recovered two kilos of fentanyl and two kilos of a fentanyl heroin mixture and more than $46,000 in cash from a vehicle in which Alexander Juarez-Sanchez was a passenger. The judge was made aware that M/T Miller had received extensive training in vehicle interdiction, narcotics, and interstate criminal enforcement.

These facts, together with affiant Miller's experience of the relationship between drug trafficking and cell phones, support Judge Bean's determination that probable cause existed to believe that the cell phones would contain stored text and voice messages, photographs and video

16

**JA44**

files and other stored document files; logs of incoming, outgoing, and missed calls; stored

phonebook information and contact lists; GPS location or direction information and internet access

information etc. that would provide evidence of violations of Maryland drug trafficking laws.

Courts can rely on an affiant's training and experience in making a probable-cause determination,

and here, the officer submitting the affidavit stated that based on his "knowledge, training and

experience in narcotics investigations [he has found] that individuals who commit CDS violations

will conceal evidence of transactions, photos and other illicit activities known in the sale and trade

of CDS on electronic devices" including "us[ing] these devices to set up drug transactions by

contacting and allowing others to contact them concerning the distribution of CDS." Exhibits 3A

and 3B. *See Ornelas v. United States*, 517 U.S. 690, 700 (1996).

Specifically, courts have acknowledged that a cell phone is "a recognized tool of the trade

in drug dealing," *United States v. Slater*, 971 F.2d 626, 637 (10th Cir. 1992), and that an affiant's

knowledge, training, and experience of drug dealers' use of cell phones in the trade can support a

finding of probable cause, *see United States v. Gibbs*, 547 F. App'x 174, 179 (4th Cir. 2013)

(holding that a search warrant authorizing GPS monitoring of a cell phone was supported by

probable cause where the affidavit recounted the user's "extensive drug dealing activities"); *United

States v. Harris*, No. 15-0170, 2016 WL 1441382, at *11-12 (E.D. Va. Apr. 11, 2016) (stating that

courts have found probable cause "to search a cell phone" where it was "discovered in proximity

to crime or contraband" because it will "almost invariably contain incriminating evidence"), *aff'd*

688 F. App'x 223 (4th Cir. 2017). *See also United States v. Worthy*, No. CR TDC-18-0062, 2019

WL 1441172, at *2 (D. Md. Apr. 1, 2019) ("[C]ourts can rely on an affiant's training and

experience in making a probable-cause determination, and here, the special agent submitting the

affidavit stated that based on his experience, there is a connection between drug dealing and cell

phones."); *United States v. Peterson*, No. 3:18-CR-00090-JAG-1, 2019 WL 1793138, at *11 (E.D. Va. Apr. 24, 2019) (upholding a warrant for the search of three cell phones and giving credence to affiant's statement, *inter alia*, that "narcotics traffickers frequently use numerous cellular telephones to further their illegal activities and to evade detection from law enforcement.").

Additionally, while defendant complains in his suppression motion at ECF No. 25 that the warrants were deficient because they "violated the Fourth Amendment's particularity requirement in that they permitted the seizure of virtually everything on the devices, without limitation" and that the government is somehow acting outside the scope by "retaining it indefinitely," defendant provides no authority to support this ground for suppression. Here, the defendant points out no information that the government searched that was outside the scope of the warrant. Additionally, in the context of digital information, and particularly one where the government has made a copy of the information, the government fails to see any issue with retaining it between the case's instigation and trial, nor does the defendant point to any authority that would call this into question vis-à-vis the Fourth Amendment.

Based on the information in the affidavit, Judge Bean had ample grounds on which to base his decision to find that probable cause existed to issue the search warrant for each of the seized cellular phones for the information requested. This Court, therefore, should grant the issuing judge's determination "great deference," as required, and deny the defendant's motion.

**B.    ASSUMING, ARGUENDO, THAT THE COURT FINDS THAT THE SEARCH WARRANT WAS NOT SUPPORTED BY PROBABLE CAUSE, A GOOD FAITH EXCEPTION APPLIES.**

Assuming, *arguendo*, that the Court finds that the search warrants were not supported by probable cause, a good faith exception applies. "Under the good faith exception to the warrant requirement, evidence obtained from an invalidated search warrant will be suppressed only if 'the officers were dishonest or reckless in preparing their affidavit or could not have harbored an

18

**JA46**

objectively reasonable belief in the existence of probable cause.'" *United States v. Lalor*, 996 F.2d 1578, 1583 (4th Cir. 1993) (quoting *United States v. Leon*, 468 U.S. 897, 926 (1984)). Here, there is simply no evidence that the officer who swore to the affidavit was dishonest, reckless, or did not believe that probable cause existed.

The Supreme Court has only noted "four situations in which an officer's reliance on a search warrant would not be reasonable," that is, where the good faith exception would not apply: (1) the judge "'was misled by information in an affidavit that the officer knew was false or would have known was false except for the officer's reckless disregard of the truth;'" (2) the judge "'wholly abandoned his detached and neutral judicial role;'" (3) the warrant "'was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;'" and (4) the "'warrant was so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers cannot reasonably presume it to be valid.'" *United States v. Hyppolite*, 65 F.3d 1151, 1156 (4th Cir. 1995) (quoting *Leon*, 468 U.S. at 923). None of these exceptions apply to the instant case.

First, M/T Miller did not mislead Judge Bean and certainly did not have a "reckless disregard" of the truth. The defendant has pointed to no factual errors in the affidavit in his memorandum. Second, there is no suggestion here that the judge abandoned his detached and neutral judicial role. As indicated by the signature on the final page of the search warrant, the trooper personally appeared before him and swore under oath that the contents of the applications were true and correct to the best of his knowledge, information, and belief. Judge Bean then reviewed the sworn affidavits, determined that there was probable cause to search the seized cellular phones for various electronically-stored information and photos related to the defendants' drug trafficking activities contained therein, and issued the requested search warrants.

**JA47**

Third, the affidavits were not so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. Rather, as set forth above, the affidavits contained probable cause that such evidence of drug trafficking crimes would be found stored within the cell phones.

Finally, the warrants were not so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers could not reasonably presume it to be valid. Rather, the warrants particularized what was to be searched – the three cell phones – in certain terms. Additionally, each warrant laid out what evidence was sought to be obtained with the search to document violation(s) of Maryland Criminal Laws Annotated Sections 5-601 and 5-602 (Possession and Distribution of Controlled Dangerous Substances):

   a. Enter and search the aforementioned cellular phone as completely described above for the evidence of the aforementioned crimes;

   b. Seize and examine by persons qualified to conduct said any voice messages, photographs or other possible digital evidence located in said cellular phone;

   c. Open and document any text messages or call lists that may exist in said cellular phone;

   d. Call logs, to include incoming, outgoing and missed calls

   e. Phonebook and contacts to include phone numbers, and e-mail addresses.

   f. SMS / MMS messages and attached multimedia files, to include incoming and outgoing.

   g. Secondary SMS applications and messages to include KIK, TextPlus and others

   h. E-mails to include incoming and outgoing

   i. Pictures and all ExIF information to include geotagging information( GPS location of the location of the picture.)

   j. Videos and geotagging information

   k. Audio files to include any voicemail stored on the device and voice notes

   l. Secondary phone number accounts such as Skype, Line 2 and other applications that can assign a second roaming phone number.

20

**JA48**

m. WiFi network information, to include SSID ( Network name) and GPS information of the network

n. GPS directions

o. Calendar information, including sync' ed calendars

p. Internet History and usage to including websites visited, search terms and Cookies And any account information, settings, and saved usage information for any and all installed applications, also known as " apps" on the device.

q. Open and search any inboxes, outboxes, messages or any other system, locked or unlocked, found in upon, or around said cellular phone or storage media.

The defendant makes no suggestion that any of the information obtained as a result of the forensic search of the cell phones was outside the warrant's scope, nor that the officers searched outside the scope of the property described, i.e., the cell phones themselves.

## V.   THE COURT SHOULD DENY THE DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

### A.   THERE ARE NO GROUNDS FOR SUPPRESSING THE STATEMENTS MADE DURING THE CAR STOP AND APPREHENSION OF THE DEFENDANT ON AUGUST 5, 2020.

The Court should reject the defendant's *Miranda* claim because the officers were not required to provide *Miranda* warnings in the first place. *Miranda* applies when a defendant is in custody and is subject to interrogation. *See, e.g.*, *Montejo v. Louisiana*, 556 U.S. 778, 795 (2009). Officers making vehicle traffic stops are not required to issue *Miranda* warnings unless and until they make an arrest. *See United States v. Sullivan*, 138 F.3d 126, 130 (4th Cir. 1998) ("[P]ersons temporarily detained pursuant to [ordinary traffic] stops are not 'in custody' for the purposes of Miranda.") (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)). In any event, the defendant did not say anything notable during the car stop, so the government is not planning to use any such statements against him.

The only statements of the defendant the government may introduce at trial that stemmed

21

**JA49**

from the August 2020 arrest were the false statements the defendant made about his identity, and questions of this type also do not need to be preceded by *Miranda* warnings. Statements made during routine arrest processing also do not require *Miranda*. *Miranda*'s protections do not apply to "routine questions" designed to secure "'biographical data necessary to complete booking or pretrial services,'" so long as the questions are not designed to elicit incriminatory admissions. *United States v. D'Anjou*, 16 F.3d 604, 608 (4th Cir. 1994)( affirming denial of suppression motion based on unwarned answers to questions concerning name, citizenship, place of birth, address, and length of residence) (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990); *accord United States v. Taylor*, 799 F.2d 126, 128 (4th Cir. 1986) (observing that "taking of basic personal information such as name, age, and place of birth is a ministerial duty incident to arrest and custody which does not constitute 'interrogation or its functional equivalent, reasonably likely to elicit an incriminating response'" (quoting *United States v. Morrow*, 731 F.2d 233, 237 (4th Cir. 1984) (internal quotation marks omitted)). The officers' arrest processing questions here easily fell within the realm of routine booking questions that do not require *Miranda* warnings. Because the officers' questions requested only routine biographical data that was not reasonably likely to elicit an incriminating admission, the defendant's arrest-scene and arrest-processing statements were not responses to "interrogation" that required *Miranda* warnings.

Juarez-Sanchez also argues that the statements should nonetheless be suppressed because he did not make them voluntarily. The government bears the burden of establishing the voluntariness of a statement by a preponderance of the evidence. *See Lego v. Twomey*, 404 U.S. 477, 489 (1972). That burden is easily met here. For a statement to be involuntary, it must be "extracted by any sort of threats or violence," or "obtained by any direct or implied promises" or "the exertion of any improper influence." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir.

997) (*en banc*). The central question "is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired'" due to "coercive police conduct." *United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002) (quoting *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987) (internal quotation marks omitted)). To answer this question, courts examine the totality of the circumstances, including the defendant's individual characteristics and background, the setting in which the statement occurred, and the details of the interview. *United States v. Elie*, 111 F.3d 1135, 1143–44 (4th Cir. 1997). The circumstances here included no evidence of "coercive" police conduct, nor is there any basis to conclude that the defendant's will became "overborne" or his capacity for self-determination "critically impaired." *Cristobal*, 293 F.3d at 140. Those circumstances here easily demonstrate the voluntariness of the defendant's statements, the Court should deny the defendant's motion to suppress them.

**B.    THERE IS NO BASIS FOR SUPPRESSING THE STATEMENTS MADE BY JUAREZ-SANCHEZ TO IMMIGRATION OFFICIALS**

Although the defendant, in ECF No. 26, challenges the introduction of his statements to ICE officials on May 21, 2021, these were voluntary statements made after defendant reviewed his *Miranda* rights on a form provided to him in Spanish and knowingly waived his Fifth and Sixth Amendment rights in writing. *See* Exhibit 5. Other than baldly claiming that any "statements, admissions, or confessions" he made at that point "were obtained in violation of Mr. Juarez-Sanchez's privilege against self-incrimination and his right to counsel," defendant's motion lacks any explanation of how the waiver was insufficient or obtained unlawfully. Without additional factual proffers, the government submits that the documentary evidence of defendant's waiver form, in his native tongue, is sufficient to establish that he was both advised of his rights and voluntarily waived them prior to making admissible confessions regarding his illegal reentry offense.

**JA51**

## VI.    CONCLUSION

For all the reasons set forth above, the United States respectfully requests that the Court

deny all three of the defendant's motions.

Respectfully submitted,

Erek L. Barron
United States Attorney


By:_____/s/_____
Adam K. Ake
Assistant United States Attorneys

Amy L. Schwartz
Special Assistant United States Attorneys
United States Courthouse, Suite 400
6500 Cherrywood Lane
Greenbelt, Maryland 20770-1249
301-344-4433

**JA52**

## CERTIFICATE OF SERVICE

Type text here

This is to certify that on this 12th day of April, 2022, a copy of the foregoing Government's Consolidated Response in Opposition to Defendant's Pretrial Motions to Suppress is being served via electronic case filing upon the defendant's counsel of record, Alfred Guillaume III, Esq.

_____
Amy L. Schwartz
Special Assistant United States Attorney

**JA53**

**EXHIBITS 1A and 1B will be filed in electronic format.**



**JA55**



**JA56**

JA57

# APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

To:   THE HONORABLE, E. BEAN, JUDGE OF THE DISTRICT COURT, ALLEGANY
      COUNTY, MARYLAND.

Application is herewith made for a Search and Seizure Warrant in that there is probable cause
to believe that evidence relating to the felony and misdemeanor crimes in that laws relating to the
illegal manufacture, possession, and distribution of Controlled Dangerous Substances, as defined
in Maryland Criminal Laws Annotated Sections 5-601 and 5-602 (Possession and Distribution of
Controlled Dangerous Substances), are being violated exists in and on a **Samsung A10e (serial
#359620108730880)**

The name of your, affiant is Master Trooper Craig Miller who has been a duly sworn police
officer in and for the State of Maryland for twenty six years.  Your affiant has been assigned to
the Criminal Enforcement Division of the Maryland State Police, Pro Active Criminal
Enforcemant Team since January 2016.  Prior to being assigned to Pro Active Criminal
Enforcement Team, your affiant, Miller, was assigned to the Cumberland Barrack, in Allegany
County, Maryland since March 1998.  Prior to being assigned to the Cumberland Barrack , your
affiant, Miller was assigned to the College Park Barrack, of the Maryland State Police for
approximately three and a half years as a Maryland State Trooper.

Your affiant Miller was assigned to roaming patrol in Prince George's County and Allegany
County, Maryland where he arrested numerous people for possession of marijuana and
possession of marijuana with intent to distribute as well as possession of heroin, possession of
crack and possession of cocaine.  Your affiant Miller also had the opportunity to assist in the
execution of numerous Search and Seizure Warrants in Allegany County,

Your affiant, Miller, was hired by the Maryland State Police as a Trooper in July 1994.  Your
affiant Miller attended and successfully completed a six-month Maryland State Police Academy,
which included courses of instruction pertaining to the identification and detection of Controlled
Dangerous Substances.  During this training your affiant Miller was able to examine various
types of Controlled Dangerous Substances including but not limited to, Marijuana,
Crack/Cocaine, Heroin, Fentanyl and Phencyclidine (PCP).  During this training, your affiant,
Miller, also received training in the Laws and Regulations that deal with the application and
execution of Search and Seizure Warrants.

Your Affiant Master Trooper Craig Miller's law enforcement experience includes:

> 3Day Course Homeland Security Investigations (HIS)- Certified as a Task Force
> Office (TFO) 2 Day Course Lane Thompson Commercial MotorVehicle
> Training

**JA58**

> 3 Day Course 420 Highway Interdiction Training
> 5 Day Course Desert Snow Comercial Vehicle Interdiction Training
> 5 Day Course Desert Snow Passenger Vehicle Interdiction Training
> 6 Week Training Course Advanced Interstate Criminal Enforcement by the
> 6 Week Training Course Advanced Interstate Criminal Enforcement by the
>   Maryland State Police
> 2 Day Course DEA Marijuana Eradication Training
> 1 Day Course Clandestine Methamphetamine Lab Training
> 5 Day Course The Total Traffic Stop Training

   Your Affiant is now working in an investigative capacity and has had the opportunity to assist in numerous investigations of Controlled Dangerous Substances; as well as, observed directly, the behaviors and characteristics of Controlled Dangerous Substance violators.
Your Affiant, through his training and experience as a Police Officer, has developed various sources of information concerning criminal activity in the Maryland area. Some of these sources are, but not limited to; Maryland State Police officers who live and/or work in these areas, police officers from allied agencies in these areas and adjoining states; concerned citizens, who often choose to remain anonymous and are conscientious enough to report occurrences of suspected criminal activity; persons involved in the criminal community who are arrested for various crimes.

In support of this application and the basis for probable cause, Your Affiant deposes and says:


   On 8-5-2020 your affiant was monitoring traffic in the area of Northbound Interstate-81 North of Halfway Boulevard, Hagerstown, Washington County, Maryland. At this location your affiant observed a white 2014 Honda Accord with Indiana registration, 928TQW. The vehicle was following the vehicle ahead of it at a dangerously close distance.
**§ 21-310. Following too closely.**

(a) General rule. - The driver of a motor vehicle may not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the other vehicle and of the traffic on and the condition of the highway.

   Your affiant pulled from the crossover, activated your affiant's emergency equipment and conducted a traffic stop in the area N/B I-81 and MD Rt.144. Your affiant then made contact with the occupants of the vehicle and stated the reason for the stop. The driver identified himself as Gavino Perez Aquilar, M/H, 7-19-1992. He later identified himself as Domingo Ramirez Roblero,M/H 7-19-1990. During the course of the traffic stop, your affiant requested Cpl. D.W.Yates and his certified narcotics detection canine "Buster" to respond to your affiant's location to perform a free air sniff of the Honda Accord. After the positive alert for narcotics, your affiant began a probable cause search of the vehicle with the assistance of ST. C. Shrout. While searching the front passenger area, your affiant located a brown paper bag hidden behind the glove compartment. Your affiant removed the paper bag and observed a black rectangular packaged wrapped in clear cellophane plastic wrap. Your affiant recognized the package as a

**JA59**

kilogram (2.2 pounds) of narcotics from my training and experience in the Maryland State Police along with my previous arrests for narcotics packaged in this manner. Your affiant also located hidden between the passenger seat cushion and metal seat pan white package similar to the first package that was also wrapped in cellophane wrap. Inside the rear, area of the center console was another kilogram package identical to the one found in the area behind the glove compartment. A search of the rear seat area led to the discovery of plastic grocery bags containing large amounts of US Currency. The currency was found behind the rear seat side bolsters which when removed revealed the currency. Both the driver and passenger who was identified as Juan Manuel Florez M/H 8-26-1979 were taken into custody and transported to the Hagerstown Barrack. At the Hagerstown Barrack Hagerstown Forensic Laboratory, personnel tested the three-kilogram packages. Two of the packages were found to be Fentanyl and one package was found to be a mixture of Fentanyl and heroin commonly referred to on the street as "gray death". The US Currency totaled 46,810 dollars. The street value of a kilo of Fentanyl is approximately $50,000 dollars. The total street value of the three kilograms is approximately $150,000 dollars. All events occurred in Washington County Maryland.

Your affiant also located and seized the following cellular phones for the investigation.

1. **Samsung Galaxy A10e (serial #353290113395768)**
2. **White iPhone (FCC ID #BCG-E3091A – IC:579C-E3091A)**

Aforementioned cellular phones were transported to the Maryland State Police Barrack "O". A MSP Form 67 Chain of Custody was completed.

Your Affiant seized the aforementioned cellular phone(s) as evidence since Your Affiant has learned through his aforementioned training, knowledge and experience that cellular phones are commonly used by those involved in the illicit sales and consumption of Controlled Dangerous Substances (CDS), including but not limited to heroin and fentanyl, to facilitate sales of CDS as well as contain photographs, text messages and other electronic means of communication to communicate with customers and also to communicate and facilitate the purchase and means of delivery of their supplier of the illicit CDS.

Your Affiant has found, based on his knowledge, training and experience in narcotics investigations that individuals who commit CDS violations will conceal evidence of transactions, photos and other illicit activities known in the sale and trade of CDS on electronic devices. Individuals who commit these violations also use the internet and electronic devices to search, view, and share information concerning CDS consumption and sales. The individuals also use these devices to orchestrate, expedite and set up drug transactions by contacting and allowing others to contact them concerning the distribution of CDS. Therefore based on Your Affiants knowledge, training and experience Your Affiant believes that there is probable cause to believe that evidence of illicit dealing of narcotics is located on cellular phone, electronic media storage device.

Your Affiant, therefore, prays that a Search and Seizure Warrant be issued for the aforesaid cellular phone, more particularly described before, with the necessary and proper assistance to:

a.  Enter and search the aforementioned cellular phone as completely described above for the evidence of the aforementioned crimes;

b.  Seize and examine by persons qualified to conduct said any voice messages, photographs or other possible digital evidence located in said cellular phone;

c.  Open and document any text messages or call lists that may exist in said cellular phone;

d.  Call logs, to include incoming, outgoing and missed calls
e.  Phonebook and contacts to include phone numbers, and e-mail addresses.

f.  SMS / MMS messages and attached multimedia files, to include incoming and outgoing.

g.  Secondary SMS applications and messages to include KIK, TextPlus and others
h.  E-mails to include incoming and outgoing
i.  Pictures and all ExIF information to include geotagging information (GPS location of the location of the picture.)

j.  Videos and geotagging information
k.  Audio files to include any voicemail stored on the device and voice notes

l.  Secondary phone number accounts such as Skype, Line 2 and other applications that can assign a second roaming phone number.

m.  WiFi network information, to include SSID (Network name) and GPS information of the network

n.  GPS directions

o.  Calendar information, including sync'ed calendars

p.  Internet History and usage to including websites visited, search terms and Cookies And any account information, settings, and saved usage information for any and all installed applications, also known as "apps" on the device.

q.  Open and search any inboxes, outboxes, messages or any other system, locked or unlocked, found in upon, or around said cellular phone or storage media;

**JA61**

SUBSCRIBED and SWORN to, this _____ day of _____, in the year of our Lord, 2020.

<div align="center">

Master Trooper Craig W. Miller
Maryland State Police

</div>

Before me, Honorable E. Bean, a District Court Judge of the State of Maryland, in and for Allegany County, this _11th_ day of _August_, in the year of our Lord 2020 personally appeared Master Trooper Craig W. Miller, personally known to me or properly identified, and made oath that the contents of the foregoing document are true and correct.

_____
Honorable

_8/10/20    12:00 pm_
DATE/TIME

**JA62**

# SEARCH WARRANT

State of Maryland
Allegany County

To: Master Trooper Craig W. Miller or any Duly Authorized Law Enforcement Officer

GREETINGS:
Whereas, it appears to me, the subscriber, Honorable, E. Bean, Judge of the District Court, Allegany County, State of Maryland, upon the oath and written information contained in the Application and Affidavit for a Search and Seizure Warrant in that there is probable cause to believe that evidence of the crime of the illegal manufacture, possession, and distribution of Controlled Dangerous Substances, as defined in Maryland Criminal Laws Annotated Sections 5-601 and 5-602 (Possession and Distribution of Controlled Dangerous Substances) Annotated Code of Maryland as amended and revised exists in and on a **Samsung A10e (serial #359620108730880)**

The grounds for Search and Seizure and the basis for probable cause are as set forth in the attached Application and Affidavit for the issuance of a Search Warrant, which grounds are as fully specified in said Application and Affidavit for Search Warrant affixed hereto and made part of this warrant.

You are, therefore, commanded with the necessary and proper assistance to:

1. Enter and search the aforementioned cellular phone as completely described above for the evidence of the aforementioned crimes;

2. Seize and examine by persons qualified to conduct said any voice messages, photographs or other possible digital evidence located in said cellular phone;

    a. Enter and search the aforementioned cellular phone as completely described above for the evidence of the aforementioned crimes;
    b. Seize and examine by persons qualified to conduct said any voice messages, photographs or other possible digital evidence located in said cellular phone;
    c. Open and document any text messages or call lists that may exist in said cellular phone;
    d. Call logs, to include incoming, outgoing and missed calls
    e. Phonebook and contacts to include phone numbers, and e-mail addresses.

**JA63**

  f. SMS / MMS messages and attached multimedia files, to include incoming and outgoing.

  g. Secondary SMS applications and messages to include KIK, TextPlus and others

  h. E-mails to include incoming and outgoing

  i. Pictures and all ExIF information to include geotagging information (GPS location of the location of the picture.)

  j. Videos and geotagging information

  k. Audio files to include any voicemail stored on the device and voice notes

  l. Secondary phone number accounts such as Skype, Line 2 and other applications that can assign a second roaming phone number.

  m. Wi-Fi network information, to include SSID (Network name) and GPS information of the network

  n. GPS directions

  o. Calendar information, including sync'd calendars

  p. Internet History and usage to including websites visited, search terms and Cookies And any account information, settings, and saved usage information for any and all installed applications, also known as "apps" on the device.

  q. Open and search any inboxes, outboxes, messages or any other system, locked or unlocked, found in upon, or around said cellular phone or storage media.

3. Open and document any text messages or call lists that may exist in said cellular phone;

4. Bring all evidence before you, the Subscriber, or some other Judicial Officer in the State in and for the county aforesaid to be dealt with and disposed of according to law.

SUBSCRIBED and SWORN to, this _10th_ day of _August_, in the year of our Lord, 2020

_____
Honorable

8/10/20 12:00pm

DATE/TIME

# APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

To:    THE HONORABLE, E. BEAN, JUDGE OF THE DISTRICT COURT, ALLEGANY
       COUNTY, MARYLAND.

    Application is herewith made for a Search and Seizure Warrant in that there is probable cause
to believe that evidence relating to the felony and misdemeanor crimes in that laws relating to the
illegal manufacture, possession, and distribution of Controlled Dangerous Substances, as defined
in Maryland Criminal Laws Annotated Sections 5-601 and 5-602 (Possession and Distribution of
Controlled Dangerous Substances), are being violated exists in and on a **Samsung Galaxy A10e
(serial #353290113395768)**

    The name of your, affiant is Master Trooper Craig Miller who has been a duly sworn police
officer in and for the State of Maryland for twenty six years.  Your affiant has been assigned to
the Criminal Enforcement Division of the Maryland State Police, Pro Active Criminal
Enforcemant Team since January 2016.  Prior to being assigned to Pro Active Criminal
Enforcement Team, your affiant, Miller, was assigned to the Cumberland Barrack, in Allegany
County, Maryland since March 1998.  Prior to being assigned to the Cumberland Barrack , your
affiant, Miller was assigned to the College Park Barrack, of the Maryland State Police for
approximately three and a half years as a Maryland State Trooper.

    Your affiant Miller was assigned to roaming patrol in Prince George's County and Allegany
County, Maryland where he arrested numerous people for possession of marijuana and
possession of marijuana with intent to distribute as well as possession of heroin, possession of
crack and possession of cocaine.  Your affiant Miller also had the opportunity to assist in the
execution of numerous Search and Seizure Warrants in Allegany County,

    Your affiant, Miller, was hired by the Maryland State Police as a Trooper in July 1994.  Your
affiant Miller attended and successfully completed a six-month Maryland State Police Academy,
which included courses of instruction pertaining to the identification and detection of Controlled
Dangerous Substances.  During this training your affiant Miller was able to examine various
types of Controlled Dangerous Substances including but not limited to, Marijuana,
Crack/Cocaine, Heroin, Fentanyl and Phencyclidine (PCP).  During this training, your affiant,
Miller, also received training in the Laws and Regulations that deal with the application and
execution of Search and Seizure Warrants.

    Your Affiant Master Trooper Craig Miller's law enforcement experience includes:

        3Day Course Homeland Security Investigations (HIS)- Certified as a Task Force
        Office (TFO) 2 Day Course Lane Thompson Commercial MotorVehicle
        Training

  3 Day Course 420 Highway Interdiction Training
  5 Day Course Desert Snow Comercial Vehicle Interdiction Training
 5 Day Course Desert Snow Passenger Vehicle Interdiction Training
 6 Week Training Course Advanced Interstate Criminal Enforcement by the
 6 Week Training Course Advanced Interstate Criminal Enforcement by the
   Maryland State Police
 2 Day Course DEA Marijuana Eradication Training
 1 Day Course Clandestine Methamphetamine Lab Training
 5 Day Course The Total Traffic Stop Training

    Your Affiant is now working in an investigative capacity and has had the opportunity to assist
in numerous investigations of Controlled Dangerous Substances; as well as, observed directly,
the behaviors and characteristics of Controlled Dangerous Substance violators.
Your Affiant, through his training and experience as a Police Officer, has developed various
sources of information concerning criminal activity in the Maryland area.  Some of these sources
are, but not limited to; Maryland State Police officers who live and/or work in these areas, police
officers from allied agencies in these areas and adjoining states; concerned citizens, who often
choose to remain anonymous and are conscientious enough to report occurrences of suspected
criminal activity; persons involved in the criminal community who are arrested for various
crimes.

In support of this application and the basis for probable cause, Your Affiant deposes and says:

    On 8-5-2020 your affiant was monitoring traffic in the area of Northbound Interstate-81 North
of Halfway Boulevard, Hagerstown, Washington County, Maryland. At this location your affiant
observed a white 2014 Honda Accord with Indiana registration, 928TQW. The vehicle was
following the vehicle ahead of it at a dangerously close distance.
**§ 21-310. Following too closely.**

(a)  General rule. - The driver of a motor vehicle may not follow another vehicle more closely
than is reasonable and prudent, having due regard for the speed of the other vehicle and of the
traffic on and the condition of the highway.

    Your affiant pulled from the crossover, activated your affiant's emergency equipment and
conducted a traffic stop in the area N/B I-81 and MD Rt.144. Your affiant then made contact with
the occupants of the vehicle and stated the reason for the stop. The driver identified himself as
Gavino Perez Aquilar, M/H, 7-19-1992. He later identified himself as Domingo Ramirez
Roblero,M/H 7-19-1990. During the course of the traffic stop, your affiant requested Cpl.
D.W.Yates and his certified narcotics detection canine "Buster" to respond to your affiant's
location to perform a free air sniff of the Honda Accord. After the positive alert for narcotics,
your affiant began a probable cause search of the vehicle with the assistance of ST. C. Shrout.
While searching the front passenger area, your affiant located a brown paper bag hidden behind
the glove compartment. Your affiant removed the paper bag and observed a black rectangular
packaged wrapped in clear cellophane plastic wrap. Your affiant recognized the package as a

**JA66**

kilogram (2.2 pounds) of narcotics from my training and experience in the Maryland State Police along with my previous arrests for narcotics packaged in this manner. Your affiant also located hidden between the passenger seat cushion and metal seat pan white package similar to the first package that was also wrapped in cellophane wrap. Inside the rear, area of the center console was another kilogram package identical to the one found in the area behind the glove compartment. A search of the rear seat area led to the discovery of plastic grocery bags containing large amounts of US Currency. The currency was found behind the rear seat side bolsters which when removed revealed the currency. Both the driver and passenger who was identified as Juan Manuel Florez M/H 8-26-1979 were taken into custody and transported to the Hagerstown Barrack. At the Hagerstown Barrack Hagerstown Forensic Laboratory, personnel tested the three-kilogram packages. Two of the packages were found to be Fentanyl and one package was found to be a mixture of Fentanyl and heroin commonly referred to on the street as "gray death". The US Currency totaled 46,810 dollars. The street value of a kilo of Fentanyl is approximately $50,000 dollars. The total street value of the three kilograms is approximately $150,000 dollars. All events occurred in Washington County Maryland.

Your affiant also located and seized the following cellular phones for the investigation.

    1. **Samsung A10e (serial #359620108730880)**
    2.**White iPhone (FCC ID #BCG-E3091A – IC:579C-E3091A)**

Aforementioned cellular phones were transported to the Maryland State Police Barrack "O". A MSP Form 67 Chain of Custody was completed.

Your Affiant seized the aforementioned cellular phone(s) as evidence since Your Affiant has learned through his aforementioned training, knowledge and experience that cellular phones are commonly used by those involved in the illicit sales and consumption of Controlled Dangerous Substances (CDS), including but not limited to heroin and fentanyl, to facilitate sales of CDS as well as contain photographs, text messages and other electronic means of communication to communicate with customers and also to communicate and facilitate the purchase and means of delivery of their supplier of the illicit CDS.

Your Affiant has found, based on his knowledge, training and experience in narcotics investigations that individuals who commit CDS violations will conceal evidence of transactions, photos and other illicit activities known in the sale and trade of CDS on electronic devices. Individuals who commit these violations also use the internet and electronic devices to search, view, and share information concerning CDS consumption and sales. The individuals also use these devices to orchestrate, expedite and set up drug transactions by contacting and allowing others to contact them concerning the distribution of CDS. Therefore based on Your Affiants knowledge, training and experience Your Affiant believes that there is probable cause to believe that evidence of illicit dealing of narcotics is located on cellular phone, electronic media storage device.

**JA67**

Your Affiant, therefore, prays that a Search and Seizure Warrant be issued for the aforesaid cellular phone, more particularly described before, with the necessary and proper assistance to:

a. Enter and search the aforementioned cellular phone as completely described above for the evidence of the aforementioned crimes;

b. Seize and examine by persons qualified to conduct said any voice messages, photographs or other possible digital evidence located in said cellular phone;

c. Open and document any text messages or call lists that may exist in said cellular phone;

d. Call logs, to include incoming, outgoing and missed calls
 e. Phonebook and contacts to include phone numbers, and e-mail addresses.

 f. SMS / MMS messages and attached multimedia files, to include incoming and outgoing.

g. Secondary SMS applications and messages to include KIK, TextPlus and others
h. E-mails to include incoming and outgoing
i. Pictures and all ExIF information to include geotagging information (GPS location of the location of the picture.)

j. Videos and geotagging information
k. Audio files to include any voicemail stored on the device and voice notes

l. Secondary phone number accounts such as Skype, Line 2 and other applications that can assign a second roaming phone number.

m. WiFi network information, to include SSID (Network name) and GPS information of the network

n. GPS directions

o. Calendar information, including sync'ed calendars

p. Internet History and usage to including websites visited, search terms and Cookies And any account information, settings, and saved usage information for any and all installed applications, also known as "apps" on the device.

q. Open and search any inboxes, outboxes, messages or any other system, locked or unlocked, found in upon, or around said cellular phone or storage media;

**JA68**

SUBSCRIBED and SWORN to, this _10_ day of _August_, in the year of our Lord, 2020.

Master Trooper Craig W. Miller
Maryland State Police

Before me, Honorable E. Bean, a District Court Judge of the State of Maryland, in and for Allegany County, this _10th_ day of _August_, in the year of our Lord 2020 personally appeared Master Trooper Craig W. Miller, personally known to me or properly identified, and made oath that the contents of the foregoing document are true and correct.

Honorable

8/10/20   12:00 pm
DATE/TIME

**JA69**

# SEARCH WARRANT

State of Maryland
Allegany County

To: Master Trooper Craig W. Miller or any Duly Authorized Law Enforcement Officer

GREETINGS:

Whereas, it appears to me, the subscriber, Honorable, E. Bean, Judge of the District Court, Allegany County, State of Maryland, upon the oath and written information contained in the Application and Affidavit for a Search and Seizure Warrant in that there is probable cause to believe that evidence of the crime of the illegal manufacture, possession, and distribution of Controlled Dangerous Substances, as defined in Maryland Criminal Laws Annotated Sections 5-601 and 5-602 (Possession and Distribution of Controlled Dangerous Substances) Annotated Code of Maryland as amended and revised exists in and on a **Samsung Galaxy A10e (serial #353290113395768)**

The grounds for Search and Seizure and the basis for probable cause are as set forth in the attached Application and Affidavit for the issuance of a Search Warrant, which grounds are as fully specified in said Application and Affidavit for Search Warrant affixed hereto and made part of this warrant.

You are, therefore, commanded with the necessary and proper assistance to:

1. Enter and search the aforementioned cellular phone as completely described above for the evidence of the aforementioned crimes;

2. Seize and examine by persons qualified to conduct said any voice messages, photographs or other possible digital evidence located in said cellular phone;

    a. Enter and search the aforementioned cellular phone as completely described above for the evidence of the aforementioned crimes;
    b. Seize and examine by persons qualified to conduct said any voice messages, photographs or other possible digital evidence located in said cellular phone;
    c. Open and document any text messages or call lists that may exist in said cellular phone;
    d. Call logs, to include incoming, outgoing and missed calls
    e. Phonebook and contacts to include phone numbers, and e-mail addresses.

    f.  SMS / MMS messages and attached multimedia files, to include incoming and outgoing.

    g.  Secondary SMS applications and messages to include KIK, TextPlus and others

    h.  E-mails to include incoming and outgoing

    i.  Pictures and all ExIF information to include geotagging information (GPS location of the location of the picture.)

    j.  Videos and geotagging information

    k.  Audio files to include any voicemail stored on the device and voice notes

    l.  Secondary phone number accounts such as Skype, Line 2 and other applications that can assign a second roaming phone number.

    m.  Wi-Fi network information, to include SSID (Network name) and GPS information of the network

    n.  GPS directions

    o.  Calendar information, including sync'd calendars

    p.  Internet History and usage to including websites visited, search terms and Cookies And any account information, settings, and saved usage information for any and all installed applications, also known as "apps" on the device.

    q.  Open and search any inboxes, outboxes, messages or any other system, locked or unlocked, found in upon, or around said cellular phone or storage media.

3. Open and document any text messages or call lists that may exist in said cellular phone;

4. Bring all evidence before you, the Subscriber, or some other Judicial Officer in the State in and for the county aforesaid to be dealt with and disposed of according to law.

SUBSCRIBED and SWORN to, this _0__ day of _August_ , in the year of our Lord, 2020

_____
Honorable

8/10/20   12:00 p.m.

DATE/TIME

**JA71**

## MARYLAND STATE POLICE
## Advice of Miranda Rights
### *Aviso de su Derechos Miranda*
(ONLY TROOPERS ON RECORD WITH THE MSP HUMAN RESOURCES DIVISION AS FLUENT IN
SPEAKING AND READING SPANISH MAY USE THIS FORM)

*Numero del Caso:*
Case Number: _____

*Nombre de la persona entrevistado:*
Name of Person Interviewed: JUAN MANUEL FLOREZ    DoB: 8-26-79

*Fecha:*                          *Lugar:*
Date:

Location: HAGERSTOWN, MSP _____

*Hora:*                          *Persona explicando los derechos:*
Time: 11:05 HRS    Person Explaining Rights: DET. R. BEHAR 0369 (FTO)

*Hora le haremos preguntas sober cualqueir informacion que usted tenga perteneciendo a una
investigacion. Por esta razon, eres avisado de los siguientes derechos:*
You are now being questioned as to any information you may have pertaining to an official police investigation.
Therefore, you are advised of the following rights:

*Usted tiene el derecho de permanecer callado(a).*
1. You have the right to remain silent.

*Cualquier declaración que usted elija hacer podrá ser usada en contra suya en su proceso legal.*
2. Anything you say or write may be used against you in a court of law.

*Usted tiene el derecho de hablar con un abogado antes de contestar cualquier pregunta y tener un
abogado presente previo a, y durante, la interrogación.*
3. You have the right to talk to a lawyer before answering any questions and to have a lawyer present at
any time before or during questioning.

*Si usted ahora quiere la asistencia de un abogado pero no tiene recursos para contratar a uno, no se
le haran mas preguntas en este tiempo, y usted puede pedir que la corte le nombre un abogado sin
que tenga que pagar ningun cargo.*
4. If you now want the assistance of a lawyer but cannot afford to hire one, you will not be asked any more
questions at this time and you may request the court to appoint a lawyer for you without charge.

*Si decides responder a las preguntas, puede terminar la entrevista en cualquier momento y pedir
ayuda de un abogado, y no le haremos mas preguntas.*
5. If you agree to answer questions, you may stop at any time and request the assistance of a lawyer, and
no further questions will be asked of you.

*Reconocimiento*
Acknowledgment

*Yo he leido o me han leido la explicacion de mis derechos.*
I have read or have had read to me this explanation of my rights.

*Firma:*                          *Fecha:*
Signature: Juan Manuel Florez    Date: 08/05/2020

*Renuncio de los Derechos Miranda*
Waiver of Miranda Rights
*Yo entiendo cada uno de estos derechos y estoy dispuesto a responder a las preguntas sin un abogado O
sin un abogado presente. Mi decicion para responder es libre y voluntariamente. No he sido prometido
nada, ni he sido amenazado o intimidado en ninguna manera.*
I fully understand each of these rights and I am willing to answer questions without consulting a lawyer or
having a lawyer present at this time. My decision to answer questions is entirely free and voluntary and I have
not been promised anything nor have I been threatened or intimidated in any manner.

*Firma:*                          *Fecha:*
Signature: Juan Manuel florez    Date: 08/05/2020

*Testigo:*                          *Fecha:*
Witnessed: BEHAR 369    Date: 08/05/2020

**JA72**



# UNITED STATES DEPARTMENT OF HOMELAND SECURITY
## IMMIGRATION AND CUSTOMS ENFORCEMENT
## RECORD OF SWORN STATEMENT

| | | |
|---|---|---|
| **Office: Baltimore, Maryland** | **A-file Number: 206 304 739** | **Corrections Number:** |
| **Before: D.Bedard/ DEPORTATION OFFICER** | | **Date: 05/21/2021** |
| **Statement of: Alexander JUAREZ-SANCHEZ** | | **In the case of: Alexander JUAREZ-SANCHEZ** |
| **Language:** X English    X Spanish    ☐ Other : | | **Interpreter:** |

I, ___Alexander JUAREZ-SANCHEZ___ , have a clear understanding that the officer before me has identified himself as an officer of United States Immigration and Customs, authorized by law to administer oaths and take testimony in connection with the enforcement of the Immigration and Nationality laws of the United States.

*Yo,* **Alexander JUAREZ-SANCHEZ** *tengo un claro conocimiento de que el oficial ante mi se me ha identificado a mi como un oficial del Servicio de Inmigracion y Aduanas de los Estados Unidos autorizado por ley para administrar juramentos y tomar testimonios con relacion la ejecucion de las leys de inmigracion y nacionalidad de los Estados Unidos.*

**I desire to take a statement regarding** (*Deseo tomar una declaracion tocante*):
1. Your name (*Su nombre*)
2. Your country of birth (*Su pais de nacimiento*)
3. Your parents name (*Los nombres sus padres*)
4. Your parents country of birth (*El pais de nacimiento de sus padres*)
5. Your criminal record (*Su archivo criminal*)
6. Your immigration record (*Su archivo de inmigracion*)

**Before we ask you any questions you must understand your rights.**
*Antes de que le hagamos cualquier pregunta, usted debe de comprender sus derechos.*
- You have the right to remain silent.
*Usted tiene el derecho de guardar silencio.*
- Anything you say can be used against you in a court, or in any immigration or administrative proceeding.
*Cualquier cosa que usted diga puede ser usada en su contra en un juzgado de leys o en cualquier procedimiento adminstrativo o de inmigracion.*
- You have the right to talk to a lawyer for advice before we ask you any question and to have him with you during questioning.
*Usted tiene el derecho de hablar con un abogado para que el lo aconseje antes de que le hagamos alguna pregunta, y de tenerlo presente con usted durante las preguntas.*
- If you cannot afford a lawyer, one will be appointed to you before any questioning if you wish.
*Si usted no tiene el dinero para emplear a un abogado, se le puede obtener uno antes de que le hagamos alguna pregunta, se usted lo desea.*
- If you decide to answer question now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.
*Si usted decide contestar nuestras preguntas ahora, sin tener a un abogado presente, siempre tendra usted el derecho de dejar de contestar cuando guste. Usted tambien tiene el derecho de dejar de contestar cuando guste, hasta que pueda hablar con un abogado.*
- Any statement you make must be given freely and voluntarily. Do you understand your rights? Yes or No._____
*Cualquier declaracion que usted haga debe de hacerlo libre y voluntariamente. ¿Entiende sus derechos? Si o No. _____*

**Are you willing to answer my questions at this time?**
A: Yes

**Do you swear that all the statements that you are about to make will be the truth, the whole truth, and nothing but the truth?**
A: Yes

**What is your true and correct name?**
A: Alexander Omar Juarez Sanchez

**Have you used any other names:**
A: Juan Manuel Florez

**Where and when were you born?**
A:May 31, 1985 two hours from Mexico city, Mexico

USCA4 Appeal: 22-4477    Doc: 30-1    Filed: 02/21/2023    Pg: 78 of 428

Case 1:21-cr-00174-JRR    Document 49-8    Filed 04/12/22    Page 2 of 5


**Did you illegally enter the United States? When? Where? How?**
A: Yes, 2019, doesn't remember, on a boat

**Were you ever deported from the United States?**
A: Yes

**How many times were you deported. When and from where?**
A: 3, First from Inadianapolis 01/27/2015, second was in Texas in 2018 and again in 2019.

**What crimes have you been convicted of in the United States?**
A: Battery

**Have you ever applied for immigration benefits? What kind? When?**
A: Yes, 2015 Lawful permanent residence

**Have you ever applied to the attorney general of the United States for permission to re-enter the United States?**
A: no

**Do you have any fear of persecution or torture should you be removed from the United States?**
A: Yes, because of the charges he currently has pending

**What is your reason for returning to the United States?**
A: for his son

**Are you a member of a gang, do you have any gang affiliation?**
A: no, no

**Have you had any family members, friends or close associates that are or were part of a gang?**
A: no

**Have you ever possessed any weapons, if so what?**
A: no

**Where have you worked in the United States? Have you ever paid taxes?**
A: yes, under his name years ago

**JA74**

## Record of Sworn Statement

I have read (or have had read to me) the foregoing statement.  I state that the answers made by me are true and correct to the best of my knowledge and belief and that this statement is a full, true, and correct record of my interrogation of the date indicated by the above named officer of the Immigration and Naturalization Service.  I have initialed each page of this statement and the correction(s) if any noted on page(s) _____ .

*Yo he leido (o me lo han leido) esta declaracion.  Yo he declarado que mis respuestas en este documento son veridicas y correctas de acuerdo a mi conocimiento y se que esta declaracion es un acta veridica y correcta de mi interrogacion en la fecha indicada por el oficial del servicio de inmigracion y naturalizacion mencionado arriba.  Yo he puesto mis iniciales en cada una de las paginas de esta declaracion y la(s) correcion(s) anotadas en la pagina(s) _____ .*

Alien's signature (*Firma del extranjero*): ___Alexander, Omar Juarez Sanchez_____

Subscribed and sworn to me at ___Baltimore, Maryland_____ on _____
(*Ante mi presencia firmo y jury en la cuidad de*)      (*en*)

_____     ___D. Bedod    D.O.___
Signature                                             Print name and title

_____     ___J. Reyes    D.O.___
Witness Signature                              Print name and title

| LEFT INDEX | RIGHT INDEX |
|---|---|

**JA75**

**U.S. Department of Homeland Security**
Immigration and Customs Enforcement                    Continuation Page for Sworn Statement

| **Name:** Alexander JUAREZ-SANCHEZ | **File number:** 206 304 739 | **Date:** 05/21/2021 |
|---|---|---|

Additonal Questions and Interview Notes:

Initial Entry / Re-entry details/ where/with who/ cost/ documents used

Response:

Vehicles and Property: (Use of Vehicles/ Driving License )

Cell Phone

Family

Employment/ Businesses (Applications, Identifications used)

Sources of Income

Alcohol Usage

Form I-831 Continuation Page Rev. 6/12/92

**JA76**



**U.S. Immigration
and Customs
Enforcement**

DECLARACIÓN DE DERECHOS

Antes de que le hagamos cualquier pregunta, Ud. debe conocer sus derechos.

Ud. tiene derecho a permanecer callado(a).

Cualquier cosa que Ud. diga puede usarse en su contra en un tribunal o en cualquier otro procedimiento.

Ud. tiene derecho a consultar un abogado antes de que Ud. haga cualquier declaración o conteste cualquier pregunta.

Ud. tiene derecho a tener un abogado presente con Ud. durante el interrogatorio.

Si no puede pagar un abogado, se le proporcionará uno antes de que le hagamos cualquier pregunta, si Ud. lo desea.

Si decide responder a nuestras preguntas ahora, Ud. aún retiene el derecho de detener el interrogatorio en cualquier momento, o de detener el interrogatorio para el propósito de consultar con un abogado.

---

RENUNCIA A LOS DERECHOS

Me han leído y explicado esta declaración de mis derechos y entiendo completamente estos derechos. Renuncio a ellos libre y voluntariamente, sin ser amenazado(a) ni intimidado(a), y sin promesa de compensación o inmunidad. Fui detenido(a) a la(s) _0943_ (hora), en el _05/21/2021_ (fecha), y he firmado este documento a la(s) _0943_ (hora), en el _05/21/2021_ (fecha).

Alexander JUAREZ-SANCHEZ
Nombre _____    Firma _Alexander Juarez, S_

Testigo: _____ 7748 _____    Fecha: _5/21/21_

Testigo: _____ 9942 _____    Fecha: _5/21/21_

**JA77**

1

```
1                 IN THE UNITED STATES DISTRICT COURT
2                   FOR THE DISTRICT OF MARYLAND
                           NORTHERN DIVISION
3

4

5       UNITED STATES OF AMERICA

6              v.                          CRIMINAL CASE NO.
                                           RDB-21-174
7       ALEXANDER JUAREZ-SANCHEZ,

8              Defendant
        _____/
9

10
                         (Motions Hearing)
11                     Monday, April 25, 2022
                        Baltimore, Maryland
12

13      Before:  Honorable Richard D. Bennett, Judge

14

15
        Appearances:
16
                On Behalf of the Government:
17               Adam K. Ake, Esquire
                 Amy L. Schwartz, Esquire
18
                On Behalf of the Defendant:
19               Alfred Guillaume, III, Esquire

20              Also Present:
                 Victoria Dopazo, Spanish Interpreter
21               Michael Zogby, Spanish Interpreter

22

23      ----------------------------------------------------------------
                         Reported By:
24              Mary M. Zajac, RPR, FCRR
             Fourth Floor, U.S. Courthouse
25              101 West Lombard Street
              Baltimore, Maryland 21201
```

2

1          (Proceedings commenced at 11:08 a.m.)

2          THE COURT:  This is calling the case of United States

3    versus Alexander Juarez-Sanchez, Criminal Number RDB-21-174.

4    Those in the back may be seated.

5          The record will reflect that, pursuant to the standing

6    orders of this court, masks are to be worn in all public areas of

7    the courthouse with the exception that, in the discretion of the

8    presiding judge in the courtroom, those participants who have

9    been fully vaccinated may remove their masks while speaking and

10   questioning the witnesses.  They don't have to, but they're free

11   to do so.

12         The record will reflect I'm up here on the bench and I

13   have been fully vaccinated and boosted and actually will get

14   another booster next week.  I am behind a wall of plexiglass so I

15   have pulled my mask down and will not be wearing it during these

16   proceedings.  So I will inquire of the vaccination status of

17   counsel as we proceed.

18         With that, good morning to everyone.  And on behalf of

19   the government?

20         MR. AKE:  Good morning, Your Honor.  Adam Ake and Amy

21   Schwartz for the government.  We're joined by Case Agents Tom

22   Adams from DEA.  And we've got one witness, Maryland State Police

23   Master Trooper --

24         THE COURT:  Yes, Craig Miller.

25         MR. AKE:  -- Craig Miller.  And all four of us are

**JA79**

3

1    fully vaccinated.

2              THE COURT:  Fully vaccinated.  So, that's fine.  You

3    all are -- you don't have to.  When Trooper Miller testifies he

4    doesn't have to pull his mask down but he certainly can.  And

5    those that keep their mask up, please speak clearly for Ms.

6    Zajac, the court reporter, who, along with keeping pace with a

7    quick talking judge, has to also get through the matter of the

8    mask on witnesses.

9              So with that, good morning to you, Mr. Ake.  Am I

10   pronouncing your name correctly?  Ake, is that correct?

11             MR. AKE:  That's correct, Your Honor.

12             THE COURT:  Nice to see you again.  And, Ms. Schwartz,

13   nice to see you.  I'm not sure if you've been before me before.

14   Mr. Ake has, I believe.

15             MS. SCHWARTZ:  I have not, Your Honor.

16             THE COURT:  Yes.  Nice to have you here.  Welcome.

17   You're a recent addition to the US Attorney's Office?

18             MS. SCHWARTZ:  I'm a Special Assistant US Attorney.

19             THE COURT:  That's great.  And coming from which

20   State's Attorney's Office?

21             MS. SCHWARTZ:  From neither.  I am so special that I am

22   from nowhere.  I retired from the Manhattan District Attorney's

23   Office and took it upon myself to fund my service at the U.S.

24   Attorney's Office.

25             THE COURT:  Well, that's great.  Nice to have you here.

**JA80**

4

```
1    Welcome.  Nice to see you.  And you all may be seated.  And on
2    behalf of the defendant?
3              MR. GUILLAUME:  Good morning, Your Honor.  Alfred
4    Guillaume on behalf of Mr. Juarez-Sanchez, who's seated to my
5    right.
6              THE COURT:  Yes.  Mr. Guillaume, always nice to see
7    you.  Welcome back.  Always a pleasure to have you here.  And
8    you're acting as court-appointed counsel, is that correct?
9              MR. GUILLAUME:  Yes, sir.
10             THE COURT:  All right.  Well, I want to thank you as
11   always for your participation on our Criminal Justice Act panel.
12   You're well known and respected to the Court.  And it's always
13   nice to have you back.
14             Mr. Sanchez, if you'll stand, please, sir.  We're going
15   to be swearing the interpreters here in a moment.  Welcome to
16   you.
17             Mr. Guillaume, I'm pronouncing your name correctly, is
18   that correct?
19             MR. GUILLAUME:  Yes, Your Honor.
20             THE COURT:  Have you been fully vaccinated?
21             MR. GUILLAUME:  Fully vaccinated and boosted, Your
22   Honor.
23             THE COURT:  That's fine.  Then you can pull your mask
24   down while questioning.  But you don't have to, once again.
25             And good morning to you, Mr. Sanchez.
```

**JA81**

5

1          Mr. Guillaume, I'm going to swear the interpreters here
2     in a moment.  To your knowledge, has Mr. Sanchez been vaccinated,
3     do you know?
4          MR. GUILLAUME:  I am unaware of his vaccination status.
5          THE COURT:  All right.  We'll get to that in a moment.
6     With that, before I address Mr. Sanchez, we will swear the court
7     reporter (sic).  And I believe we have -- the interpreter here
8     today is Michael Zogby, is that correct?
9          MR. ZOGBY:  That's correct, Your Honor.
10          THE COURT:  Mr. Zogby.
11          MR. ZOGBY:  Good morning.
12          THE COURT:  Good morning.  Nice to have you.  Welcome
13     back.  Are you the only -- we also have Ms. Victoria Dopazo here,
14     is that correct?
15          MS. DOPAZO:  Good morning, Your Honor.
16          THE COURT:  Good morning, Ms. Dopazo.  Nice to see you.
17     You have a much younger assistant helping you here, Mr. Zogby.
18     It's always nice to see both of you.  If you will both --
19     Victoria Dopazo is well known to this Court as well.  And Michael
20     Zogby as well.  And if you'll raise your right hands and Ms.
21     Maldeis will swear the interpreters.
22          (Interpreters sworn.)
23          MS. DOPAZO:  I do.  For the record, Victoria Dopazo,
24     Federally Certified Spanish Interpreter.  Good morning.
25          MR. ZOGBY:  I do.  Michael Zogby, federally certified,

**JA82**

6

1    Your Honor.

2              THE COURT:  Thank you all very much.  Now, finally,

3    good morning to you, Mr. Schwartz.  Sir, have you been fully

4    vaccinated?

5              MR. ZOGBY:  Your Honor, you said "Mr. Schwartz."

6              THE COURT:  I'm speaking to Mr. Schwartz.  I'm speaking

7    to Mr. Sanchez.  I'm sorry.  Mr. Sanchez.  Excuse me.

8              Good morning to you, Mr. Sanchez.  Have you been fully

9    vaccinated?

10             THE DEFENDANT (Through Interpreter):  No.

11             THE COURT:  All right.  Then, Mr. Sanchez, in the event

12   that you were to testify here today -- you don't have to testify,

13   but I'll be explaining that to you later -- you should keep your

14   mask up at all times.  You understand that, sir?

15             THE DEFENDANT(Through Interpreter):  Yes.

16             THE COURT:  All right.  So with that, I think counsel

17   can be seated.  Everyone can be seated, including Mr. Sanchez.

18   Let me just go over the posture of this case.  And then we'll

19   proceed with the motions hearing here.

20             The defendant has been charged by way of an indictment.

21   He was also charged with his codefendant, Domingo

22   Ramirez-Roblero, who the record will reflect has entered a guilty

23   plea I think on this case.  Correct, Mr. Ake?

24             MR. AKE:  That is correct, Your Honor.

25             THE COURT:  All right.  And Mr. Sanchez is charged by

**JA83**

7

1    way of indictment in three counts.  Count One, he is charged with

2    conspiracy to distribute 400 grams or more of fentanyl and 100

3    grams or more of heroin, in violation of 21 United States Code

4    Section 846.

5            In Count Two, he is charged with possession with intent

6    to distribute 400 grams or more of fentanyl and 100 grams or more

7    of heroin, in violation of 21 United States Code Section 841.

8            And then on Count Three he's charged with illegal

9    reentry back into the United States after prior deportation, in

10   violation of 8 United States Code Section 1326(a).

11           There are a series of motions which have been filed.  I

12   believe they were filed by prior counsel, if I'm not mistaken,

13   Mr. Guillaume, is that correct?

14           MR. GUILLAUME:  Yes, Your Honor.

15           THE COURT:  That's right.  Essentially, the pending

16   motions before the Court are the defendant's motion to suppress

17   tangible and derivative evidence with respect to the traffic stop

18   of August 5, 2020 in Washington County, Maryland, near

19   Hagerstown, Maryland.  That's Paper Number 24.

20           There's also another motion to suppress tangible,

21   digital, and derivative evidence with respect to cell phones that

22   were searched subject to a warrant issued by I believe a state

23   judge.  Is that correct, Mr. Ake?

24           MR. AKE:  It is, Your Honor.

25           THE COURT:  And there's a motion to suppress that

**JA84**

8

1    tangible evidence, which is Paper Number 25.  Then there's Mr.

2    Sanchez's motion to suppress statements, which is Paper Number

3    26.

4         There is a fourth motion for leave to file additional

5    pretrial motions, Paper Number 27.  That is really not before me.

6    No additional motions have been filed.

7         The trial date is coming up in about another I think

8    six weeks, if I'm not mistaken.

9         So I'll just leave that open in the event that there's

10   some other miscellaneous matters.  Agreeable to you, Mr. Ake?

11        MR. AKE:  No objection, Your Honor.

12        THE COURT:  Mr. Guillaume, just don't wait until the

13   week before trial, is the point.

14        MR. GUILLAUME:  Yes, Your Honor.

15        THE COURT:  That's fine.  So with that I would note

16   that the government has filed a consolidated response in

17   opposition to these motions, which is supported by exhibits,

18   which is Paper Number 49.  And there has not been any reply filed

19   by Mr. Sanchez to the government's response.

20        The government will present testimony, as I understand

21   it, and evidence today, as it bears the burden of proof.  And the

22   controlling burden of proof at suppression hearings should impose

23   no greater burden than proof by a preponderance of the evidence,

24   as noted by the United States Supreme Court in United States v.

25   Matlock, 415 US 164, a 1974 opinion.  And also, a more recent

**JA85**

9

1    case, Colorado v. Connelly, the Supreme Court's opinion in 1986.

2            So, that's where we are on this.  And we're ready to

3    proceed I believe with the presentation of witness testimony of

4    State Trooper Craig Miller.  The case agent can come sit behind

5    you if you want, Mr. Ake, from DEA.  I don't care one way or the

6    other.  Or he can stay back where he's seated.

7            I would note that in connection with Trooper Miller

8    testifying, that the government submitted to me certain

9    background information going back quite a few years as to any

10   complaints as to Trooper Miller by any citizens or what have you.

11   My policy has always been, Mr. Guillaume, as I think you know, is

12   is that, with no disrespect intended to the government, I always

13   review that myself.  And the government contends none of it is

14   Giglio, but they've given it to me.

15           I've reviewed over the weekend a citizen complaint over

16   discourtesy many years ago and an incident involving scraping the

17   fender of another State Police car.  There's just nothing of any

18   moment here.  None of it falls within Giglio v. The United

19   States, and none of it is such that it would impeach Mr.,

20   agent -- I'm sorry -- Trooper Miller.

21           I will have this material that was submitted to me be

22   placed under seal.  I've signed an order this morning noting the

23   documents for Giglio review will be placed under seal.  The

24   public docket shall reflect entry of the order but not the nature

25   of the sealed documents.

**JA86**

10

1           Ms. Maldeis, you will have this material here.  My law

2    clerk will make sure we follow up and give you that.  This is a

3    copy of the order here that I signed this morning.

4           So I think with that we are ready to proceed here.  If

5    either side would like to make any general opening statement, you

6    can.  And then we'll proceed with witness testimony being offered

7    by the government.  Then if there's any testimony to be offered

8    by the defense, I'll hear that as well.

9           Mr. Ake, a general opening statement?  You don't need

10   to.  But I've read your memorandum.

11           MR. AKE:  Right.  No.  I just was going to speak to,

12   administratively, I think we'll call Trooper Miller and then

13   we'll go right into argument after Mr. Guillaume has the

14   opportunity to cross examine.

15           THE COURT:  That's fine.  That's fine.  Mr. Guillaume,

16   you want to make any general openings statements, sir?

17           MR. GUILLAUME:  None other than to inform the Court,

18   Your Honor, just for purposes of brevity, I guess with respect to

19   this hearing, the defense is going to submit on ECF 26, which is

20   I think the motion to suppress statements.

21           THE COURT:  Statements, okay.

22           MR. GUILLAUME:  We'll submit on the papers on that

23   particular motion.  And the main thrust of our argument today

24   will be with respect to the search of the cell phones, which is

25   ECF 25, I believe.

**JA87**

11

1          THE COURT:  That's fine.  That's fine.  I'll explain

2     this to you later, Mr. Sanchez, but I want to make sure -- if

3     you'll stand for a moment, please, sir.  Let me just explain

4     something to you.

5          Under Rule 1101(d) of the Federal Rules of Evidence,

6     the formal rules of evidence do not apply in this proceeding,

7     which is under the auspices of Rule 104(a) of the Federal Rules

8     of Evidence with respect to admissibility of evidence.  But Rule

9     104(d) of those rules specifically provides that in the event

10    that a defendant offers testimony with respect to the

11    admissibility of certain evidence, that under Rule 104(d) -- wait

12    a second here -- under Rule 104(d) it specifically provides that

13    by testifying on a preliminary question, a defendant in a

14    criminal case does not become subject to cross examination on

15    other issues in the case.

16         What that means is is that you have a privilege against

17    self-incrimination.  I draw no inference with respect to whether

18    or not you testify here today or not.  But so you understand, to

19    the extent that you wanted to offer limited testimony just on one

20    matter before the Court today, on the admissibility of evidence,

21    you could do so, and you would not be subject to cross

22    examination on any other matters.

23         Anything further you want me to add on that, Mr. Ake,

24    from your point of view?

25         MR. AKE:  No, Your Honor.  Thank you.

1          THE COURT:  Mr. Guillaume, anything further from your

2    point of view?

3          MR. GUILLAUME:  No, Your Honor.  Thank you.

4          THE COURT:  Just want to make sure Mr. Sanchez

5    understands that.  Do you understand that, sir?

6          THE DEFENDANT(Through Interpreter):  Yes.

7          THE COURT:  With that, sir, you may be seated.  Thank

8    you very much.  With that, Mr. Ake, if you will call Maryland

9    State Trooper Craig Miller to the stand.

10          MR. AKE:  I do so call him to the stand.  Thank you,

11    Your Honor.

12          THE COURT:  Good morning, sir.  If you'll come forward

13    here and be sworn.

14          THE WITNESS:  Good morning, Your Honor.

15          THE CLERK:  Raise your right hand.

16      MASTER TROOPER CRAIG MILLER, GOVERNMENT'S WITNESS, SWORN

17          THE WITNESS:  I do.

18          THE CLERK:  You may be seated in the witness box.

19          And speaking directly into the microphone, can you

20    please state your full name and spell your last name for the

21    record?

22          THE WITNESS:  Master Trooper Craig Miller.  I'm sorry.

23    What --

24          THE CLERK:  Spell your last name for the record,

25    please.

DIRECT EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. AKE    13

1              THE WITNESS:  M-I-L-L-E-R.

2              THE CLERK:  Thank you.

3              THE COURT:  Good morning to you, Master Trooper Miller.

4    With that, you indicated you've been fully vaccinated, is that

5    correct?

6              THE WITNESS:  Yes, sir.

7              THE COURT:  All right.  You can pull your mask down

8    while speaking.  You don't have to.  But you're free to do so.

9              THE WITNESS:  Thank you, Your Honor.

10             THE COURT:  With that, Mr. Ake, you may proceed.

11             DIRECT EXAMINATION

12   BY MR. AKE:

13   Q    Thank you, Your Honor.  Master Trooper Miller, how long have

14   you been serving with the Maryland State Police?

15   A    I will have 28 years with the Maryland State Police in July

16   of this year.

17   Q    And where and to what units within the Maryland State Police

18   are you currently assigned?

19   A    I am assigned to the Maryland State Police Proactive

20   Criminal Enforcement Unit and I work mainly west of the Baltimore

21   area, in Maryland.

22   Q    Okay.  And what does -- what are the duties of a state

23   trooper that is assigned to the PACE team?

24   A    Our main duties are traffic stops on the interstate.

25   Q    Okay.  And are those intended to only cite traffic citations

**JA90**

DIRECT EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. AKE    14

1    or is there other intentions that the PACE team has when it makes

2    traffic stops?

3    A    There are other intentions.  And those would be to find any

4    type of criminal enterprises or activity using motor vehicles on

5    the interstate.

6    Q    And have you received special training that makes you more

7    sensitive to indicia of different types of criminal activity in

8    order to serve on a PACE team?

9    A    Yes, I have.

10   Q    And could you give some examples of that type of training?

11   A    Some examples would be the initial Maryland State Police

12   Proactive Criminal Enforcement training, which was approximately

13   two months of training involving what we do on the interstates:

14   Detecting criminal activity, dealing with vehicles with hidden

15   compartments, understanding drug trafficking trends.  That's just

16   through the Maryland State Police.

17           I've also had approximately 1000 hours of other

18   training through other companies that train people throughout the

19   country to do what our unit does.

20   Q    Now, but at the initiation of every stop, though, you're

21   still looking for an identifiable traffic offense, is that

22   correct?

23   A    That's correct.

24   Q    Okay.  Now, in 2020, were you assigned to the same unit?

25   A    I was.

DIRECT EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. AKE     15

1   Q    Now, could you describe your unit's organization, like the
2   number of officers and other supporting actors that you have with
3   your particular unit in western Maryland?
4   A    In the western part of the state where I work we have a
5   three-man team.  We have two troopers and a K-9 supervisor that
6   are working together in every area we are located.
7   Q    Now, you mentioned the K-9.  Do you only have one dog or are
8   there multiple dogs?
9   A    Our unit has four K-9s assigned to it.
10  Q    Now, are all the K-9s on your team certified as
11  drug-sniffing dogs?
12  A    I can't speak to all their certification but the K-9 that I
13  work with is a certified drug-detection K-9.
14  Q    And is that the -- the dog you're referring to, is that the
15  dog that assisted in the traffic stop that you made the morning
16  of August 5th, 2020?
17  A    Correct.
18  Q    Now, are you a certified drug dog handler?
19  A    No, I'm not.
20  Q    Who on your team is certified?
21  A    Corporal Yates.
22  Q    And was Corporal Yates present at the stop on August 5th,
23  2020?
24  A    He was.
25  Q    Now, do you recall what you were doing on that particular

DIRECT EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. AKE    16

1    day?

2    A    I was monitoring northbound traffic.

3    Q    And where were you located physically?

4        THE COURT:  For the record, on the specific day, I'm

5    not sure if we've mentioned this, is August 5, 2020.  Correct?

6    That's the specific day you're referencing?

7    BY MR. AKE:

8    Q    Yes, Your Honor.

9    A    Yes.  On August 5th of 2020 I was monitoring northbound

10   traffic at approximately the five-mile marker on northbound I-81

11   in Washington County in Hagerstown, Maryland.

12   Q    And do you recall something drew your attention that morning

13   around nine?

14   A    That's correct.

15   Q    And what specifically drew your attention that caused you to

16   initiate a traffic stop that morning?

17   A    It was a white four-door passenger vehicle following the

18   vehicle ahead of it at an extremely close distance.

19   Q    Now, is this an infraction that you frequently cite or pull

20   people over and cite them for violating?

21   A    Yes.

22   Q    Following too close is the offense?

23   A    Correct.

24   Q    Now, just one more question before I show you the first

25   exhibit.  Do you recognize the man sitting at defendant's table

DIRECT EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. AKE          17

1    in the courtroom?

2    A    I do.

3    Q    And how do you recognize him?

4    A    He was the passenger in the vehicle that was stopped.

5    Q    Okay.  I'm going to show you --

6         THE COURT:  The record will reflect the witness has

7    identified the defendant, Mr. Sanchez.

8    BY MR. AKE:

9    Q    Thank you, Your Honor.  So, Trooper Miller, I am going to

10   attempt here to show you -- there we go.  So on the screen ahead

11   of you is a still image from what's been previously submitted to

12   the Court in this case as Government's Exhibit 1 Alpha.  Do you

13   recognize this image?

14   A    I do.

15   Q    And what are we looking at there?

16   A    That's the interstate from the location in which I was

17   monitoring.

18   Q    And is this actually a still image that was recorded from

19   the dash camera in your assigned vehicle?

20   A    Yes.

21   Q    Now, I want to just draw your attention to the upper

22   left-hand corner of the screen.  There's a date and a time

23   showing there.  To your knowledge, is that date and time the

24   accurate timestamp appropriate for this particular picture?

25   A    Yes.

DIRECT EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. AKE      18

1   Q    So it shows 8/5/2020.  That was the date, correct?

2   A    Yes.

3   Q    And 9:06:55, would be 9:06 and 55 seconds.  And that would

4   be a.m., correct?

5   A    Correct.

6   Q    These use 24-hour times, right?

7   A    I believe so.

8   Q    Okay.  So what are we looking at in this still image?

9   A    It's, you see the hood of my patrol vehicle and traffic on

10  the right side of the roadway.

11  Q    Okay.  In this image, can we see the Honda Accord that drew

12  your attention?

13  A    I believe it's the second vehicle, where your cursor is

14  right there.

15  Q    Okay.  All right.  I'm going to go ahead and play this and

16  stop it.  And I will refer to the times not based on the sliding

17  bar, but I'll refer to the times that are time-stamped on the

18  video when I stop it.  So I'm starting at 9:06:55.  Restart this.

19           (Tape playing.)

20           So, Trooper Miller, I'm stopping this vehicle (sic) at

21  9:07:13.  We heard audio kick in about midway through that

22  segment.  Is there a reason there wasn't audio at the beginning?

23  A    The way that particular system was set up, and that was a

24  Panasonic Arbitrator In-Car Video System, I believe it had a

25  30-second buffer.  So prior to me activating my lights, the

DIRECT EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. AKE          19

1    camera will retrieve 30 seconds prior to the activation of the

2    emergency equipment.

3    Q    And so the audio pretty much kicked on when you turned on

4    your emergency lights, is that accurate, or somewhere around

5    there?  Is that what triggers the camera?

6    A    That's correct.

7    Q    So activation of your emergency equipment.  Okay.  Now,

8    while we're showing that, approximately how fast was traffic

9    moving at that time?

10   A    Between 60 and 70 miles an hour.

11   Q    So was the Honda that you directed to pull over, was it

12   speeding excessively?

13   A    Not excessively, but it wasn't traveling 60 miles an hour.

14   Q    Now, about how close had you observed that Honda in terms of

15   how close was it to the vehicle that was in front of it that you

16   said it was following too close?

17   A    As it, as the vehicle approached my location, I could tell

18   that it was following the SUV in front of it at approximately one

19   to two car lengths.

20   Q    And what would you like to see at speeds of 60 to 70 miles

21   an hour for a safe distance?

22   A    A safe distance would be one car length for every 10 miles

23   an hour.  The area in which this traffic stop was made was a

24   60-mile-an-hour zone.  So a minimum of six car lengths for a safe

25   reaction time.

DIRECT EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. AKE        20

1    Q    And just in terms of placing this location-wise.  The

2    overpass that is visible now in this video, is that where Route

3    144 crosses Interstate 81?

4    A    That's correct.

5    Q    So this is right on the western edge of Hagerstown proper,

6    is that right?

7    A    Correct.

8    Q    Okay.  I'm going to resume play of the video at 9:07:13.

9    Okay, I'm stopping the video at 9:07:31.  Now, in that recording

10   you just provide some information to your dispatcher, correct?

11   A    No.

12   Q    Who did you provide that information to?

13   A    That is just to be recorded on the, on the in-car camera

14   system in case something were to happen to me during the traffic

15   stop.

16   Q    Okay.  So at this point you haven't made any calls back to

17   Dispatch?

18   A    No, I hadn't.

19   Q    Okay.  I'm going to resume play, 9:07:31.  Trooper Miller,

20   I'm stopping that at 9:09:24.  So, just for the record, could you

21   describe what happens since we started the video segment here?

22   So you left your car, you went up to approach the vehicle, right?

23   And when you approached the vehicle, was the window down?

24   A    No.

25   Q    Okay.  Is that usual that people keep their windows up when

DIRECT EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. AKE   21

1    a trooper approaches the car?

2            MR. GUILLAUME:  Objection.

3    A    Usually they're rolling it down as --

4            MR. GUILLAUME:  Objection.

5            THE COURT:  Overruled.  Overruled.  You may answer the

6    question.

7            THE WITNESS:  Usually they're rolling the window down

8    as we approach the vehicle.

9    BY MR. AKE:

10   Q    And after the window was rolled down, what, what did you ask

11   for at that point?

12   A    I asked for his -- well, I first identified myself and then

13   I asked for his license and registration.

14   Q    And what, if anything, was provided?

15   A    He did not have a license.  He told me he didn't have it

16   with him or he didn't have it.  I don't recall the exact wording.

17   And they were in the process of finding the registration in the

18   glove compartment.

19   Q    Now, did -- were they able to say who the car was actually

20   registered to?

21   A    He was not able to.  He just told me it was a friend's.

22   Q    And when you say "he", you're referring to the driver, not

23   the defendant in the courtroom?

24   A    Correct.

25   Q    Is that correct?

**JA98**

DIRECT EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. AKE    22

1    A    Not the passenger.

2    Q    Okay.  So did the passenger say anything at this point?

3    A    No.

4    Q    Now, there was another law enforcement officer that appeared

5    in the video.  Who was that?

6    A    I'm unaware of his name.  I know that he is a Washington

7    County deputy.  And he was right behind me as I was stopping the

8    vehicle.  And out of courtesy he stopped along with me.

9    Q    So he wasn't there as part of your team or by request?

10   A    No, sir.

11   Q    Okay.  Just on his own he stopped and saw if he could try to

12   help?

13   A    That's correct.

14   Q    Okay.  Now, at this point, is there a problem if the driver

15   does not have a driver's license or other identification?  Is

16   that a problem from your perspective?

17   A    It makes our identifying the operator of the vehicle

18   difficult.

19   Q    Is that in itself a citable offense of not carrying a

20   driver's license when you're operating a motor vehicle on public

21   roads?

22   A    It is.

23   Q    Now, if, even had the incident ended here where neither the

24   driver or the passenger had identification that matched the

25   registration, what would you have done given that you don't know

DIRECT EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. AKE     23

1  who's operating the car vis-à-vis who the car is registered to?

2  A    This would be a case where we would impound the vehicle to

3  protect the owner's property and try to determine who the owner

4  was.

5  Q    All right.  So I'm going to continue playing the video.

6  We're at 9:09:24.  Stopping at 9:10:24.  What did he just tell

7  you on the video?  And I'm referring to the driver.

8  A    He said he didn't have his ID and that he had lost his

9  passport.

10  Q    All right.  I'm going to go ahead and continue at 9:10:24.

11       Trooper Miller, stopping the video at 9:14:43.  There

12  was just a series of questions that you had, the recording showed

13  that you had posed to the driver.  In that last question you had

14  asked him the name of the passenger, is that correct?

15  A    Correct.

16  Q    And what was his response?

17  A    There was some hesitation.  He snapped his fingers and he's

18  trying to think, he's trying to recall his name.  And he finally

19  tells me Miguel, and he doesn't know his last name.

20  Q    And if you could put yourself back in this position back in

21  2020.  And I realize it's been almost two years now.  But what

22  were you thinking at that point in terms of evaluating the

23  situation that was in front of you?

24  A    From the entirety of the traffic stop until this point, I

25  have determined that there's criminal activity afoot.

**JA100**

DIRECT EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. AKE    24

1   Q    Okay.  And what led you to that conclusion?

2   A    If I kind of work backwards, I guess it would be he didn't

3   know his friend's full name.  He has been driving with this

4   individual since Indiana and doesn't know his full name.  The

5   ownership of the car is very vague as to how he acquired that.

6   He was giving me a lot of information that I didn't need about

7   who owned the car, someone being gay, another vehicle thrown in,

8   how long he was going to have this vehicle, what he was going to

9   do with the vehicle.

10          Prior to that I walked up to the vehicle and the window

11  was not down.  And they rolled that down just a short distance,

12  and then I had to ask them to roll it down again.  And that is a

13  typical stalling technique, just so they can possibly develop a

14  story or just delay the traffic stop in some way.

15  Q    Were there any behavioral cues that you picked up or tics --

16  A    Yes.

17  Q    -- that caused you to be suspicious?

18  A    Yes.  I noticed that he was having difficulty standing

19  still.  I noticed that his hands were trembling and shaking.  And

20  I noticed that, and it can be seen on the videotape, his forehead

21  becomes shinier, and that's just perspiration developing.

22  Q    Now, at this point did you make any decision about how you

23  were going to continue with the investigation?

24  A    Yes.

25  Q    And what did you decide at this point?

**JA101**

DIRECT EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. AKE      25

1    A    That I was going to request our K-9 handler to respond to my

2    location and conduct a K-9 scan of the vehicle.

3    Q    Okay.  And I'm resuming play of the video at 9:14:43.

4    Trooper Miller, this video is going to end at approximately

5    9:17 -- 9:16:52, and we're going to continue with Exhibit 1-B,

6    which has previously been submitted as a video exhibit in this

7    case.  That video is at 9:16:55.

8         Trooper Miller, I'm stopping the video at 9:17:49.  It

9    sounded like some of that was radio call -- some of that last

10   with somebody in person that you were discussing with?

11   A    Yes, it was in person.

12   Q    Okay.  And who was that conversation with about where you

13   wanted to do the search?

14   A    That was Corporal Yates.  And he is at my passenger window

15   and we're talking through the open window.

16   Q    Okay.  And who else do we see now in the camera picture

17   that's wearing a ball cap?

18   A    That is Trooper Shrout.  He's assigned to the PACE team,

19   also.

20   Q    All right.  So right now we have all three members of your

21   Western Maryland PACE team on site, is that correct?

22   A    Yes.

23   Q    Okay.  All right.  I'm going to continue play -- but the

24   trooper that was at your window, is he the K-9 handler?

25   A    That's correct.

DIRECT EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. AKE      26

1  Q    So how was he able to respond so fast?

2  A    We're all positioned in the same area on the interstate.

3  Q    So about how far away were Trooper Yates and Trooper Shrout

4  when you called?

5  A    Roughly two miles.

6  Q    All right.  I'm going to go ahead and continue playing

7  Exhibit 1 Bravo at 9:17:49.

8         Okay.  Stopping the video at 9:18:27.  We see a man

9  coming out of the passenger side of the Honda Accord and being

10 frisked.  Who is that person?

11 A    That is the passenger.

12 Q    Okay.  And that is the defendant here in court today?

13 A    That's correct.

14 Q    Now, what was the reason for bringing him out of the vehicle

15 at this time?

16 A    Prior to a K-9 scan of the vehicle, Maryland State Police

17 policy is that all occupants are removed from the vehicle.

18 Q    Okay.  All right.  I'm going to go ahead and continue

19 playing Exhibit 1-B at 9:18:27.

20        I'm stopping the video at 9:19:53.  I just want to ask

21 you about a couple things.  So when the defendant came back to

22 the vehicle, did we see him carrying a cell phone on that video?

23 A    Yes.

24 Q    Okay.  And as I stop it, it's paused right now at 9:19:53,

25 does he appear to be using a cell phone at that time?

**JA103**

DIRECT EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. AKE    27

1    A    He does.

2    Q    Now, in the center right of the screen, do we see the K-9

3    handler and the K-9 approaching the vehicle?

4    A    Yes.

5    Q    All right.  I'm going to go ahead and continue to play

6    9:19:53.

7            Trooper Miller, I'm just stopping the video at 9:21:54.

8    So, the video showed the dog handler and the K-9 moving away.

9    What are you doing at this point?

10   A    I'm working on the citation or the paperwork in my vehicle

11   regarding the traffic stop.

12   Q    Okay.  And at this point are you waiting for the dog handler

13   to tell you whether the scan yielded anything or whether the dog

14   responded?

15   A    I'm waiting for that and for the dispatcher to return the

16   other information I called in.

17   Q    Okay.  Resuming play at 9:21:54.

18           Just one other note.  I'm at 9:22:01.  Is the defendant

19   now placing a phone call or attempting to place a phone call?

20   A    That's what it appears.

21   Q    Okay.  Continuing to play 9:22:01.

22           Okay.  So stopping at 9:22:27.  You just asked a

23   question.  What was that?

24   A    I was verifying that it was a positive K-9 alert.

25   Q    Now, you don't work directly with the K-9 in the sense that

**JA104**

DIRECT EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. AKE        28

1    you're not trained to look for that particular dog's nuances and

2    how they respond to different signals, right?

3    A    Correct.

4    Q    So you're relying on the dog handler who does work with that

5    K-9 to provide you that information?

6    A    Correct.

7    Q    And he told you that the dog had alerted?

8    A    That's correct.

9    Q    And to the extent that you know, does that tell you what

10   they alerted for other than just generic controlled substances?

11   A    All I know that it's a positive alert for narcotics.

12   Q    Okay.  So at this point what did you decide to do?

13   A    A search of the vehicle.

14   Q    So, Your Honor, at this point I'm going to stop playing the

15   video and I'm just going to transition to some still pictures

16   from the search.

17        THE COURT:  That's fine.

18   Q    Going to switch off.  I'm going to go to -- I'm going to

19   show you Exhibit 2-A.  But while I'm going to show you that, how

20   do you search vehicles?  Do you have a normal pattern?

21   A    Yes.

22   Q    Okay.  And does that have to change based on the

23   configuration of the car, vis-a-vis the highway and so forth?

24   A    It's usually indicative of the situation where the vehicle's

25   parked.

**JA105**

DIRECT EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. AKE      29

1    Q    So, in this situation where you're on the right shoulder of

2    a busy highway, how do you normally approach a vehicle search?

3    A    We'll approach everything from the passenger side first.

4    Q    And did anyone assist you with the vehicle search?

5    A    That's correct.

6    Q    Who was that?

7    A    That was Trooper Shrout.

8    Q    Okay.  So when you and Trooper Shrout started searching the

9    car, what was the first thing that came to your attention that

10   was remarkable?

11   A    An item I found behind the glove compartment.

12   Q    Okay.  And I'm going to show you exhibit, what's been marked

13   as Government's Exhibit 2-A.  And do you recognize this picture?

14   A    Yes.

15   Q    All right.  And what are we looking at there?

16   A    What you see is a fast food bag.  And that is behind the

17   glove compartment.

18   Q    Okay.  So we are looking at a glove compartment where the

19   actual container that we would call the glove box has been

20   removed, right?

21   A    Correct.

22   Q    Okay.  And so the gap on the side, is that where normally

23   the, that container would, would hook in and have a stop,

24   essentially, to be able to, or to keep it from falling out?

25   A    Yes.

DIRECT EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. AKE          30

1   Q   So you were able to gain access to this, to take this

2   picture by just removing, non-destructively, but removing the

3   glove box from its compartment, is that right?

4   A   That's correct.

5   Q   So we're looking at it, the picture on this would be towards

6   the outer, that McDonald's bag would be jammed in between the

7   dashboard and the outer skin of the vehicle over the front tire?

8   Is that approximately right?

9   A   Yes, in that general area.

10  Q   And what did that McDonald's bag contain after you pulled it

11  out?

12  A   The McDonald's bag contained a, a kilo-sized item wrapped in

13  black, I believe it was some type of electrical tape or duct

14  tape.

15  Q   I'm going to show you what's been marked but not previously

16  submitted to the Court, as Exhibit 2-D. Do you recognize this

17  picture?

18  A   Yes, I do.

19  Q   Okay.  When was that picture taken?

20  A   That was taken the day of the traffic stop.

21  Q   Okay.  And these are the same members of your team that

22  participated in the stop and the search?

23  A   Correct.

24  Q   Is that correct?

25  A   Yes, that's correct.

1    Q    Okay.  And I'm going to zoom in to the center.  So above the

2    currency there's three objects.  And what are those objects?

3    A    They're kilo packages.

4    Q    And so the one that was in the McDonald's bag, was that one

5    of the two that's black?

6    A    Yes.

7    Q    Wrapped in black.  Okay.  So, so around the time you start

8    recovering the controlled substance, have you gotten any feedback

9    from the dispatcher regarding the driver's license and warrant

10   check?

11   A    At this point I don't recall receiving anything back yet

12   from the dispatcher.

13   Q    So continuing -- I'm going to show you what's been marked as

14   Exhibit 2 Bravo.  Do you recognize this exhibit?

15   A    Yes, I recognize that area.

16   Q    Okay.  So what are we looking at in this exhibit?

17   A    That is the back of the center console if you're in the rear

18   passenger area looking forward.  And what is missing from this is

19   a black trim cover that goes over all of that metal and the black

20   plastic in the sticker with the S-A on it.

21   Q    Okay.  So this is, the black plastic would normally cover,

22   it would be trim that would cover what we're seeing right now,

23   correct?

24   A    Yes.  Yes.

25   Q    And what's in the white plastic bag that's under the

1   console?

2   A    That is another kilo package identical to the one that was

3   found in the, the Honda glove compartment.

4   Q    Okay.  Now showing you Exhibit 2 Charlie, or I will show it

5   in a moment.  Do you recognize this picture?

6   A    Yes.

7   Q    And what are we looking at there?

8   A    This is the passenger seat with the seat cover and foam

9   pulled up off of the seat frame, exposing another kilo package.

10  Q    Now, I'm going to go back and show you Exhibit 2-D.  That

11  package that was under the seat, is that that red one?

12  A    That's correct.  That's it.

13  Q    And again, this is the seat that the defendant was sitting

14  on, is that correct?

15  A    That's correct.

16  Q    Now, did you find any relevant property in the back seat

17  area or in the trunk, in addition to the controlled substances

18  that we've pictured here?

19  A    Yes.

20  Q    And what were those?

21  A    A large amount of US currency was found in the back seat

22  area.

23  Q    Okay.  And approximately how much?

24  A    I believe it was $46,000.

25  Q    And is that the currency that's displayed in Exhibit 2-D?

DIRECT EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. AKE    33

1    A    That's correct.

2    Q    And where was the cash actually in the vehicle?  Was it

3    sitting out, open?

4    A    No.  The cash was in plastic bags, shopping bags, and it was

5    hidden within the seat trim of the rear seats.  It would be, if

6    you're sitting behind the driver, it would be to your left

7    shoulder, the trim that's along the side of the vehicle.  And if

8    you're sitting behind the passenger, it would be the trim to your

9    right shoulder.  It's against the side of the vehicle.

10   Q    So these are the pieces of plastic that are made to look

11   like part of the cushion area that are accessible when you put

12   the seats down?

13   A    Correct.

14   Q    Okay.  So was there a backpack that you discovered as well?

15   A    That's correct.

16   Q    Was there anything of significance that you located in that

17   backpack?

18   A    Yes.  I found a statue of a figure which is referred to as

19   the Santa Muerte.  It --

20            MR. GUILLAUME:  Objection.

21            THE COURT:  Basis of objection?

22            MR. GUILLAUME:  The witness's basis of knowledge, Your

23   Honor.

24            THE COURT:  I'm sorry?

25            MR. GUILLAUME:  The witness's basis of knowledge for

DIRECT EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. AKE     34

1   the name of the statue.

2          THE COURT:  Well, objection sustained.  Lay a

3   foundation for it, Mr. Ake.

4   BY MR. AKE:

5   Q    All right.  What did the statue looked like?

6   A    The statue looks like what is known as, the commonly

7   referred to as the grim reaper.

8   Q    And does the -- the grim reaper would be a skeletal figure?

9   A    Correct.

10  Q    Okay.  With a black hood over its head?

11  A    Yes.

12  Q    And black robes?

13  A    Correct.

14  Q    And is there anything -- what was it holding?

15  A    It was holding some US currency rolled up into a, almost

16  like a tube.

17  Q    Okay.  But the actual statue itself didn't have the

18  currency, right?  That was in the arm?

19  A    Correct.

20  Q    And the arms also hold a piece of agricultural equipment, is

21  that correct?

22  A    Correct.

23  Q    And what is that agricultural equipment that the statue

24  holds?

25  A    A scythe.

DIRECT EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. AKE      35

1    Q    A scythe?  Like for old-fashioned reaping of crops?

2    A    Correct.

3    Q    And, hence, the grim reaper is one way people refer to these

4    types of statues?

5    A    Correct.

6    Q    And have you seen those before during drug arrests?

7    A    I've seen them through training and had many experts advise

8    the significance of that type of statue.  And we have seen that

9    image in drug traffickers before in the past.

10   Q    All right.  Just a few more questions.  After this, did you

11   arrest both the defendant and the driver?

12   A    That's correct.

13   Q    And did you take their demographic and identity information

14   at the time of the arrest?

15   A    Yes.

16   Q    And booking?

17   A    Yes.

18   Q    Okay.  And did the defendant provide a name, date of birth,

19   etc.?

20   A    Yes.

21   Q    And what name did he provide?

22   A    Court's indulgence, Your Honor.

23   Q    Just to be clear, you're looking through your arrest notes?

24   A    That's correct.

25   Q    If defense counsel would permit me to be leading.

**JA112**

DIRECT EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. AKE    36

1            MR. GUILLAUME:  Yes.  I don't have any objection to the

2    leading.

3    Q    Was the name Juan Flores?

4    A    That's correct.

5    Q    Okay.  So that's how you knew the defendant here in the

6    courtroom?

7    A    That's correct.

8    Q    Okay.  Before this case was initiated, had you ever learned

9    the name under which he is charged?

10   A    Yes.

11   Q    Is Alexander Juarez-Sanchez?

12   A    Correct.

13   Q    Now, after making the arrest, did you seize several phones

14   from the defendant and his driver?

15   A    We seized three phones.

16   Q    And did you request arrest warrants to search those phones?

17   A    Yes.

18   Q    And were you the sole affiant on those search warrants?

19   A    Yes, I was.

20   Q    Okay.  So just for, showing you what's previously been

21   submitted to the Court as Exhibit 3-A.  Just draw your attention.

22   This is your affidavit, is that correct?

23   A    Correct.

24   Q    And that's to search one of the Samsung phones.  And then

25   Exhibit 3-B, just noting you're also the affiant here, and this

**JA113**

DIRECT EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. AKE      37

1    is the other Samsung Galaxy phone?

2    A    Correct.

3    Q    Okay.  Court's indulgence.  One thing that wasn't shown, we

4    stopped in the video.  But I believe one of your fellow troopers

5    saw some irregularities with bolts in the car?

6    A    That's correct.

7    Q    Okay.  And I just wanted to ask what the significance of

8    having some disturbed seat bolts would be?

9         MR. GUILLAUME:  Objection.  I'm not clear, Your Honor,

10   if this witness --

11        THE COURT:  Objection sustained.  If you'll lay the

12   foundation.

13   BY MR. AKE:

14   Q    So did your fellow trooper provide a shout-out during the

15   search of something that he noticed early in the search?

16   A    Yes.

17   Q    And what, what was the substance of the, of what he said, if

18   not, if you don't remember exactly?

19   A    I believe he told me that he had noticed the seat bolts were

20   disturbed or had been off, had been removed.

21   Q    And what would be the significance of that statement to you

22   during the process of a search?

23   A    That could indicate to me that there could be a hidden

24   compartment within the floor under that seat.

25   Q    Now, just two other questions about the search.  Where was

**JA114**

CROSS EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. GUILLAUME    38

1  the backpack or the knapsack located?

2  A    I believe the backpack was in the trunk of the vehicle.

3  Q    Okay.  And during the video the driver had provided a name

4  to you, I believe it was Gabino?

5  A    Correct.

6  Q    Javier, or something like that?  Does that sound right?

7  A    That's correct.

8  Q    Now, did he later provide, that same day did he provide a

9  different name?

10  A    He did.

11  Q    And was that, was that the name Domingo Ramirez-Roblero?

12  Did he provide that later that day?

13  A    That's correct.

14  Q    All right.  Your Honor, I'll go ahead and pass the witness.

15  Thank you.

16        THE COURT:  All right.  Thank you very much, Mr. Ake.

17  With that, Mr. Guillaume, be glad to hear from you.

18        CROSS EXAMINATION

19  BY MR. GUILLAUME:

20  Q    Thank you, Your Honor.  Good morning, sir.

21  A    Good morning.

22  Q    I do have a few questions for you.

23  A    Yes, sir.

24  Q    Starting off with your duties that day.  You did not receive

25  any specified tip about drugs being transported that day, is that

CROSS EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. GUILLAUME    39

1    correct?

2    A    Are you referring to your client, sir?

3    Q    Just, you didn't.  No.  Just generally speaking, you didn't

4    receive any notifications about drugs being transported?  I'll be

5    more specific.  Around that particular time?

6    A    No, sir.

7    Q    So other than following too closely, the vehicle that you

8    stopped, you didn't notice anything that would be indicative of,

9    based on your training, of any kind of drug crime at that

10   juncture, correct?

11   A    That's correct.

12   Q    How long -- the video I know we saw was I believe

13   Government's 1-A.  We saw the stop itself.  But how long would

14   you estimate that you followed the vehicle from your car, how

15   long a period of time?

16   A    That particular location is only maybe two miles from where

17   I initially saw him.

18   Q    Did you follow it for around two miles or less?

19   A    I believe I caught up to him within, say, three-quarters of

20   a mile.

21   Q    And your car was stationery when you made your initial

22   observation, is that right?

23   A    That's correct.

24   Q    Okay.  Now, you testified on direct that you, that the area

25   is about 60 mile an hour or, actually, the area is, has a

CROSS EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. GUILLAUME    40

1    60-mile-an-hour speed limit, is that correct?

2    A    Yes, sir.

3    Q    And the cars typically at that time were traveling between

4    60 and 70 miles per hour?

5    A    That's correct.

6    Q    Were you able to clock the speed of the car or did you just,

7    using your best judgment to clock the speed of the car?  The car

8    I'm referring to, the car which you stopped.

9    A    That was not a speed stop so I was not operating radar at

10   the time.  But I do recall at a later date seeing my video

11   recording, which showed a speed of I believe 63 or 65 miles an

12   hour in that zone.

13   Q    And that would be of the car you were following, not your

14   car, is that right?

15   A    That would be of my vehicle.

16   Q    Of your vehicle.  Okay.  Thank you.  Thank you for

17   clarifying that.

18        When you first walked to the car, you didn't smell

19   anything that would be indicative of a controlled dangerous

20   substance, is that right?

21   A    No, I did not.

22   Q    There were no, from which you could see from your initial

23   observation, no controlled dangerous substance or drugs in plain

24   view?

25   A    That's correct.

**JA117**

CROSS EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. GUILLAUME    41

1    Q    No one in the car -- I know you couldn't hear everything,

2    but no one in the car said they were using drugs or drugs were

3    present in that initial stop, is that right?

4    A    That's correct.

5    Q    Neither the driver or the passenger looked to be under the

6    influence of drugs or alcohol, is that correct?

7    A    They did not.

8    Q    There was no drug paraphernalia that you noticed in the car,

9    is that right?  Like needles, hypodermic needles, or pill casings

10   or anything like that that would indicate drug usage?

11   A    None.

12   Q    Okay.  No furtive movements by driver or the passenger that

13   you noticed?

14   A    Not that I noticed.

15   Q    Okay.  And ultimately, just skipping ahead a little bit to

16   when both men were out of the car, no weapons were found on

17   either men, is that correct?  When I say "weapons", let me be

18   specific, firearms.

19   A    Okay.  There were no firearms, either.

20   Q    And speaking specifically about the passenger, Mr. Sanchez,

21   he did not try to run, that you could see at any point, from any

22   encounter?  I know we didn't watch the whole thing.  But he

23   didn't try to run from the encounter?

24   A    No, he did not.

25   Q    You've mentioned that Mr. -- actually, I'm sorry.  I already

**JA118**

CROSS EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. GUILLAUME    42

1   asked that question.

2           Other than the cell phone that was seen in the video,

3   Government's Exhibit 2-A, I believe, that my client was using, he

4   wasn't in possession of any other items, is that right, other

5   than maybe a wallet?

6   A    I don't recall the exact items he was in possession.

7   Q    Okay.  And when he was asked to get out of the car, I think

8   you were not the one that asked him to get out of the car, is

9   that right?

10  A    That's correct.

11  Q    Are you aware or did you give any specific instruction for

12  him, my client, not to use his cell phone?

13  A    When he was being --

14  Q    When he initially was, when he was, got out of the car and

15  came to the front of the, of your parked car, you did not give

16  him any instruction telling him not to use his cell phone, is

17  that right?

18  A    Not until I exited my vehicle.

19  Q    And when you exited your vehicle -- so I have the timing

20  right -- is that when you learned the K-9 had alerted?  Or had

21  you not been told that yet?  I'm sorry.  I don't remember from --

22  we could probably pull it up if we needed to.

23  A    When I exited my vehicle, I did that to talk to the K-9

24  handler who was coming up on the passenger side of my vehicle.

25  Q    And you were told pretty quickly that he had alerted, that

CROSS EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. GUILLAUME    43

1    the K-9 had alerted, correct?

2    A    Correct.

3    Q    And at that time you gave a directive to my client to not

4    use his phone any longer?

5    A    I believe I asked him before I was notified of that.

6    Q    Okay.

7    A    I can't remember.

8    Q    But at some point you asked him to not use the phone, right?

9    A    Yes, sir.

10   Q    And he complied, right?

11   A    He did.

12   Q    Okay.  And when he was using the phone, you didn't hear his

13   conversation, correct?

14   A    No, I did not.

15   Q    Okay.  I just have a few more questions for you.

16          Going back to, or going forward -- excuse me -- to the

17   actual search of the car, in Government's Exhibit 2-A, the glove

18   compartment -- I'm sorry.  I don't have it.  Maybe potentially if

19   I could -- Court's brief indulgence, Your Honor.

20          THE COURT:  Take your time.

21   Q    And I see we're already on the ELMO.  Is that -- perfect.

22   Trooper Miller, can you see this on your screen?

23   A    Yes, sir.

24   Q    For the record, this is Government's Exhibit 2-A as in

25   alpha.  This, the point of view of this picture is -- well,

1    actually, before I get to that, I just want to confirm that when

2    you started your search of the car, the glove compartment box was

3    closed, right?

4    A    That's correct.

5    Q    And there were no other markings or anything on the door

6    that you noticed, correct, on the door of the glove compartment

7    box?

8    A    Not that I recall.

9    Q    And you were able to open the glove compartment box with

10   your hand, like you would -- you didn't need a key to open it,

11   right?

12   A    I opened it without a key.

13   Q    Yes, without a key.  And this, going back to Government's

14   2-A.  Is this the point, is this what you observed upon opening

15   the box?

16   A    That's correct.

17   Q    Okay.  Other than this picture, because this is a very

18   close-up picture, just want to be clear, there's no other

19   paperwork or anything inside the glove compartment?

20   A    There were items in the glove compartment.  I do not recall

21   what items were in there.  The glove compartment has been removed

22   at this point.

23   Q    Was it removed by you or was it removed when you opened the

24   door?  Was it already removed?

25   A    I removed the door.

**JA121**

CROSS EXAMINATION OF MASTER TROOPER CRAIG MILLER BY MR. GUILLAUME    45

1    Q    Okay.  And when you removed the door -- when you opened the

2    door, is that the same as removing the door or --

3    A    I opened the door, and when I saw this item, I removed it.

4    Q    Okay.  That was my question.  Thank you for clarifying.

5    A    Yes, sir.

6    Q    Just a couple more questions for you, sir.  I want to refer

7    you to what I'm going to put on the ELMO as exhibit, Government's

8    Exhibit 2-B as in bravo.  And this, you've been asked about this

9    on direct testimony.  This picture is the back of the driver's

10   seat or the passenger seat?

11   A    The picture is the back of the center console.  And what you

12   see in the lower right corner of the photograph is the left-hand

13   side of the passenger seat.

14   Q    Okay.  So thank you for clarifying that.  I'm going to

15   direct your attention to where we see the white packaging at the

16   bottom of the picture.

17   A    Yes.

18   Q    Do you see that?

19   A    Yes, sir.

20   Q    You testified that normally there would be some sort of

21   covering there.  Well, I think that actually the government

22   counsel stated that.  And I was not clear if that was removed by

23   someone, yourself or another officer, or if that's, this picture,

24   2-B, is how it appeared when you saw it for the first time?

25   Could you clarify that, please?

1 A    It did not appear like this the first time I saw it.  The

2 seat or the back of the center console was covered by a material

3 or a plastic that's similar to what you see there on that seat

4 plastic at that bottom corner.

5 Q    Okay.  Thank you.  That answers my question.  Court's brief

6 indulgence, Your Honor.

7        THE COURT:  Take your time.

8 Q    I have the same question for this exhibit, Government's 2-C,

9 C as in Charlie.  The package that looks like it's in the seat, I

10 see there's a hand that's pulling up on the seat cushion, is that

11 correct?

12 A    That's correct.

13 Q    Okay.  And I'm assuming, just want to be clear, that in

14 order to view this package, one had to lift up, as someone is

15 doing in this picture, the fabric, is that correct?

16 A    That's correct.

17 Q    Okay.  And sir, I think, I think that's it.  I'm just going

18 to check and make sure.  That is all the questions that I have.

19        THE COURT:  All right.

20        MR. GUILLAUME:  Thank you.

21        THE COURT:  The Court has just a few questions, Master

22 Trooper Miller.  First of all, with respect to the initial

23 inquiry as to the driver, I thought I understood you to say on

24 direct examination that he indicated that he had not only did not

25 have any identification, he had lost his passport, is that

47

1    correct?

2              THE WITNESS:  That's correct, Your Honor.

3              THE COURT:  And it appears from my listening to the,

4    the video, that there was a Hispanic accent, a Spanish accent,

5    correct, on the part of the driver when you were speaking with

6    him?

7              THE WITNESS:  That's correct, Your Honor.

8              THE COURT:  So did you inquire any further in terms of

9    his passport status?  He brought it up, you didn't ask him.  He

10   said he didn't have his passport, is that right?

11             THE WITNESS:  Your Honor, we were busy with what was

12   unfolding.  And I did not -- it did cross my mind but I did not

13   ask him that question.

14             THE COURT:  But he himself volunteered that he did not

15   have his passport with him, is that right?

16             THE WITNESS:  That's correct.

17             THE COURT:  And then the other thing is I thought I

18   understood from reviewing the submissions that the driver not

19   only, did not have his driver's license and volunteered he did

20   not have his passport, but do I understand that the Indiana tags

21   had expired on this vehicle?  Is that right?

22             THE WITNESS:  Yes, for sometime, Your Honor.

23             THE COURT:  And how long had they been expired?

24             THE WITNESS:  I believe seven months.

25             THE COURT:  So you have a driver with no

**JA124**

48

1      identification, volunteering that he does not have his passport,

2      and you have a vehicle with license tags that are no longer

3      valid, out-of-state license tags which are no longer valid?

4                    THE WITNESS:  Correct.

5                    THE COURT:  All right.  Thank you very much.  Any

6      further questions from the government?

7                    MR. AKE:  No, Your Honor.  Ask that this witness be

8      excused.

9                    THE COURT:  That's fine.  Any questions, Mr. Guillaume,

10     based upon the Court's questions?

11                   MR. GUILLAUME:  No, Your Honor.  Thank you.

12                   THE COURT:  All right.  Thank you very much, Master

13     Trooper Miller.  You may step down, sir.  In the event you are

14     called back to the witness stand, it might be the safest process

15     if you'll just stay out in the vestibule area --

16                   THE WITNESS:  Yes, sir.

17                   THE COURT: -- until this hearing is over with.

18                   THE WITNESS:  Yes, sir.

19                   THE COURT:  All right.  With that, I'll be glad to hear

20     first from you, Mr. Ake, given that the government bears the

21     initial burden here by a preponderance of the evidence with

22     respect to the presentation of evidence here.  And then I'll hear

23     from Mr. Guillaume.

24                   MR. AKE:  Yes.  Thank you, Your Honor.  Ms. Schwartz is

25     actually going to handle it.

**JA125**

49

1          THE COURT:  That's fine.  Ms. Schwartz, be glad to hear

2     from you.  You can speak there from the podium or wherever you'd

3     like.  And you can pull your mask down while speaking or whatever

4     you want.  You're fine.

5          MS. SCHWARTZ:  Thank you, Your Honor.  Good afternoon.

6          THE COURT:  Good afternoon.

7          MS. SCHWARTZ:  So, the government agrees with the

8     defense that the defendant as a passenger in the car has standing

9     to challenge the stop of the car.  But he does not have standing

10    to challenge the search of the car.  Only if he has a reasonable

11    privacy interest of his own in the car would he be able to

12    challenge the search of the car.  The Supreme Court made that

13    very clear in Rakas in 1978.  I can give full -- that's

14    R-A-K-A-S.  I can give full citations but I'm -- unless the Court

15    wants it.

16         THE COURT:  No.  And I think, there's no dispute that,

17    as Mr. Demetriou, my very able law clerk, has noted in preparing

18    for this hearing, that in Brendlin, B-R-E-N-D-L-I-N, v.

19    California, a unanimous Supreme Court joined all US Circuit

20    Courts of Appeals and nearly every state court in ruling that a

21    traffic stop is a seizure of both the driver and any passenger

22    and, therefore, a passenger may challenge the constitutionality

23    of the stop.  Correct?

24         MS. SCHWARTZ:  The stop, exactly.  Not only Brendlin,

25    but Soriano-Jarquin in the Fourth Circuit has held the same,

**JA126**

50

1    actually the same year.

2              But when it comes to the search of the car, the stop

3    itself -- and the stop was justified both at its inception and in

4    duration, which I'll get to in a moment -- but in terms of the

5    items found within the car, my point being under Rakas is the

6    defendant does not have a privacy interest of his own.  Rakas

7    dealt with the area in the glove box and under the front

8    passenger seat, which coincidentally are the same areas that we

9    have here, and it commented that the same was true for the trunk.

10             So once we get to the point that the stop is

11   legitimate, which we will in a moment, once the stop is

12   legitimate the defendant's rights essentially end there as to

13   materials found in the car --

14             THE COURT:  The principle being that, as the Fourth

15   Circuit has held, passengers in searched vehicles have no

16   reasonable expectation of privacy in regard to the items found in

17   another's vehicle.

18             MS. SCHWARTZ:  Exactly.  Exactly.  This was not his

19   car.  It was not the driver's car.  It was the driver's

20   girlfriend's friend's car, which is certainly attenuated from any

21   privacy interest that the --

22             THE COURT:  Which had an expired driver's license.

23             MS. SCHWARTZ:  Yes.

24             THE COURT:  Driver's tag, rather.

25             MS. SCHWARTZ:  Yes.

**JA127**

1           THE COURT:  License tag.

2           MS. SCHWARTZ:  So there's no privacy interest under the

3    front passenger seat, no privacy interest in the trunk, and so

4    forth.

5           So let's turn to the car stop itself.  The two-part

6    test, and the Fourth Circuit reaffirmed this earlier this month

7    actually, in the Perez case, the two-part test is that the stop

8    must be legitimate at its inception and the officers' actions

9    during the stop must be reasonably related in scope to the basis

10   of the stop.

11          So the stop was certainly legitimate at its inception.

12   Any traffic violation is sufficient to justify a stop.  The

13   Fourth Circuit, leading case there in the Fourth Circuit is Hasan

14   El from 1993.

15          Observing any traffic violation provides sufficient

16   justification for a police officer to detain the offending

17   vehicle for as long as it takes to perform the traditional

18   incidents of a routine traffic stop.  The Fourth Circuit said

19   that in Branch in 2008 and again in Ortiz in 2012.

20          And following too closely in particular under this very

21   Maryland law, Maryland Code of, Annotated Code of Transportation

22   21-310(a), is a valid basis for a stop.  The Fourth Circuit said

23   that in Gibbs, an unpublished decision in 2017.

24          The driver of a motor vehicle -- the statute itself

25   reads that the driver of a motor vehicle may not follow another

**JA128**

52

1   vehicle more closely than is reasonable and prudent, having due

2   regard for the speed of the other vehicle and the traffic on and

3   condition of the highway.

4          So notice that the officer, as counsel brought out, was

5   stopped at the point that he first observed the defendant, the

6   Honda driving.  So what we're seeing is after he pulls out, he's

7   now behind the Honda, that's when the, that's when the video

8   kicks in.  And you can see that the Honda at that point, once the

9   officer pulls out, is a little bit further back, maybe slowing

10  down.  But he's still, even as we see him, within two to three

11  car lengths.  And in a situation where you're supposed to be six

12  to seven car lengths away, that is too close, that is not

13  prudent, that is not due regards for the other vehicle.  That is

14  in violation of the statute and that is grounds for a stop.

15          The district --

16          THE COURT:  The record will reflect that I have

17  reviewed the video and can definitely see on the video that the

18  white Honda was definitely, easily within, in my view, two car

19  lengths to the car in front of it, from what I see of the video.

20  And I make a factual finding as to that.

21          MS. SCHWARTZ:  So, given that, there are various other

22  cases.  Pore from the District of Maryland.  In a different, in a

23  different context, a suit against the State Police by the NAACP.

24  That violation that the Court has found as a factual matter is

25  grounds to stop the vehicle.

**JA129**

1            And even if the officer had another motivation for

2    doing so, even if there had been something suspicious to him

3    about that car, which he said there wasn't, it would not matter

4    under Hasan El, it would not matter under the US Supreme Court's

5    decision in Whren, W-H-R-E-N, 1996.  It's not the subjective

6    motivation of the officer.  It's the actual existence of the

7    violation which the Court has observed itself.

8            So, once we have the car stop, the stop was reasonable

9    in scope.  And I can break this down, you know, minute by minute

10   in terms of the video.  But in some sense, cutting to the chase,

11   this car was not going anywhere very quickly once it was stopped

12   because the driver had no license, the driver had no ID, and the

13   tags were expired.  And no one could quite explain who the owner

14   was in any way that really made sense.  The explanation of what

15   sounded like, you know, you take my car, I take your car, once

16   you sell this car, then we'll give you the title to that car.  I

17   mean, it's, I've never heard anything like that.  It's not the

18   ordinary traffic stop situation.  So this had to be sorted out.

19           And even if there were no drugs in the car, we're

20   talking several hours to sort out just the car stop.

21           So the fact that the officer takes basically five

22   seconds, if I have it right, in the video, to call for a K-9

23   team, which arrives in moments, at the same time the officer is

24   putting over the license number to be checked, that's not a

25   significant, that's as de minimis as de minimis comes.

54

1          The basic --

2          THE COURT:  Does the officer need to have separate

3     reasonable suspicion to justify using a K-9 search?

4          MS. SCHWARTZ:  He does not.  He simply, no specific

5     justification is needed for the K-9 search.  But --

6          THE COURT:  I mean, that was the holding I think of the

7     Branch case by the Fourth Circuit, 2008, that an officer does not

8     need separate reasonable suspicion to justify using a K-9 during

9     an otherwise legitimate traffic stop because the Fourth Circuit

10    has said a dog sniff is not a search for Fourth Amendment

11    purposes, isn't that correct?

12         MS. SCHWARTZ:  That is correct.  And the Fourth Circuit

13    was drawing on Illinois v. Caballes from the US Supreme Court in

14    2005.

15         So, the only question is, I mean, there are cases where

16    the traffic stop is over, where, you know, the license has been

17    checked, the registration has been checked, and everything is

18    good, and yet the officer has everyone wait around for another

19    seven minutes, waiting for the K-9.  The point I was trying --

20    and those are problems unless there's reasonable suspicion to

21    justify waiting for the K-9 at that point because the stop is

22    over.

23         The point I was trying to make is this stop was not

24    over.  It was far from over.  It would probably, even without any

25    drugs, you know, without any, if there were no K-9 in the area,

55

1    this stop would not have ended for easily an hour, probably half

2    a day, possibly until some other person with a license showed up

3    to be able to drive the car away.

4           So, there's no issue of the fact of the K-9 search

5    extending this, extending this stop beyond what it otherwise

6    would have been.

7           In fact, the officer, as he's putting over the name of

8    the driver, which is not going to get him anything because as it

9    turns out the driver later admits that's not really his name, he

10    was prosecuted under, in this court under his true name, the

11    Roblero name, the driver's license was never going to come back

12    good under the false name.

13           And meanwhile, even before that happened, before the

14    officer turned over the information about the driver to the

15    dispatcher, the dispatcher got back to him on the first check and

16    said that the tags had expired.

17           So -- and, frankly, all of this nonetheless took almost

18    no time at all.  Sorting through the driver's situation and

19    getting the papers and getting him to write down his name, I

20    mean, if the driver has an actual license and an actual

21    registration handy, this would have been a very short stop.  But

22    the driver had none of that.  So it took seven minutes just to

23    sort out, you know, so give me your name.  And, frankly, it makes

24    perfect sense that the officer then has to make further inquiries

25    about what's going on because he needs to find out whether the

56

1    driver, who has no identification, is legitimately in possession

2    of this car.  So putting aside any consideration of narcotics,

3    there's a question of the ownership of the car.

4          And I'd note that in the Perez case in the Fourth

5    Circuit earlier this month --

6          THE COURT:  What is the citation of the Perez case?

7          MS. SCHWARTZ:  It came out on the 7th.  And I don't --

8          THE COURT:  April 7th?  We'll find it.  Okay.  Thank

9    you.

10          MS. SCHWARTZ:  It's cited in the, it's cited in the

11    government's motion response.  I'm going to give a copy of that

12    to counsel and he'll find it as I speak.

13          THE COURT:  We'll find it.  Perez case decided about

14    two weeks ago.

15          MS. SCHWARTZ:  In any event, in that case there was a

16    suspicion of an expired tag, a possibly fictitious tag, and a

17    possible license revocation.  And it was understood in that case

18    that those things make things take longer.

19          Branch talked about the additional delay caused by a

20    driver providing, you know, false information.

21          So there was essentially no, no undue extension of the

22    stop.  Even if there was, there was reasonable suspicion based on

23    no license or ID, the driver doesn't know the name of his

24    passenger with whom he's been since Indiana, doesn't know the

25    name of the person who owns the car.  There's certainly

**JA133**

57

1    reasonable suspicion of criminal activity, driving without a
2    license, and various other things.
3           Once the car is lawfully stopped, you can have the
4    driver step out of the car, Ohio v. Robinette, 1996.  It's
5    sensible to have this all happen in front of the dashcam, anyway,
6    because it resolves a lot of questions.
7           I can give you many more examples of where reasonable
8    suspicion for delays for a K-9 search, which is not the facts
9    here, occurred.  But I think it's just so clear here that there
10   was a basis for this stop and that the K-9 sniff did not extend
11   that at all.
12          Now, once there's a positive alert, there's grounds to
13   search in the area of the alert.  And right by the side of car,
14   where the dog you can see had been, because the dog doesn't go
15   around to the other side, they're searching the same side, the
16   officer pops out the glove box in a way that he said was
17   non-destructive, and finds in the cavity where the glove box had
18   been the package.
19          There's plainly probable cause to search that at this
20   point.  He can feel that it feels like a kilo.  And once he looks
21   in the bag he can see that it is in fact a kilo.
22          And once you find that first thing, there's then
23   probable cause to search the entire vehicle.  And with each thing
24   you find there's cause to search further.
25          So, I'm happy to, I can go on --

**JA134**

58

1           THE COURT:  Thank you very much, Ms. Schwartz.  Thank

2    you very much.  Thank you.

3           MS. SCHWARTZ:  But now we get to the cell phones, which

4    I think is where counsel wants to make -- unless you want to do

5    one argument at a time.

6           THE COURT:  No.  That's fine.  That's fine.  This is

7    fine.

8           MS. SCHWARTZ:  All right.  So, counsel indicated he's

9    going to submit on the statements, so we will as well.  So I'll

10   turn --

11          THE COURT:  Meaning the motion to suppress statements,

12   Paper Number 26?

13          MS. SCHWARTZ:  Yes.  So I am not going to address that

14   if counsel's not going to address that and we'll stand on our

15   paperwork as well.

16          The warrants were plainly sufficient.  The reviewing

17   court, as this Court knows, must give great deference to the

18   magistrate judge's finding of probable cause.  The Supreme Court

19   has said that in Illinois v. Gates and the Fourth Circuit has

20   said it in Hodge, among other cases.

21          THE COURT:  Just so the record is clear, because I

22   don't think there's any dispute, that Master Trooper Miller

23   applied to Allegany County District Judge Eric Bean, B-E-A-N, and

24   obtained search warrants for all three phones.

25          MS. SCHWARTZ:  Yes.

**JA135**

59

1            THE COURT:  That's a factual record, correct?

2            MS. SCHWARTZ:  Yes.

3            THE COURT:  Any dispute about that, Mr. Guillaume?

4            MR. GUILLAUME:  No dispute, Your Honor.

5            THE COURT:  So that's a fact.  And then Judge Bean

6    signed the warrants apparently the same day, on August 10, 2020.

7            MS. SCHWARTZ:  And this Court is not to do a de novo

8    analysis of probable cause, as the Supreme Court said in

9    Massachusetts v. Upton in 1984.  And there's no Franks issue.

10   The defense has not suggested any kind of Franks issue so I am

11   not going to even address that.

12           But the warrant provided a lot of information about the

13   phone.  There was a warrant for each phone.  It provided, it

14   identified the phone to be searched, the other phones that had

15   been seized.  Described the trooper's expertise, 26 years of

16   service.  The Court has it in front.  The affiant was clearly

17   someone with substantial experience in narcotics interdiction.

18   It gave a detailed account of his training, which the Court has

19   also heard about in person.  And it gave the basis for the stop.

20   The recovery of the three kilos, the presence of the two men in

21   the car, the certified K-9 alert.  The fact that the packages,

22   two of them contained fentanyl and one contained the

23   heroin/fentanyl mixture, drug valued at $150,000, and cash

24   totaling $46,000 plus.

25           The averment -- and the key thing here, too, was the

60

1  averment based on the affiant's knowledge, training and

2  experience that individuals who commit controlled dangerous

3  substance offenses will conceal evidence of transactions, photos,

4  and other illicit activities known in the sale and trade of drugs

5  on electronic devices.  And that they use the internet and

6  electronic devices to search, view, and share information about

7  drug sales, and that they use these devices to orchestrate,

8  expedite, and set up drug transactions by contacting others and

9  allowing others to contact them about drug distribution.

10          And based on all of that and his training and

11  experience, that he believes there is probable cause to believe

12  that each phone held evidence of illicit dealing of narcotic

13  substances, including possession, distribution of controlled

14  dangerous substances, as defined in Maryland criminal law as

15  annotated 5-601 and 5-602, possession and distribution of

16  controlled dangerous substances.

17          He listed 17 specific areas of the phone that he wanted

18  to look at.  That's A through Q in the warrants.  I'm not going

19  to recite them all.

20          And all told, this provided probable cause, given all

21  the circumstances set forth in the affidavit, that there was a

22  fair probability, indeed, the government would say much more than

23  a fair probability, but a fair probability is the standard in

24  Illinois v. Gates, that contraband or other evidence of a crime

25  would be found in a particular place.  And in this case it would

1    be inside the phone.

2              Now, there were, you know, we briefed this extensively

3    in the government's response, but there's two additional cases

4    that I wanted to bring to the Court's attention because the Court

5    wrote them.  And the government neglected to cite them in the

6    court's response.  And I've provided counsel --

7              THE COURT:  That's quite all right.  You don't offend

8    me in any way, Ms. Schwartz.  That's quite all right.

9              MS. SCHWARTZ:  Before I do that, the citation for Perez

10   is, it's Docket Number 20-4285 2022, Westlaw 1042500, Fourth

11   Circuit, April 7th, 2022.  It's the most recent car stop case

12   that I found.

13             In any event, it seems to me in terms of getting back

14   to the warrants, the controlling cases here, in this courtroom at

15   least, would be the Court's opinions in Fisher and Herevia,

16   H-E-R-E-V-I-A, in 2015 and 2014 respectively.

17             In particular in Herevia, which were facts essentially

18   on all fours with the facts here, of phones found in the car with

19   significant amounts of drugs and money and a warrant that sounds

20   just like our warrant, the Court may remember the one in Herevia

21   better because we haven't seen it, but it's clear that that's

22   enough.

23             THE COURT:  The Fourth Circuit had the privilege to try

24   to affirm me on that or not, Ms. Schwartz.

25             MS. SCHWARTZ:  I did not see an affirmance.

**JA138**

62

1          THE COURT:  Apparently, they didn't take it up.  We're

2     smiling here.  It doesn't necessarily reflect upon my total

3     intellectual ability.  It may just be that no one took it up.

4     Mr. Guillaume, do you think that's a fair comment?

5          MR. GUILLAUME:  Yes, Your Honor, I agree.

6          THE COURT:  Mr. Guillaume and I are sharing a laugh

7     here.  Anyway, I don't think that case went up, as I recall.

8          MS. SCHWARTZ:  I don't believe it did, either, Your

9     Honor, because I would have cited the affirmance if it did.

10          But, in general, I mean, as you know, an affidavit can

11     even be based on hearsay.  An informant can say search this guy's

12     house, he's a drug dealer.  And if the informant is reliable

13     enough, that's sufficient reason to do it.

14          Here we have far more than that.  We have the actual

15     drugs and cash, $200,000 worth of contraband in the car.  And

16     many courts, not just Your Honor, have recognized the

17     relationship between phones, phones and trafficking.

18          Some of the other examples, one of them is cited by the

19     Court, the DC District Court in Eiland, E-I-L-A-N-D, in 2006.

20     The 10th Circuit in Slater explained that a cell phone is, quote,

21     "a recognized tool of the trade in drug dealing", end quote.  I

22     think I said 1992 in the 10th Circuit.

23          Worthy in the District of Maryland in 2009 looked to

24     the affiant's statement about the connection between drug dealing

25     and cell phones in rejecting a nexus-based challenge to a device

**JA139**

1    warrant.

2            Gibbs, an unpublished 2013 Fourth Circuit opinion,

3    pointed out that the affiant's knowledge, training, and

4    experience of drug dealers' use of cell phones in the trade can

5    support a finding of probable cause.  The Eastern District of

6    Virginia in Harris in 2016, Worthy in the District of Maryland in

7    2019.  These are just examples of cases that find the linkage

8    between drug dealing and phone use.

9            And we don't have to prove that these specific phones

10   were used, although in fact the inference is clear that they were

11   and we probably see some of it on the actual video.  Weigand from

12   the Southern District of New York in 2020, does not -- state it

13   outright that there is no support for the defendant's claim that

14   the government must show that these very devices were used for

15   conspiratorial communications in order to justify searching them.

16           The particularity here is the reference to the specific

17   devices and the specific crimes.  And under the, under Cobb that

18   is more than sufficient.

19           I could go on but I just don't really see --

20           THE COURT:  Thank you very much, Ms. Schwartz.

21           MS. SCHWARTZ:  -- an issue here.

22           THE COURT:  Thank you very much.  Thank you.  Mr.

23   Guillaume, be glad to hear from you.

24           MR. GUILLAUME:  Yes, Your Honor.  Thank you.

25           THE COURT:  Mr. Guillaume, I don't in any way mean to

**JA140**

64

 1    interrupt you in terms of how you want to approach this.  I

 2    gather that with respect to the cell phones, your primary attack

 3    is under Wong Sun, the fruit of the poisonous tree, they only

 4    have the cell phones because of what you contend was an extended

 5    Terry stop.

 6              MR. GUILLAUME:  Well --

 7              THE COURT:  You can pull your mask down.

 8              MR. GUILLAUME:  Sorry.  Forgot about it.

 9              THE COURT:  Is that essentially the thrust of your

10    argument on the cell phones?

11              MR. GUILLAUME:  It's not, Your Honor.

12              THE COURT:  Okay.  Go ahead.  Argue whatever facts that

13    you want, then.

14              MR. GUILLAUME:  Right.  I will say that, for the

15    record, so the record is clear, we don't concede but will submit

16    on the probable cause with respect to the stop.

17              THE COURT:  To the state's search warrant?

18              MR. GUILLAUME:  In terms of the stop itself.

19              THE COURT:  Okay.  All right.

20              MR. GUILLAUME:  I don't have any argument but I am not

21    conceding it.  But I won't argue.

22              THE COURT:  I understand.

23              MR. GUILLAUME:  The same goes for the statement.  We'll

24    stand on the papers for that.

25              Now, I just want to focus my argument, very narrowly

**JA141**

65

1    tailored, to the seizing of my client's cell phone.  As Your

2    Honor can see from my questions, I was very specific in inquiring

3    about my client's particular behavior during the traffic stop and

4    the surrounding circumstances.

5         I agree with most of what the government said,

6    ironically enough, with respect to the stop -- not the stop

7    itself, but with respect to the authority, some of the authority

8    that was cited for searching cell phones.  However, I did not

9    hear anything in the presentation as to how it relates to my

10   particular client.

11        And even viewing this evidence, knowing that the, this

12   Court, Your Honor, gives great deference to, as well established

13   in the Fourth Circuit, and the Supreme Court has set precedent as

14   well, to the reviewing judge's decision, however, there needs to

15   be something there that, some sort of a nexus between the place

16   to be searched and the items that are seized, and I don't see it

17   in this case.

18        My client's -- my client, for purposes of this case, is

19   a passenger in a car where drugs are not visible in the car.

20   There's no suspicious movements by him.  There's no testimony

21   that he was nervous.  I mean, I really, I just kind of went down

22   the laundry list of things that could pique a particular

23   officer's suspicion.  Now, those things were all there for, with

24   the exception of the drugs and the smelling of drugs and that

25   sort of thing, with respect to the codefendant.  The

**JA142**

66

1    codefendant's nervous, the codefendant doesn't give a complete

2    story.

3              The only consistency we have is that my client and the

4    codefendant agree to officers at separate times that they're both

5    going to New York, which would seem to be true.

6              However, my client largely remains in the car during

7    the traffic stop.  When he's asked to exit the car, he does so

8    willingly.  He doesn't try to run.  And he remains on scene until

9    he's directed to do otherwise.  Until he's arrested, actually.

10              Your Honor, you know, looking at the cases that the

11    government cited, the cases decided by Your Honor, specifically

12    the Edemia (sic) and Fisher cases -- the Fisher case is

13    RDB-14-413, Edemia (sic) 13-639 -- both of those cases, while

14    there's some similarities, I would argue this case is factually

15    distinct in that those, there's nothing, nothing alleged as far

16    as my client's behavior that would give rise to reasonable

17    articulable suspicion, much less probable cause.  The mere fact

18    that he has a cell phone and possesses a cell phone in and of

19    itself I would argue is insufficient to justify the search.

20              In looking at the warrant that -- excuse me -- at the

21    affidavit provided for the search warrant, it's mentioned in

22    passing that the items were seized, the cell phones were seized.

23    And there's nothing indicative about, other than just very broad

24    language about cell phones being used for potential drug

25    purposes, is the term I'm going to use.  As we noted, that's

67

1    true.  But cell phones can be used for plainly legitimate

2    purposes.  And my client was even using his cell phone on the

3    scene, as evidenced by the video.

4         And when I asked Trooper Miller about whether he heard

5    the conversation or if he wasn't allowed to, he said he was.  He

6    didn't tell him he couldn't use it.  When he told him, he

7    stopped.  And he didn't hear anything that would be indicative of

8    a conversation that would be otherwise unlawful, discussing drugs

9    and that sort of thing.

10        So, had any one of those things been present, Your

11   Honor, I would have a much weaker argument.  But because there's

12   literally no criminal activity on my client's, or suspicion of

13   criminal activity, I just don't see how the judge could have made

14   the determination with respect to my client -- I agree that there

15   is probable cause to search the cell phone of the other person

16   that's there.

17        THE COURT:  Just so we're clear on the record.  The

18   white iPhone was not attributable to your client.  We're talking

19   about the two Samsung phones that were associated with your

20   client, correct?

21        MR. GUILLAUME:  Correct, Your Honor.  I believe that

22   those phones, had any other factor been there -- and this is more

23   of a factual argument than a legal argument, Your Honor, on my

24   behalf, my client's behalf -- I just don't see had any other

25   factor been there, maybe the government, it would have been thin

**JA144**

68

1    depending on what it was, but they would have had it.  But they

2    just, he's perfectly compliant.  He's not nervous.  He gets out

3    of the car.  He's the passenger.

4         And I don't think it's enough to say that drug

5    traffickers use cell phones because everyone, and I think the

6    Court can take judicial notice of the fact that everyone in

7    society for the most part in 2020, which is the time of this

8    stop, used a cell phone for legitimate and illegitimate purposes.

9    Use it for literally anything you want.

10        So, because there's a lack of, because of his behavior

11   at the time and the surrounding circumstances, under the totality

12   of the circumstances I would argue that the government, the judge

13   made the wrong call.  The government just has not met the burden

14   that it needs to meet to show why his particular cell phone needs

15   to be, needed to be searched and/or seized, Your Honor.

16        And again, with respect to the statement, I'll submit,

17   as well as I will submit, but not concede, the legality of the

18   stop itself.

19        THE COURT:  Well, thank you very much, Mr. Guillaume.

20   Any further comments from the government, Ms. Schwartz?

21        MS. SCHWARTZ:  Just briefly, Your Honor.

22        THE COURT:  Sure.

23        MS. SCHWARTZ:  Counsel seems to be essentially making

24   the argument that the defendant was just an innocent fellow along

25   for the ride from Indiana to New York with a driver who didn't

**JA145**

69

1    even know his name, but valued his company so much that he was

2    going to bring this innocent man along to a drug deal.  That's

3    just, that's not worthy of belief.

4              The very existence of probable cause to arrest the

5    defendant for the drugs in the car is the nexus, which of course

6    there is based on the volume of the drugs.  He's sitting on a

7    kilo of them, which you got to think that the seat is a lot less

8    comfortable with a kilo under your rump.

9              The very fact that he's in the car with that much in

10   the way of narcotics and money is the nexus to drug dealing that

11   gives him the, that creates the nexus that justifies the search.

12   It's no different.  If the driver's nervousness is not the basis

13   for the search of the iPhone, it's the drugs in the car, it's the

14   circumstances.  He's come from Indiana with this unlicensed

15   driver.

16             There's probable cause to arrest him.  There's probable

17   cause to believe he's a drug dealer.  And as such, counsel's

18   argument fails.

19             THE COURT:  Thank you, Ms. Schwartz.  The record will

20   reflect in that regard that the testimony is from the Trooper

21   Miller -- actually, Mr. Guillaume, any other testimony you want

22   to offer here?

23             MR. GUILLAUME:  We have no further testimony or

24   witnesses.

25             THE COURT:  That's why I wanted to make sure I advised

70

1    your client of his rights under Rule 104(d).  And he has chosen

2    not to, is that correct?

3            MR. GUILLAUME:  Yes, he will not be testifying.

4    Correct, Your Honor.

5            THE COURT:  Not holding an inference against him.  I

6    wanted to verify we're ready to rule on this.

7            The record also will reflect that the driver could not

8    name his passenger but referred to him as Miguel, and could not

9    provide a last name, according to my notes.  And then the

10   defendant provided a name Juan Manuel Flores, which is not

11   Miguel, and it was later determined that that was also a fake

12   name.  So the defendant/passenger identified himself by a name

13   that wasn't the least bit referenced by the driver in this

14   matter.

15           A telling fact here is that this car was not only being

16   driven by someone who had no driver's license or passport, this

17   car had an expired Indiana license.  And there's simply no way

18   that law enforcement could allow that car to be moved.  So,

19   there's no issue of delay.

20           The government has aptly noted that car could stay on

21   the side of the road for the next four, five hours until it's

22   towed somewhere.  There's no way a police officer can permit an

23   unlicensed vehicle traveling in the interstate highways by an

24   individual who doesn't have a license or a passport, and doesn't

25   have a valid license tag on it, to be allowed to move the car.

**JA147**

71

1          I'll follow up with an opinion on this, not a very

2     lengthy opinion, but a brief opinion summarizing this.

3          With respect to the initial stop, certainly, the

4     passenger, Mr. Sanchez, may challenge the constitutionality of

5     the stop.  But there's clearly reasonable suspicion here to

6     justify the stop.  And clearly, the Fourth Circuit has held in

7     the Carter case, 300 F.3d 415, 2002, and the Rusher case, 966

8     F.2d. 868, that in regard to the vehicle searches, the Fourth

9     Circuit has held that the passengers of searched vehicles have no

10    reasonable expectation of privacy in regard to the items found in

11    another's vehicle.

12         And the car was lawfully stopped for a violation of a

13    state traffic law.  I've observed the video here in this matter.

14    And it was clearly no more than two car lengths behind, going in

15    excess of 60 miles an hour, and it was lawfully stopped.  And the

16    car stop was then reasonably objective in terms of scope and was

17    not prolonged in any way for the simple fact the car couldn't

18    move, anyway.

19         In the alternative, I would note that in light of this,

20    there's simply no basis to suppress the fruits of the August 5,

21    2020 traffic stop, and the steps to be, in which this is to be

22    analyzed under the Whren case, Supreme Court opinion, 1996, as

23    well as the more recent case of the Fourth Circuit, United States

24    v. Williams at 808 F.3d 238, a Fourth Circuit opinion, 2015.

25         And under the Terry v. Ohio criteria the test is the

**JA148**

72

1    stop must be legitimate at its inception, which it clearly was,

2    under United States v. Hasan El.  Secondarily, the officer's

3    actions during the stop must be reasonably related in scope to

4    the basis of the stop.  That is pretty well established.

5    Immediately, upon having someone who doesn't have a driver's

6    license, doesn't have a passport, is driving the car with an

7    expired license, and says he's not sure of the name of his

8    passenger.

9            With respect to that, Trooper Miller did not have to

10   have separate reasonable suspicion to justify the K-9 search as

11   is established in United States v. Branch by the Fourth Circuit

12   in 2008, 537 F.3d 328, which cites Illinois v. Caballes,

13   C-A-B-A-L-L-E-S, at 543 US 405, a 2005 opinion of the Supreme

14   Court.

15           But an alert for the drug, by the sniffing dog gives

16   reasonable probable cause to search the vehicle.  That's exactly

17   what happened here.  At most there may be 13 minutes that elapsed

18   between the initial stop and the positive K-9 alert.  That

19   length is of no moment because the car couldn't go anywhere,

20   anyway, because it has an expired tag.

21           And Mr. Sanchez has no standing to challenge the actual

22   search of the vehicle, as I've already noted.

23           So there's simply no basis to suppress the fruits of

24   the August 5, 2020 traffic search.

25           With respect to the matter of the cell phones, and

**JA149**

73

1    specifically three cell phones were seized.  One was the white

2    iPhone attributable to the driver, and then there were the two

3    Samsung phones which are attributable to the defendant, Mr.

4    Sanchez.  The Supreme Court has essentially noted three separate

5    components of a warrant requirement because a warrant was sought

6    by a state judge, an independent neutral judicial official,

7    before these cell phones were searched.

8            The criteria are, first, that it must be by a neutral

9    and detached magistrate, which is exactly what happened here with

10   respect to the search warrant, which was submitted to the judge

11   of the District Court of Maryland for Allegany County, Judge

12   Bean, B-E-A-N.  Clarify that one second here.  Hold on.  Judge

13   Erich Bean, E-R-I-C-H, Bean, B-E-A-N.

14           With respect to the warrant that was issued, the

15   defendant is climbing a stiff mountain here with respect to an

16   independent affidavit which is submitted to a state judge.  Once

17   a search warrant has been issued in that fashion by Judge Bean,

18   review of the probable cause determination by that judicial

19   officer is to be shown great deference.  And that is hornbook law

20   that's been observed by the Fourth Circuit continually, from

21   United States v. Blackwood, 913 F.2d 139 in 1990; in United

22   States v. Jones, 942 F.3d 634, a Fourth Circuit opinion in 2019;

23   United States v. Blakeney, B-L-A-K-E-N-E-Y, 949 F.3d 841, a

24   Fourth Circuit opinion in 2020.

25           The task of this court is not to conduct a de novo

74

1   determination of probable cause, but only to determine whether

2   there is substantial evidence in the record supporting the

3   decision of the state judge to issue the warrant.  And that has

4   been noted.  They are the principles of Massachusetts v. Upton,

5   the Supreme Court's opinion in 1984 at 466 US 727, and in accord

6   with Illinois v. Gates, the 1983 opinion of the Supreme Court at

7   462 US 213.

8           I would also note that it's consistent with an opinion

9   of the Fourth Circuit in United States v. Bosyk, B-O-S-Y-K, at

10  933 F.3d 319, a Fourth Circuit opinion in 2019, as to which

11  certiorari was denied by the Supreme Court.

12          The validity of a state search warrant in this fashion

13  is to be tested by the requirements of the Fourth Amendment to

14  the US Constitution, obviously, and not by state law standards

15  necessarily.

16          It's abundantly clear to me that the affidavits in

17  question provided substantial grounds to support Judge Bean's

18  finding that there was probable cause that investigators would

19  discover evidence of drug trafficking based upon the lawful

20  search of the car and almost $47,000 that was seized, as well as

21  the narcotics that were located.

22          There's simply no basis to suppress the searches of

23  those two Samsung phones.

24          The three components of the Fourth Circuit's warrant

25  requirement have been satisfied.  And it's well established, as

**JA151**

75

1    most recently as by the Fourth Circuit in <u>United States v. Gibbs</u>,

2    an unreported opinion in 2013, that a cell phone is a recognized

3    tool of the trade in drug dealing.

4            And the particularity requirement was certainly

5    satisfied with respect to the information provided.

6            In any event, we haven't, we haven't discussed this,

7    but in terms of any good faith exception, if necessary, there's

8    no indication that these affidavits were literally falsified or

9    that Judge Bean was biased in some way.  And the <u>Leon</u> exception

10   would certainly apply, if necessary, although we don't even need

11   to get that far with it.

12           So, accordingly, for those reasons, the defendant's

13   motion to suppress tangible and derivative evidence, Paper Number

14   24, will be denied.

15           The defendant's motion to suppress tangible and digital

16   and digital and derivative evidence as to the cell phone

17   searches, Paper Number 25, will be denied.

18           With respect to the motion to suppress statements, it's

19   been submitted on the record here with respect to the matter of

20   the statements.  We start with the fact that, following his

21   arrest, the defendant, Mr. Sanchez, provided a false name.  He

22   was interviewed and subsequently signed a Spanish language

23   document waiving his rights.  <u>Miranda</u> warnings are not required

24   when a person is questioned during a routine vehicle stop in what

25   would be known as the booking exception here.  And I will discuss

**JA152**

76

1    that in more detail in an opinion that will follow.

2            But the simple fact of the matter is the proper

3    questions and statements fall within the scope of the booking

4    exception.  And I'm satisfied that they were voluntarily given.

5            So with that, that motion, paper number, motion to

6    suppress statements, Paper Number 26, will be denied as well.

7            I'll follow up with an opinion within the next 48

8    hours, certainly by Wednesday, maybe Thursday morning, we'll

9    follow up with an opinion on that.  And this case remains

10   scheduled for trial to commence, a one-week jury trial to

11   commence on Monday, May 23.  And the pretrial conference will be

12   held on Tuesday, May 17.

13           There's another case I have on my calendar.  We'll work

14   that out if necessary.  And, if necessary, another judge of this

15   court would try this case if the other case continues to be

16   scheduled as well.  This case will proceed to trial on May 23.

17           MR. GUILLAUME:  Your Honor, if I may inquire.  When is

18   the pretrial, what time is the pretrial conference?

19           THE COURT:  The pretrial conference is scheduled, Mr.

20   Guillaume, Monday -- I mean Tuesday, May 17, at 4:00 p.m.

21           MR. GUILLAUME:  Thank you, Judge.

22           THE COURT:  All right.  Thank you very much.  And thank

23   you, Mr. Guillaume, for your very careful representation of your

24   client here.

25           Is there anything further from the point of view of the

77

1  government, Mr. Ake or Ms. Schwartz?

2          MR. AKE:  No, Your Honor.  Other than a motion in

3  limine deadline that the Court has.  Is that two weeks out from

4  trial?

5          THE COURT:  I think that you -- I don't really have a

6  deadline for that.

7          MR. AKE:  Okay.  Just wanted to make sure I -- -

8          THE COURT:  Are there any motions in limine that have

9  been filed?

10         MR. AKE:  None have been filed.  So it would just be a

11 question of --

12         THE COURT:  All right.  I guess to the extent they

13 should be filed, if there are going to be any motions in limine

14 filed, it would be helpful if they would be filed within the next

15 10 days.  Certainly, if they could be filed by next Friday, May

16 the 6th, any motions in limine, if they could be filed by Friday,

17 May 6th.  Is that workable for the government?

18         MR. AKE:  Yes, Your Honor.

19         THE COURT:  Is that workable with you, Mr. Guillaume?

20         MR. GUILLAUME:  Yes, Your Honor.

21         MR. AKE:  And then jury instructions, you just want

22 before the pretrial conference?

23         THE COURT:  Yeah, that's right.  That would be fine.

24 That would be fine.  Thank you very much.  As well as the voir

25 dire questions.

**JA154**

1          The jury instructions, I'm not that uptight about that,

2     Mr. Ake.  It's mainly the voir dire questions that we want to

3     work on because we'll get the voir dire ready.  And I will

4     discuss those with you all at the pretrial conference.  And then

5     we'll proceed from there.

6          I don't need all the jury instructions.  The basic

7     boilerplate is fine.  It's sort of a moving target on that.  But

8     I definitely need to see the voir dire proposed questions.

9          MR. AKE:  Thank you, Your Honor.

10          THE COURT:  Thank you.  Anything further from your

11     point of view, Mr. Guillaume?

12          MR. GUILLAUME:  No, Your Honor.  Thank you.

13          THE COURT:  Nice to see you as well.  With that, Ms.

14     Dopazo, Mr. Zogby, it's nice to have you both here.

15          MS. DOPAZO:  Thank you, Your Honor.

16          MR. ZOGBY:  Thank you, Your Honor.

17          THE COURT:  Nice to see you.  With that, this Court

18     stands adjourned for the day.

19          (Conclusion of Proceedings at 1:14 p.m.)

20

21

22

23

24

25

**JA155**

79

1                             INDEX

2

3                                                      PAGE

4       GOVERNMENT'S WITNESS

5       WITNESS: MASTER TROOPER CRAIG W. MILLER
        DIRECT EXAMINATION BY MR. AKE                    13
6       CROSS EXAMINATION BY MR. GUILLAUME               38

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**JA156**

80

1

2
                         REPORTER'S CERTIFICATE
3

4          I, Mary M. Zajac, do hereby certify that I recorded

5    stenographically the proceedings in the matter of USA v.

6    Alexander Juarez-Sanchez, Case Number(s) RDB-21-174, on April 25,

7    2022.

8          I further certify that the foregoing pages constitute

9    the official transcript of proceedings as transcribed by me to

10   the within matter in a complete and accurate manner.

11         In Witness Whereof, I have hereunto affixed my

12   signature this _____ day of _____, 2022.

13

14

15

16                   _____/S/_____

17                   Mary M. Zajac,
                     Official Court Reporter
18

19

20

21

22

23

24

25

**JA157**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | Criminal No. RDB-21-0174 |
| ALEXANDER JUAREZ-SANCHEZ, | * | |
| Defendant. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**<u>MEMORANDUM ORDER</u>**

Defendant Alexander Juarez-Sanchez ("Defendant" or "Juarez-Sanchez") is charged in three counts of a four-count Indictment with the following offenses: conspiracy to distribute and possess with intent to distribute 400 grams or more of fentanyl and 100 grams or more of heroin in violation of 21 U.S.C. § 846 (Count One); possession with intent to distribute 400 grams or more of fentanyl and 100 grams or more of heroin in violation of 21 U.S.C. § 841 (Count Two); and re-entry after deportation in violation of 8 U.S.C. § 1326(a) (Count Three).[1] (Indictment, ECF No. 3.) Presently pending before this Court are the Defendant's Motion to Suppress Tangible and Derivative Evidence (ECF No. 24); Motion to Suppress Tangible, Digital, and Derivative Evidence (ECF No. 25); Motion to Suppress Statements (ECF No. 26); and Motion for Leave to File Additional Pretrial Motions (ECF No. 27). The parties' submissions have been reviewed, and on April 25, 2022, this Court received evidence and heard the arguments of counsel at a motions hearing in this case. (Hrg

---

[1] On September 2, 2021, Juarez-Sanchez's sole Co-Defendant Domingo Ramirez-Roblero pled guilty before this Court to Count Four of the Indictment, which charged him separately with re-entry after deportation, as well as Count One. (Plea Agreement, ECF No. 20.)

Ex. List, ECF No. 53.) For the reasons stated on the record at the hearing and as

supplemented below, the Defendant's motions to suppress (ECF Nos. 24, 25, 26) are

DENIED. The Defendant's Motion for Leave to File Additional Pretrial Motions (ECF No.

27) is MOOT.

## BACKGROUND

This case arises out of traffic stop conducted on August 5, 2020 on Interstate 81 in

Hagerstown, Maryland. Shortly before 9:07 a.m., Maryland State Police Master Trooper

Craig Miller ("Trooper Miller"), who was assigned to the Pro-Active Criminal Enforcement

(PACE) Team, observed from a stationary position on the side of the road a 2014 white

Honda accord with Indiana tags traveling northbound in the right traffic lane at a distance

too close to the vehicle in front of it, a gray SUV. Trooper Miller testified that the speed

limit on the stretch of highway where he observed the white Honda is 60 miles per hour. He

testified that he regularly monitors traffic on the highways of Western Maryland and looks to

see that drivers keep a distance of approximately one car length per 10 miles per hour of

speed between themselves and any vehicle in front of them. He also testified that the white

Honda was traveling between one and two car lengths behind the gray SUV at the time he

made his observation. Trooper Miller then activated his vehicle's emergency system and

drove to catch up to the white Honda.

Dash cam footage starts 30 seconds before Trooper Miller activated his vehicle's

emergency system. The first seconds of the footage show the white Honda traveling

approximately two car lengths behind a gray SUV. (Gov. Exs. 1A, 1B.) The footage also

depicts an audio and visual recording of the subsequent traffic stop. After Trooper Miller

**JA159**

and the driver of the white Honda pulled over on the right side of Interstate 81, Trooper Miller approached the passenger side of the Honda on foot. Trooper Miller testified that the occupants of the car had only slightly rolled down the passenger side window and that he needed to ask them to roll it down further to conduct the stop. Trooper Miller explained to the occupants that he had stopped the Honda because it was following too closely behind another vehicle. He then asked the driver for his license and registration. The driver explained that he did not have his driver's license and that he had lost his passport. The driver also began searching for the car's registration. Trooper Miller asked the driver to step out of the car to continue the conversation. The passenger remained in the Honda. Once outside of the car, the driver repeated that he did not have a license or any other form of identification. He also explained that the car belonged to his girlfriend's friend and that the friend had allowed him to use the vehicle to travel from Indiana to New York. The driver made mention of some connection to Mexico and to the fact that eventually the girlfriend's friend would allow for transfer of the car's title. Trooper Miller noted that the driver's hands were trembling and that his forehead appeared to glisten from perspiration.

Trooper Miller asked the driver for his name. The driver indicated that his name was Gavino Perez-Aguilar and that he was born on July 19, 1992. Trooper Miller also asked the driver for the passenger's name. The driver hesitated and snapped his fingers as if to try to recollect. The driver then stated that his passenger's first name was Miguel and that he did not know the passenger's full name. Trooper Miller returned to his vehicle and called for a

**JA160**

canine team to meet him.[2] He then radioed the Honda's license plate information to a

dispatcher for a records check. As Trooper Miller waited for the dispatcher's response,

PACE team members Sergeant Christoper Shrout and Corporal David Yates arrived at the

scene. Trooper Miller testified that Corporal Yates was trained in handling narcotics-

detecting canines. Corporal Yates arrived with his canine partner, a dog certified and trained

in narcotics detection.

        Before conducting the canine sniff, officers had the passenger step out of the Honda,

patted him down, and instructed him to wait with the driver by Trooper Miller's vehicle.

While officers conducted the open-air sniff, Trooper Miller learned from the dispatcher that

the Honda's Indiana tags were expired. After exiting his vehicle, Trooper Miller learned that

the canine had returned a positive alert. Approximately 13 minutes had elapsed from the

initial stop of the Honda to the positive canine alert. Officers then proceeded to search the

Honda, in which they discovered three, kilogram packages of suspected narcotics and over

$46,000 in U.S. currency. (Gov. Exs. 2A, 2B, 2C, 2D.) Officers then placed the driver and

the passenger under arrest. Officers recovered three cell phones from the driver and the

passenger: one iPhone and two Samsung phones.

        After being taken into custody, the passenger identified himself as Juan Manuel

Florez.[3] At 11:05 a.m., the passenger signed a Spanish language Advice of *Miranda* Rights

Form (Gov Hrg Ex. 4; ECF No. 49-7), but he declined to speak with narcotics investigators.

_____

[2] Trooper Miller also testified that his suspicions were raised by the fact that the driver appeared not to
remember the name of his passenger, with whom he had driven all the way from Indiana to Hagerstown,
Maryland.
[3] Once taken into custody, the driver, on the other hand, admitted that his real name was Domingo Ramirez-
Roblero.

**JA161**

Later, officers had the suspected narcotics tested at the Maryland State Police Hagerstown Barrack Forensic Laboratory. Two of the kilogram packages were found to be fentanyl and the third was found to contain and mixture of heroin and fentanyl. On August 10, 2020, Trooper Miller applied for and received warrants signed by a judge of the District Court of Maryland for Allegany County to search the contents of the three recovered phones. (Gov. Hrg Exs. 3A, 3B; ECF Nos. 49-5, 49-6.)

Subsequent investigation revealed that the passenger's name was not Juan Manuel Florez. A December 2020 fingerprint examination matched fingerprint cards associated with the name Alexander Juarez-Sanchez and with proceedings connected to the voluntary departure of Juarez-Sanchez from the United States on February 10, 2015, and his subsequent deportations from the United States on May 3, 2016, August 1, 2018, and May 17, 2019.[4] On May 21, 2021, Juarez-Sanchez was interviewed by an ICE Deportation Officer in Baltimore. The officer provided him with a Spanish-language document setting forth his rights. Juarez-Sanchez signed a Spanish-language document waiving those rights. He subsequently made statements, which were recorded in writing. (Gov. Hrg Ex. 5; Record of Sworn Statement, ECF No. 49-8.)

While Juarez-Sanchez was originally charged in the Circuit Court for Washington County, Maryland with narcotics offenses related to the August 5, 2020 traffic stop, those charges were later placed on the stet docket in favor of federal prosecution. *See* Case No. C-

_____

[4] Trooper Miller testified at the motions hearing that he recognized the Defendant Alexander Juarez-Sanchez as the passenger in the white Honda Accord from the August 5, 2020 traffic stop.

5

**JA162**

21-CR-20-469 (Cir. Ct. Washington Cnty.).[5] On May 24, 2021, Juarez-Sanchez appeared

before Magistrate Judge Coulson of this Court for his Initial Appearance on the Indictment

returned against him. Trial in this matter is set for May 23, 2022.

## ANALYSIS

### I.    Motion to Suppress Tangible and Derivative Evidence (Traffic Stop)

Defendant Juarez-Sanchez has moved to suppress the fruits of the August 5, 2020

traffic stop. Specifically, Juarez-Sanchez seeks suppression of: (1) just under 2 kilograms of

fentanyl; (2) just under 1 kilogram of a heroin-fentanyl mixture; (3) $46,997.00 in United

States currency; and (4) derivative evidence. As this Court stated on the record at the

motions hearing, there is no basis to suppress this evidence. The United States Court of

Appeals for the Fourth Circuit has recently restated the well-established standards for

assessing the constitutionality of a traffic stop:

> A traffic stop "constitutes a 'seizure' under the Fourth Amendment and is thus
> subject to a reasonableness requirement." *United States v. Williams*, 808 F.3d 238,
> 245 (4th Cir. 2015) (citing *Whren v. United States*, 517 U.S. 806, 810, 116 S. Ct.
> 1769, 135 L. Ed. 2d 89 (1996)). And "[b]ecause a traffic stop is more akin to an
> investigative detention than a custodial arrest," courts review the stop under the
> two-prong standard in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889
> (1968). *Id.* Under *Terry*, a traffic stop is reasonable if (1) the stop is legitimate at
> its inception and (2) the officer's actions during the stop are reasonably related
> in scope to the basis for the stop. *See United States v. Bowman*, 884 F.3d 200, 209
> (4th Cir. 2018).

*United States v. Perez*, No. 20-4285, 2022 U.S. App. LEXIS 9405, at *8 (4th Cir. Apr. 7, 2022).

The August 5, 2020 traffic stop was legitimate at its inception. If an "officer has

probable cause or a reasonable suspicion to stop a vehicle, there is no intrusion upon the

---

[5] Juarez-Sanchez was charged in the state case under the name Juan Manuel Florez, the name he provided to
law enforcement officers on August 5, 2020.

**JA163**

Fourth Amendment." *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993). "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810. As this Court concluded on the record at the motions hearing, Trooper Miller had probable cause to stop the white Honda when he witnessed a traffic violation: the driver of the white Honda was following too closely behind another vehicle. *See* Md. Code Ann., Transp. § 21-310 (making it unlawful to follow another vehicle more closely than is "reasonable and prudent"); *see also United States v. Gibbs*, 680 F. App'x 184, 185 (4th Cir. 2017) (upholding a traffic stop based on § 21-310).

In addition, officers did not extend the traffic stop beyond its initial scope until they had probable cause to believe that there was contraband in the car. A traffic stop is a seizure, but "the Fourth Amendment tolerate[s] certain unrelated investigations that [do] not lengthen the roadside detention." *Rodriguez v. United States*, 575 U.S. 348, 354, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015). An officer does not need separate reasonable suspicion to justify using a canine during an otherwise legitimate traffic stop "because a dog sniff is not a search" for Fourth Amendment purposes. *United States v. Branch*, 537 F.3d 328, 335-36 (4th Cir. 2008) (citing *Illinois v. Caballes*, 543 U.S. 405, 408-09, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005)). But an alert from a drug sniffing dog gives probable cause to search a vehicle. *See Florida v. Harris*, 568 U.S. 237, 246-47, 133 S. Ct. 1050, 185 L. Ed. 2d 61 (2013).

In this case, Trooper Miller encountered a driver who had neither a driver's license nor any other form of identification. The driver was not able to identify readily the owner of the vehicle. The driver's hands trembled, and his forehead perspired as he answered Trooper Miller's questions. Based on the forgoing, Trooper Miller called in a canine team while he

reported the Honda's tags to a dispatcher to run a search. As the canine team was

completing its sniff, the dispatcher informed Trooper Miller that the Honda's tags were

expired. Trooper Miller could not have allowed the driver, who had no driver's license, to

leave the scene in the Honda, which bore expired tags. The traffic stop would have been

extended whether or not Trooper Miller called in a canine team. Accordingly, this Court

concludes that the officers' actions with respect to the August 5, 2020 traffic stop were

reasonably related to the scope of the stop until the canine alert gave them probable cause to

search the Honda.[6] Therefore, the Defendant's Motion to Suppress Tangible and Derivative

Evidence (ECF No. 24) is DENIED.

## II.    Motion to Suppress Tangible, Digital, and Derivative Evidence (Cell Phone Searches)

The Defendant has moved to suppress evidence related to the searches of the

following two cell phones which were recovered on August 5, 2020: (1) a Samsung Galaxy

A10e, serial no. 353290113395768 and (2) a Samsung A10e, serial no. 35962010873088.[7]

These phones were searched pursuant to warrants signed by a judge of the District Court of

Maryland for Allegany County. Again, as this Court stated on the record in open court, there

is no basis to suppress the fruits of these searches. The Fourth Amendment to the United

States Constitution provides that "no Warrants shall issue, but upon probable cause,

---

[6] Furthermore, Juarez-Sanchez has no standing to challenge the actual search of the vehicle. "A passenger in a car normally has no legitimate expectation of privacy in an automobile in which he asserts neither a property interest nor a possessory interest and where he disclaims any interest in the seized object." *United States v. Carter*, 300 F.3d 415, 421 (4th Cir. 2002). Juarez-Sanchez has claimed no possessory interest in the white Honda.
[7] At the motions hearing, Juarez-Sanchez conceded that the iPhone recovered on August 5, 2020 was not associated with him and that he was not challenging the search of that phone because he did not have a reasonable expectation of privacy in it.

## JA165

supported by Oath or affirmation, and particularly describing the place to be searched, and

the persons or things to be seized." U.S. Const. amend. IV. The Supreme Court of the

United States "has required that the existence of probable cause be decided by a neutral and

detached magistrate whenever possible." *Gerstein v. Pugh*, 420 U.S. 103, 112 (1975) (citing

*Johnson v. United States*, 333 U.S. 10, 13-14 (1948)). The magistrate is required "simply to make

a practical, commonsense decision whether, given all the circumstances in the affidavit

before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay

information, there is a fair probability that contraband or evidence of a crime will be found

in a particular place." *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990) (quoting

*Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

Significantly, the Fourth Amendment exclusionary rule does not bar the admission of

evidence obtained by officers acting in reasonable reliance on a search warrant issued by a

magistrate that is later found to be invalid. *United States v. Leon*, 468 U.S. 897, 913-14 (1984).

The evidence will be suppressed only if (1) the issuing judge was misled by information that

the affiant knew or should have known was false, (2) the judge "wholly abandoned" her

neutral role, (3) the affidavit was "so lacking in indicia of probable cause as to render official

belief in its existence entirely unreasonable," or (4) the warrant is so facially deficient that no

reasonable officer could presume it to be valid. *Id.* at 923 (citations omitted).

When a defendant challenges a search warrant, the Government bears the burden of

proof by a preponderance of the evidence at a suppression hearing. *See United States v.

Matlock*, 415 U.S. 164, 177-78 n.14 (1974). In reviewing the search warrant, this Court must

show "great deference" to the probable cause determination of a magistrate judge. *Blackwood*,

**JA166**

913 F.2d at 142. "[T]he task of the reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984).

The two warrants at issue satisfy the three components of the Fourth Amendment's warrant requirement. *See Dalia v. United States*, 441 U.S. 238, 255 (1979). First, there is no allegation that Judge Bean of the District Court of Maryland for Allegany County was anything but neutral and detached in his review of the warrants in question.

Second, the warrants are supported by ample probable cause. The affidavits in support of the warrants detail the affiant's 25 years of training and experience with the Maryland State Police. They also detail the August 5, 2020 traffic stop during which the phones in question were seized and which led to the discovery of kilogram quantities of suspected narcotics and over $46,000 in cash. The affidavits describe that laboratory testing later confirmed that the substances in question were in fact fentanyl and a heroin-fentanyl mixture. The affidavits also explain that the affiant has training and experience regarding the use of cell phones in drug trafficking. As Judge Chuang of this Court has recently summarized:

> Furthermore, courts can rely on an affiant's training and experience in making a probable-cause determination, and here, the special agent submitting the affidavit stated that based on his experience, there is a connection between drug dealing and cell phones. *See Ornelas v. United States*, 517 U.S. 690, 700, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996). Specifically, courts have acknowledged that a cell phone is "a recognized tool of the trade in drug dealing," *United States v. Slater*, 971 F.2d 626, 637 (10th Cir. 1992), and that an affiant's knowledge, training, and experience of drug dealers' use of cell phones in the trade can support a finding of probable cause, *see United States v. Gibbs*, 547 F. App'x 174, 179 (4th Cir. 2013) (holding that a search warrant authorizing GPS monitoring

10

**JA167**

of a cell phone was supported by probable cause where the affidavit recounted the user's "extensive drug dealing activities"); *United States v. Harris*, No. 15-0170, 2016 U.S. Dist. LEXIS 48445, 2016 WL 1441382, at *11-12 (E.D. Va. Apr. 11, 2016) (stating that courts have found probable cause "to search a cell phone" where it was "discovered in proximity to crime or contraband" because it will "almost invariably contain incriminating evidence").

*United States v. Worthy*, No. TDC-18-0062, 2019 U.S. Dist. LEXIS 56275, at *4-5 (D. Md. Apr. 1, 2019).

Third, the warrants satisfy the particularity requirement. Although electronic devices like cell phones and laptops contain vast amounts of personal data, warrants authorizing searches of these devices are not subject to a heightened particularity requirement. *See United States v. Grinder*, CCB-17-0226, 2018 WL 2943235, at *5 (D. Md. June 12, 2018) (rejecting argument that warrant for cell phone search "requires a more robust particularity requirement" and noting that Government had heeded Supreme Court authority, notably *Riley v. California*, 134 S. Ct. 2473, 2482 (2014), by obtaining a warrant for cell phone data); *United States v. Christian*, 1:16-cr-2017 (LMB); 2017 WL 2274328, at *10 (E.D. Va. May 24, 2017) (acknowledging that a sometime in the future the law "may impose unique particularity requirements on cell phone ping warrants" but that day had not yet come); *United States v. Will*, 5:15-CR-6, 2015 WL 3822599, at *13 (N.D.W.Va. June 19, 2015) (holding that warrant which authorized search and seizure of "any and all computers, hard drives, cell phones, digital media storage devices" located in Defendant's home satisfied the requirements of the Fourth Amendment). The warrants in this case set forth the specific phones to be searched for evidence related to drug trafficking crimes. The warrants also detail the files to be searched. Accordingly, the warrants satisfy the particularity requirement.

**JA168**

In any event, the *Leon*, 468 U.S. 897, good faith exception applies to these warrants. There is no allegation by Juarez-Sanchez that that the affidavits contained deliberately falsified information or that the issuing judge was biased in some manner. Juarez-Sanchez claims that the affidavits were "so deficient that no objectively reasonable officer" could have relied in good faith on them, but he offers no support for that bald declaration. (ECF No. 25 at 3.) As noted above, there is no heightened particularity requirement for warrants to search cell phone data. Accordingly, there is simply no basis to suppress the fruits of the searches of the two Samsung phones associated with Juarez-Sanchez. The Defendant's Motion to Suppress Tangible, Digital, and Derivative Evidence (ECF No. 25) is, therefore, DENIED.

## III.    Motion to Suppress Statements

Finally, the Defendant has moved to suppress "any statements, admissions, or confessions" made: (1) during his encounter with law enforcement on August 5, 2020 and (2) while questioned by Immigration and Customs Enforcement ("ICE") agents on May 21, 2021. Again, as this Court stated on the record at the motions hearing, there is no basis to suppress these statements.

The Fifth Amendment privilege against self-incrimination provides that "[n]o person. . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., Amendment V. In *Miranda v. Arizona*, the Supreme Court established a prophylactic, procedural mechanism that safeguards a defendant's Fifth Amendment privilege when that defendant is subject to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 444, (2000) (reaffirming *Miranda* as "a

**JA169**

constitutional rule."). "Before conducting a custodial interrogation of a suspect, law

enforcement officials must inform the suspect that he has the right to remain silent, that his

statements may be used against him at trial, and that he has the right to an attorney during

questioning." *United States v. Wilder*, 304 F. Supp. 3d 464, 469 (D. Md. 2018). "An individual

subject to custodial interrogation may waive his *Miranda* rights; however, for such a waiver to

be valid, it must be voluntary, knowing, and intelligent." *United States v. Silva*, No. 2:15-cr-1,

2015 U.S. Dist. LEXIS 57609, at *18 (N.D.W. Va. Apr. 10, 2015) (citing *United States v.*

*Cardwell*, 433 F.3d 378, 389-90 (4th Cir. 2005)). "[T]he controlling burden of proof at

suppression hearings should impose no greater burden than proof by a preponderance of the

evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14, (1974); *Colorado v. Connelly*, 479

U.S. 157, 168-69 (1986) ("Whenever the State bears the burden of proof in a motion to

suppress a statement that the defendant claims was obtained in violation of our *Miranda*

doctrine, the State need prove waiver only by a preponderance of the evidence."); *United*

*States v. Robinson*, 404 F.3d 850, 860 (4th Cir. 2005).

###### A.    August 5, 2020 Statements

The Defendant has offered no specific argument as to why his statements to law

enforcement on the day of the traffic stop should be suppressed. Moreover, the

Government has represented that the only statements stemming from Juarez-Sanchez's

August 5, 2020 arrest it may seek to introduce at trial "were the false statements the

defendant made about his identity." (ECF No. 49 at 22.) It is well established that

> [r]outine questions attendant to legitimate police procedures do not require
> *Miranda* warnings. *See Pennsylvania v. Muniz*, 496 U.S. 582, 601, 110 L. Ed. 2d
> 528, 110 S. Ct. 2638 (1990); *United States v. Morrow*, 731 F.2d 233, 237 (4th Cir.

**JA170**

1984) (holding that *Miranda* warning not required for taking of basic biographical information such as name, age, etc.)

*United States v. Han Zhang*, No. 99-4901, 2000 U.S. App. LEXIS 15979, at *4 (4th Cir. July 11, 2000). The proffered questions and statements fall well within the scope of this exception. *See United States v. D'Anjou*, 16 F.3d 604, 608 (4th Cir. 1994) ("there exists an exception to *Miranda's* coverage for routine booking questions securing biographical data necessary to complete booking or pretrial services"). In addition, the Defendant has offered no argument that his statements were involuntary or that his will was "overborne" by coercive police conduct. *United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002). Therefore, there is no basis to suppress the Defendant's August 5, 2020 statements to law enforcement.

### B.    May 21, 2021 Statements

Nor is there any basis to suppress the Defendant's May 21, 2021 statements to an ICE Deportation Officer. The record reflects that that Juarez-Sanchez was indeed subject to custodial interrogation by ICE officials and that he waived his rights and agreed to speak to those officials. (ECF No. 49-8.) The Defendant has presented no specific argument that his waiver was in any way not knowing, voluntary, or intelligent. Accordingly, the Defendant's Motion to Suppress Statements (ECF No. 26) is DENIED.

### IV.    Motion for Leave to File Additional Pretrial Motions

The Defendant has requested leave to file additional pretrial motions as he completes his review of the discovery in this matter. This motion was filed on September 13, 2021 by Juarez-Sanchez's prior counsel, Assistant Federal Public Defender Jeffrey Dahlberg. After Mr. Dahlberg withdrew from the case and Mr. Guillaume entered his appearance, this Court granted a consent motion to extend the deadline to file pretrial motions through February

**JA171**

28, 2022. (Order, ECF No. 45.) No additional motions have been filed. Both Juarez-Sanchez

and the Government will have the opportunity to file motions *in limine* in advance of the

pretrial conference set for May 17, 2022 at 4:00 p.m. Accordingly, this motion is MOOT.

## CONCLUSION

For the reasons stated above, it is HEREBY ORDERED this 26th day of April, 2022

that the Defendant's motions to suppress (ECF Nos. 24, 25, 26) are DENIED. The

Defendant's Motion for Leave to File Additional Pretrial Motions (ECF No. 27) is MOOT.

_____/s/_____
Richard D. Bennett
United States District Judge

15

**JA172**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**UNITED STATES OF AMERICA**          *

  **v.**                                   *   **Criminal Case No. JRR-21-174**

**ALEXANDER JUAREZ SANCHEZ**     *

*   *   *   *   *   *   *   *   *   *   *

### DEFENDANT'S MOTION IN LIMINE TO EXCLUDE EVIDENCE

Defendant Alexander Juarez-Sanchez, by and through counsel, Alfred Guillaume III, hereby moves this Honorable Court to exclude any testimony by Sergeant Craig Miller of the Maryland State Police as both a fact *and* an expert with respect to the following issues: 1) that fentanyl is primarily imported into the United States by Mexican Cartels; 2) the typical transportation method of fentanyl into the United States; and 3) the significance of the "Santa Muerte" statue found inside a backpack in the trunk of the car during the traffic stop.

### I.    Procedural History

On May 19, 2021, Alexander Juarez-Sanchez was indicted by a federal grand jury for conspiring to distribute controlled substances in violation of 21 U.S.C. §846, Possession with Intent to Distribute Controlled Substances in violation of 21 U.S.C. §841, and reentry after deportation, in violation of 8 U.S.C §1326(a).  On April 25, 2022, this Honorable Court denied the requested relief in defense pretrial motions (ECF 24, 25, 26) at the conclusion of a contested motions hearing.  Trial is scheduled to begin on May 23, 2022.

### II.    Relevant Facts

On August 5, 2020, Alexander Juarez-Sanchez ("Mr. Sanchez) and Domingo

1

**JA173**

Ramirez-Roblero ("Mr. Roblero) were arrested during a traffic stop in Hagerstown, Maryland. Approximately three kilograms of a substance later determined to be heroin was recovered from the vehicle. Also recovered inside a backpack in the trunk of a vehicle was a statute of the Grim Reaper, known in certain cultures as "Santa Muerte." Sergeant Craig Miller of the Maryland State Police, initiated the traffic stop, investigated the individuals involved, and made the decision to call for a K-9 unit to investigate a potential drug crime. The government intends to call Sergeant Miller as both a fact and expert witness in its case in chief. Sergeant Miller will testify that fentanyl is imported into the United States primarily through Mexico, and its flow is largely controlled by Mexican drug cartels, including those in the State of Sinaloa; fentanyl is transported into the United States from Mexico by motor vehicles, with the use of hidden compartments and that the image of "Santa Muerte" is the patron Saint of drug traffickers.

### III.    ARGUMENT

The Fourth Circuit has affirmed the practice of a witness testifying as both a fact and expert witness if proper safeguards are in place to help prevent jury confusion.[1] However, in this case, there is little the court could do to prevent jury confusion if Sergeant Miller were to testify as both a fact and expert witness. The government plans to argue to the jury, primarily with the use of text messages and location data, that Mr. Juarez-Sanchez was transporting drugs between the west and east coasts. There will be no intervening witness to offer an expert opinion on the meaning of the text messages and location data. The jury is likely to confuse Sergeant Miller's testimony regarding drug

---

[1] See *United States v. Minnick*, (2016 U.S. Dist. LEXIS 168794)

2

trafficking in Mexico as an affirmation of the government theory of the case.

Rule 403 of the Federal Rules of Evidence allows for evidence to be excluded if "if its probative value is substantially outweighed by…unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." In the instant case the government will argue that the Mr. Juarez-Sanchez is transporting drugs from the west coast (California) to distribute in different States. However, the government does not have any evidence that the drugs recovered during the traffic stop in Maryland originated in Mexico, or in the State of Sinaloa. Although the government has no evidence that Mr. Juarez worked for the Sinaloa Cartel, it will likely argue that Mr. Juarez-Sanchez communicated and sent money to persons in Mexico in the days and weeks preceding the traffic stop in Maryland. The government will argue that the money and communication were related to drug trafficking. This argument, combined with Sergeant Miller's testimony that fentanyl in the United States primarily comes from Mexico, and is typically transported by car, will unduly prejudice Mr. Juarez-Sanchez.

The government plans to elicit expert opinion testimony from Sergeant Miller that the statue found inside the backpack of the trunk of the car is a replication of "Santa Muerte", the patron Saint of drug traffickers. Additionally, Sergeant Miller plans to testify that he has encountered Santa Muerte imagery several times in his experience as a police officer, and the persons who follow or believe in the existence of this image consider themselves to be part and parcel of the drug trade, not persons who are acting merely as mules/carriers. Sergeant Miller's proffered testimony would be unduly prejudicial to Mr. Juarez-Sanchez. Sergeant Miller is unaware if this statue belonged to

3

Mr. Juarez-Sanchez or had any other meaning or cultural significance.  Sergeant Miller's

proffered testimony regarding the belief of the persons who possess a statue of this sort is

unduly prejudicial and would confuse and mislead the jury.

#### IV.    CONCLUSION

For the foregoing reasons, Defendant Alexander Juarez-Sanchez, respectfully

requests that this Honorable Court exclude Sergeant Miller from testifying as both a fact

and expert witness with respect to the foregoing issues.

Respectfully submitted,

*Alfred Guillaume*

Alfred Guillaume III, Esq. (Bar #30117)
Law Offices of Alfred Guillaume III, LLC
1350 Connecticut Ave. NW, Ste. 308
Washington, DC 20036
202-321-0549

#### REQUEST FOR A HEARING

Pursuant to Rule 105.6 of the Local Rules of the United States District of

Maryland, a hearing is requested on this Motion.

*Alfred Guillaume*

Alfred Guillaume III, Esq. (Bar #30117)

#### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 11th of May 2022, a copy of the
foregoing Motion was served electronically via ECF to: Office of the United
States Attorney, 36 South Charles Street, Fourth Floor, Baltimore, Maryland
21201.

*Alfred Guillaume*

Alfred Guillaume III

4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. JRR 21-174 |
| | * | |
| ALEXANDER JUAREZ-SANCHEZ, | * | |
| | * | |
| Defendant. | * | |
| | * | |

*******

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION IN LIMINE

The government has received the Defendant's Motion in Limine regarding the substance of Master Trooper Craig Miller's anticipated expert testimony during trial related to two specific areas of testimony. ECF No. 60. For the reasons below, the government is willing to limit Trooper Miller's testimony on the significance of the Santa Muerte symbology discovered during the case. On the other area, the government would ask that the Court either reject Defendant's request to preclude testimony on the geographic origin of most illicit fentanyl flowing into the United States or work with the parties to fashion a compromise articulation.

**Background**

This case arose from an August 5, 2020, traffic stop in Hagerstown. After Maryland State Police Master Trooper Craig Miller pulled a white Honda Accord over for following too closely on I-81 that morning, he became highly suspicious when neither the driver nor passenger provided identification and neither was the registered owner of the vehicle, which also had expired Indiana tags. Master Trooper Miller is a 28-year veteran of the State Police and the senior member of the Western Maryland-based team that specifically targets criminal trafficking along major highways. After requesting a K-9 scan a few minutes into the interaction, a search

**JA177**

of the vehicle yielded 3 kilogram sized packages of drugs hidden in the car, including under the passenger seat cushion, and over $47,000 in cash. The drug packages, each just under 1 kilogram, were determined to be fentanyl (two packages labeled "W2") and heroin (labeled "RATA"). Both men initially provided false identity information but fingerprint matches revealed them to be previously deported Mexican nationals.

Because this was a reactive case with no prior investigation, and the Defendant—the car's passenger—has denied knowledge of the drugs, evidence recovered from the men's cell phones is critical to this case to prove knowledge and criminal intent. Besides position location information (exclusively located in the driver's iPhone), most of the evidence relevant to drug trafficking was located in the Defendant's two cell phones. Those phones contain records of communications with several coconspirators, including at least two based in Mexico. Using WhatsApp, Defendant took instructions from a Mexico-based co-conspirator he identified in his phone as "Pariente 2" to travel to California in early July 2020 and receive drugs from another coconspirator the Defendant dubbed "Viuda Negra" in Burbank on July 11, 2020. The Defendant and his driver, co-defendant Domingo Ramirez-Roblero, then transported the drugs to a buyer in Skokie, Illinois (north of Chicago) on July 13, after which "Pariente 2" directed Defendant to send money transfer to a nominee recipient in Mexico. Based on the smaller money amounts involved, some hesitancy the California-based suppliers evinced in meeting with him, and the apparent absence of contacts beforehand, this may have been a "trial-run" for Defendant with the drug trafficking organization.

In late July, however, cell phone evidence shows that Defendant planned a much larger deal. He again recruited Ramirez-Roblero to drive, this time with a newer vehicle after the earlier trip was plagued by car problems. Records from Defendants phone show that "Pariente

2" directed him to send nearly $13,000 to recipients in Sinaloa and Queretaro states in Mexico ahead of the drug pickup in Burbank.  Each remittance was made by Defendant (using two aliases), Ramirez-Roblero, or friends of those two whom the former recruited to send money in increments always below $1,000.  Notably, however, regardless of who made the transfer, Defendant was the one who sent each receipt, which contained a critical code needed for the recipient to claim the funds, to "Pariente 2."

After sending the money, Pariente 2 sent Defendant instructions to contact Viuda Negra and pick up seven parcels: one "RATA," two "W2," and four "W2/3."  After meeting Viuda Negra or another coconspirator at a Mexican restaurant in Burbank that evening, cell records show that the two immediately began driving back across the country.  On the early morning of August 4, Defendant took instructions from another Mexico-based co-conspirator, listed as "Compa Neto" in his phone, to contact a buyer in Kentucky who instructed Defendant to meet at a WalMart parking lot in Lexington, Kentucky.  Compa Neto told Defendant to provide the buyer the four "W2/3" for which he would receive "papel" in the amount of "44."  After the sale, Defendant sent three remittances from a nearby Mexican supermarket to Mexican recipients and sent the receipts to Compa Neto.  The men, now heading to meet a buyer in New York, resumed their eastward drive before being stopped by Master Trooper Miller the next morning in Hagerstown.

On May 19, 2021, Defendant was indicted in this District and charged in Count One with Conspiracy to Distribute Controlled Substances between July 10 and August 5, 2020, as well as with Possession with Intent to Distribute Controlled Substances on August 5, 2020, here in Maryland (Count Two) and Illegal Reentry of a Previously Removed Alien (Count Three).

- 3 -

**JA179**

**Expert Testimony Issue**

On March 22, 2022, the government provided Defendant with the substance of the expert testimony it would seek to present through Master Trooper Millerat trial.  Because the expert-type information that the government felt necessary to present to the jury in this case is very limited and because Master Trooper Miller has testified as an expert previously in Maryland state court, the government elected to simply re-call him as an expert after a few intervening witnesses following his factual testimony in the case, while contemporaneously instructing the jury that the witness is testifying in a different capacity.  This is consistent with accepted practice in the Fourth Circuit.  *See United States v. Garcia*, 752 F.3d 382, 391 (4th Cir. 2014); *United States v. Baptiste*, 596 F.3d 214, 223 (4th Cir. 2010); *United States v. Wilson*, 484 F.3d 267, 275-76 (4th Cir. 2007).

The government provided Defendant with Master Trooper Miller's resume and the followingdisclosure on the substance of his anticipated testimony:

1) Fentanyl is primarily imported from China, usually through Mexico.  Of late, Mexican cartels have begun manufacturing fentanyl themselves rather than import it from China.  In either case, however, the flow of fentanyl into the U.S. is largely controlled by Mexican cartels, including those based in Sinaloa state.
2) Most fentanyl moves across the country from the SW US-Mexico border via motor vehicle.  This is often in tractor trailers but also in passenger vehicles, typically in hidden compartments.
3) Fentanyl's wholesale price is ~ $10,000/kg in the SW US.  The wholesale price increases the farther away from the SW border you travel.
4) On the street, Fentanyl will sell for about $100/gram (4 hits), but is usually sold after it has been "stretched" with other dilutants.  1 kg of fentanyl might be "stretched" into 4-5 kg of fentanyl after dilutants are added, allowing 1 kg to ultimately sell for $40 - $50K at the retail level and produce 16-20K doses/hits.
5) Santa Muerta is considered the patron saint of drug traffickers, who believe carrying images of him will ward off law enforcement.  M/T Miller will testify that he has encountered Santa Muerta imagery several times, and would characterize those who subscribe to this particular belief/cult to be those who consider themselves part of the drug trade rather than recruited mopes/mules with limited knowledge.

Defendant presently objects to all but numbers 3 and 4.  (On page 2 of his motion, Defendant

- 4 -

**JA180**

mistakenly refers to the seizure here as involving three kilograms of heroin.  In fact, the seized drugs were two kilograms of fentanyl and  one kilogram of heroin.)

As to the Santa Muerte issue, the government is willing to limit Trooper Miller's testimony regarding the two Santa Muerte symbols recovered from Defendant to the fact that he has encountered it during previous arrests of drug traffickers who are transporting significant amounts of drugs.  The government additional suggests limiting his comments on this issue to the factual portion of his testimony.  That said, the government also plans to introduce evidence that the statute Trooper Miller recovered from the car is the same statutette that Defendant photographed in what appears to be his home a few weeks before the arrest as it tends to show that he exercised control over the backpack and the drugs & cash hidden in the car.

On the other issue--the fact that most of the fentanyl in the United States is sourced from Mexico—Is broadly recognized in the counterdrug community, but this fact may not be commonly known to the jury.  It is highly relevant to this case as it provides context and significance to the Defendant's contacts with, and payments to, coconspirators in Mexico.  The coconspirators directing the Defendant to the source of the fentanyl and heroin in Burbank, California, on both occasions  have Mexican phone numbers (country code 52) and communicate exclusively in Spanish.  Additionally, all of the persons whose names and addresses to whom these Mexican coconspirators directed the Defendant send money were located in Mexico.  The government does not plan to put on any evidence that these coconspirators are members of any particular or identified drug cartel, but their control over the movement of, and payment for, fentanyl and heroin is placed in the proper context once one realizes that most of the U.S. sythentic opioid trade is orchestrated through Mexico.

Again, this fact is not in much dispute.  Although as late as 2019 the Drug Enforcement

- 5 -

**JA181**

Administration viewed China as the source of most finished fentanyl, the Commission on

Combating Synthetic Opioid Trafficking, a multi-agency commission created pursuant to the

2020 National Defense Authorization Act, published its Final Report in February of this year.  In

its executive summary, the Commission reported that:

Since 2014, when illegal synthetic opioids began their rapid expansion in the United States, their source has evolved. From about 2014 until 2019, 70 to 80 percent of the pure fentanyl and fentanyl analogues that federal authorities seized came from foreign suppliers in the PRC. They relied on the internet to sell their drugs and on the international mail and parcel delivery systems to ship their products to the United States.

**Since then, the dominant source of illegally sourced fentanyl has been Mexico**. The drug is manufactured in illegal laboratories there using precursors from Asia—mainly the PRC—and is trafficked principally by land into the United States. **Fentanyl coming from Mexico is often of very low purity—generally, in powder form around or slightly above 10 percent—but now accounts for almost all the fentanyl that law enforcement has seized since late 2019**. Trafficking in synthetic opioids has increased in part because of its low cost: It is cheaper to illegally manufacture fentanyl or a fentanyl analogue than it is to grow poppies, extract the raw materials from them, and produce heroin.[1]

(emphasis added).  Although the government could submit the entire Commission report as a

public record under Federal Rule of Evidence 902(5), we assess this would be overkill when just

a few facts from the report are necessary to this case and can be elicited from Master Trooper

Miller.[2]  In lieu of that, the government would propose that the Defendant stipulate on this point

rather than offering the Commission's full report for this limited purpose.

---

[1] Commission on Combating Synthetic Opioid Trafficking, "Commission on Combating Synthetic Opioid Trafficking." February 2022, p. xi, available at https://www.rand.org/hsrd/hsoac/commission-combating-synthetic-opioid-trafficking.html (last accessed May 13, 2022)

[2] As another alternative, the government could have Master Trooper Miller read that particular extract from the Commission report while he testifies.

**JA182**

**Conclusion**

For these reasons, the government requests that the Court deny Defendant's motion to limit Master Trooper Miller's expert testimony regarding the source of illicit fentanyl and the distribution techniques of its traffickers.

Respectfully submitted,

Erek L. Barron
United States Attorney

By: */s/ Adam K. Ake*
Adam K. Ake
Assistant United States Attorney

Amy L. Schwartz
Special Assistant United States Attorney

**CERTIFICATE OF SERVICE**

This is to certify that on May 14, 2022, I am causing a copy of the foregoing Response to Defendant's Motion in Limine to be electronically filed in CM/ECF, and that a copy of this document is also being sent to counsel via email.

———//s//———————————
Adam K. Ake
Assistant United States Attorney

- 7 -

**JA183**

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                      NORTHERN DIVISION

 3
    UNITED STATES OF AMERICA        )
 4           Plaintiff,             )
                                    )
 5        v.                        )Criminal No. 1:21-cr-00174-JRR
                                    )
 6  ALEXANDER JUAREZ-SANCHEZ        )
               Defendant.           )
 7  _____)
                                        Baltimore, Maryland
 8                                      May 25, 2022
                                        2:07 p.m.
 9

10          THE ABOVE-ENTITLED MATTER CAME ON FOR
                    PRETRIAL CONFERENCE
11          BEFORE THE HONORABLE JULIE R. RUBIN

12

13                  A P P E A R A N C E S

14  On Behalf of the Plaintiff:
         ADAM AKE, ESQUIRE
15       AMY L. SCHWARTZ, ESQUIRE

16  On Behalf of the Defendant:
         ALFRED GUILLAUME, III, ESQUIRE
17
    Also Present:
18       ARMANDO HASBUN, INTERPRETER
         ADANNA SMITH, LAW CLERK
19

20

21

22       (Computer-aided transcription of stenotype notes)

23                      Reported by:
                 Ronda J. Thomas, RMR, CRR
24               Federal Official Reporter
              101 W. Lombard Street, 4th Floor
25               Baltimore, Maryland 21201
```

```
 1   (2:07 p.m.)
 2              THE COURT:  Good afternoon.
 3              MR. AKE:  Would you like us to call the case, Your
 4   Honor?
 5              THE COURT:  Yes, please.  Thank you.
 6              MR. AKE:   Your Honor, we're here in the matter of the
 7   United States of America v. Alexander Juarez-Sanchez.  Criminal
 8   Number JRR-21-174.  I'm Adam Ake for the United States.  I'm
 9   joined at counsel table by Special Assistant U.S. Attorney Amy
10   Schwartz.  We're here for our pretrial conference.
11              THE COURT:  Thank you.  Good afternoon.
12              MR. GUILLAUME:  Good afternoon, Your Honor.  For the
13   record, Alfred Guillaume on behalf of Mr. Alexander
14   Juarez-Sanchez, who is seated to my left.
15              THE COURT:  Can you inform me exactly, how does the
16   Defendant wish me to refer to him in terms of his last name,
17   which I know is hyphenated so I just want to be sure he is
18   called as he wishes.
19              MR. GUILLAUME:  Juarez-Sanchez.  Sanchez may be a
20   little bit easier.  Sanchez is also fine.
21              THE COURT:  That's why I'm asking.  Nice to see you,
22   Mr. Guillaume.
23              MR. GUILLAUME:  Thank you, Your Honor.
24              THE COURT:  I know we have Mr. Hasbun here, do we need
25   to have Mr. Hasbun sworn?
```

3

```
 1          THE CLERK:  Please stand and raise your right hand.
 2      (Interpreter sworn.)
 3          THE CLERK:  Thank you.  Please state your full name
 4  for the record.
 5          THE INTERPRETER:  Armando Hasbun, H-A-S-B-U-N.
 6          THE COURT:  Thank you for being here.
 7          THE INTERPRETER:  You're very welcome.
 8          THE COURT:  Everything working well?
 9          THE INTERPRETER:  Yes.
10          THE COURT:  Good afternoon to everybody.  Most of you
11  know now I'm Judge Rubin.  I'm presiding over this case.  I
12  just want to be clear that this was originally assigned to
13  Judge Bennett and it has been reassigned to me.
14      Before we move forward this afternoon, I want to just go
15  over some of the basic COVID protocols.  I'm sure you're all
16  familiar.  I'm probably the one who is least familiar with the
17  court's COVID protocols in the room.  So I just want to be sure
18  that we're all in agreement and if there are any objections we
19  can address them.
20      Pursuant to the standing order which is 2022-01, all
21  persons are required to wear a mask in any public area of the
22  courthouse.  Inside the courtroom, however, it's in my
23  discretion to allow a participant in a court proceeding to
24  remove his or her mask while speaking so long as that
25  individual has been fully vaccinated against COVID-19.
```

1    Are there any objections from counsel regarding fully
2  vaccinated individuals being allowed to remove their mask for
3  speaking purposes?
4          **MR. AKE:**  Not from the Government, Your Honor.
5          **MR. GUILLAUME:**  No, Your Honor.
6          **THE COURT:**  All right.  So I'm going to ask those at
7  trial table what their vaccination status is so that you can
8  then be comfortable to remove your mask if you in fact are
9  fully vaccinated.
10    Counsel, can you identify yourselves for the record and
11  then state whether or not you are fully vaccinated?
12          **MR. AKE:**  Yes, Your Honor.  For the Government Adam
13  Ake, and I am vaccinated.
14          **MS. SCHWARTZ:**  For the Government Amy Schwartz, and
15  I'm fully vaccinated and boosted.
16          **MR. GUILLAUME:**  Your Honor, Alfred Guillaume for
17  Mr. Juarez-Sanchez, I am fully vaccinated and boosted as well.
18    I want the Court to know my client is not though.
19          **THE COURT:**  Right.  As Mr. Sanchez is not fully
20  vaccinated, he is instructed to keep his mask on during the
21  course of the proceedings, and counsel are welcome to remove
22  their masks if they wish to.
23    So we are here for our pretrial conference and to address
24  the outstanding Motion in Limine.  I also want to take -- be
25  sure we have adequate time to go through what is the joint

1   proposal on jury instructions.  I have some thoughts and happy

2   to open that up for discussion.

3        So I am happy to do this in a different way if somebody

4   has a better idea, and I'm open to it, but I think it might be

5   helpful if we first review the Motion in Limine so that might

6   inform some of the other decisions we make today.

7        Any objection to going first with that?

8            MR. GUILLAUME:  No, Your Honor.

9            THE COURT:  Okay.  I'm happy to hear from you.

10           MR. GUILLAUME:  Your Honor -- Court's brief

11  indulgence.

12           THE COURT:  Take your time.

13           MR. GUILLAUME:  Your Honor, as the Court is aware I

14  did file on behalf of Mr. Juarez-Sanchez under ECF-60 a Motion

15  in Limine with respect to certain evidentiary items that we

16  anticipate will be an issue at trial.

17       I think I'll start first with the issue with respect to

18  the proposal from the Government to use Sergeant Miller from

19  the Maryland State Police as an expert and fact witness.

20       Your Honor, I'm not going to re-recite my motion but I'll

21  just focus on a few points, in that, I do agree that the Fourth

22  Circuit has -- with the Government -- that the Fourth Circuit

23  does allow for this type of testimony.

24       However, in a case such as this, which is kind of outlined

25  in my motion where there's not going to be a lot of witnesses,

1  one; and the fact that Sergeant Miller did not participate in

2  the, I guess -- before I even phrase it like that.

3       I guess just so the Court is aware, this case -- and the

4  Government laid it out more in their motion of how it's going

5  to go play out.  It starts with a traffic stop and an

6  investigation that kind of goes from there.  So as opposed to

7  the other way around where there's been an ongoing

8  investigation.

9       Sergeant Miller did not participate in any of the

10 investigation, other than the traffic stop, which was based on

11 a routine traffic violation and which later turned out to be a

12 drug seizure.  The Government seized phones from my client and

13 the other individual in the car, did an analysis of those

14 phones and determined that there was in their opinion an

15 ongoing drug conspiracy, which was charged, and here we are

16 today.

17      Sergeant Miller is going to testify as to various aspects

18 about the investigation and about the procedures, I guess, that

19 were used in this case.  And the way I've always had it

20 presented before, in this sort of a case, is that there's a --

21 not always -- but typically an expert witness from a Government

22 agency, such as the DEA or FBI, that is totally unrelated to

23 the case, which will explain to the jury the significance of

24 certain things.  Some of those things which the Government

25 proposes that Sergeant Miller testify about.

7

1          The primary concern I have with respect to those issues,

2    in general, is that a jury would be confused or misled by the

3    fact of his testifying as both a fact witness who actually did

4    pretty much everything in this case from a law enforcement

5    standpoint on the scene at the time versus an expert witness.

6          And I know the Government may argue that they're going to

7    take pains to inform the jury that he did not participate in

8    any of the other aspects of the investigation.

9          I'm still concerned of the potential prejudice that would

10   befall -- the undue prejudice that would befall

11   Mr. Juarez-Sanchez.

12         If you look into the two cases that were cited, the *Garcia*

13   case and the other more recent case *Minnick* in the Fourth

14   Circuit, the commonality in those cases in my opinion is that

15   there are intervening witnesses -- and the Court I believe in

16   *Minnick* talks about that -- that can help distinguish -- help a

17   jury to distinguish the fact and the expert testimony.

18         I'm concerned in this case if Sergeant Miller starts

19   referring to the things in which the Government wants him to

20   testify about, with respect to his expert testimony, they will

21   somehow be led to believe that that played a factor in or give

22   credibility to the overall investigation of which he did not

23   play a part in whatsoever.

24         I think it's a bit of a close call in my opinion.  Clearly

25   the Fourth Circuit says that you can do it.  You can have this

1   person testify in this manner.  But the things in which the

2   officer would testify about, specifically the price of

3   fentanyl, the way it's transported by vehicle from Mexico,

4   typically from Mexico into the United States, and those sorts

5   of things.

6       And then the Government will put on evidence from other

7   witnesses and they won't have -- as far as I understand, the

8   Government can correct me if I'm wrong -- there will not be a

9   case agent to explain any of the significance of the

10  investigation, other than to say this is what we did.

11      Most of the evidence in this case comes via the phones of

12  my client and the person who was in the car with him,

13  combination of the location data in the phones and the text

14  messages in the phones that will -- the Government presumably

15  will argue shows the existence of this drug conspiracy.

16      And with Sergeant Miller having testified to the very

17  same -- essentially it's going to fit the narrative that

18  Sergeant Miller will lay out in the general sense.  It will

19  kind of fit exactly into that narrative.

20      We have a case where it's alleged that my client travels

21  from the east to the west coast, picks up what's later

22  determined to be fentanyl, distributes it in various states.

23  And there's also a connection with Mexico.  There's an

24  allegation that the money or money was sent to Mexico via

25  Western Union or an electronic means of that nature.  And

9

1  there's going to be evidence of that.

2      So I'm concerned that -- and I don't -- I'm not saying

3  that these things can't be discussed.  I want to be clear.  I

4  think the Government can put a witness on to testify about

5  certain aspects.  The jury has a right to know how these things

6  function, according to the Government.

7      However, I'm concerned that this particular witness --

8          **THE COURT:**  You're concerned for who the speaker is?

9          **MR. GUILLAUME:**  Correct.  That's my primary concern.

10 And there's other specific issues I have with him, with respect

11 to some of the five areas in which have been outlined by the

12 Government.  But I'm speaking now in the general sense.  And I

13 think that's pretty much all I have on that.  I think Your

14 Honor hit the nail on the head.

15     But if I focus on the number one issue for us, is that

16 the -- I believe it's the fifth thing on the list in the

17 Government's motion with respect to there's a statue that's

18 uncovered --

19         **THE COURT:**  Yes.

20         **MR. GUILLAUME:**  -- in the car of an alleged -- the

21 witness will testify that this statue known as Santa Muerte, or

22 in English we might say the Grim Reaper statue, is a patron

23 saint of drug traffickers I think is clearly overly

24 prejudicial.  I think under Rule 403 it should be excluded.

25 Even with a limiting instruction, Your Honor, I think that --

1  the fact remains that there could be a million other reasons
2  for this particular statue being in this car.  There could be
3  other cultural significance attached to it, et cetera.  So I
4  think that -- and even if it was, assuming that it was the
5  patron saint of drug traffickers, right -- and I'm not
6  conceding that for a second.

7          **THE COURT:**  I understand.

8          **MR. GUILLAUME:**  I still think it should be excluded
9  under those circumstances for that reason.

10      Also the officer -- and I think we may have cleared this
11  issue up, this may be a non-issue.  I've kind of had some
12  discussions with the Government with respect to where --
13  they'll, I'm sure, obviously they can speak for themselves and
14  come up here and let Your Honor know, if there is any reference
15  to a specific state in Mexico, specific cartel in Mexico such
16  as the Sinaloa Cartel, I would argue that isn't -- by this
17  witness as far as where drugs typically generate from.  And I
18  think I may have cleared that up, but I just want to bring it
19  to the Court's attention in case it's an issue.

20          **THE COURT:**  So in other words, you're not necessarily
21  taking issue with -- well, I understand you don't want it
22  coming out of Miller's mouth.  You're not so much taking issue
23  with the jury hearing about Mexico as a common source, but
24  you're talking about the specific location or identity of
25  source within Mexico?

1       **MR. GUILLAUME:**  Correct.  I don't think I can stop the
2  Government from saying that there's drugs that come from
3  Mexico.  I think that they can -- they can have an expert to
4  testify to that.  Not necessarily saying that the drugs in this
5  case come from Mexico but just generally speaking.
6       **THE COURT:**  I get it.
7       **MR. GUILLAUME:**  So those are the issues I raise, Your
8  Honor.  I think we've tried to be -- work as closely as
9  possible to try to eliminate these issues.
10      **THE COURT:**  I appreciate that.
11      **MR. GUILLAUME:**  The number one issue for us is the
12 Santa Muerte statue and the fact versus expert witness
13 testimony.  I just think that Sergeant Miller's -- the proposed
14 testimony that he would give with the specificity in which he
15 would give it -- and again I think the Government can bring out
16 all these facts.  I'm just concerned that the speaker is not
17 appropriate for reasons outlined in the motion.
18     So that's all I have with respect to the Motion in Limine,
19 Your Honor.
20      **THE COURT:**  Okay.  All right.  Thank you very much.
21     Mr. Ake.
22      **MR. AKE:**  Thanks, Your Honor.
23      **THE COURT:**  Can you just first start off just let me
24 know whether or not you have reached agreement as to the
25 mention of the cartel or the specific location within Mexico.

1    MR. AKE:  Sure.  We haven't reached an agreement in

2  the sense of Mr. Guillaume and I actually hammering any

3  particular compromise out.  Just as an opening matter, the

4  Government conceded that just for reasons of not wanting to

5  infect the testimony with any religiosity issues and it just

6  may be a potentially fraught issue.

7    So the Government is willing to make sure that Trooper

8  Miller speaks to the discovery of the Santa Muerte statuette

9  during his factual testimony and limits the significance of

10  that discovery to the fact that he's found similar statuettes

11  and other iconography similar to in this case both the

12  statuette and an embroidered Santa Muerte both found during the

13  search of the vehicle.

14    So --

15    THE COURT:  If he's not going to be testifying about

16  what he believes is the significance of Santa Muerte generally,

17  what does it add to allow him to testify that he's discovered

18  it elsewhere?

19    MR. AKE:  Because it -- it has been his experience

20  that he's found it when he found other narcotics traffickers

21  when he's -- in interdictions.  It is also significant in that

22  unless the Defendant stipulates to ownership of the phone,

23  there is a picture --

24    THE COURT:  Yes, I'm not getting to that issue.

25    MR. AKE:  Okay.

13

1          **THE COURT:**  I'll hear from Mr. Guillaume.  I don't
2     know what your position is on using the photo to, you know,
3     establish possession or ownership of the satchel itself.
4          What is your position about that?
5          **MR. GUILLAUME:**  Your Honor, even if we conceded that
6     the phone -- he was using a phone during a traffic stop.
7          **THE COURT:**  Yeah.
8          **MR. GUILLAUME:**  I think the issue is going to come
9     down at trial potentially did he use the phone all the time, et
10    cetera, et cetera.
11         **THE COURT:**  Let me put the pause button on that.
12    Mr. Ake, I'm not quite sure that there's a distinction without
13    a difference as to his -- Trooper Miller?
14         **MR. AKE:**  Trooper Miller, yes.
15         **THE COURT:**  -- Trooper Miller's entitlement to testify
16    about what he thinks the overall significance of the statute is
17    in terms of it being the patron saint of drug traffickers and
18    not just carriers or mules versus him being able to testify
19    "I've seen this before in other cases."
20         **MR. AKE:**  So you don't see that as a --
21         **THE COURT:**  What is the material distinction there?  I
22    mean, isn't the -- it's the effective equivalent of him
23    communicating to the jury that my belief is that this is
24    carried by drug traffickers.
25         **MR. AKE:**  So without going into any -- I think there

14

```
 1  is a difference in the sense of what we're trying to avoid is
 2  the -- this idea that there's some sort of deference to it in
 3  kind of a religious aspect.
 4          THE COURT:  I see.
 5          MR. AKE:  So totally willing to --
 6          THE COURT:  So not the patron saint part?
 7          THE WITNESS:  Exclude the patron saint part.
 8          THE COURT:  I understand now.
 9          MR. AKE:  Other than just that this is frequently
10  seen, and he's seen it personally when he's made stops before
11  that have yielded in significant drug quantities.
12          THE COURT:  What's its relevance in that instance?
13          MR. AKE:  Well, again, it's the ownership, tying him
14  to that, to the drugs.  He had a picture of that in his
15  residence after the first drug-run earlier in July.  He had
16  made money so there's a picture of the statuette with money
17  arrayed from the proceeds of the first drug-run they made.
18          THE COURT:  So the way I come down on the photograph
19  thing is I think I just want to, you know, let that play out.
20  I don't, in candor, I don't imagine that I would not allow him
21  to testify to that photograph as a way of, you know, connecting
22  the possession issue.  But I'm not making a ruling on that.
23  I'm saying I'm going to let the evidence unwind and where I'm
24  leaning right now is I don't see a problem.  But we'll see
25  where it goes.
```

1        But as far as Trooper Miller's testimony that he has seen
2   the same statue or this icon in other drug stops, I see a huge
3   disconnect that I think does run the risk of a lot of
4   prejudice.  And I just don't see the relevance to it without
5   him being able to testify that it's the patron saint of drug
6   traffickers, which he's not going to testify to.
7            MR. AKE:  Okay.  All right, Your Honor, so then the
8   plan -- or the Government's plan in terms of presentation of
9   evidence we would start with Trooper Miller.  We do need him to
10  at least authenticate the photographs that were --
11           THE COURT:  Fine.
12           MR. AKE:  As I'm understanding what you'd like us to
13  do is -- he can say he discovered it.  We're going to
14  authenticate the photo, what was that.  And then there's a
15  separate picture that we plan to admit of an embroidered
16  version of the same thing.  But that'll just be with everything
17  else.
18           THE COURT:  Right.
19           MR. AKE:  So, okay.
20           THE COURT:  Just as though he had a picture with Papa
21  Smurf in the background.  Same thing.
22           MR. AKE:  Sure.  Right.  We're okay with that, Your
23  Honor.
24       So in terms of the other issues that Mr. Guillaume has
25  raised.  So when I've had drug experts testify before,

1  frequently, I'd say at least three times, it's been in cases
2  where one of the case agents was actually called as a drug
3  expert and it was typically in the vein of they were not only
4  talking about prices and quantities and distribution, things
5  that establish there was an intent to distribute, but they were
6  also called upon to decode coded language in wiretap
7  investigations.  So I'm not sure why Mr. Guillaume thinks that
8  an officer is really only involved in a case for less than a
9  day is going to be less prejudicial -- or more prejudicial than
10  the case agent that worked the case for months and months and
11  months in terms of their ability to kind of separate sort of
12  expert knowledge from the facts of the case.
13       What we're proposing to do here, and I actually offered
14  before we even decided, you know, we need to call him as an
15  expert witness, is to ameliorate any concerns that there would
16  be some sort of halo effects of later qualifying him as an
17  expert witness, and that would somehow lend extra credence to
18  his factual testimony to just get out the few limited facts
19  that we're trying to get in.  Because we'd like to be able to
20  make the arguments to the jury, and we don't want to run afoul
21  of rules arguing facts that aren't in evidence, about how many
22  doses this amount of fentanyl, two kilograms of fentanyl and a
23  kilogram of heroin, could ultimately lead to once diluted by
24  folks that were going to add, you know, the various fillers and
25  dilutants down to that.  What would it equate to in terms of

1   street value?

2       Right now that's just a gap in the case and because this

3   is a reactive case where we adopted it from a state case, quite

4   candidly, this was actually presented by the ICE agent as an

5   illegal reentry case until we figured out that there was so

6   many drugs involved it in, and it wasn't actually being

7   investigated by a federal law enforcement.  So I didn't have a

8   case agent, *per se*, working on this case like a normal federal

9   case.  As a result it was difficult finding a case agent who

10  was willing to come in and testify as an expert.

11          **THE COURT:**  Fact for fact.

12          **MR. AKE:**  Which was why given that Trooper Miller has

13  extensive training and has been qualified at the state level

14  and has previously testified as an expert witness that I

15  proposed --

16          **THE COURT:**  Well, that answers the question that was

17  itching my brain.  Why Miller?  Okay.

18          **MR. AKE:**  Why Miller.  I really didn't have a lot of

19  investigative resources in this case, Your Honor.  So given

20  just the very small number of expert-style facts that we were

21  seeking to get in, what I proposed was just work it into his

22  factual testimony, "Have you received training on this?"  And

23  just do it more like a training experience question about

24  dosing, you know, how many street quantities, sales, can come

25  out of one gram.  That kind of thing.  And how these drugs are

1   usually stretched after, you know, they're high quality when
2   they're originally packaged.

3       And one of the things we're going to get from the chemist
4   is at least the fentanyl was packed so tightly and it actually
5   had an imprint in it, meaning it had not been -- it had not
6   been touched or stretched between the time it was packaged,
7   presumably by whoever manufactured it, and when it was seized
8   in Maryland.

9       So relatively high quality fentanyl that could have been
10  stretched many, many ways.

11      So that's the reason that we would like to get that
12  information in and we feel it's necessary to convey the
13  significance of the quantities.  Because I'm sure there's lots
14  of people in this community that know those things, but they're
15  probably not the ones who are qualified to sit on the jury.
16  And anyone that would have firsthand knowledge of that is
17  probably going to be excluded by our *voir dire* questions.  So
18  that is not in the realm of common knowledge and it -- we still
19  need a way to get that in.

20      So I'm willing to do it -- put all of it just with him as
21  a factual witness.  Break it up.  We are going to have a very
22  large attenuating witness, a very anodyne witness.  The
23  forensic agent is going to -- I'll probably be on with him for
24  about three hours going through all the text messages and the
25  location data.  It's just going to take a long time to go

1  through because there's a lot of pieces to tie together.  It's

2  not going to be, like, a 10-minute witness, Miller testifies,

3  10-minute witness and then he's back on as an expert.  It would

4  be the afternoon at the earliest.

5          THE COURT:  Okay.

6          MR. AKE:  Do you need anything else from me, Your

7  Honor, or is that sufficient?

8          THE COURT:  I know we talked about at the outset but

9  with respect to the issue of mentioning the source.

10         MR. AKE:  Oh.  So, Your Honor, the Government doesn't

11  plan to put on any -- we, frankly, have no evidence that ties

12  to any named cartel.  Nor am I going to assert that either of

13  the co-conspirators with Mexican phone numbers were in one

14  state or the other.  There were just instructions to send money

15  to recipients and the nominees all had addresses either in

16  Querétaro state, which is north of Mexico City and is not

17  connected to Sinaloa, geographically they're not contiguous.

18  And then the rest were to addresses in Sinaloa.  So that's the

19  only mention of Sinaloa.

20         Again, the evidence at this point there's no -- we don't

21  have any witness.  The cooperator testimony is not going to say

22  that he knew who he was working with or whether it was a cartel

23  or just a well-organized group.

24         THE COURT:  Okay.

25         MR. AKE:  Maybe by definition that's a cartel.  But

```
1   again, there's going to be no mention of a specific cartel.
2           THE COURT:  Okay.  So, as I understand it, the
3   Government is not going to tie to its evidence any named cartel
4   or geographic location as the origin of the CDS.
5           MR. AKE:  Right.  The Government has no information on
6   the origin before it got to Burbank, California.
7           THE COURT:  So that portion of the motion it seems is
8   somewhat granted by consent.
9       Mr. Guillaume, are you satisfied with that limitation?
10          MR. GUILLAUME:  Yes, Your Honor.  It seems that both
11  the Santa Muerte issue is resolved as well as -- if I
12  understand the Court's ruling, and I would adopt the Court's --
13  you said it a litte more articulately than I did -- with
14  respect to whether -- basically the jury can -- the Government
15  can imply to the jury that this statue is used by drug
16  traffickers.  We would consent of course that it was found.  I
17  mean, we can't stop them from saying what was found.  But its
18  significance I think is highly inappropriate.
19          THE COURT:  No, my ruling is that there will not be
20  testimony.
21          MR. GUILLAUME:  Correct.  I just wanted to confirm
22  that.
23          THE COURT:  Yes, that's correct.  So what I have said
24  is that I'm going to allow the Government to lay the typical
25  foundation to establish the authenticity and the source of the
```

1  photograph so that the jury, if they're persuaded, can tie it
2  up as far as the possession aspect.
3          MR. GUILLAUME:  Correct.
4         THE COURT:  But there will not be testimony as to the
5  believed significance of Santa Muerte in any way, shape or
6  form.
7          MR. GUILLAUME:  Thank you very much, Your Honor.  And
8  I just want to confirm --
9         THE COURT:  Or that, or that Trooper Miller has
10 observed versions of the Santa Muerte at other drug stops.
11         MR. GUILLAUME:  Okay.  Great.  Thank you very much.  I
12 just want to make sure with the second part of the ruling.  I
13 think I understand that there will be no testimony with respect
14 to the origin of the alleged drugs, however, will there be, I
15 guess, as far as the -- unfortunately the term "Sinaloa" in
16 popular culture has become synonymous with drugs and drug
17 trafficking.  Will there be any mention -- and I would argue
18 that it doesn't -- it's not relevant where the money was sent
19 in Mexico.  We would concede it was sent to Mexico.  If it was
20 sent to Acapulco or Cancun versus Sinaloa, I feel like the term
21 "Sinaloa," even though it's a state of Mexico, ****it always
22 has been since its existence I assume, would be not
23 appropriate.  Even though it's the truth that it happened in
24 this case.  I don't think it's relevant.  I think that it can
25 be excluded even if it's admissible but potentially

22

1  prejudicial.

2          THE COURT:  I understood, Mr. Ake, that the Government

3  is not going to do that.

4          MR. AKE:  No.  Your Honor, there's going to be text

5  messages from his co-conspirators that send addresses to him

6  that clearly say Sinaloa.  So, Your Honor, trying to whitewash

7  that is --

8          THE COURT:  Yeah, no, I think -- I guess what I'm

9  saying is the -- I have to be careful using the word "facts"

10  because nothing has been established.  But in terms of what is

11  on the face of the evidence factually it is what it is.

12          MR. GUILLAUME:  Correct, Your Honor.  I just didn't

13  want the Government to argue -- I don't think they are.

14          THE COURT:  There's not going to be any attempt to

15  draw any connection.

16          MR. GUILLAUME:  Correct.

17          THE COURT:  Right.  I mean, it is what it is.  This is

18  the source, this is what the address says, this is what the

19  evidence is on its face.

20          MR. AKE:  Yes, Your Honor.

21          THE COURT:  Conclusions will be drawn as they will be

22  drawn.

23          MR. AKE:  Right.  So I forgot to address the other

24  points that Mr. Guillaume raised in his motion.  So the

25  Government would, again, still seek to put in evidence that

most of the fentanyl that comes in the United States originates
in Mexico.

THE COURT:  I understand that.  I haven't hit that
issue yet.

MR. AKE:  It was just that we -- the only place --
that's again to tie the conspiracy to these counterparties with
the 52 country code numbers in the Defendant's phone with his
WhatsApp connections.  Because we're only going to, you know,
by evidence be able to say that up to, you know, where we can
track the drugs.  They started in Burbank, but the fact that
all this money is going down to Mexico is significant.  And
there's some explanatory power in knowing that since the last
couple of years nearly all the fentanyl trafficked in the
United States is trafficked out of Mexico, so at least
coordinated out of Mexico, if not actually physically
originating there.

So we're not going to be able to put on any evidence to
say that it originates there or these particular drugs
originated there.  But only that the folks that were pulling
all the strings and orchestrating the movement of the drugs
across country were in Mexico.

THE COURT:  I think we're all on the same page.

MR. AKE:  Then the last thing, in terms of Trooper
Miller's testimony about the means of transportation.  So
Trooper Miller is actually going to say that most of the bulk

```
 1  fentanyl trafficking is done with, like, 18-wheelers and hidden
 2  in larger trucks and this is actually unusual, and it does mark
 3  them out as a smaller scale.  So I don't think that necessarily
 4  hurts.  In terms of we're not trying to overly prejudice the
 5  jury and say this was a large-scale distributor.
 6      I think Trooper Miller's -- his expert testimony is
 7  actually going to lend to the opposite conclusion, which is
 8  that these were relatively novices, small fry, which I think is
 9  also what the text messages show.  And the earlier run out in
10  early July appears to have been the first instance.  There was
11  a lot of mistrust events from the text messages.  It's a small
12  quantity or relatively smaller quantity.  And so that I don't
13  think that unfairly prejudices the Defendant.  I think that's
14  adequate to touch all the points I need to touch, Your Honor.
15          THE COURT:  Thank you.  Mr. Guillaume, did you want to
16  offer rebuttal as to the Trooper Miller as expert?
17          MR. GUILLAUME:  Just one point to make clear to the
18  Court, Your Honor.  I'm not objecting necessarily to the
19  potential testimony with respect to the street weight and all
20  that kind of stuff.  Just the witness himself.
21          THE COURT:  I understand.
22          MR. GUILLAUME:  That's it.  So I just want to make
23  that clear.
24          THE COURT:  Okay.  Yeah.  As to the Motion in Limine
25  on the question of whether Trooper Miller is going to be
```

1   permitted to testify as an expert generally, I want to be clear

2   when I announce this ruling, this of course assumes that the

3   Court is satisfied that all 702 foundation has been met, so

4   we'll see where that goes.  So I'm not making a ruling on that

5   aspect in terms of his qualifications to be clear about that.

6       I hear you, Mr. Guillaume, on the concerns that you've

7   raised.  As I read *Garcia* and its progeny, I don't see any

8   particular sort of carve-out or in particular limitation of the

9   rulings that it can be done if done carefully.  Based on the

10   numerosity of witnesses, I also appreciate Mr. Ake's

11   representation that the intervening witness will be long.

12       So I am satisfied to allow the Government to attempt to

13   offer Trooper Miller's testimony as an expert generally

14   provided that we are all careful that the *Garcia* safeguards are

15   in place and, you know, the cases talk about a laundry list.

16   It's a multifaceted effort to prevent confusion and you do

17   what's appropriate in the given case.  It's a non-exhaustive

18   list.

19       I'm happy to consider other measures, Mr. Guillaume or

20   Mr. Ake, that you think might be appropriate in a case with a

21   small number of witnesses.  So I'm going to allow the

22   Government to do that.  And we'll just be sure that we are

23   creative and diligent about those safeguards in place.

24       I would ask that counsel, as I'm sure you would anyway,

25   work together to come to some kind of an agreement about the

1  order of witnesses or what other measures will be put in place
2  other than simply divvying up his testimony that you are all
3  comfortable with.  I'm sure that if you are able to reach
4  agreement and, of course, Mr. Guillaume, your objection will be
5  preserved for the record notwithstanding any agreement you
6  reach as to safeguards.  I want to be clear about that.  So
7  whatever you agree to, I'll be happy as a clam to put in place.
8          MR. GUILLAUME:  Thank you, Your Honor.
9          THE COURT:  Is there anything else, Mr. Guillaume, as
10  to the Motion in Limine?
11          MR. GUILLAUME:  As to the Motion in Limine, no, Your
12  Honor.
13          MR. AKE:  Your Honor, there's one additional expert
14  witness potential issue that I just wanted to raise for the
15  Court that we haven't been able to hammer out.  And that's
16  over -- so the Government has the text message extracts from
17  the Defendant's phone.  In all but one case they are entirely
18  in Spanish.  And so the DEA, who joined the case when the
19  Government took it, did contract a linguist to translate the
20  body of the text messages that were in Spanish into English
21  both as an aid for the jury but ultimately because it's not
22  just an interpretive aid unless members of the jury speak
23  Spanish, it's indecipherable, as opposed to having a wiretap
24  recording where a transcript is provided.  And, you know, a lot
25  of times when we play wiretap calls a lot of it's muffled.

1   There's some doubt about what's being said.

2       So in this district we typically have a binder with the

3   transcripts that are given not as evidence themselves but as an

4   aid.  But that's because the recordings are still usually going

5   to be preserved and go back into evidence and the jury can

6   consider it.  But if it's a foreign language it's at least my

7   position that they would need the translations to go back into

8   the jury.

9       **THE COURT:**  Well, they need a translation.  I

10  certainly can't expect jurors to evaluate and consider evidence

11  they can't read.

12      **MR. AKE:**  Exactly.  For that reason the Government is

13  not just seeking to use it as demonstrative evidence but also

14  as substantive evidence.

15      The Government does have the linguist prepared to come in.

16  Because it's a contract linguist that doesn't work for the

17  government, he does have a conflict on the first day of trial

18  which is when we would probably need to bring him in as to

19  qualify as an expert.  The one issue, I guess, is it's not

20  expert testimony in kind of the traditional sense because this

21  could really be done by anybody that is just bilingual could

22  produce a version of the translation.

23      So we provided the -- our version of the translations a

24  month or so back to defense counsel.  Mr. Guillaume has said he

25  wants the linguist there to ask questions about some of the

1    translations, but has not identified what, if any, the actual

2    translations that he takes issue with.  Because in order --

3    what I propose in order to avoid calling the linguist is if he

4    had some different version of the translation that he wanted,

5    I'm happy to put that on the -- on the actual spreadsheet as a

6    competing -- a competing translation if that's what defense

7    assert is actually the better translation.

8         THE COURT:  I'm going to put that ball squarely in

9    Mr. Guillaume's court.  So if you want to examine the linguist

10   on the stand because you take issue with his expertise or his

11   translation or whatever it is you want to examine him on, you

12   can do that.  If you want to reach agreement and have

13   alternative versions, you can do that too.

14        MR. GUILLAUME:  Yes, Your Honor.  Really it's not -- I

15   don't want to be difficult.

16        THE COURT:  You're not being difficult.  You're doing

17   your job.

18        MR. GUILLAUME:  I do want the linguist here.  I guess

19   we'll just be upfront with the Court and Government.  I'm not

20   going to challenge necessarily that he's mistranslating things.

21   But from a strategic standpoint there are probably four or five

22   questions that I want a jury to hear me ask him.  So there

23   won't be a challenge that Your Honor will have to consider

24   about, you know, this is not accurate Spanish translation.

25        THE COURT:  I understand.  So if the Government offers

1  him as an expert in the language of Spanish.

2        **MR. GUILLAUME:**  I have no issue with the translations

3  *per se*.  Again, without relating strategic -- for strategy

4  purposes I want the jury to hear me ask --

5        **THE COURT:**  So that I get.  And I'm not asking you to

6  divulge anything you're not comfortable divulging.

7      Do you anticipate challenging his expertise in the area?

8        **MR. GUILLAUME:**  No.

9        **THE COURT:**  All right.  So we'll call him.

10        **MR. AKE:**  Your Honor, I guess the only other issue is

11  right now I planned to go over the text messages with the

12  forensic agent, who I planned to put on as the second witness,

13  because the linguist may not be available the first day.  Would

14  the Court accept a conditional entry, conditional on the

15  linguist being available the next day to provide some ability

16  to cross.

17        **THE COURT:**  I don't have a problem with that.

18        **MR. AKE:**  Is that okay?

19        **MR. GUILLAUME:**  That's fine with me.

20        **MR. AKE:**  We may be able to get him that day.

21        **THE COURT:**  That's fine.  We're nimble.  That's fine.

22        **MR. AKE:**  That takes care of the Government's concerns

23  on that, Your Honor.  Thank you.

24        **THE COURT:**  Okay.  So I do want to go over the

25  proposed joint *voir dire*.  As I mentioned I just have some

1   questions.  Witness list, is it --

2         MR. AKE:  So we usually provide those the day before

3   trial.

4         THE COURT:  So I've been asked and, you know, this is

5   my first rodeo in terms of jury trials in this court.  I've

6   been asked by our court clerk to provide the *voir dire* because

7   they're going to have to prepare it for the prospective jurors.

8   So I am going to try to provide that to her by close of

9   business today but not if I don't have a witness list.

10        MR. AKE:  We can get that together, Your Honor.  We

11  did disclose the one cooperating witness yesterday.

12        THE COURT:  Let me do this then.  If you can get that

13  to me -- this I think will be a better idea.  I have some

14  requested -- when I say requested, I realize I'm the

15  decision-maker, but I'm going to try to reach agreement with

16  everybody, I have some requested changes on the proposed *voir*

17  *dire*.

18     So why don't we agree that whatever the changes are on the

19  voir dire that happen as of today's conference and the witness

20  list, can we get all of that revised into chambers by email by

21  10:00 a.m. tomorrow?  That way you'll have plenty of time to

22  revise what you need to revise and create the witness list.  If

23  you email it to our chamber's email address we can be sure that

24  our Clerk's Office isn't behind the eight ball.  Does that make

25  sense?

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

**JA213**

1       **MR. AKE:**  Yes, Your Honor.

2       **THE COURT:**  Okay.  All right.  So we'll have that by

3  10:00 a.m. tomorrow.

4     As to the vaccination status of jurors.  My way of doing

5  this is that prospective jurors will be asked whether they are

6  vaccinated against COVID-19 virus and the unvaccinated jurors

7  that have been selected for the jury panel will need to report

8  to the courthouse 30 minutes before the start of the trial date

9  to take a rapid test.  Any unvaccinated jurors who indicate on

10  the answer sheet that they're unwilling to be tested, it's my

11  preference to not bring those jurors into the courtroom for

12  individual questioning during the *voir dire* process.

13     Does any counsel have an objection to that?

14       **MR. AKE:**  Just exclude them for cause *ab initio*?

15       **THE COURT:**  Yes.

16       **MR. GUILLAUME:**  No objection.

17       **THE COURT:**  Very good.  All right.  So I've got your

18  proposed *voir dire*, and I first want to address question 30,

19  which I know Mr. Guillaume has an objection to.  And then I'll

20  loop it back to the start of it so that I can just drag you

21  through some things that made me just kind of wrinkle my nose

22  but I'm not wed to.

23     The number 30 objection, just to be clear, this is the

24  question as to a juror's ability to, you know, be open-minded

25  about the testimony of a witness who has a cooperation

```
 1  agreement.  I don't like the way this is drafted because it --
 2  it smacks of some kind of endorsement by me.  I don't quarrel
 3  with the nature of the question itself.  I have a proposed
 4  alternative way of asking that that I think will get the
 5  Government to the place it wants to be.  I'm going to read it
 6  into the record, and I'm happy to hear from counsel if you have
 7  any problems with it.
 8      So instead this would be to replace proposed Question
 9  Number 30:  This case may involve testimony from convicted
10  persons who are cooperating with law enforcement in exchange
11  for the possibility of receiving a reduced sentence.  Do you
12  have any strong views about such witnesses or the Government's
13  use of them?  If they click "yes" then we're going to bring
14  them up and ask.
15          MR. AKE:  That's fine from the Government, Your Honor.
16          MR. GUILLAUME:  Your Honor, I appreciate and much
17  prefer that question.  However, I think that a cooperator
18  question, in general, draws attention to the issue.  I think
19  that the credibility of witness instruction they're going to
20  receive at the close of the case will allow a jury to assess
21  all the witnesses in the same vein.  I understand Your Honor
22  wants to give the question, I've had it given before, but I
23  always object to it, and I'll do the same here.  So there's
24  really no language that I would approve of.  But I do like that
25  better than what --
```

1        (Laughter.)

2            THE COURT:  I had a law professor who after pinning me

3    for a long time on a question he said to me "You are almost

4    right," and that's what that kind of felt like.

5        (Laughter.)

6            MR. GUILLAUME:  This is my rule, Your Honor, that I

7    have --

8            THE COURT:  No, I get it.  I understand.  I think as

9    written it does sort of remove -- when I say "as written,"

10   proposed from the Government does sort of remove from the

11   purview of the jury the entitlement to evaluate the credibility

12   of witnesses.  I will ask what I've proposed because I do

13   understand its value.

14       And I also, Mr. Guillaume, I appreciate your objection and

15   it is preserved.  It may end up giving you helpful information

16   as well if a juror thinks anybody who cooperates in a city like

17   Baltimore has got to be telling the truth, maybe that's a jury

18   you want to strike.

19           MR. GUILLAUME:  Thank you, Your Honor.

20           THE COURT:  I will substitute that.

21           MR. AKE:  Your Honor, the Government would note that

22   the mere image of that is the law enforcement officer question

23   which can only hurt us too.

24           THE COURT:  I understand.

25           MR. AKE:  So if one goes, we would ask the law

34

```
1   enforcement question go too.
2       (Laughter.)
3           THE COURT:  All right.  Let me just run through the
4   precautions and procedure that I'll go through with jurors
5   because, you know, we're going to be doing the voir dire à la
6   COVID so that the jurors will be in a separate room.  I know
7   you all know this, but just to be clear, I'm going to appear by
8   a television monitor in the jury selection area and will walk
9   the prospective jurors through the questionnaire.  Those sheets
10  will then be collected and brought to the courtroom where we're
11  going to be.
12      So jurors will be called in one at a time to discuss their
13  answer sheets and for me to ask further questions for the ones
14  that they answered in the affirmative to determine if there's
15  any cause basis to strike.
16      If there is a cause basis to strike, I'm going to ask you
17  to holler once the juror has departed the courtroom.  If I
18  don't hear from you, I'll assume you have no motion to strike.
19  Obviously if I think there's a reason to strike for cause on my
20  own I will voice it at that time.  But once that juror goes and
21  another juror comes in, if I haven't heard from you, I'll
22  assume you have no motion to strike for cause.
23          MR. AKE:  Your Honor, just a question about the
24  results of the questionnaires.  Obviously you're going to have
25  them, but what is counsel going to receive?
```

```
 1          THE COURT:  I, frankly, am not wed to this.  I don't
 2  see why counsel would have them because in an ordinary
 3  non-COVID time you have your juror lists and we all kind of
 4  make our scribble notes on them.  I think it just makes more
 5  work for my courtroom deputy to have to gather them and
 6  distribute them.  So I am not inclined to provide counsel with
 7  the answer sheet.
 8          MR. AKE:  So we won't know ahead of time when someone
 9  is coming in what positive responses they've made?
10          THE COURT:  Well, no, I think we're going to have it
11  up for you.
12          THE CLERK:  Your Honor, we'll put it on the ELMO
13  machine.  It will be broadcasted into the courtroom.
14          THE COURT:  Of course you will see it.  You'll see it.
15  I'm not going to ask you to be blind-sided by it.  I'm just not
16  distributing it so that we don't have to make copies of it and
17  get it back and all that kind of stuff.  So you will have a
18  visual of it in live time.
19          MR. AKE:  I justed wanted to know in advance how much
20  time we're going to have to --
21          THE COURT:  Yes, I don't mean to impair your ability
22  to prepare for that scenario.  Okay.
23      The preliminary instructions -- Adanna, have you passed
24  those out?
25      I'm going to give you my preliminary instructions that I
```

1  propose to give once the jury has been seated.  If you can just

2  sort of take a moment now.  Ordinarily I would have given them

3  to you in advance, but my saddle is not broken in so I'm going

4  to give them to you now and give you time to look at them.

5  There's nothing out of the ordinary about them, but please feel

6  free to voice any objections or concerns that you have.

7        MR. GUILLAUME:  Your Honor, just a housekeeping

8  question while we're looking at this.

9        THE COURT:  Yes.

10        MR. GUILLAUME:  What time does the Court intend to

11  start each morning?

12        THE COURT:  My usual is to start at 9:00 because

13  nothing ever really starts at the time that you want and then

14  half the day is over before you know it.

15        MR. GUILLAUME:  Okay.  That's fine.  And one other

16  question.  I have a paralegal that I was hoping I could bring

17  into court to help me.  I don't know if every day, at least one

18  day maybe, for closing in particular I'm thinking about.

19        THE COURT:  And to sit at the trial table?

20        MR. GUILLAUME:  Is that okay?

21        THE COURT:  I have no problem with that.  Counsel, do

22  you have any objection?

23        MR. AKE:  No, Your Honor.

24        THE COURT:  And I'll just ask you, as an officer of

25  the court, to confirm that she is fully vaccinated, and she can

```
 1  remove her mask if she is.  And if she does remove her mask, I
 2  will assume she is fully vaccinated.
 3            MR. GUILLAUME:  I will do that, Judge.  Thank you.
 4            THE COURT:  Oh, before you get headlong into that,
 5  what I also want to let you know is in terms of bench
 6  conference I'm going to use the technology so you can all just
 7  stay put and we'll put on the white noise and do it from our
 8  seats.  And I've never done that so I'll see how it goes.
 9            MR. AKE:  I hope it works, Your Honor.
10            THE COURT:  And if it doesn't we'll come up.
11            THE CLERK:  So it's just essentially everyone will
12  talk into the mic but listen with the earpiece.  So you'll talk
13  through your table mic and so will the judge, but you will be
14  able to hear everyone through the earpiece.
15            MR. GUILLAUME:  Your Honor, I've reviewed, and I don't
16  have any objections to these instructions.
17            MR. AKE:  No.
18            THE COURT:  So we're good for the preliminary
19  instructions.  Let me drag you through the proposed joint *voir*
20  *dire*.  Do you all have copies in front of you?
21            MR. GUILLAUME:  Yes, Your Honor.
22            THE COURT:  Not entirely, but for all -- and I'm happy
23  for you to tell me why -- but the family and friends
24  references, I just don't see how it's directly connected to a
25  potential juror's ability to be fair and impartial, and it
```

1  seems to just really prolong the *voir dire* process with a lot

2  of things that end up not being very helpful.

3       MR. AKE:  Is this the family and friends been to law

4  school or work for the Government?

5       THE COURT:  Well, it's like, you know, have you or any

6  of your family members or anybody that you know ever been in a

7  traffic stop?  Like, really?  Or, you know, it seems to open up

8  a gigantic number of responses that are really utterly

9  unhelpful and not relevant to that juror's ability to be fair

10 and impartial.  So I tend to not ask them.  There are certain

11 questions I will ask because I do see that -- I'll walk us

12 through rather than describing.

13      But let me just on Page 3G, the fifth word "please," I

14 think that's not intended.  Would you be tested -- is it be

15 comfortable sitting?  I'm not sure what that's supposed to ask

16 so if you could revise it and --

17      MS. SCHWARTZ:  Okay.

18      MR. AKE:  Just should be, "Would you be comfortable."

19      THE COURT:  I could get the gist of the question but

20 there are some errors in it when you resend it.  And that

21 witness list on Page 6 would be bumped in.

22      Number 13, I would omit reference to any member of your

23 family or any close friends.  I mean, you're going to have

24 every single person stand up that they know somebody who has

25 worked in a law firm.  It's just not going to be helpful in my

1  opinion.

2      Same for 14 and 15, I would take out references to family

3  members and close friends.

4      Page 8, same thing for 17 and 18.  Page 8 number 19A so

5  here's -- so I see -- if we do keep it, I would change it to

6  read "the role of the grand jury," not "Do you understand?"

7  because it ends with a question.  There's two different

8  questions there.

9          MR. AKE:  I can put "Do you understand that?"

10         THE COURT:  Yes, you could start "The role of the

11  grand juror is very different."

12         MR. AKE:  Thank you, Your Honor.

13         THE COURT:  But my question really is as to the

14  necessity of this question, and I'm completely open to it in

15  the general prospect, but there seems as though there's a

16  question if they're going to follow my instruction.  So do I

17  really care if they understand this standard difference at this

18  point?

19         MR. AKE:  I'm fine with that, Your Honor.

20         MR. GUILLAUME:  No objection.

21         THE COURT:  So we'll omit 19A.

22      Next page, C.  I wrote next to this "Why?"  What

23  importance does 20C have to you?

24         MR. GUILLAUME:  More to the question both sides like

25  if it's not guilty the Government thinks it's real

1   appropriate --

2          THE COURT:  So you both really want this one?

3          MR. GUILLAUME:  Well, it doesn't help me at all so I'm

4   okay with it.

5          MR. AKE:  I generally like to know.  We usually ask as

6   a follow-up question at the bench what the result was.

7          THE COURT:  All right.  Mr. Guillaume agreed to it and

8   I'll keep it.

9       Twenty-two on Page 10 I think should be revised.  I will

10  keep in the member of your immediate family or closest

11  associates for that question.  But I think you can omit "victim

12  of a crime."  I think it should just be "been the victim of a

13  crime related to drugs."  Because there's no human being who

14  does not consider themselves or a family member or a friend

15  being the victim of a crime.

16      And inquiry as to the necessity of 22A as to the reporting

17  to the police.  What significance does that have?

18         MR. GUILLAUME:  I agree to it but it doesn't matter if

19  it's there for me to my perspective.

20         MR. AKE:  The reporting --

21         THE COURT:  I question A and B, to be candid.

22         MR. AKE:  I think, Your Honor, generally we --

23         THE COURT:  Is that really a bias question?  I mean,

24  how does that get to the issue whether they can be fair and

25  impartial?

1          MR. AKE:  Right.  Generally, I mean, usually if they

2     answer "no" that they weren't --

3          THE COURT:  But that's just you want to know.  But how

4     does that indicate if they can be fair and impartial?

5          MR. AKE:  Well, we usually ask them that question, is

6     that going to interfere with your ability --

7          THE COURT:  I know the follow-up but the first

8     question -- the question at the first instance has to in some

9     way bear upon a juror's ability to be fair and impartial.  Did

10    they report it to the police?  Do they trust the police?  I

11    understand why you want to know.  I don't see that really bears

12    on a juror's impartiality.

13         MR. AKE:  I prefer to keep it in, Your Honor, but I

14    understand where you're coming from.

15         THE COURT:  I'm going to omit it, 22A and B.

16    For 23, 4 and 5 on Page 11 I would omit reference to

17    family and friends or family and associates.

18         MR. AKE:  Twenty-three, 24 and 25?

19         THE COURT:  Yes.  I can keep it in for 26.  It has

20    more significance there that I understand.

21    I'm going to swap out 30.

22    I would omit reference to family and friends in 36 on Page

23    14.  The use of the word "problem" is so general.  I think

24    you're going to have the whole world stand up.  I'm happy to

25    consider keeping family and friends in if the question is more

1  pointed towards significant health problems, additional

2  counseling.  Something that makes it more closely tied to

3  something that might make someone unable to be here impartial.

4  But to simply say someone has a problem is so general, I don't

5  know what significance it has.

6       I'll leave it to you all if you're dead set on having it

7  in.  I think we're going to get a cattle call of jurors.

8       I can see, you know, "I have a close friend from college

9  who received alcohol abuse counseling."  Oh, well.

10           **MR. AKE:**  Maybe take out the "close friends"?

11           **THE COURT:**  Yes, that's fine.  I will leave it to you

12  two to massage that a little bit.  It just seems too general to

13  me to be helpful.

14       Forty-one, I would omit reference to family and friends

15  but I'm happy to keep it in as to a particular juror.

16       I have a few more.  On Page 20, number 55, you have a

17  double question mark at the end of it, which gives the

18  impression that you are really emphasizing that.

19       (Laughter.)

20           **THE COURT:**  Number 57, I think there's just a typo in

21  there.  It should read "interfere with your ability..." or

22  however you want to reword it.

23       Fifty-nine seems like it kind of duplicates 58.  Tell me

24  what you think?

25           **MR. GUILLAUME:**  I don't have any objection to removing

```
 1   it, Your Honor.  I see what you mean.
 2           THE COURT:  It seems like the same thing.
 3           MR. GUILLAUME:  It's basically the same question.
 4           THE COURT:  So I would take out 59 or 58.
 5       Sixty is the same-ish as 63.  I would take out one or the
 6   other.  And that's the last one on the list.
 7           MR. AKE:  Your Honor, are you going to send us your
 8   formultion on 30?
 9           THE COURT:  Yes.  Yes, I can do that.
10       Adanna, can you do that?
11           MS. SMITH:  Yes.  If not, I have the physical copy.
12   Either way we have it.
13           THE INTERPRETER:  Your Honor, may the interpreter take
14   a break?  We've been going for over an hour now.
15           THE COURT:  Absolutely.
16           THE INTERPRETER:  Also, I did consult with the
17   gentleman and he is following what is being said.  He has no
18   input to the questions, as his counsel is interacting, so
19   conceivably you could continue until you get to something where
20   he actually has --
21           THE COURT:  Why don't we err on the side of caution
22   and take a 10-minute break.
23           THE INTERPRETER:  I just need to get something to
24   drink.
25           THE COURT:  Absolutely.  Take your time.  Is 10
```

1  minutes adequate?

2          THE INTERPRETER:  Yes.

3          THE COURT:  All right.  We'll stand in recess until 20

4  after 3:00.  Thank you.

5          THE CLERK:  All rise.  This Honorable Court is now in

6  recess.

7      **(There was a break in the proceedings at 3:10 p.m. and**

8  **court resumed at 3:20 p.m.)**

9          MR. AKE:  So we were talking about whether 60 and 63

10  were --

11          THE COURT:  Yes, thank you very much.  I was going to

12  omit 60 and let 63 be, the last one, be the catchall.  Does

13  that meet your approval?

14          MR. AKE:  Yes, Your Honor.

15          MR. GUILLAUME:  Yes, Your Honor.

16          THE COURT:  So that's all the comments I had about the

17  *voir dire*.  Yes.  I will be sure we email you the text of 30.

18  Oh, I know what I wanted to tell you.  The number of jurors.  I

19  think we're getting a pool of 55; is that right?

20          THE CLERK:  That's usually the standard number.

21          THE COURT:  Yeah, so in terms of the duration of the

22  trial, I've seen a couple of different estimates.  So I'm

23  trying to figure out how many alternates we want to sit.  So

24  how long?

25          MR. AKE:  Your Honor, the Government's case is going

1  to be two days of evidence.  Depending on how long the defense
2  case is, I think we're looking at probably Friday morning
3  closings, I would think.
4          MR. GUILLAUME:  I would agree with that assessment,
5  Your Honor.
6          THE COURT:  Okay.  I'm thinking two.
7          THE CLERK:  Yes.
8          THE COURT:  Two alternates.  All right.  Jury
9  instructions, verdict form.  We can wait until the first day
10 unless you have the means to get them to me earlier.  I know
11 you're in the mid --
12         MR. AKE:  We've circulated a draft to Mr. Guillaume.
13 We'll see if I can get an agreement.
14         MR. GUILLAUME:  Your Honor, with respect to the jury
15 instructions, I haven't made a decision yet, and every judge is
16 different, but typically the Government uses the Sands jury
17 instructions.  I have in the past, well one time, submitted
18 jury instructions from another Fourth Circuit pattern.  I think
19 it was from South Carolina I think is what I used, their
20 pattern instruction.  Some judges are totally against that,
21 others are open to it case-by-case.  I don't know if Your Honor
22 has an opinion one way or the other.
23         THE COURT:  I don't.
24         MR. GUILLAUME:  So I'll probably search for something,
25 if it's applicable I would not be afraid to add it.

46

1          THE COURT:  Yes.

2          MR. GUILLAUME:  Thank you.

3          THE COURT:  Just to be clear, who your case agents

4  are, Mr. Ake?

5          MR. AKE:  So, Your Honor, sitting at counsel table

6  with us for the trial is going to be DEA Special Agent Tom

7  Adams.  He is not going to testify.  There is an additional ICE

8  agent that actually originated the case, and he's here in the

9  gallery today, Deportation Officer Daniel Bedard, who will --

10  is a fact witness so we'll probably just call him the second

11  day.  He is testifying to a transcribed interview that the

12  Defendant adopted and will be testifying as to the

13  circumstances of that interview as well as putting in documents

14  from the Defendant's alien file.

15      This all relates to Count 3.  We kind of got --

16          THE COURT:  Three and re-entry.

17          MR. AKE:  We have the drug case and the illegal

18  re-entry.

19          THE COURT:  Okay.  All right.  Have I failed to raise

20  anything that you want to discuss?

21          MR. AKE:  Oh, we just want to clarify, Your Honor,

22  that the local evidence rules, in terms of not having to

23  formally request to admit evidence once it's been shown to the

24  jury.  So I'm sure you've heard this already, but I'll recite

25  what I understand to be the practices and make sure that we're

1   all on the same sheet of music that unless the side that's
2   offering the evidence puts a caveat in initially and says, you
3   know, for identification purposes only or for demonstrative
4   purposes only that a document is being admitted -- is being
5   offered for admission into evidence absent one of those
6   qualifiers and that as long as it's been up and viewed by the
7   jury without objection then it's going to be entered into
8   evidence.
9           THE COURT:  It is my intention to invoke that local
10  rule, and I'm glad that you mentioned it.  But obviously I have
11  not operated under that local rule.  I haven't been sitting in
12  this court, but, yes, that is the --
13          MR. AKE:  Just verifying.
14          THE COURT:  -- but that is the rule that I'm going to
15  operate under.
16          MR. GUILLAUME:  Your Honor, do you have a policy or --
17  I don't know that I'm going to use any exhibits but typically
18  it's done.  Defense exhibits are given on the first day and
19  sometimes before and it would be just to tell the Court a
20  certain discovery that I've been provided by the Government
21  such as text messages or maps or something like that I may use
22  as an exhibit.  Do you want me to give your staff, if I decide
23  to use that, heads up prior to the first day of court?
24          THE COURT:  Obviously that would be preferred but I'm
25  not going to require you to do it.  But --

1          MR. GUILLAUME:  I'm still working through it.

2          THE COURT:  I can tell from the way you said --

3      (Laughter.)

4          THE COURT:  You're, like, I'm not quite there yet.

5  Yes, Mr. Ake.

6          MR. AKE:  Just, Your Honor, particular thought.  So

7  there's a huge universe of potential text messages that were

8  between the three cell phones.  We are happy to have our

9  forensic agent, you know, the Government's -- as long as it's

10 relevant -- the Government doesn't want to be viewed as hiding

11 anything.  But in terms of actually authenticating the evidence

12 I think we would need our forensic agent.  Rather than

13 subjecting to recall, I would probably be okay if he wanted to

14 do it during cross-examination if he has any texts.  Just do it

15 that way so we can let the witness go and he doesn't have to

16 come back the next day.

17         THE COURT:  I take it you're not stipulating to the

18 authenticity *in toto*?

19         MR. GUILLAUME:  No.  I would -- I'm not going to, if

20 the Government can prove it then --

21         THE COURT:  Then great.

22         MR. GUILLAUME:  Then great.

23         THE COURT:  Mr. Guillaume, are you willing to do that,

24 to seek to authenticate things you anticipate using on cross or

25 do you not wish to do that?  I can understand you not wishing

```
1   to and I will leave it to you.  If possible to avoid
2   recalling --
3            MR. AKE:  Or I'm willing to stipulate to authenticity
4   of text messages, as long as he identifies them ahead of time.
5            MR. GUILLAUME:  I'm not going to use any that wasn't
6   given to me by the Government.
7            MR. AKE:  That should not be an issue.  We actually
8   provided a huge amount of discovery.
9            MR. GUILLAUME:  It's relevant --
10           MR. AKE:  I'd like him to identify, you know, before
11  he puts on a case, what evidence he plans to --
12           THE COURT:  But you're not quarreling with the
13  authenticity obviously because you gave it --
14           MR. AKE:  If it came from the cell phone, it came from
15  the cell phone.  I just want to be able to verify it.
16           THE COURT:  So you won't need to establish the
17  authenticity.  You just need to identify what it is you're
18  going to use --
19           MR. GUILLAUME:  As he said, it's thousands of messages
20  so I'm just going to pair it down between all the phones.
21           THE COURT:  So what is your wish as far as timing to
22  disclose?
23           MR. GUILLAUME:  To the Court you mean?
24           THE COURT:  To the Court and to counsel.
25           MR. GUILLAUME:  Well, what day is today?
```

```
1              THE COURT:  Today is --
2         MR. GUILLAUME:  Wednesday.
3              THE COURT:  Today is Tuesday.
4         MR. GUILLAUME:  Tomorrow I'm going to have a marathon
5    session with my paralegal so potentially Friday by close of
6    business if that's okay.
7              THE COURT:  Is that agreeable?  Is that enough time?
8         MR. GUILLAUME:  Again, I may use nothing but I just --
9    it's a lot of stuff there.
10             THE COURT:  I mean, we're not even pulling the jury
11   until Tuesday.
12        MR. AKE:  Yes, Your Honor.  Assuming it's not hugely
13   voluminous.
14        MR. GUILLAUME:  It won't be hugely voluminous.
15        MR. AKE:  We did provide our drafts.
16             THE COURT:  He's on record saying it's not hugely
17   voluminous.
18        MR. GUILLAUME:  If anything at all.
19             THE COURT:  Close of business Friday for me is fine as
20   well.  Any other things I have not addressed?
21        MR. AKE:  Oh, does the Court have a policy on
22   uniformed law enforcement officers?  So there's at least one
23   judge in this district that does not allow officers that are in
24   a uniform division to appear before a jury while wearing their
25   uniform.
```

1          THE COURT:  Well, I'll tell you that is sort of the
2    local practice in the city is that we don't.
3          MR. AKE:  You don't either.
4          THE COURT:  I don't have a personal policy.
5          MR. AKE:  Okay.
6          THE COURT:  I will say this, I understand the
7    objection.  If Mr. Guillaume objects I will sustain that
8    objection, but I don't as the Court have a problem with it.
9    But I would honor a defense objection because I think it's
10   understandable, so.
11         MR. AKE:  So we only have one uniformed witness.
12   Well, we may have a second depending on whether -- we have a
13   customs and border protections officer.
14         THE COURT:  I don't have an issue with it.
15   Mr. Guillaume, I would ask that you give him advanced notice.
16         MR. GUILLAUME:  Is it Miller?
17         MR. AKE:  Miller is the one.
18         MR. GUILLAUME:  Can he not wear it?
19         MR. AKE:  He's going to be on a video in uniform too.
20   We can talk about it, Your Honor.  That's fine.  We'll talk
21   about it.
22         THE COURT:  Okay.  You'll let him know.
23         MR. GUILLAUME:  We'll work it out.
24         THE COURT:  I don't think it's a big deal.  Anything
25   else?

1              **MR. AKE:**  No, Your Honor.  I was hoping that -- I just

2    need to talk to Mr. Guillaume about this but nothing else from

3    the Court.

4              **THE COURT:**  Okay.  Just to kind of recap.  By tomorrow

5    at 10:00 o'clock you'll get us the updated voir dire.  We will

6    outfit you with that number 30 swap out.  We talked about your

7    witness list, your proposed jury instructions, and verdict

8    sheet I can wait on until day one.  And we talked about exhibit

9    lists.  I think that's a wrap.

10             **MR. AKE:**  Oh, Your Honor, preference for paper exhibit

11   books?

12             **THE COURT:**  Yes.

13             **MR. AKE:**  So you would like a copy?

14             **THE COURT:**  Yes.

15             **MR. AKE:**  A copy on the bench.  We'll make one for the

16   defense.

17             **THE COURT:**  Yes.

18             **MR. AKE:**  And then we'll make one that will go back

19   with the jury that will actually be stamped.  We need at least

20   three paper copies.

21             **THE COURT:**  Three, yes.  Yes, I do like to have one.

22   I appreciate that.

23             **MR. AKE:**  Oh, and we'll make one for the witness stand

24   as well.

25             **THE COURT:**  Yes, you should.

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

**JA235**

```
 1              MR. AKE:  Although the Government will put on most of
 2    its evidence using the courtroom technology here.
 3              THE COURT:  Okay.  That's fine.  But yes, you should
 4    make a binder for the witness stand.  I think would be
 5    appropriate.  If there isn't anything else?
 6              THE CLERK:  One more minor detail.  Counsel, if you
 7    could bring your own water for yourself and your witnesses
 8    because we don't provide it because of COVID.  Just a small
 9    detail.
10              THE COURT:  That's a wrap everybody.  So I will email
11    that instruction to you, and otherwise we'll just wait to hear
12    from you tomorrow as to those revisions.  And otherwise court
13    is adjourned.
14         (Court adjourned at 2:25 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4      I, Ronda J. Thomas, Registered Merit Reporter, Certified

 5  Realtime Reporter, in and for the United States District Court

 6  for the District of Maryland, do hereby certify, pursuant to 28

 7  U.S.C. § 753, that the foregoing is a true and correct

 8  transcript of the stenographically-reported proceedings held in

 9  the above-entitled matter and the transcript page format is in

10  conformance with the regulations of the Judicial Conference of

11  the United States.

12                          Dated this 24th day of October 2022.

13

14

15  _____
         Ronda J. Thomas
16      Ronda J. Thomas, RMR, CRR
        Federal Official Reporter
17

18

19

20

21

22

23

24

25
```

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

**JA237**

```
 1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
 2                         NORTHERN DIVISION

 3
     UNITED STATES OF AMERICA        )
 4           Plaintiff,              )
                                     )
 5       v.                          )Criminal No. 1:21-cr-00174-JRR
                                     )
 6   ALEXANDER JUAREZ-SANCHEZ        )
             Defendant.              )    Trial Day 1
 7   _____)
                                         Baltimore, Maryland
 8                                       May 25, 2022
                                         9:30 a.m.
 9

10           THE ABOVE-ENTITLED MATTER CAME ON FOR
                         JURY TRIAL
11           BEFORE THE HONORABLE JULIE R. RUBIN

12

13                    A P P E A R A N C E S

14   On Behalf of the Plaintiff:
         ADAM AKE, ESQUIRE
15       AMY L. SCHWARTZ, ESQUIRE

16   On Behalf of the Defendant:
         ALFRED GUILLAUME, III, ESQUIRE
17
     Also Present:
18       Amanda Sirleaf and Krystal Honeycutt, Paralegals
         Armando Hasbun and Laura Egbert, Interpreters
19

20

21

22       (Computer-aided transcription of stenotype notes)

23                         Reported by:
                     Ronda J. Thomas, RMR, CRR
24                   Federal Official Reporter
                   101 W. Lombard Street, 4th Floor
25                   Baltimore, Maryland 21201
```

1                           **<u>INDEX</u>**

2                         <u>May 25, 2022</u>

3
   PLAINTIFF'S WITNESSES:                              PAGE
4
   Master Trooper Craig Miller
5       Direct by Ms. Schwartz                          36
        Cross by Mr. Guillaume                           75
6       Redirect by Ms. Schwartz                         80

7  Sergeant Jun Lee
        Direct by Mr. Ake                                83
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

             Ronda J. Thomas, RMR, CRR – Federal Official Reporter

**JA239**

```
 1  (9:31 a.m.)
 2         THE COURT:  Madam Clerk, would you call the case,
 3  please.
 4         MR. AKE:  Your Honor, we're here in the matter of
 5  United States of America v. Alexander Juarez-Sanchez,
 6  JRR-21-174.  Adam Ake and Amy Schwartz appearing for the United
 7  States.
 8         MR. GUILLAUME:  Good morning, Your Honor.  Alfred
 9  Guillaume for Mr. Alexander Juarez-Sanchez, who's seated to my
10  left, along with my paralegal Amanda Sirleaf and paralegal
11  Krystal Honeycutt.
12         THE COURT:  Thank you.  Good morning.
13     And, Madam Clerk, could we swear in Ms. Egbert and
14  Mr. Hasbun.
15         THE CLERK:  Sure.  Madam -- I'm sorry.  Mr. and Madam
16  Interpreter, will you please rise and raise your right hand.
17     (Interpreters sworn.)
18         THE CLERK:  Thank you.  Please state your first and
19  last name for the record.
20         MS. EGBERT:  Lauren Egbert, E-G-B-E-R-T.
21         MR. HASBUN:  Armando Ezquerra Hasbun, H-A-S-B-U-N.
22         THE CLERK:  Thank you.
23         THE COURT:  Thank you.  And good morning.  I would
24  like to just confirm that Mr. Sanchez is able to hear clearly.
25         THE INTERPRETER:  Yes.
```

```
 1            THE COURT:  Okay.  Good morning to you, sir.
 2            INTERPRETER:  Good morning.
 3            THE COURT:  Counsel, is there anything that you need
 4  me for?  I do want to run over our jury instruction schedule,
 5  but other than that, is there anything else that you need to
 6  address?
 7            MR. GUILLAUME:  Your Honor, I believe that there's no
 8  witnesses in the courtroom, but I'd just ask for a rule on
 9  witnesses.
10            THE COURT:  Any fact witnesses that are in the
11  courtroom or people who anticipate being called to testify are
12  required to exit the courtroom until you are called to testify.
13  Those who remain in the courtroom are instructed not to share
14  with any person who is expected to be a fact witness anything
15  that has gone on in the courtroom so that when that person is
16  called, they have not been informed about any previous
17  testimony or argument.
18            MR. GUILLAUME:  Understood, Your Honor.
19            THE COURT:  Thank you.
20            MR. AKE:  And, Your Honor, just -- the only thing the
21  Government needs to report to the Court is that the parties did
22  enter into a stipulation regarding the chemical composition as
23  well as some other details around the -- that would have been
24  elicited during the chemist's testimony.
25       So we're cutting out one witness as a result.  And
```

```
 1   Ms. Schwartz will enter that stipulation in during the
 2   presentation of the first witness's testimony.
 3          THE COURT:  That's fine.  Thank you.  I appreciate
 4   that.  I will tell you in candor, in my previous iteration as a
 5   judge in circuit court, I would ask the parties if they wanted
 6   me to read it to the jury.  But you're going to take care of
 7   advising the jury of the stipulation; is that correct?
 8          MR. AKE:  Yes, Your Honor.
 9          THE COURT:  Okay.
10          MR. AKE:  And then we'll ask for a jury instruction on
11   how they should take stipulations.
12          THE COURT:  Okay.
13          MR. AKE:  But if you wanted to provide a quick
14   instruction before -- when she signals she's going to read it,
15   that would be appreciated as well.
16          THE COURT:  That's fine.  I'm just going to let them
17   know that this is an agreement the parties have reached and
18   they can assume as true the facts set forth in the stipulation.
19      Mr. Guillaume, is that agreeable?
20          MR. GUILLAUME:  Yes, Your Honor.
21          THE COURT:  Anything else?  No?
22          MR. AKE:  No, Your Honor.  Sorry.
23          THE COURT:  So instructions, you wanted to provide
24   them tomorrow morning; is that right?
25          MR. GUILLAUME:  Your Honor, I think -- talking to the
```

```
1   Government last night, I think that I don't -- I want to just
2   review what they've sent over.  I don't have anything else to
3   add.  I just want to make sure I don't object to any of the
4   ones they've proposed --
5            THE COURT:  Sure.
6            MR. GUILLAUME:  But I think we're all on the same
7   page.
8            THE COURT:  As far as timing, what were you thinking?
9            MR. GUILLAUME:  I can tell you by the end of today, if
10  not by after lunch --
11           THE COURT:  I just did a little jig inside when you
12  said that.
13      (Laughter.)
14           MR. GUILLAUME:  I think I'll know then.
15           THE COURT:  Very good.  That sounds fine.  You'll just
16  let me know where we are.
17      If there's nothing else, we can bring in our jury.
18           THE CLERK:  All rise for the jury.
19      (Jury enters.)
20           THE COURT:  Good morning.  Please be seated.  Everyone
21  may be seated.  Thank you.
22      Good morning.  And thank you for being on time.  I
23  appreciate that.  And I know that being on time in City of
24  Baltimore is not always the easiest task, so I truly appreciate
25  it.  It lets us be as efficient as we possibly can.
```

1          Madam Clerk, we need to swear these fine people in.

2              THE CLERK:  Will everyone please stand and raise your

3    right hand.

4          (Jury sworn.)

5              THE CLERK:  Thank you, you may be seated.

6          Jury sworn.

7              THE COURT:  Thank you very much.

8          Good morning all of you and good morning to counsel and to

9    Mr. Sanchez.  Again, my name is Judge Julie Rubin.  I think I

10   only said that once yesterday.  I appreciate your all being

11   here.  I will preside over this trial.

12         Just to kind of give you a little bit of a look-see of

13   where we're going to be headed, I'm going to first read to you

14   some preliminary instructions that will apply to the entirety

15   of your service and then we'll go from there.

16         But the first thing I'm going to do is designate the

17   foreperson of the jury.  It is my practice to designate Juror

18   Number 1 to serve as the foreperson of the jury, unless he

19   declines to do so.

20         Before you agree, because I anticipate you may agree, I'm

21   just going to let you know it's not as onerous, I think, as

22   movies and books and TV might have you think.  You're not

23   required or obligated to manage or lead discussions.

24         Really your chief task is to read out your jury's verdict,

25   if and when you should reach a unanimous verdict, in open

1  court.  That really is the chief role of the foreperson, but it

2  is a critical role.

3       Are you willing to be the foreperson of your jury?

4            **JUROR NO. 1:**  Yes.

5            **THE COURT:**  Very good.  Thank you.

6       Members of the jury, we now begin the trial in the case

7  about which you heard some details during the process of jury

8  selection.  At the close of the evidence in this case, I will

9  thoroughly explain the elements of the charges contained in the

10  indictment.

11       Before the trial begins, however, there are certain

12  instructions you should have in order to better understand the

13  case which is to be presented to you.  If anything I say at the

14  close of the case differs from anything I say now, what I say

15  at the close of the case controls because sometimes things

16  change.

17       As I told you earlier, this is a criminal case brought by

18  the Government against the Defendant, Alexander Juarez-Sanchez.

19  The Government has charged the Defendant by an indictment.  An

20  indictment is not evidence, it merely describes the charges

21  that have been made against the Defendant.

22       The Defendant is charged with three counts.  Under the

23  first count, the Defendant is charged with conspiracy to

24  distribute and possess with intent to distribute 400 grams or

25  more of a mixture or substance containing a detectable amount

1  of fentanyl, a Schedule II controlled substance, and 100 grams

2  or more of a mixture or substance containing a detectable

3  amount of heroin, a Schedule I controlled substance.

4      Under the second count, the Defendant is charged with

5  possession with intent to distribute 400 grams or more of a

6  mixture or substance containing a detectable amount of

7  fentanyl, a Schedule II controlled substances, and 100 grams or

8  more of a mixture or substance containing a detectable amount

9  of heroin, a Schedule I controlled substance.

10     Under the third count, the Defendant is charged with

11 re-entry into the United States of America after deportation.

12 I will instruct you in detail on the elements of these charges

13 at the conclusion of the case and before you deliberate your

14 verdict.

15     You will determine the facts based on the evidence in the

16 case.  The evidence consists of the physical exhibits, which

17 are admitted into evidence; stipulations between the parties;

18 and testimony.  Testimonial evidence comes from the testimony

19 that witnesses give here in open court.  The lawyers' openings

20 and closing statements are not evidence, nor are the

21 instructions I will give you at the end of the trial.

22     There are two types of evidence, direct evidence and

23 circumstantial evidence, and both are admissible and can be

24 considered by you.

25     Many people think circumstantial evidence is not as

reliable as direct evidence, but that is not necessarily the case.  You may rely on it just as much as you rely on direct evidence.

Direct evidence is evidence where a witness tells you that he directly observed something with his senses.  For example -- pardon me, the witness has personal firsthand knowledge of the matter about which he is testifying.  For example, the witness may testify that he saw that it was raining last night.  This is direct evidence that, in fact, it was raining last night.

Circumstantial evidence is evidence which flows from a logical inference from a known observed fact.  For example, the witness may say that he did not look outside last night but he saw somebody who had just been outside and that person had an umbrella and the person and the umbrella were wet.  This is circumstantial evidence that it was raining outside.

You are free to make such logical inferences in your determination of the facts in this case.  That's all there is to circumstantial evidence.  You infer on the basis of reason and experience from an established fact the existence or the nonexistence of some other fact.

Circumstantial evidence is of no less value than direct evidence, as a general rule, the law makes no distinction between direct and circumstantial evidence.

Please do not discuss the case among yourselves during the progress of the trial.  Do not discuss the evidence or any

aspect of the case.  Do not speak with any of the witnesses in
the case.  Do not talk to any other person about the case, and
do not permit anyone to talk to you about the case.  This
includes the lawyers in the case, who are not permitted to
speak to you under any circumstances.

The only time you are permitted to discuss or consider the
case is when it's submitted to you for your final
consideration, that is to say after all the witnesses have
testified and the lawyers have expressed their views as to what
the evidence supports as to a factual finding and I've
instructed you on the law.

It is only when the case is submitted to you for
determination and you go into the jury room that you might have
the -- pardon me, that you have the right to discuss or to
consider the evidence and make your fact determination.

If you wish to take notes during the course of the trial,
you may do so.  You've been given pads to do so.  If you do
take notes, do not discuss them or share them with any juror or
other person before or during your deliberations.

Your notes are to be used solely to assist you and are not
to substitute for your recollection of the evidence in the
case.

The fact that a particular juror has taken notes entitles
that juror's views to no greater weight than those of any other
juror.  At the end of each day, you should hand your notes to

1   the courtroom clerk, who will return them to you the following

2   day.

3        You must not be influenced by anything you may have seen

4   or heard outside the courtroom regarding this case.  You are in

5   the best position of anyone to listen to what the witnesses

6   testify to.  You are instructed not to read about the case in

7   any newspaper or other print or online news source or to

8   consult dictionaries, reference books or any other sources

9   other than the evidence presented in court.  That's what I was

10  instructing you about last night when I talked about not doing

11  outside research.

12       You are specifically instructed not to utilize Google to

13  do any research in this case.  You are also not to use

14  Facebook, Twitter, LinkedIn, Instagram, Snapchat, TikTok, or

15  any other social networking site to share or discuss any

16  information about the case.

17       In the age of the internet, you're not to do any research

18  of your own on the evidence or on the law or about any of the

19  participants in this case, such as the Defendant, the witnesses

20  or the lawyers.  The only evidence you may consider is the

21  evidence that is admitted in this courtroom during the trial.

22       At the end of the case, I will give you the controlling

23  instructions on the law, which you are bound to follow when you

24  retire to the jury room to deliberate.

25       When you do deliberate in this case, you will not receive

1   a copy of the trial transcript in the case.  So your

2   recollection of the evidence controls.  You will, however, have

3   all of the exhibits, and if you took notes, you will have those

4   notes as well with you in the jury room.

5        You probably have many other questions that you may be

6   wondering about, and I will try to answer them upfront.  You

7   will not be sequestered in a hotel during the trial.  You'll be

8   free to go home at the end of the day.

9        The case is scheduled to last about five or six days, but

10  we're going to move efficiently.  We will sit each day from

11  about 9:00 or 9:30 until approximately 5:00 o'clock with

12  intermittent breaks and one hour for lunch.  You are free to

13  leave the courthouse for lunch, but keep in mind that you must

14  return within an hour.  I ask that you consider sort of

15  budgeting your time to get through what may be a security line

16  and the elevator service.

17       Counsel, is there anything you require of me before we

18  begin with openings?

19            **MR. AKE:**  No, Your Honor.

20            **MR. GUILLAUME:**  No, Your Honor.  Thank you.

21            **THE COURT:**  Thank you.  Government, please.

22            **MR. AKE:**  May it please the Court.

23       Good morning, ladies and gentlemen of the jury.  We are

24  all here today because in the summer of 2020, the Defendant,

25  sitting here, Alexander Juarez-Sanchez, conspired with a number

1 of individuals, including a driver that he recruited, to

2 traffic fentanyl and heroin from California to points in the

3 midwest and then the east coast.

4     That was until on August 5th, 2020, as he was driving with

5 his driver across I-81 across through Maryland, around

6 Hagerstown, he was pulled over at a traffic stop by a Maryland

7 State Police officer.

8     And he was arrested, along with his driver, Domingo

9 Ramirez-Roblero.  Because after that traffic stop or during the

10 course of that traffic top, the state trooper involved

11 ultimately was suspicious, called for a drug dog sniff -- I'm

12 sorry -- and ultimately discovered two kilograms of fentanyl

13 and one kilogram of heroin secreted in compartments in the

14 vehicle, along with over $47,000 in cash.

15     Now, two kilograms of fentanyl, depending on purity, is

16 enough to kill -- or enough to produce up to one million lethal

17 doses of fentanyl.

18     Now, I'm Adam Ake, and along with my colleague Amy

19 Schwartz, we have the honor of representing the United States

20 in this case.

21     Now, as you heard during *voir dire* and then again from

22 Judge Rubin, the Defendant is facing three charges in this

23 trial.  Those are conspiracy to distribute controlled

24 substances, possession with intent to distribute controlled

25 substances and illegal re-entry of a previously removed alien.

 1        Now, as Judge Rubin just instructed you, she's going to
 2   give you a more fulsome set of instructions at the end of
 3   trial, particularly on the elements that you need to be
 4   satisfied that the Government has proven beyond a reasonable
 5   doubt to find the Defendant guilty, but I want to preview those
 6   for you ahead of time so that you know what to look for as we
 7   present evidence.
 8        And, again, her instructions are going to control.  These
 9   are standard instructions that we're presenting, but generally
10   this is what you need to find.
11        So the first crime is conspiracy.  And so federal law
12   makes agreeing to commit a crime with one or more other people
13   a crime in and of itself separate from actually committing the
14   crime.
15        So, generally speaking, a person is guilty of conspiracy
16   so long as he or she has undertaken to commit a crime with
17   another person, who we call a co-conspirator, and then at least
18   one member of the conspiracy takes some step in furtherance of
19   actually committing the crime or takes a step towards
20   committing a crime.
21        So in this case the Government is going to put on evidence
22   that shows the Defendant conspired with probably at least five
23   other people.  Those five include his driver Domingo
24   Ramirez-Roblero; a co-conspirator in Mexico who provided him
25   with instructions on -- directing him to transmit money to

16

recipients, nominee recipients in Mexico, to travel out to
California to pick up drugs from a specified provider there or
handler of the drugs.

In this case, it's a woman that the Defendant had named in
his cell phone as Viuda Negra, which is Spanish for Black
Widow, and then that handler in Mexico directed him to sell
those drugs on a first trip to -- we have evidence that you're
going to see showing that he was directed to an address in
Illinois in the northern suburbs of Chicago to sell to a buyer
there.  And then more specific evidence of a sale made to a
Kentucky buyer during a second trip, and that's the trip during
which the Defendant and his driver were arrested in this case.

So in this -- just going back to the elements, if you find
the first two elements have been proven, then you'll be tasked
with making a special finding as to the quantities involved in
the conspiracy.

So these would be the objects of the conspiracy or what
the conspirators sought to accomplish.  And here we've alleged
that the objects of the conspiracy were to distribute at least
400 grams of fentanyl and at least 100 grams of heroin.

Okay.  So Count 2, the elements are slightly different.
This crime, possession with intent to distribute controlled
substances, alleges possession on a particular date and
alleges -- it only expands or reaches the quantities that were
possessed on that particular date.

1      So on -- the indictment alleges that on August 5th, 2020,
2   the Defendant knowingly possessed the controlled substances
3   recovered from the car he was traveling in and that he intended
4   to distribute them.
5      So those are the -- the elements before you.  That's what
6   you need to look for.  And, like in Count 1, so long as you
7   find that the first three elements have been satisfied, you'll
8   be asked to make a special finding as to the quantities
9   involved.
10      Now, I do want to point out here that the elements refer
11   to controlled substances, both in the conspiracy charge and the
12   possession with intent to distribute charge.
13      The Government does not need to prove and you don't need
14   to find that the Defendant knew specifically what substances he
15   was transporting.  What the law penalizes or forbids is
16   trafficking controlled substances.
17      So as long as the Defendant -- as you find the Defendant
18   knew that he was trafficking some sort of illegal controlled
19   substance, that satisfies the criminal elements, or the
20   criminal intent element.  That's separate from -- the specific
21   findings, we're going to ask you to find quantities of fentanyl
22   and heroin.  That's distinct from the finding you need to make
23   as to his intent to distribute.
24      Finally, in Count 3, the Defendant is charged with
25   illegally re-entering this country, after having previously

1  been removed, which is another word for deported and having

2  done so without first obtaining special permission, as he was

3  required to do, from the heads of the agencies that can

4  authorize such exceptions to rule.

5      So the evidence is going to -- in this case, you're going

6  to hear that after his arrest in this case, the Defendant

7  actually admitted in a Mirandized interview, after he'd been

8  advised of his rights against self-incrimination, that he had

9  previously been deported three times and signed an affidavit in

10  Spanish attesting to that fact.

11      So you'll also see documents about his three prior

12  removals as to the dates.  His picture's on all of them and

13  you'll see some of that.  And as well as evidence that he never

14  sought or obtained the requisite permissions to reenter.

15      So I want to turn now to preview the actual evidence that

16  you're going to see in this case as opposed to us just talking

17  about it.  So I do this because trial evidence can be somewhat

18  confusing, as it comes in factored, and that's just the nature

19  of how we present evidence.

20      So witnesses, particularly fact witnesses, can only

21  testify to things that they've personally seen or heard.  And

22  so sometimes when we're putting in evidence through witnesses,

23  predominantly, then it comes in like pieces of a puzzle.  And,

24  you know, we're -- it's difficult to expect you to assemble

25  those unless you've actually seen the picture on the front of

1   the puzzle box, to continue with the metaphor.  So this is my

2   opportunity to show you the picture on the puzzle box before we

3   start throwing pieces at you and asking you to reassemble

4   those.

5       So starting off, the first witness you're going to hear is

6   Master Trooper Craig Miller from Maryland State Police, who, on

7   August 5th, 2020, was patrolling Interstate 81.  You'll hear

8   the fact that he was the person out on patrol that day.  It was

9   particularly bad luck for this Defendant because Master Trooper

10  Miller is a 28-year-veteran of the Maryland State Police.  And

11  he specifically focuses on drug interdiction.  That's been his

12  specialty for quite a while.

13      So during Trooper Miller's testimony, we will play dashcam

14  video, from which this is a still that you see in front of you,

15  of that traffic stop where he encountered the Defendant and his

16  driver.

17      You'll hear that after the driver and the Defendant failed

18  to produce any identification at all and provided some

19  confusing information about where they were going that Trooper

20  Miller became suspicious, ordered a drug dog to come out and

21  that after that dog alerted for the presence of controlled

22  substances, they searched the vehicle.

23      And you'll hear and see on the video that Trooper Miller

24  and another member of his team began searching the passenger

25  compartment of the car and that rather rapidly yielded a

1  discovery of a one-kilogram brick of fentanyl hidden in a
2  McDonald's bag behind the glove compartment, kind of adjacent
3  to the front right bumper of the car, inside that.
4      And then a second kilogram package of fentanyl that was
5  hidden under the center console next -- in between the driver
6  and passenger seat.  And this is a view from the backseat.  It
7  was hidden behind trim once they took it off.
8      And then finally they found a kilogram package of what
9  turned out to be heroin that was sitting -- that the driver --
10  or that the Defendant had been sitting on.  It was under the
11  cushion of the passenger seat.  So that was it on the drugs.
12     The last part there, so the plastic bags, there was
13  47,000 -- or they found $47,000 of cash stuffed into the rear
14  seat cushions alongside where, like, seats fold down in sort of
15  the edge trim next to the edges of the car.
16     So afterwards you're going to hear that those seized drugs
17  were taken to the lab, where they field tested positive and
18  then they were also later confirmed by a chemical analysis with
19  that chemist that you saw in the last picture.
20     We were going to call him as a witness in the case.  The
21  Defendant has agreed to stipulate to the substances and what
22  the substances contained, so that'll be provided to you as a
23  stipulation.  But ultimately confirmed that the substances were
24  indeed fentanyl and heroin.
25     Now, in addition to the drugs and cash, the physical

1  evidence taken from the Defendants, you'll hear -- or the
2  Government is going to present evidence that Master Trooper
3  Miller seized three cell phones from the Defendants.  The first
4  was a white iPhone that was seized from the driver.  And then
5  there were two nearly identical Samsung A10s that were seized
6  from the Defendant.
7      And I put the picture that's in front of you up because
8  you can actually see the Defendant holding one of those phones,
9  those black Samsung A10s.  And you'll see in the video that the
10 Defendant was still texting and talking on those -- that
11 particular phone during the traffic stop that you can see in
12 this still.
13     Now, the evidence that we're going to present from those
14 phones is very substantial, and fair warning, that's going to
15 take a good chunk of today to get through.  Among many, many,
16 many other things on the Defendant's phones, he used WhatsApp,
17 which is an encrypted messaging system.
18     And during the presentation of the cell phone evidence,
19 we'll show you WhatsApp threads that were on both phones with a
20 counterparty or co-conspirator in Mexico who in one phone the
21 Defendant had named in his contacts Pariente 2, and then in his
22 newer phone he had named the same contact as Compa Neto.  And
23 that's the one I was alluding to earlier that was providing him
24 direction on where to go, where to send money, so forth.
25     Additionally, the Defendant's cell phone provides text

1   message threads that used WhatsApp to talk with Viuda Negra, or
2   the Black Widow, who was located in Burbank, California and
3   provided him with drugs on two occasions that are documented by
4   his phone and which are charged in this case.
5        The conspiracy here is alleged to encompass not just the
6   traffic stop, but dates between July 10th, 2020 and August 5th,
7   2020.
8        And as I've just mentioned, this is going to be the long
9   pole in the tent today -- well, we'll largely be focusing on
10  text messages and other files from the Defendant's two cell
11  phones.  There was also useful information on the driver's cell
12  phone.  The driver used an iPhone that kept location data, and
13  since they traveled on both trips together, we're going to
14  present evidence that they went on both trips together.
15       You're going to see that we are able to plot location data
16  that was taken from the driver's phone and plot that on Google
17  Earth.  So hopefully, my internet connection cooperates during
18  the presentation of evidence and we can show some live
19  zoom-ins, but we do have some stills additionally that we'll be
20  able to enter in that show plots along with associated times of
21  the travels made between July 9th and July 14th of 2020 and
22  then the trip out to California from July 30th that ended here
23  in Maryland on August 5th.
24       So that first trip that I'm alluding to, and we're going
25  to put evidence on, the text message traffic is going to show

 1  that the Defendant and his driver left Indianapolis, Indiana,

 2  where the two men were living, and drove virtually nonstop to

 3  Los Angeles before arriving late on July 10th.

 4       The text messages evidence is going to show that the

 5  Defendant spent most of the next day, July 11th, working with

 6  his handler in Mexico, Pariente 2 or Compa Neto, however you

 7  want to refer to him, to get the co-conspirators located in

 8  Burbank to actually hand over the drugs to him.  The evidence

 9  will show that there was some reluctance on their part.

10       So once that was successful on the late evening of

11  July 11th, the two men immediately departed and started heading

12  back east.  But rather than heading directly back to

13  Indianapolis, you'll see from the location data that they took

14  a detour and went to a northern suburb of Chicago, where the

15  Defendant met with a buyer on the evening of July 13th, 2020.

16       So what I'm now putting before you is an example of some

17  of the text messages that you'll see during the case.  And

18  don't worry about not catching this now.  This will come

19  through when we're going through this in depth.

20       But as a note, the original texts were all in Spanish.

21  There's a shaded column in orange that is a translation that

22  the Government had made through a linguist, who you'll hear

23  from tomorrow.  But these translations in English are what I'm

24  going to be referring to predominantly as we go through these

25  text messages.

1    So the -- what this particular excerpt shows -- and,

2    again, we'll detail more later -- are text messages that were

3    over WhatsApp, the WhatsApp application, between the

4    Mexican-based party Pariente 2 and the Defendant's older phone.

5    This particular extract is the runup to the Defendant's

6    dropping off drugs at a residential address in Skokie,

7    Illinois, where the location data confirms they were.  And

8    there's also text messages between the Defendant and the driver

9    that showed that the particular address was communicated

10   between the two of them.

11   Now, I will suggest that the evidence here is not going to

12   suggest that this was a huge deal.  This entire first trip may

13   have been more of a trial run, where the Defendant was

14   establishing himself or proving himself trustworthy.  But

15   interestingly, shortly after the deal appears to have finished,

16   of interest to you and the rest of us is that Pariente sends

17   the Defendant the first of what you'll are many names and

18   addresses as well as an instruction to use Elektra, which

19   you'll hear is a Western Union or MoneyGram-like service that

20   people use to remit money to Mexico.

21   So after receiving this instruction with the name, the

22   next morning the text message traffic will show that the

23   Defendant sends Pariente 2 a text message with just an

24   attachment in it and then that attachment is a receipt showing

25   the transmission of $470, which, again, is why I'm kind of

saying this doesn't look like it was the largest of drug
transactions, but a payment of $470 sent through the Elektra
network to the same person that Pariente directed him -- or
gave him information on the night before.

That's not the only money that's going to be suggested
that was a proceed of -- that the evidence is going to suggest
was proceeds of that particular activity, though, because the
Defendant apparently had at least $8,000 in cash on hand two
weeks later.

And as you'll see on July 30th, 2020, as part of the same
thread of WhatsApp chats between he and Pariente, the Defendant
started receiving more names and addresses.  And the first one
here, Antonio Lopez Vargas, you see it says Querétaro, Mexico,
which is one of the states in Mexico, through Elektra.

Fifty minutes later, after receiving that instruction, the
Defendant sends Pariente a message with an attachment through
WhatsApp, which in this case is an image file showing that
money was sent, a thousand dollars here plus a 10-dollar
service charge to Antonio Vargas at that -- the same city
through the Elektra network.  The sender here is Juan Flores,
as you'll note at the top, but that is, apparently, one of the
aliases that the Defendant used.  He had taken a picture of
this particular fake ID that he had obtained and had a photo of
this on his phone, which was also extracted from his phone.

And you'll note he sent this money from a supermarket on

1  North Post Road, Indianapolis.  But just a few minutes later,
2  evidence is going to show he went to a different supermarket
3  and sent more money.  The pattern repeats kind of rapidly over
4  the ensuing day.
5      This is the next transaction.  This is just 13 minutes
6  later, the Defendant sends Pariente a receipt for another
7  transaction, this time sending $950 to David Ullses Torres
8  Gomez in Sinaloa, Mexico, just like Pariente had instructed him
9  to do 34 minutes earlier.  This time, a different name as the
10 sender.  You're not going to see evidence about who this person
11 is, but this all goes through the Defendant's phone and back to
12 Pariente.
13     Now, over the next several hours -- I meant to talk
14 through those slower -- over the next several hours, though,
15 you'll see that the Defendant responds to all seven names and
16 addresses that Pariente directs him to on July 30th and has
17 sent money by noon the next day, just under a -- either at a
18 thousand or within $50 of a thousand from various senders in
19 Indianapolis.
20     These the next five receipts.  Again, we'll go through
21 these slower during the presentation of evidence.  But
22 ultimately sends just under $7,000 over the next 48 -- or next
23 18 hours after he receives these instructions.
24     The evidence is going to show that even as many of these
25 money transfers was being made, though, the Defendant and his

1  driver were actually driving out to California.

2      So on the morning of August 1st, the Defendant texted

3  Pariente to tell him that he was 30 minutes out from Los

4  Angeles.  The location evidence is going to show that they had

5  started driving the day before.

6      After appearing to promise to send one more payment, the

7  Defendant asked Pariente to, quote, send me the phone.  So in

8  response to that, there's a -- Pariente responds with a message

9  that just contains an attachment.  This jpeg file that ended in

10 WA0006 appears to be a screenshot or photo of another phone

11 screen.  I'd ask you to pay particular attention to this piece

12 of evidence, and you'll see it several times.

13     It's important.  It provides a phone number and says to

14 pick up seven items.  The phone number turns out to be the same

15 one that the Defendant had used earlier in July to contact

16 Viuda Negra, or the Black Widow, as you'll see when we put

17 those text messages on.

18     But pay particular notice to the middle bubble on the

19 screen that breaks down the seven items.  The top bubble, it

20 said -- or the second bubble says, "You'll pick up seven

21 items."  The middle bubble breaks down -- appears to break

22 those seven items down into four of a W2/3, two of a W2, and

23 one R-A-T-A or RATA.  And then the bottom two say -- or

24 basically instruct the recipient only to make calls over

25 WhatsApp and not submit any texts.

1        So this is -- appears to be coded language.  Fortunately
2   we have a good indication of what the code meant because here's
3   a photo of the drugs that were recovered from the car.
4        And so you'll note here that the two black packages which
5   contained fentanyl were labeled W2 on the outside and the
6   single red package, kilogram of heroin, was labeled with the
7   letters RATA.
8        And one of the stipulations you'll hear was not only was
9   the fentanyl packaged and had W2 on the outside, there was
10  actually an imprint made directly into the pressed fentanyl
11  brick, which was of over 50 percent purity.  It was actually
12  pressed in when it was manufactured, suggesting that it had not
13  been tampered with since it had originally been produced.
14       So, moreover, the phone evidence is going to show what
15  happened to the other four packages that were labeled as W2/3.
16  So after picking up the drugs on August 1st in Burbank, which
17  you'll see texts along with location information that supports
18  that, the text chain will show that the Defendant actually
19  switches the phones and starts contacting the person that he
20  previously titled Pariente 2 in his older phone.  He named him
21  as Compa Neto, but those texts with the co-conspirator in
22  Mexico are going to show continued communication after the
23  delivery of those drugs or after he picked them up, sorry, from
24  Viuda Negra.
25       And then on August 4th, just the day before his arrest in

1  Hagerstown, position -- location data from the driver's phone
2  is going to show they were en route to Lexington, Kentucky.
3  And text messages between the Defendant and Compa Neto -- who
4  he's calling Compa Neto at the time, show that the Defendant
5  asked Compa Neto to "send me the number," at the top of that
6  screen, and then "tell me the flavors."
7      Compa Neto responded by sending him a number beginning
8  859.  That's a Kentucky area code.  And tells the Defendant
9  there are four of the brand W2/3.  All four of that brand, and
10  you will receive a papel, meaning paper or money, of 44.
11      And, again, you'll have already heard by this point that
12  Trooper Miller discovered just over $47,000 of cash in the
13  vehicle that they were driving in just the next day.
14      And then you'll also see text messages between the
15  Defendant and the Kentucky recipient, who apparently spoke
16  English, and they appear to set up a drug transaction on
17  August 4th after meeting at a Walmart, with the last text
18  exchanges occurring shortly before 2:00 p.m. on August 4th.
19      And then immediately after those text messages cease and
20  after some phone calls with Compa Neto over WhatsApp, you'll
21  see that Compa Neto, or Pariente, sends the Defendant names and
22  cities to send over Elektra.  And the Defendant then sends
23  three attachments with more pictures of money transfer
24  receipts, this time using his Juan Flores identity, to the two
25  names Compa Neto directed him, one to Salvador Hernandez and

1  two to Ernesto Vargas, although it appears that the second to
2  Ernesto Vargas was a redo of the first one that didn't go
3  through successfully.
4      And then the next morning is when the Defendant and his
5  driver are pulled over by Master Trooper Miller.  Here you can
6  see he's actually texting with that Mexican handler, Compa
7  Neto, while the arrest is undergoing or while the stop is
8  undergoing -- ongoing.  And you'll see that the Defendant
9  actually was -- the last text to Compa Neto was "They're
10 bringing the dogs" or something to that effect and letting
11 Compa Neto know that that was ongoing.  I actually have the --
12 captured the exact time from the dashcam video.
13     Now, finally, you're going hear from the driver and
14 co-defendant in this case, Domingo Ramirez-Roblero.  You'll
15 hear that he's already pleaded guilty here to the crimes -- to
16 similar crimes and is pending sentencing and he's testifying
17 pursuant to an agreement with the Government, under which he
18 hopes to get a sentence reduction in exchange for his
19 assistance with the prosecution of Mr. Juarez-Sanchez.
20     He's also someone who, like the Defendant, was in this
21 country illegally and used false identities because he'd
22 previously been deported several times.
23     We expect that he will testify that he was recruited by
24 the Defendant largely because he had a car and the Defendant
25 did not and twice drove him to California, the first time in

exchange for about $1,500 and the second time, we expect he'll testify that he was promised $8,000.

We expect he'll testify that he didn't know the true reason for the trip to California during the first trip, though he'd figured it out between the first trip and the second trip, which is why he was asking for more money.

But we expect that he will testify that he never actually saw the drug transactions and didn't participate in them personally.

We'll also expect he'll tell you the Defendant asked him before the second road trip to recruit others to send some of that money on his behalf to Mexico so that four of those thousand-dollar transactions were just under -- that were sent on July 30th, the Defendant will acknowledge that he -- or the -- excuse me, the cooperator is going to acknowledge that he coordinated those money transmissions and then forwarded them on to the Defendant.

So as a note on cooperators, you'll get special instructions from the Court before you deliberate on some special care you need to take when you evaluate their testimony, including weighing the risk that they are more interested in assisting a successful prosecution and obtaining a sentence reduction than they are at telling the truth. That is always a risk with cooperators.

And so like the Court is going to urge you, I urge you or

32

1  I recommend that you closely compare the other facts in the
2  case, such as the position, location information, the other
3  text messages and so forth when you evaluate whether or not the
4  cooperator is telling the truth.
5       Now, I have spent most of this time focusing on reviewing
6  the evidence of the drug trafficking portion of this case, and
7  that's largely because Counts 1 and 2 represent very, very
8  serious crimes, not that illegal entry is not serious, but it's
9  also a felony and it's part of our immigration laws.  So we're
10 going to put on evidence of that as well.
11      Specifically, we'll present evidence of the Defendant's
12 prior deportations in 2016, 2018 and 2019.  You will also see
13 documents from his alien file showing that each time he had
14 been warned not to return to the United States, in the first
15 case 10 years, and then after he had come back the first time
16 unlawfully, that was increased to a 20-year prohibition on
17 returning to the United States without obtaining prior
18 permission to do so.  And the evidence we'll present is that he
19 did fail to do so.
20      And you'll hear that -- most of that evidence from
21 immigration and customs enforcement agent, Deportation Officer
22 Daniel Bedard, who interviewed the Defendant after his arrest
23 in this case.  And during that interview, Agent Bedard will not
24 only testify but provide a transcription that the Defendant
25 signed and adopted of his answers to the questions that Agent

33

```
1    Bedard posted -- posed to him regarding his immigration history
2    and in which the Defendant acknowledged that he had three times
3    been removed in the past.
4         So as you can probably tell, this is not a case that is
5    going to require many inferential leaps or where we're going to
6    ask you to rely on the testimony of a single witness or
7    cooperator.
8         I'd submit that we don't really need you to rely on
9    witnesses at all in this case because combined with the
10   physical evidence, the information extracted from the Defendant
11   and his co-conspirator's cell phone provides probably all the
12   evidence you're going to need to reach a verdict in this case.
13        Now, as a final closing comment, despite the weight of the
14   evidence in this case, the Defendant has elected to exercise
15   his right to go to trial and he has every right to do so.  And
16   the Government embraces its burden to prove Defendants guilty.
17   They are under no obligation to give themselves up or, you
18   know, plead guilty or testify.
19        Absolutely no responsibility rests on the Defendant.  It
20   all rests on the Government.  And we embrace that burden and
21   we're going to meet it and hopefully in two we will be back
22   before you in closing and my co-counsel here will show how we
23   have met every element of each of the charges and ask you to
24   return the only verdict that's consistent with the evidence
25   presented in this case, which is that the Defendant is guilty
```

1   on all three charges.

2       Thank you.

3           THE COURT:  Thank you, Mr. Ake.

4       Mr. Guillaume, whenever you're ready, sir.

5           MR. GUILLAUME:  May it please the Court.

6           THE COURT:  Thank you.

7           MR. GUILLAUME:  Good morning.  My name is Alfred

8   Guillaume, and I represent Mr. Alexander Juarez-Sanchez, who's

9   seated right here at the trial table.

10      My remarks here are going to be brief.  I'm going to save

11  my presentation for the end of the case, but I will make a

12  couple of remarks and kind of lead with where my colleague left

13  off.

14      The Government has the absolute burden of proof in this

15  case.  The Constitution requires the Government to prove each

16  and every element of the crimes charged beyond a reasonable

17  doubt.  That will make more sense to you at the close of this

18  case, when I'm going to argue from the evidence.

19      The judge just told you a few moments ago that argument is

20  not evidence.  So what I'm saying to you now is not evidence.

21  And what my colleague just said on behalf of the Government is

22  also not evidence.  The evidence comes from the testimony that

23  will be presented in court and from the different exhibits that

24  are admitted into evidence.

25      I will argue to the best of my ability at the close of

1  this case from the evidence.  I'm going to argue that the
2  Government has not met their burden of proof.
3      I'm going to point to specific things in the evidence that
4  you haven't heard yet, but you will hear by the close of the
5  case and argue that under those specific pieces of evidence,
6  the Government will not meet their burden, has not met their
7  burden and therefore you should vote not guilty with respect to
8  my client's charges.
9      Now, thank you for your time and for your service under
10 these unusual times that we find ourselves in this world and
11 this country with the pandemic still going on and as you all
12 sit here looking at me masked, which is a little unusual for
13 all of us, but I do thank you for the time and attention that
14 you've given in this case.  Without your participation the
15 wheels of justice would come to a grinding halt.
16      So I'm going to be seated.  I'll have a chance to speak to
17 you again in a few days and give you my take on the evidence in
18 the case.  And at that time I'm going to ask you for a verdict
19 of not guilty.  Thank you again for your time and attention.
20           **THE COURT:**  Thank you very much.
21      Will the Government call its first witness.
22           **MS. SCHWARTZ:**  The Government calls Master Trooper
23 Craig Miller.  I believe he's down the hall and while my
24 co-counsel gets him, I just want to test the audio.
25           **THE COURT:**  That's fine.

1    MS. SCHWARTZ:  I've tested the video.

2    THE COURT:  Yeah, I appreciate that.

3    THE CLERK:  Good morning, sir.  Please come forward

4  and approach the witness bench.  Before you're seated, raise

5  your right hand and I'll swear you in.

6    (Witness sworn.)

7    THE CLERK:  Thank you.  Have a seat.  Please adjust

8  the microphone, speak directly into it.

9    State and spell your first and last name for the record.

10   THE WITNESS:  First name Craig, C-R-A-I-G.  Last name

11  Miller, M-I-L-L-E-R.

12   THE CLERK:  Thank you.

13   THE WITNESS:  Sure.

14   MS. SCHWARTZ:  May I proceed, Your Honor.

15   THE COURT:  Yes.

16   MS. SCHWARTZ:  Thank you.

17                    -   -   -

18                 **DIRECT EXAMINATION**

19                    -   -   -

20  BY MS. SCHWARTZ:

21  Q.  By whom are you employed?

22  A.  With the Maryland State Police.

23  Q.  And what is your position there?

24  A.  I am a Master Trooper.

25  Q.  Okay.  And Master Trooper Miller, I also should have said

*Direct Examination - C. Miller (by Ms. Schwartz)*

37

1  good morning, so good morning.

2  **A.**    Good morning.

3  **Q.**    How long have you worked for the Maryland State Police?

4  **A.**    It will be 28 years this July.

5  **Q.**    What is your current assignment?

6  **A.**    I'm assigned to the Maryland State Police Proactive

7  Criminal Enforcement Team.

8  **Q.**    What's the short name for that?

9  **A.**    PACE.

10  **Q.**    And what is the PACE team?

11  **A.**    PACE team is a unit of troopers specially designed to

12  enforce the criminal laws on the highways in the state of

13  Maryland by the use of traffic stops.

14  **Q.**    And describe your background with the Maryland State

15  Police up until the point that you joined the PACE team.

16  **A.**    Prior to the PACE team, I worked general patrol duties for

17  18 years and then became a member of the PACE team.

18  **Q.**    And prior to joining the Maryland State Police, describe

19  your educational background and work experience, just briefly.

20  **A.**    I have educational experience through high school, some

21  college and college credits through the Maryland State Police.

22  **Q.**    And did you join the state police straight out of school,

23  then?

24  **A.**    No, I did not.

25  **Q.**    Briefly describe your experience before that.

1  A.   I had numerous employment through retail outlets in the

2  Maryland area.  And I didn't join the state police until I was

3  30.

4  Q.   So once you joined the PACE team, did you receive any

5  special training and other experience up until the time of the

6  stop in this case, August 5th, 2020?

7  A.   Yes, I did.

8  Q.   Can you describe that, please?

9  A.   I've had numerous courses in criminal interdiction, motor

10  vehicle interdiction, interdiction of exploited and missing

11  children, training for counterfeit goods, training to identify

12  cigarette smugglers.  Basically training that would involve

13  anything we come across on the highways.

14  Q.   Does that include training in narcotic and controlled

15  substances?

16  A.   That's correct.

17  Q.   And directing your attention now to August 5th, 2020, what

18  was -- where were you assigned on that day?

19  A.   On that day I was assigned to Washington County in the

20  Hagerstown area of I-81 northbound.

21  Q.   And what was your tour of duty that day?

22  A.   I believe we started at 7:00 a.m. on that day and worked

23  until 3:00 p.m.

24  Q.   And were you -- how do you patrol in the PACE unit?

25  A.   We use Ford Explorer patrol vehicles.

1  Q.   And when you patrol, are you alone or part of a team?

2  A.   I'm part of a western unit within the PACE team.

3  Q.   How many people are in that unit?

4  A.   There are three people in that unit.

5  Q.   Do you each have your own vehicles or are you paired up?

6  A.   We each have our own vehicle.

7  Q.   And who are you working with that day?

8  A.   On that day I was working with Corporal Yates, a certified

9  K9 handler, and Senior Trooper Shrout.

10 Q.   And Corporal Yates you said was a certified K9 handler.

11 Did he have a K9 with him?

12 A.   He did.

13 Q.   What was the K9's -- what was the dog's name?

14 A.   The dog is Buster.

15 Q.   And were you all in uniform or plain clothing?

16 A.   We were in uniform.

17 Q.   Was there any particular crime that you were focused on on

18 August 5th or just whatever crime you happened to come across?

19 A.   Nothing in particular.

20 Q.   Okay.  Now, at roughly 9:00 o'clock, just a little bit

21 before the events of this case, where were you located?

22 A.   I was positioned monitoring northbound traffic right

23 around the 5-mile marker on I-81 in Hagerstown area.

24 Q.   Were you stationary or mobile patrolling at that point?

25 A.   I was stationary.  I was positioned in a crossover between

*Direct Examination - C. Miller (by Ms. Schwartz)*

40

1   the north and southbound lanes.

2   **Q.**   And how about your colleagues, Corporal Yates and Sergeant

3   Shrout?

4   **A.**   Senior Trooper Shrout was monitoring southbound traffic

5   and I was northbound.  Corporal Yates, I'm not positive, but I

6   believe he was watching southbound traffic also.

7   **Q.**   But all three of you were at that crossover?

8   **A.**   That is correct.

9   **Q.**   Okay.  And directing your attention to just before

10  9:07 a.m., did you notice a vehicle connected to this case?

11  **A.**   I did.

12  **Q.**   What drew your attention?

13  **A.**   I observed a white Honda Accord following a gray SUV at an

14  extremely close rate.

15  **Q.**   And what about following closely was a concern to you?

16  **A.**   The concern was that he was roughly one to maybe two car

17  lengths behind the vehicle and I-81 is notorious for rear-end

18  collisions resulting in fatalities and that's one of the major

19  violations we enforce on that interstate.

20  **Q.**   How often do you stop vehicles for that violation?

21  **A.**   Probably two or three times a day.

22  **Q.**   And was your vehicle that day equipped with a dash-mounted

23  camera?

24  **A.**   It was.

25  **Q.**   How does that system work?

1  **A.**   The Axon camera operates with a interface between our

2  emergency equipment and the camera itself.  As soon as the

3  camera -- or the emergency equipment on the vehicle is

4  operational, the camera turns on and then it buffers, I

5  believe, 30 seconds back.

6  **Q.**   So to be clear, when you turn it on, it shoots going

7  forward and it also picks up 30 seconds before the point that

8  you've turned on the emergency equipment and it starts

9  recording?

10  **A.**   That is correct.

11  **Q.**   Is there any difference between the recording -- the

12  contents of the recording from the moment you turn it on and

13  the 30 seconds back?

14  **A.**   No.

15  **Q.**   How about the audio component, is there any difference

16  going forward and the 30 seconds back?

17  **A.**   I believe the audio does not activate until that 30-second

18  buffer is achieved.

19  **Q.**   Okay.  So I'm going to show you Government Exhibit 1A and

20  ask if you recognize -- can you see it on the screen in front

21  of you?

22  **A.**   I can.

23  **Q.**   Do you recognize Government Exhibit 1A?

24  **A.**   I do.

25  **Q.**   What do you recognize that initial shot to be?

*Direct Examination - C. Miller (by Ms. Schwartz)*

1  A.   That is northbound I-81 and I believe that is at the exact

2  time I activated my -- or I'm pulling from the crossover.

3  Q.   And can you -- is the time on top of the screen there?

4  A.   Yes.

5  Q.   Can you just state that for the record?

6  A.   9:06:52.

7  Q.   So just a couple seconds before 9:07?

8  A.   Correct.

9  Q.   Now, the shot that we're seeing here is -- first of all,

10 which car is the Honda in this picture, if you can tell?

11 A.   I believe it is the third one in line.

12 Q.   Okay.  We'll get closer to it so you'll have a chance to

13 see it more closely.  So my question to you now is, is this,

14 focusing on the actual day, August 5th, 2020, was this your

15 first view of the Honda or is this a little bit into your first

16 noticing the Honda?

17 A.   This was after I first noticed it.

18 Q.   Okay.  When traffic was passing you, when you were in the

19 crossover, was it going from your right to your left or the

20 other way?

21 A.   Going from my right to my left.

22 Q.   And did you first see the Honda when it was on your right

23 or already when it had passed you to the left or in between?

24 A.   As it was approaching from my right I noticed it.

25 Q.   Okay.  And then about how long after that did you pull out

*Direct Examination - C. Miller (by Ms. Schwartz)*

43

1  and turn on your emergency lights?

2  **A.**   I don't recall the exact time, but I believe there may

3  have been traffic coming and I had to wait for that clear

4  before I pulled out.  So maybe a few seconds.

5  **Q.**   Okay.  So I'm going to play the video, but before I do

6  that, I'm going to ask -- just skip ahead a little bit and ask

7  whether you made any arrests on August 5th, 2020.

8  **A.**   Okay.

9  **Q.**   Did you?

10  **A.**   Yes.

11  **Q.**   How many people did you arrest?

12  **A.**   Two.

13  **Q.**   And do you see either of them in the courtroom today?

14  **A.**   Yes.

15  **Q.**   Could you indicate an item of clothing that the -- well,

16  first of all, how many do you see?

17  **A.**   I see one right here.

18  **Q.**   Okay.  And can you identify a piece of clothing that that

19  individual is wearing?

20  **A.**   The striped shirt with the checked pocket.

21  **Q.**   Okay.

22       **MS. SCHWARTZ:**  For the record, Your Honor, I'd like

23  the record to reflect that the witness has identified the

24  Defendant.

25       **THE COURT:**  Very good.

*Direct Examination - C. Miller (by Ms. Schwartz)*

```
 1   BY MS. SCHWARTZ:
 2   Q.   And was he in the car that we're about to see more of?
 3   A.   He was.
 4   Q.   Was he -- where in the car was he sitting?
 5   A.   He was in the driver's seat.
 6   Q.   He was driving?
 7   A.   I'm sorry, the passenger seat.
 8   Q.   Front or back?
 9   A.   He was in the right front passenger seat.
10   Q.   Thank you.  All right.  So I'm now going to play that
11   video file, which is the first 10 minutes of the stop.  If
12   there's something that you need to say as it's going, let me
13   know and I can stop it.  Otherwise I'll ask you questions when
14   it's over.
15   A.   Yes, ma'am.
16   Q.   Okay.
17        (Video playing.)
18   Q.   Who did you just call at 9:15?
19   A.   At that point I called Senior Trooper Shrout and Corporal
20   Yates on our private radio --
21   Q.   Thank you.
22   A.   -- to assist.
23        (Video playing.)
24   Q.   As the video ends, it ends at about 9:16 and a little bit,
25   what are you doing at that point?
```

*Direct Examination - C. Miller (by Ms. Schwartz)*

45

1   **A.**   At that point I'm examining the documents that I received

2   from the driver, and I believe I started entering some

3   information in the computer for the traffic enforcement part.

4   **Q.**   And we saw another officer in the video, mostly just

5   standing there.  Who was that?

6   **A.**   I'm not sure of his last name.  But he was a deputy with

7   the sheriff's department who just happened to be traveling the

8   same direction I was and stopped to see if I needed any help.

9   **Q.**   Is it he part of your team or not?

10  **A.**   No, he's not.

11  **Q.**   Okay.  So now I'm going to pick up with the next chunk of

12  your dashcam video.  What's going to be happening at the

13  beginning of this next video?

14  **A.**   I believe this will be a continuation.

15  **Q.**   Does -- yeah, I'll start it for you and then ask.  Sorry.

16       So this now starts at -- the other one ended at

17  9:16 something and this one picks up at 9:16:56.

18       (Video playing.)

19  **Q.**   Who are you talking to at this point?

20  **A.**   That's K9 handler Corporal Yates.

21  **Q.**   And he's standing by one of the windows of your vehicle?

22  **A.**   He's at my passenger side front window.

23  **Q.**   By the way, I noticed in the first video we can see that

24  you approached the passenger side of the vehicle, the white

25  Honda.  Was there a reason for that?

*Direct Examination - C. Miller (by Ms. Schwartz)*

1  A.   Due to the car parked right on that white line.  It's just
2  a safety issue.
3  Q.   Understood.
4       (Video playing.)
5  Q.   Who's talking to Gavino Perez in front of your vehicle as
6  I stop the video at 9:17:45?
7  A.   That is Senior Trooper Shrout.
8  Q.   Resuming.
9       (Video playing.)
10 Q.   Now, who's that in the middle on the right walking towards
11 your vehicle that I'm pointing out with the arrow at 9:18:18?
12 A.   That's a K9 handler, Corporal Yates.
13 Q.   Continuing.
14      (Video playing.)
15 Q.   Stopping at 9:18:39 with Gavino Perez on the right and
16 Shrout in the middle with the trooper behind him and the front
17 seat passenger, who just got out, on the left.
18      What is the front seat passenger -- what does he appear to
19 be holding in his right hand?
20 A.   That's a cell phone.
21 Q.   Okay.  Continuing at 9:18:39.
22      (Video playing.)
23 Q.   Stopping at 9:19:50.  What's going on on the right, on the
24 far -- on the grassy side of the guardrail, the movement where
25 I just -- I stopped it?  I can play it again if you need to see

```
 1  it.
 2  A.    Could you play that again, please.
 3  Q.    Okay.
 4        (Video playing.)
 5            THE WITNESS:  That's Corporal Yates and his K9
 6  partner.  They came up on the other side of the guardrail and
 7  now they're going to go under the guardrail for a scan of the
 8  vehicle.
 9  BY MS. SCHWARTZ:
10  Q.    Okay.  Continuing at 9:19:53.
11        (Video playing.)
12            MS. SCHWARTZ:  And this is Exhibit 1B for the record.
13            THE COURT:  Thank you.
14        (Video playing.)
15  BY MS. SCHWARTZ:
16  Q.    Okay.  And then what just -- what's that movement now at
17  9:20:37 on the far side of the guardrail?
18  A.    That's Corporal Yates returning from the K9 scan.
19  Q.    Resuming.
20        (Video playing.)
21  Q.    By the way, the microphone for your dashcam, that's
22  mounted on you?
23  A.    That's correct.
24  Q.    And that's why we can't hear the conversation right now?
25  A.    That's correct.
```

1  **Q.**   Is that right?

2       (Video playing.)

3  **Q.**   What does the -- stopping at 9:21:59 and focusing on the

4  very left side of the camera by the ear of the passenger, can

5  you tell what he appears to be doing, or do I need to play

6  more?

7  **A.**   No, it appears he's using his telephone.

8  **Q.**   Okay.  Continuing at 9:22.

9       (Video playing.)

10  **Q.**   So stopping at 9:23:22 of Exhibit 1B, what are you guys --

11  what are you and Sergeant Shrout -- sorry, Senior Trooper

12  Shrout about to do?

13  **A.**   We're going to start our probable cause search of the

14  vehicle.

15  **Q.**   Okay.  Continuing.

16       (Video playing.)

17  **Q.**   Which part of the car are you searching in the rest of the

18  segment?

19  **A.**   I'm at the front passenger side.

20  **Q.**   And Senior Trooper Shrout?

21  **A.**   He's at the rear passenger side.

22       (Video playing.)

23  **Q.**   What does "seat bolts" being off signify?

24  **A.**   Seat bolts being removed from the seat would indicate that

25  maybe something was -- some area was accessed under the seat.

*Direct Examination - C. Miller (by Ms. Schwartz)*

49

1  And through our training in the Maryland State Police, we've
2  discovered that that's an indicator that there could be a
3  possible compartment, hidden compartment with either contraband
4  or currency in it.
5  **Q.**  Okay.  And that was bolts, B-O-L-T-S, that you said?
6  **A.**  That's correct.
7  **Q.**  Okay.  Resuming at 9:24:09.
8     (Video playing.)
9  **Q.**  So 9B ended at 9:16:53 -- I'm sorry, 9:26:53.  As that was
10  ending, describe what you thought you saw.
11  **A.**  I saw a paper bag, and it appeared to be a McDonald's
12  paper bag, and I saw that through an opening in the side of the
13  glove compartment assembly after the glove compartment was
14  removed.  And it appeared to be on the passenger's side close
15  to the firewall of the vehicle.
16  **Q.**  So if one were sitting in the front passenger's seat of
17  the vehicle, what part of the front passenger's body would be
18  closest to that place in the car -- in that compartment in the
19  car that you -- where you saw the bag?
20  **A.**  The passenger's right foot.
21  **Q.**  Was it at -- and what level height was it with respect to
22  the passenger?  At the foot level, at the chest level, at the
23  shoulder level, roughly?
24  **A.**  Approximately waist level.
25  **Q.**  Okay.  I'm going to start video Exhibit 1C, which starts

1  at 9:26:50.

2      (Video playing.)

3  **Q.**  Okay.  Are you still there trying to get that bag?

4  **A.**  Yeah.

5      (Video playing.)

6  **Q.**  Stopping the video at 9:27:57.  What just happened?

7  **A.**  I removed the paper bag from up under the dashboard.

8  **Q.**  And go on.

9  **A.**  I removed a paper bag from up under the dashboard and felt

10  a hard package within the paper bag.  I opened up the paper bag

11  and observed what I know from my training as a kilogram of

12  narcotics.  It was wrapped in some type of tape, black tape and

13  clear tape.

14  **Q.**  And having seen that, what happened after that?

15  **A.**  After we discovered that, then at that point we took both

16  of the occupants into custody.

17  **Q.**  And you said "10-95" before you and Senior Trooper Shrout

18  walked toward the two men.  What is that, 10-95?

19  **A.**  That is our 10 code for a prisoner or an arrestee.

20      **THE COURT:**  I'm sorry, prisoner or -- say again?

21      **THE WITNESS:**  Arrestee.

22      **THE COURT:**  Arrestee.

23  **BY MS. SCHWARTZ:**

24  **Q.**  So is it fair to say that at this point the two men were

25  cuffed and arrested?

1    A.    That's correct.

2    Q.    And prior to this point, prior to removing that package

3    from the assembly holding the glove compartment, you took a

4    photograph of it?

5    A.    I did.

6    Q.    I'm going to ask you to look at Government Exhibit 9 and

7    ask if you recognize that.

8    A.    I do.

9    Q.    What do you recognize that to be?

10   A.    That is the first view that I saw of the paper bag.

11   Q.    Now, if the glove compartment were in place at this point

12   and you took the same picture from the same place, could we see

13   this paper bag?

14   A.    No.

15   Q.    What part of the glove compartment door, we'll call it --

16   well, where was the glove compartment door at the point that

17   you took this picture?

18   A.    The assembly that is the glove compartment was released

19   from its clips that hold it in, and it's just hanging all the

20   way open.

21   Q.    And if you reached into where the glove compartment would

22   be if the assembly had not been taken off and dangling, where

23   would this bag have been with respect to the interior of the

24   glove compartment?

25   A.    If you're looking forward of the car or towards the hood,

*Direct Examination - C. Miller (by Ms. Schwartz)*

1  you would be on the right side, passenger's side, of the car.

2  Q.   So beyond the bag, is that the right side of the car or

3  the front of the car, to the -- to the right of the screen in

4  Government 9.

5  A.   That is the right side and it would be around the end of

6  the fender where it meets the opening of the passenger door.

7  Q.   I'm going to return to video 1C.

8       (Video playing.)

9  Q.   Stopping the video at 9:28:49.  What does it say on the

10  white part of the marking on the package that's being put on

11  the front of your vehicle?

12  A.   W2.

13  Q.   Okay.  Continuing at 9:28:49.

14       (Video playing.)

15  Q.   Did you -- stopping at 9:31:55.  Did you see the labeling

16  as it was put on the car trunk?

17  A.   I did.

18  Q.   And what did the label say?

19  A.   W2.

20  Q.   Okay.  Resuming at 9:31:55.

21       (Video playing.)

22  Q.   Stopping at 9:16:12.  What did you just say?

23  A.   I said, "There's a hump right here, Chris."

24  Q.   And what area were you referring to?

25  A.   The passenger's side front of the seat.

*Direct Examination - C. Miller (by Ms. Schwartz)*

53

```
 1  Q.   The front of the passenger's seat?
 2  A.   That's correct.
 3       (Video playing.)
 4       MR. AKE:  Your Honor, this might be a good time to
 5  take a break, a morning break.
 6       THE COURT:  That's fine.  We'll take a recess.
 7       THE CLERK:  All rise.  This Honorable Court is now in
 8  recess.
 9       (Jury exits.)
10       THE COURT:  Be seated.  Tell me what you would like.
11       MR. AKE:  Oh, no, I was going to take our morning --
12       THE COURT:  Oh, yeah, so I said --
13       MR. AKE:  -- bathroom break.
14       THE COURT:  I said go about your business, yeah.
15       MR. AKE:  Oh, okay.  Got it, got it.  Yes, Your Honor.
16  Thanks.
17       (Whereupon, a recess was taken from 11:18 a.m. to 11:39
18  a.m.)
19       THE COURT:  Counsel, just as a housekeeping manner, I
20  have to take our lunch recess at about five of or 10 of 1:00.
21  I have a bench meeting.  So we'll take our break then.
22       (Jury enters.)
23       THE COURT:  Counsel, before we begin, ladies and
24  gentlemen, I do want to just let you know we're going to break
25  for our lunch at about five of or 10 of 1:00.
```

1          MS. SCHWARTZ:  May I proceed, Your Honor?

2          THE COURT:  Yes, please.

3      Master Trooper, you do remain under oath.

4  BY MS. SCHWARTZ:

5  Q.   Trooper Miller, on the screen are Government Exhibits 10

6  and 11.  Do you recognize those?

7  A.   I do.

8  Q.   What do you recognize those to be?

9  A.   Those are the back of the center console between the

10 driver's seat and passenger's seat.

11 Q.   And these pictures are taken from the front or from the

12 back?

13 A.   From the back.

14 Q.   And are these the two pictures referenced in the video

15 that you took in connection with the recovery of the second,

16 kilo-sized package?

17 A.   That's correct.

18 Q.   And at this time I'm going to resume with the next video,

19 1D.  We won't have to play all of it, but starting at the

20 beginning, 9:36:54.

21      (Video playing.)

22 Q.   Okay.  Stopping at 9:38:19.  And focusing on the

23 reddish-colored item in the middle of the hood, or closer to

24 the middle of the hood, what is that, Trooper Miller?

25 A.   That is the third kilo package that was found.

1  **Q.**   And what marking, if any, was on that third package?

2  **A.**   That had the letters R-A-T-A on it.

3  **Q.**   R-A-T, as in Tom, A?

4  **A.**   Correct.

5  **Q.**   Okay.  And I think we get a better view in the next

6  minute.

7       (Video playing.)

8  **Q.**   Stopping at 9:38:44.  Why is the car being moved?

9  **A.**   So we could search the driver's side safely.  Due to the

10  location, we had to move it.

11  **Q.**   And where is it moved to?  Where are we going to see it in

12  the future video?

13  **A.**   You'll see it on the other side of this bridge here.

14       (Video playing.)

15  **Q.**   Okay.  So I'm going to skip ahead a little bit.  What's

16  going on now with respect to the two men?

17  **A.**   They're being placed in our patrol vehicles.

18  **Q.**   Okay.  Moving forward from 9:43:16.  And what's going on

19  now at 9:45:35?

20  **A.**   The evidence is being placed into clear plastic bags.

21  **Q.**   Okay.  And skipping ahead, as we end 1D at 9:46:53 and the

22  car is about to be moved, you said?

23  **A.**   That's correct.

24  **Q.**   Okay.  So let's go on to 1E.

25       (Video playing.)

1   Q.   And I'm going to skip forward from 9:46 to 9:49.  Where is

2   the car now at 9:49:39?

3   A.   It's on the other side of the bridge.

4          MS. SCHWARTZ:  Okay.  And sorry, I -- for the benefit

5   of the court reporter, I apologize for speaking over the video?

6          THE COURT:  I was just going to go say that, that it

7   does make it difficult for her to record.

8   BY MS. SCHWARTZ:

9   Q.   So the question was, where is the car now at 9:49:43.  And

10  I will try to be better about remembering to stop the video.

11  A.   We've moved it from before the bridge to after the bridge.

12  Q.   Okay.  And I'm going to skip now to 9:53.  And I'm going

13  to ask you before I start the video again what is going on now?

14  A.   We're continuing the search.

15  Q.   Okay.

16       (Video playing.)

17          MS. SCHWARTZ:  Your Honor, the video appears to be

18  frozen.  I'm just going to start it over and see if I can --

19          THE COURT:  Okay.

20          MS. SCHWARTZ:  -- get it moving.

21          THE COURT:  This is D, 1D?

22          MS. SCHWARTZ:  No, we're on E.

23          THE COURT:  I mean, sorry, 1E?  Okay.

24  BY MS. SCHWARTZ:

25  Q.   Okay.  Starting it at 9:54:02.  And does the search

1  continue --
2  **A.**   It does.
3  **Q.**   Does this search continue for a bit?
4  **A.**   It does.
5  **Q.**   Okay.  I'm going to skip to 9:56.
6       (Video playing.)
7  **Q.**   Okay.  Stopping at the end of 1E at 9:56 -- well, just
8  short of 9:57 or just at the end.
9       You snapped two photographs at the end of that video.
10 What did you take a photograph of?
11 **A.**   Of a statue that I found in the backpack that I removed
12 from the trunk.
13 **Q.**   Okay.  Actually, let me back up.  I realized I skipped an
14 exhibit that I'd like you to look at.
15      Looking at Government 12, which we didn't see before, what
16 are we looking at?
17 **A.**   This is the front passenger's seat, and Trooper Shrout is
18 holding up the cushion and seat cover, exposing the red package
19 that was located there.
20 **Q.**   Okay.  So looking at this object that says Hardy or Harby
21 on it, on the left side of -- the upper left side of the photo,
22 is that Trooper Shrout's hand?
23 **A.**   That's correct.
24 **Q.**   And this striped, white and black vinyl or leather, what
25 is that?

*Direct Examination - C. Miller (by Ms. Schwartz)*

58

1  A.   That is the seat cover.

2  Q.   So if the passenger were to be sitting in the front seat

3  of the car, front passenger's seat of the car, is this what the

4  passenger sits on or something else?

5          MR. GUILLAUME:  Objection.

6          THE COURT:  Basis?

7          MR. GUILLAUME:  Speculation.

8          THE COURT:  Overruled.

9          THE WITNESS:  That's correct.

10  BY MS. SCHWARTZ:

11  Q.   Had you moved the package prior to taking this photo?

12  A.   No.

13  Q.   Now I'm going to take you back to the trunk as we ended 1E

14  and ask you to take a look at Government 13 and Government 14.

15  What are those?

16  A.   That is a Santa Muerte statue.

17          MR. GUILLAUME:  Objection, move to strike.

18          THE COURT:  Basis?

19          MR. GUILLAUME:  May we approach, Your Honor?

20          **(Whereupon, the following conference was held at the**

21  **bench:**

22          THE COURT:  Can you hear me?

23          MR. GUILLAUME:  Yes, I can hear you, Your Honor.

24  Can everyone hear me?  Are we ready?

25          THE COURT:  Is the Government ready?

*Direct Examination - C. Miller (by Ms. Schwartz)*

1    **MS. SCHWARTZ:**  I can hear, yes.

2    **THE COURT:**  Is the Defendant able to hear?

3    **MR. GUILLAUME:**  Can Mr. Sanchez hear?  He can hear me.

4    **THE COURT:**  I'm getting a lot of feedback.

5    **MS. SCHWARTZ:**  I am as well.

6    **THE COURT:**  So I want to just be certain that

7   Mr. Sanchez is able to hear clearly so he can participate.

8    **MR. GUILLAUME:**  I don't believe he can hear clearly.

9   He can hear me talking because I'm talking in a louder voice,

10  but he can't hear on his headset.

11   **THE CLERK:**  He can hear the interpreter.  Of course he

12  can't hear what we're saying, but he can hear only the

13  interpreter.

14   **MR. GUILLAUME:**  Can the interpreter hear me?  If the

15  interpreter can hear me, then he can --

16   **THE COURT:**  Is the interpreter able to hear the Court?

17   **THE INTERPRETER:**  The interpreter is able to hear the

18  Court.

19   **THE COURT:**  So all is good.  Very good.  I'm getting

20  some feedback.  Is everybody else?

21   **MR. GUILLAUME:**  I am getting feedback as well.

22   **MS. SCHWARTZ:**  Your Honor, I'll withdraw the question

23  and just ask him to describe it without naming it.

24   **THE COURT:**  Well, I do need to know -- it's fine.  The

25  question can be withdrawn, but I would nonetheless like to know

1  the basis of the objection because I want to be certain that

2  the Court's rulings on motions in limine is clear.

3      **MR. GUILLAUME:**  Well, it was just that, Your Honor.  I

4  think that the Court's ruling on the motion in limine with

5  respect to calling the statue by a name, Santa Muerte, implies

6  a basis of knowledge that would need to be explained, which I

7  believe that's already been ruled we cannot discuss because of

8  its prejudicial effect on the jury.

9      But if the question's withdrawn, I guess it's moot, so...

10      **THE COURT:**  So the Court will not rule on the

11  objection because it is withdrawn.

12      **MR. GUILLAUME:**  Thank you, Judge.

13      **MS. SCHWARTZ:**  Thank you.

14  **(Whereupon, the bench conference was concluded.)**

15      **MR. GUILLAUME:**  Your Honor?  Sorry.

16  **(Whereupon, the following conference was held at the**

17  **bench:**

18      **MR. GUILLAUME:**  Your Honor, I would just ask for the

19  Court to instruct the jury to disregard the Government's last

20  question.

21      **THE COURT:**  Yes, I will so instruct.

22      **MR. GUILLAUME:**  Thank you.

23  **(Whereupon, the bench conference was concluded.)**

24      **THE COURT:**  Ladies and gentlemen, you are instructed

25  to -- you are instructed to disregard the Government's last

1 | question.
2 |      Ms. Schwartz, you may proceed.
3 | **BY MS. SCHWARTZ:**
4 | **Q.**   Without naming the statue in any way, can you just
5 | describe what we're looking at?
6 | **A.**   It is a skeletal figure with a scythe.  And beside the
7 | scythe and the left side of the figure is a 5-dollar bill and a
8 | 1-dollar bill rolled in a -- inside of each other.
9 | **Q.**   And where did you -- where did you locate the item?
10 | **A.**   Inside the red backpack in the picture on the right is
11 | where I saw it initially.
12 | **Q.**   And what were some of the other items inside the backpack?
13 | **A.**   The next item which was notable was several pairs of latex
14 | or vinyl gloves.
15 | **Q.**   Showing you Government 15.  Do you recognize Government
16 | 15?
17 | **A.**   I do.
18 | **Q.**   What do you recognize that to be?
19 | **A.**   Those are the gloves that I removed from the same red
20 | backpack.
21 | **Q.**   Okay.  Now, I'm going to ask you to pick up the item 5 in
22 | the -- in front of you.  I believe it's the one on top.  And
23 | you should have scissors up there.  And I'm going to ask you to
24 | open -- and is that a sealed bag?
25 | **A.**   That's correct.

1  **Q.**   Okay.  Can you open it, please.

2          **MS. SCHWARTZ:**  And for now, Your Honor, I'll deem the

3  contents marked Government 5 and we'll affix the label

4  thereafter.

5          **THE COURT:**  Fine.

6  **BY MS. SCHWARTZ:**

7  **Q.**   Can you -- is the item that you've just put on the edge of

8  the witness box the item that you recovered from the knapsack?

9  **A.**   That's correct.

10 **Q.**   Minus, if I'm seeing correctly, the cash?

11 **A.**   Correct.

12 **Q.**   Okay.  Was the cash separately secured?

13 **A.**   I don't recall, but I believe it was.

14 **Q.**   All right.  So resuming now, I'm going to move on to --

15 well, actually, I will ask you to take a look at 52B, which

16 should be in front of you, another envelope.

17         **THE COURT:**  Counsel, you said 52B?

18         **MS. SCHWARTZ:**  52B.

19 **BY MS. SCHWARTZ:**

20 **Q.**   Which is -- the B is just for identification is the

21 packaging and there will be items within.

22         And I'm going to ask if you recognize 52B before you open

23 it.

24 **A.**   Yes.

25 **Q.**   What do you recognize 52B to be?

1   A.   This was an envelope which contained other items seized

2   from that red backpack.

3          THE COURT:  I'm sorry.  I'm having a little bit of

4   trouble hearing you.  If you could speak more closely into the

5   microphone, that would be helpful.

6          THE WITNESS:  I'm sorry, Your Honor.

7          THE COURT:  No, don't apologize.  Thank you.

8          THE WITNESS:  These were some more items that were --

9   that I located from the red backpack.

10  BY MS. SCHWARTZ:

11  Q.   And I'll ask you now to open 52B for identification and

12  take out what we will -- what will be 52C in evidence, the

13  gloves.  And just -- okay.  Setting aside the receipts -- okay.

14      Are those gloves the same gloves pictured in Government 19

15  on the screen?

16  A.   That's correct.

17  Q.   Okay.  You can put them back in the envelope.  And the

18  other items we'll come back to -- what are the --

19          MS. SCHWARTZ:  And, Your Honor, those will be -- the

20  other items will be separately labeled at a later time

21  Government Exhibits 52A, 53A, 54A, 55A, 71A, 72A, 85A and 87A.

22  BY MS. SCHWARTZ:

23  Q.   And those additional items inside 52A, what are those?

24  A.   Those were receipts that were located within the vehicle.

25  Q.   Okay.  And are those -- were those secured after the

*Direct Examination - C. Miller (by Ms. Schwartz)*

1  search and after the recovery of the items?

2  **A.**   They were.

3  **Q.**   And did you open the bag in preparation for this trial?

4  **A.**   I did.

5  **Q.**   And resecure it intact?

6  **A.**   That's correct.

7  **Q.**   And then the receipts are in the same condition today?

8  **A.**   They are.

9  **Q.**   Okay.  All right.  I will take the receipts --

10         **MS. SCHWARTZ:**  May I approach, Your Honor?

11         **THE COURT:**  You may.  You don't have to ask again.

12         **MS. SCHWARTZ:**  Thank you.  They just look precarious

13  over there.

14  **BY MS. SCHWARTZ:**

15  **Q.**   Okay.  All right.  We're going to resume the video with

16  the last one at 1F.  Does 1F pick up immediately after the end

17  of 1E?

18  **A.**   Yes.

19  **Q.**   Okay.

20      (Video playing.)

21  **Q.**   Do you continue to search the backpack at this point --

22  **A.**   That's correct.

23  **Q.**   -- stopping at 9:57:18?

24  **A.**   That's correct.

25  **Q.**   I'm going to skip forward to 10:03.

*Direct Examination - C. Miller (by Ms. Schwartz)*

65

1        (Video playing.)

2    BY MS. SCHWARTZ:

3    Q.   Okay.  And I'll stop the video there.  That was just

4    before 10:06 on 1F.

5        All right.  And now I'm going to ask you to take a look at

6    some more photos.

7        Do you recognize 16, Government 16?

8    A.   Yes.

9    Q.   What do you recognize there?

10   A.   That is the bag -- one of the bags containing cash that

11   was found hidden behind the seat.

12   Q.   Is that one of the photos that we hear you taking --

13   pictures that we hear you taking prior to the recovery?

14   A.   That's correct.

15   Q.   Okay.  And turning to 17.  What is that?

16   A.   That is one of the bags of money, again, that was located

17   behind the seat.

18   Q.   And 18?

19   A.   Again, a bag with U.S. currency.

20   Q.   Okay.  And 19?

21   A.   That is the driver of the vehicle.

22   Q.   And what car is he in at this point?  His car, the car

23   they were stopped in, or some other vehicle?

24   A.   He is in my patrol vehicle.

25   Q.   Okay.  And -- okay, that's 19.  Now 20?

**JA302**

*Direct Examination - C. Miller (by Ms. Schwartz)*

1  **A.**   And that is the front seat passenger of the Honda Accord,
2  and he is in a patrol vehicle.
3  **Q.**   Okay.  And is that the Defendant?
4  **A.**   That is correct.
5  **Q.**   And 21?
6  **A.**   That's the open bag exposing the currency that was
7  located.
8  **Q.**   How about 21A?
9  **A.**   That shows all of the separate totals of the seized
10  currency.
11  **Q.**   And what is the total amount in the -- from those three
12  bags of money based on 21A?
13  **A.**   $46,810.
14  **Q.**   And did you count that up?
15  **A.**   Yes.
16  **Q.**   Okay.  And then 24.  Do you recognize Government 24?
17  **A.**   Yes, I do.
18  **Q.**   What is that?
19  **A.**   That is a necklace with the same figure that we already
20  discussed.
21  **Q.**   The figure matching the statuette, Government 5?
22  **A.**   That's correct.
23  **Q.**   And do you recall where you located that item -- that you
24  pictured in Government 24?
25  **A.**   As I recall it was in the center console of the vehicle.

1  Q.    And then I'm going to show you Government 25.  What are we
2  seeing there?
3  A.    This is the total seizure from that vehicle, including the
4  narcotics, suspected narcotics, and the currency.
5  Q.    So those are the two W2 packages that we can't see the W2,
6  those are the same ones?
7  A.    Correct.
8  Q.    And the third package with the RATA?
9  A.    Correct.
10  Q.    Okay.  And then 26?
11  A.    This is the western PACE team with the seizure, including
12  the K9 used in that traffic stop.
13  Q.    Did you cause all three packages of drugs to be submitted
14  for testing?
15  A.    Correct.
16  Q.    To where?
17  A.    To the Maryland State Police crime lab within the
18  Hagerstown Barrack.
19  Q.    And were the packages opened prior to being delivered to
20  the lab for testing?
21  A.    No, they weren't.
22  Q.    I'm just going to show you a couple of pictures,
23  Government 22.  Where was this photograph taken, Government 22,
24  if you recognize it?
25  A.    That is in the lab on the second floor of the Hagerstown

*Direct Examination - C. Miller (by Ms. Schwartz)*

68

1  Barrack.  That is the upward draft vent system.

2  **Q.**   So we're looking at -- in 22 we're looking at one of the

3  packages inside a venting system?

4  **A.**   That's correct.

5  **Q.**   Okay.  And I'm going to have you take a look at 23.  Do

6  you recognize the individual shown in 23?

7  **A.**   That is one of the chemists, and that is Charles Miller.

8  **Q.**   Okay.  And is he doing something inside that venting

9  system?

10 **A.**   Yes, he's testing the -- one of the packages.

11       **MS. SCHWARTZ:**  Okay.  Your Honor, at this time, I

12 would like to read to the jury the stipulation reached between

13 the defense and the prosecution --

14       **THE COURT:**  Of course.

15       **MS. SCHWARTZ:**  -- regarding the testing.

16       **THE COURT:**  Thank you.

17    Ladies and gentlemen, before you came out this morning,

18 counsel advised me that they've reached a stipulation, which is

19 just a fancy word for agreement.

20    So Ms. Schwartz is going to read to you the contents of

21 the parties' agreement.  And so what I want you to do is accept

22 as true the facts set forth in their stipulation.

23    Go ahead.

24       **MS. SCHWARTZ:**  The United States and the Defendant,

25 Alexander Juarez-Sanchez, stipulate as follows.  One, the drugs

1  in Government Exhibits 2A, 2B and 2C were examined by forensic

2  chemist Charles Miller of the Maryland State Police.

3      Two, when received by chemist Miller, the drugs in

4  Exhibits 2A and 2B were in hard brick-like packages tightly

5  wrapped in many layers of plastic wrap and were each marked W2

6  on the outside.  When Miller cut open each package, he found it

7  to contain a tightly compressed off-white narcotic drug.  The

8  drug inside Exhibit 2A was imprinted with the letter W and some

9  other character that crumbled before he could read it.  The

10  drug inside Exhibit 2B was imprinted W2.

11      Number three, the contents of Exhibits 2A and 2B each

12  consisted of a mixture or substance containing a detectable

13  amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl]

14  propanamide, commonly referred to as fentanyl, a Schedule II

15  controlled substance.

16      The net contents of Exhibit 2A weighed 992.92 grams, and

17  the net contents of Exhibit 2B weighed 998.96 grams (one kilo

18  is a thousand grams).  Exhibits 2A and 2B each contained

19  fentanyl at a purity exceeding 50 percent.

20      Four, an amount of fentanyl the size of five to seven

21  grains of sand -- sorry, of salt -- can be fatal.  When testing

22  the contents of the packages, chemist Miller used protective

23  gloves, a facemask and a fume hood with an exhaust as

24  safeguards.

25      Five, when received by chemist Miller, the drug in

*Direct Examination - C. Miller (by Ms. Schwartz)*

70

1  Exhibit 2C was in a hard brick-like package tightly wrapped in

2  many layers of plastic wrap and marked RATA, R-A-T-A, on the

3  outside.  The package contained a compressed gray substance

4  containing 995.26 grams of the narcotic drug heroin, a

5  Schedule I controlled substance.

6      Six, in testing the three exhibits, chemist Miller broke

7  up the contents of each package so as to test a homogeneous

8  sample.  After testing each exhibit, he placed the original

9  wrapping and the drug inside a new, clear plastic protective

10 bag and heat-sealed it.

11     Exhibits 2A, 2B and 2C contain the drugs as repackaged by

12 chemist Miller.

13     The stipulation is signed by Mr. Ake, myself, the

14 Defendant and Mr. Guillaume.

15         **THE COURT:**  Thank you.

16     Is your examination complete?

17         **MS. SCHWARTZ:**  No, you said not to ask to approach the

18 witness, but I just wanted to --

19         **THE COURT:**  That's correct.  I just didn't know

20 whether there was --

21         **MS. SCHWARTZ:**  Correct.

22         **THE COURT:**  -- the long pause because you were tossing

23 the witness.

24         **MS. SCHWARTZ:**  No, I was just --

25         **THE COURT:**  Very good.

*Direct Examination - C. Miller (by Ms. Schwartz)*

71

```
 1              MS. SCHWARTZ:  Okay.  I'm going to give the witness
 2   gloves and ask the witness to look at the contents --
 3              THE WITNESS:  Do you want me to come around?
 4              MS. SCHWARTZ:  Your Honor, what do you --
 5              THE CLERK:  As long as we can hear when he's speaking.
 6              THE COURT:  I was going to say --
 7              MS. SCHWARTZ:  You know what?  I'll just put this here
 8   and back up and ask the witness to look at and show the jury
 9   packages 2A, 2B -- Government Exhibits 2A, 2B and 2C.  And I'm
10   going to ask him a question about 2C.
11              THE WITNESS:  Court's indulgence.
12              THE COURT:  Take your time.
13              THE WITNESS:  I'm ready.
14   BY MS. SCHWARTZ:
15   Q.   Ready?  Okay.  So if you could just hold up so the jury
16   can see 2A, 2B and when you get to 2C, I have a question about
17   that.  There should be an exhibit label with a number on the --
18   on each one.
19   A.   Which package first?
20   Q.   2A.  The exhibit stickers look like this (indicating).
21   A.   I see.
22   Q.   If you could -- all right.  And then --
23              THE COURT:  Can everyone see?
24   BY MS. SCHWARTZ:
25   Q.   Okay.  And then just put it down.  And 2B.  Okay.
```

1    And then I'm going to ask you to look at 2C and tell me

2  if, when you look at 2C, you can see any of the markings that

3  were visible before the analysis through the clear part of 2C.

4  **A.**   Yes, I can.

5  **Q.**   And what does 2C -- what can you read through 2C?

6  **A.**   I can see R-A-T-A.

7  **Q.**   Okay.  Thank you.  You can put those back in the plastic

8  bag.  I will come get them.  And I'm also going to put them on

9  the ELMO.

10    Right now the display is showing a clear image of

11  Government 5.  As I retrieve 2A, 2B and 2C.

12    Showing 2B, 2A.

13       **THE COURT:**  I think you need to turn it around.  Yep.

14  **BY MS. SCHWARTZ:**

15  **Q.**   And 2C.

16    Now, were any phones recovered in connection with the

17  arrest?

18  **A.**   Can I remove these gloves?

19  **Q.**   Oh, yes.  Sorry.

20  **A.**   Yes, ma'am.  Three phones were removed from the vehicle.

21  **Q.**   Okay.  I'm going to ask you -- you should have one more

22  package left there with Exhibits 6, 7 and 8 inside.

23    Do you have those, Trooper Miller?

24  **A.**   Yes.

25  **Q.**   And do you recognize those?

*Direct Examination - C. Miller (by Ms. Schwartz)*

73

1  A.   Yes.  These were the phones removed from the vehicle and

2  the occupants.

3  Q.   Okay.  And do you recall which phones were removed from

4  the vehicle and which phones were removed from one of the

5  people?

6  A.   This phone with the dents was removed from the Defendant

7  and these other two, I believe one was removed -- the white one

8  was removed from the driver and the other dark-colored one from

9  the vehicle.

10  Q.   And did you request search warrants to seize the phones?

11  A.   Yes.

12  Q.   Did you obtain warrants to have the phones searched?

13  A.   Yes.

14  Q.   And did you submit the phones for analysis pursuant to the

15  search warrants?

16  A.   Yes.

17  Q.   Were the phones altered in any way between the time they

18  were seized and the time that they were submitted for analysis?

19  A.   No, they were not.

20  Q.   In fact, did you seal them into one of the external

21  packagings there, which is 4A for identification?  Both of the

22  two envelopes, we'll consider 4A for identification.

23       Did you seal the phones into one of those on its way to

24  being -- on their way to being analyzed?

25  A.   Yes, I did.

*Direct Examination - C. Miller (by Ms. Schwartz)*

74

```
1              MS. SCHWARTZ:  If I may have a moment, Your Honor?
2              THE COURT:  That's fine.  Take your time.
3              MS. SCHWARTZ:  I have nothing further for this
4  witness.
5              THE COURT:  All right.  Thank you very much.
6         Mr. Guillaume, I'm going to give you the option.  The
7  reason I had to break when I said I was going to break has been
8  canceled.  If you would prefer to wait to begin your cross
9  until after lunch, we can do that, or you can start now and we
10 can go for half an hour.
11             MR. GUILLAUME:  Your Honor, I don't think my questions
12 are going to take half an hour.  I think I'll be about
13 10 minutes if that's okay.
14             THE COURT:  That's entirely fine.  I'm just saying,
15 you know, if you'd rather do it later, that's fine.
16             MR. GUILLAUME:  I'll just do it now.
17             THE COURT:  Okay.  Cross.
18             MS. SCHWARTZ:  Your Honor, if I can just remove my
19 setup.
20             THE COURT:  Of course.
21             MR. GUILLAUME:  May I proceed, Your Honor?
22             THE COURT:  You may.  Thank you.
23             MR. GUILLAUME:  Thank you.
24                           - - -
25                      CROSS-EXAMINATION
```

```
 1                          - - -
 2  BY MR. GUILLAUME:
 3  Q.   Good afternoon, Master Trooper Miller.  How are you?
 4  A.   Very good, sir.  Thank you.
 5  Q.   I have just a few questions for you, so it's probably
 6  going to be less than 10 minutes.
 7  A.   Yes, sir.
 8  Q.   I want to start with some of the things that were found in
 9  the car that you testified about on direct examination,
10  particularly the statue that you were shown and other items,
11  such as the drugs in the car.
12       Once you recovered those items, you took control of them
13  and put them -- I guess we'll start with the drugs -- in sealed
14  bags.  What did you do?  Can you just clarify that?  I just
15  want to make sure I understand.
16  A.   Do you mind explaining that one more time?
17  Q.   Sorry.  What did you do with the drugs when you brought it
18  back to the station?
19  A.   The drugs were transferred up to the crime lab at that
20  point.
21  Q.   Okay.  And then at that point is that when the chemist did
22  his analysis?
23  A.   That's correct.
24  Q.   That same day?
25  A.   The pictures that you saw were the same day.
```

*Cross-Examination - C. Miller (by Mr. Guillaume)*

1  Q.   Okay.  And were those -- the packaging on -- the original

2  packaging that was on the drugs, was that somehow submitted for

3  fingerprint analysis or anything after that or before that

4  analysis of the -- before the chemical analysis?

5  A.   No, they weren't.

6  Q.   They were not, okay.  Was anything that you recovered from

7  the car submitted for fingerprint analysis?

8  A.   I don't recall anything being sent in for fingerprint

9  analysis.

10  Q.   Okay.  Master Trooper Miller, I just want to make sure I

11  understand that the name that you were given by the driver of

12  the car was Gavino; is that correct?

13  A.   Initially I was given that last name by the driver of the

14  vehicle.

15  Q.   Okay.  And he did not have identification, correct, the

16  driver?

17  A.   That's correct.

18  Q.   Okay.  I want to just kind of talk about your initial

19  search when you're in the car in the glove compartment, where

20  you found the first item.

21      Now, if I understand your direct testimony, you had to

22  disassemble the glove compartment to a certain extent when you

23  were searching the car?

24  A.   Yes, I had to remove the door from the -- from the

25  compartment that holds the glove compartment.

*Cross-Examination - C. Miller (by Mr. Guillaume)*

1  **Q.**    Okay.  So --

2  **A.**    If you understand what I --

3  **Q.**    Right.  That's what I wanted -- I should have asked you

4  did you remove the door.  Yes?

5  **A.**    Yes, in the --

6  **Q.**    Okay.

7  **A.**    -- compartment that holds -- or the door's attached to is

8  your actual glove compartment.

9  **Q.**    Right.  So when you first encountered the vehicle, the

10  door was closed; is that right?

11  **A.**    That's correct.

12  **Q.**    Okay.  When you first made your initial observations, you

13  didn't observe any sort of contraband or drugs in plain view;

14  is that right?

15  **A.**    No, I did not.

16  **Q.**    Okay.  You didn't notice any residue or powders in the car

17  that caught your attention initially, correct?

18  **A.**    No, I did not.

19  **Q.**    Okay.  There was no drug paraphernalia, needles or other

20  things, like a spoon or a syringe or something?

21  **A.**    No, there was not.

22  **Q.**    Okay.  Neither the driver or my client appeared to be

23  under the influence of drugs or alcohol; is that correct?

24  **A.**    That's correct.

25  **Q.**    And with respect to my client, Mr. Juarez, there was -- he

*Cross-Examination - C. Miller (by Mr. Guillaume)*

1  didn't make any sort of furtive movements or give you any

2  reason to suspect he was trying to hide anything; is that

3  right?

4  A.    No, he did not.

5  Q.    And both men were checked, and there was no weapons

6  found -- there were no weapons found on Mr. Juarez; is that

7  correct?

8  A.    That's correct.

9  Q.    And no weapons in the car?

10 A.    That's correct.

11 Q.    Okay.  Mr. Juarez was not told that he could not use

12 the -- his cell phone; is that right?  He wasn't instructed by

13 you to not use his phone?

14 A.    At one point he was.

15 Q.    Okay.  Initially he was not, correct?

16 A.    Correct.

17 Q.    After you searched the car, that's when you arrested both

18 men and they couldn't use the phone anymore; is that right?  Or

19 my client couldn't use his phone anymore; is that correct?

20 A.    That's correct.

21 Q.    Okay.  And I know we've seen the video, but it stopped at

22 various stages, so I just want to be clear about something,

23 that Mr. Juarez did not attempt to run from the scene or walk

24 away; is that correct -- during the traffic stop; is that

25 right?

*Cross-Examination - C. Miller (by Mr. Guillaume)*

1  **A.**   No, he did not.

2  **Q.**   Okay.  And Mr. Juarez did not -- you didn't speak to him

3  and he didn't claim to you that he owned the car; is that

4  correct?

5  **A.**   No, he did not.

6        **MR. GUILLAUME:**  Court's brief indulgence.

7        **THE COURT:**  Take your time.

8  **BY MR. GUILLAUME:**

9  **Q.**   The items -- the last couple questions I have are about

10  the other items, the drugs that were in the car.  They were --

11  the drugs in the front part of the car that we saw the picture

12  of with the hand being held up, that was -- the cloth seat

13  covering was intact when you observed -- initially observed the

14  car; is that right?

15  **A.**   It was intact, but it appeared to have been tampered with.

16  **Q.**   Correct, but it was covering the seat is my point;

17  correct?

18  **A.**   That's correct.

19  **Q.**   Okay.

20        **MR. GUILLAUME:**  And, sir, I think that's all I have

21  for you.  Thank you so much for your time today.

22        **THE WITNESS:**  You're welcome, sir.

23        **THE COURT:**  Redirect?

24        **MS. SCHWARTZ:**  If I may have the Court's indulgence

25  for a moment?

```
 1              THE COURT:  That's fine.
 2                           - - -
 3                  REDIRECT EXAMINATION
 4                           - - -
 5  BY MS. SCHWARTZ:
 6  Q.    Based on your training and experience, Trooper Miller,
 7  when a person is wearing latex gloves, such as the ones that
 8  are 52C in evidence, does that person leave fingerprints on an
 9  object?
10  A.    They can.
11  Q.    The object besides the gloves?
12  A.    I thought you were referring to the inside of the gloves.
13  Q.    No, no, no.  If someone is wearing latex gloves and
14  touches a third object, are fingerprints left on the third
15  object?
16  A.    No.
17  Q.    And when you were -- well, how did you come to notice the
18  package in that front passenger seat, 2C?
19  A.    I initially observed a hump in the seat that did not
20  appear to be a factory seat.
21  Q.    And did you feel the seat prior to undoing the upholstery
22  to look within?
23  A.    I did.
24  Q.    What did it feel like?
25  A.    It was raised and it was hard.
```

1          **MS. SCHWARTZ:**  Nothing further.

2          **THE COURT:**  All right.  We will then take our lunch

3   recess.  And the question I have for counsel is, is Master

4   Trooper Miller excused for the day?

5          **MR. AKE:**  Your Honor, I think --

6          **THE COURT:**  We can talk about that.

7          **MR. AKE:**  -- we're probably not going to get back to

8   him today, so I think we'll recall him at the end, most likely.

9          **THE COURT:**  All right.  Master Trooper, you are

10  welcome to take leave of the courthouse for now.

11         **THE WITNESS:**  Thank you.

12         **THE COURT:**  Everyone else, we're going to take our

13  lunch break.  Just a reminder of the admonition not to talk

14  about the case in any way, shape or form among yourselves or

15  with anyone else.  Why don't we have you back in the jury room

16  in one hour exactly, so that would be 25 of 2:00, and we

17  will -- you're welcome to leave for lunch.  You can also eat

18  lunch in the jury room, whichever you wish.

19         **THE CLERK:**  All rise.  This Honorable Court is now in

20  recess.

21     (Jury exits.)

22         **THE COURT:**  Thank you, everyone.  You can be seated.

23  Do you need anything from me before we recess?

24         **MR. AKE:**  No, Your Honor.  I don't believe so.

25         **MR. GUILLAUME:**  No, Your Honor.  Thank you.

*Re-direct Examination - C. Miller (by Ms. Schwartz)*

82

1          **MS. SCHWARTZ:**  Thank you, Your Honor.

2      (Whereupon, a recess was taken from 12:35 p.m. to

3  1:50 p.m.)

4          **THE COURT:**  Counsel, are we ready to go?

5          **MR. AKE:**  Yes, we are, Your Honor.

6          **THE CLERK:**  All rise for the jury.

7      (Jury enters.)

8          **THE COURT:**  Everyone may be seated.  Thank you.

9          **MR. AKE:**  Okay.

10          **THE COURT:**  Whenever you're ready.

11          **MR. AKE:**  Yes, Your Honor.  At this time the

12  Government will call Jun Lee to the stand.

13          **THE CLERK:**  Good afternoon, sir, you'll come forward

14  to the witness bench.  Before you're seated, please raise your

15  right hand.

16      (Witness sworn.)

17          **THE CLERK:**  Please state and spell your first and last

18  name for the record.

19          **THE WITNESS:**  Sergeant Jun Lee.  First name is Jun,

20  J-U-N.  Last name is Lee, L-E-E.

21          **THE CLERK:**  Thank you.

22                      -   -   -

23                **DIRECT EXAMINATION**

24                      -   -   -

25  BY MR. AKE:

*Direct Examination - J. Lee (by Mr. Ake)*

83

1  Q.   All right.  And, Sergeant Lee, which agency do you work

2  for?

3  A.   I am with Maryland State Police.

4  Q.   Okay.  And how long have you been with the state police?

5  A.   Twenty-four years.

6  Q.   Okay.  And prior to joining the police, did you have any

7  other military or law enforcement background?

8  A.   Yes, I was in the Navy.

9  Q.   For how long?

10  A.   After I joined the state police, I went to the reserves --

11  total of 22 years combined.

12        THE COURT:  Sergeant, can you please lean into the

13  microphone so we can --

14        THE WITNESS:  Yes, ma'am.

15        THE COURT:  -- be sure to hear you clearly?

16  Thank you.

17        THE WITNESS:  Yes.

18     And total combined of 22 years, including active and

19  reserve.

20  BY MR. AKE:

21  Q.   Okay.  So since you joined the Maryland State Police --

22  and I would ask that you stay close to the microphone for the

23  record here -- what types of duties have you had as a state

24  policeman?

25  A.   For the first five years, I was what's referred to as road

*Direct Examination - J. Lee (by Mr. Ake)*

84

1  trooper, which is a patrol, five years down in PG County,
2  Prince George's County.  Then from there I went into our
3  technical surveillance unit, which deal with anything
4  technical, such as wiretapping, installing cameras and such,
5  for three years.
6      So after three years, I was admitted to the Maryland State
7  Police digital forensic lab as a forensic examiner.
8  Q.  Okay.  And so just doing the math, that means for the last
9  16 years, you've been working in the digital forensics area?
10 A.  Yes, I have.
11 Q.  Okay.  And what type of training did you receive initially
12 to do that?
13 A.  The initial training requires -- the first six months is
14 all the training involved in learning about computers.  Then
15 after six months, you go to all the certification training,
16 such as EnCase, all the softwares that we use, to get
17 certified.
18 Q.  Okay.  And when you began, was most of the forensic work
19 you did performed on traditional computers or on cell phones?
20 A.  It was initially started with just traditional computers
21 and laptops.
22 Q.  Okay.  But more recently it's transitioned to primarily
23 cell phones --
24 A.  Yes.
25 Q.  -- is that fair?

*Direct Examination - J. Lee (by Mr. Ake)*

85

1  **A.**   Yes, the pendulum has swung completely the other way to

2  80 percent cell phones now.

3  **Q.**   Okay.  And what is the standard tool that forensics

4  personnel like you use to extract information from cell phones?

5  **A.**   So our primary tool that we use for digital devices is

6  Cellebrite forensic software.  Cellebrite's been around ever

7  since I got into the forensic lab, 16 years.  They started off

8  with just transferring data from one flip phone to another.

9  Now they migrated into the leading software for cell phone or

10 mobile device forensics.

11 **Q.**   Okay.  And so how does Cellebrite work generally?  And you

12 can kind of -- if you need to talk about what training you've

13 done on that you can mix that in.

14 **A.**   So I am Cellebrite certified, certified examiner.  To be a

15 certified examiner, it's a five-week course you have to attend.

16 It starts from how datas get stored in the cell phone to

17 actually taking apart the cell phone and extracting data from

18 the chip itself.  So it's from beginning to advanced.

19      After five weeks, you're allowed to take a practical test,

20 and once you pass that, with two years' experience, you're

21 allowed to take the written exam.  Then once you pass the

22 written exam, then you will -- you get certified.

23 **Q.**   Okay.  And how often do you use Cellebrite in your work

24 these days?

25 **A.**   I use literally every day.

*Direct Examination - J. Lee (by Mr. Ake)*

86

```
 1  Q.   Okay.  And did you use Cellebrite on evidence seized in
 2  this particular case?
 3  A.   Yes, I have.
 4  Q.   All right.  I'm going to bring you an evidence bag here,
 5  and I'd ask that you take a look at the contents.
 6       Do you recognize what's -- what that bag contains?
 7  A.   Yes, these are the three cell phones I analyzed for this
 8  particular case.
 9  Q.   Okay.  Now, they're marked -- the individual cell phones I
10  believe are marked as Exhibits 6, 7 and 8.  Did you --
11  A.   Yes.
12  Q.   -- did you refer to them in your report as -- under
13  different names?
14  A.   Yes.  All mobile devices starts with the letter M as a
15  mobile device.  And since this has three, it's mobile 1 -- M1,
16  M2, M3.
17  Q.   Okay.  So for internal tracking purposes, you used -- you
18  referred to the white iPhone as which exhibit?
19  A.   As M1.
20  Q.   Okay.  And the cracked -- sorry, the clean, black Samsung
21  cell phone --
22  A.   Yes.
23  Q.   -- how did you refer to that?
24  A.   As an M2.
25  Q.   Okay.  And the one with the cracked case?
```

1  A.    M3.

2  Q.    Okay.  Now, I'm going to show you what -- a demonstration

3  exhibit only, not for admission, but for record purposes we're

4  going to call this Exhibit 6A -- 6 alpha.

5       Do you recognize this screen?

6  A.    Yes.  This screen here is what I see when Cellebrite

7  successfully extracts the data.  So it's a dashboard displaying

8  all the links to -- that are categorized separately.

9  Q.    Okay.  And just going back, you mentioned that there were

10  some very technical searches that you're trained for all the

11  way to very simple extractions.  How would you categorize the

12  extractions on these three phones?

13  A.    So I can't even count the amount of different makes of

14  cell phones that are out there.  For this particular case, if I

15  have the passcode and Cellebrite was able to get in it, it's a

16  simple what we call file system download.  It extracts all the

17  data, then displays in this manner.

18       And before the data is extracted, in the forensic world,

19  what we call -- we use a methodology called best practice.

20  And, of course, that changes over time.  But it's to isolate

21  the cell phone, the mobile device, from data being corrupt or

22  being manipulated.

23       So we take the SIM card out, which disconnects it from the

24  network, and also we always put it in airplane mode so you

25  can't connect to any wireless networks.

*Direct Examination - J. Lee (by Mr. Ake)*

1  Q.   Okay.  So in this case when you received the cell phone --

2  or when you received the exhibits --

3  A.   Yes.

4  Q.   -- as evidence, what condition were they in, in terms of

5  protected from any kind of external corruption?

6  A.   So I had to put them in airplane mode and take the SIM

7  card out but tape it to the back before I started the

8  extraction.

9  Q.   Okay.  And so did the arresting officers or the seizing

10  officers do that before or did you do that?

11  A.   So the cell phones come in completely turned off, and I

12  place those cell phones into what we call a Faraday box.  It's

13  a small metal box that prevents the signal from coming in or

14  out so we're in a sterile environment, just in case I can't put

15  it --

16        THE COURT:  Sergeant, I think the question was whether

17  the telephones came to you in that condition or whether you put

18  them in that condition.

19        THE WITNESS:  Oh no, I put them in that situation.

20  BY MR. AKE:

21  Q.   Okay.  And so once you began the extraction -- and just to

22  make sure that you answer the question I asked maybe two

23  questions ago -- did this turn out to be a successful

24  extraction --

25  A.   Yes, yes.

1  **Q.**   -- of each of these cell phones?

2  **A.**   What you -- the dashboard you see here is the result of a

3  successful extraction.

4  **Q.**   Okay.

5  **A.**   Without the successful extraction, you won't see this.

6  **Q.**   Okay.  Got it.  So on this screen there's some case

7  information.  Is that your name there as the examiner?

8  **A.**   Yes.

9  **Q.**   Okay.  And once data -- once you've performed an

10 extraction, can anyone manipulate the data once it's in this

11 form or presented like this?

12 **A.**   It's read-only, meaning you can't write to it, so it's

13 just read format.

14 **Q.**   Okay.  And this interface, does it allow you to do

15 particular searches or narrow the existing data and kind of get

16 some sort of output that you can customize?

17 **A.**   Yes.  Well, they're initially categorized in the tile

18 format so you -- they're categorized.

19 **Q.**   Okay.  And you're pointing to the bottom right-hand part

20 of the screen; is that it?

21 **A.**   Yes.

22 **Q.**   Okay.  So, yeah, let's ask about that.  So what are these

23 tiles here?  What's the significance?

24 **A.**   So such as, like, contacts, you see contacts there.  All

25 the contacts that are in the phone, all the phone numbers the

1  owner has put in there are in the contacts folder.  So if you

2  click that open, you'll see all the contacts that are in that

3  particular cell phone.

4  Q.   Okay.  And we'll go do some of that in a second, but this

5  particular phone, so this is Exhibit 6, is there an Apple ID

6  associated under the device info?

7  A.   Yes.

8  Q.   And just for the record could you read that out?

9  A.   So GavinoPerez_114@iCloud.com.

10  Q.   Okay.  And scrolling down, there's some last used MSISDN

11  and MSISDN.  What is that?

12  A.   The MSISDN is a mobile subscriber number.  That's actually

13  the telephone number.

14  Q.   Okay.  So what's the one in front of -- so that's a

15  12-digit number instead of an 11-digit -- or --

16  A.   Yeah.

17  Q.    -- sorry, an 11-digit instead of 10-digit?

18  A.   MSISDN is also displayed in the international number

19  format.  One is the U.S. Code.

20  Q.   Okay.  So moving over into the content, how does

21  Cellebrite know how to put different data into these different

22  categories?

23  A.   It goes by what we call file header.  It knows by the file

24  what category it is and puts it in this format.

25  Q.   Okay.  So I'd like to focus just a moment on -- first look

1  at the user accounts tile.  So what are we seeing -- and I'll

2  scroll over a little bit to the right here.

3      So what information is showing here?

4  A.   So the accounts he created on this particular phone is all

5  in the user accounts.  So in this case you have 20 accounts on

6  this cell phone.

7  Q.   Okay.  So looking at the highlighted row number 15 there,

8  what -- can you tell what --

9  A.   So that is a -- the user name is actually the WhatsApp

10  user account, which contains the mobile number for that

11  particular --

12  Q.   Okay.

13  A.   -- cell phone.

14  Q.   So if there are different applications that are installed

15  on the phone that require an account, will that information be

16  depicted here?

17  A.   Yes.

18  Q.   Okay.  Now, you mentioned WhatsApp is the -- this

19  particular account is for WhatsApp.  What is WhatsApp?

20  A.   WhatsApp is currently the most popular chat messaging,

21  social network chat messaging system.  Now, they tout their

22  messaging app as the most secure because from the data being

23  transferred from one cell phone to another, it's encrypted from

24  end to end, meaning no one can access that data, like highjack

25  that data.  So only you and the user could actually see the

*Direct Examination - J. Lee (by Mr. Ake)*

92

1  data back and forth.

2  Q.   Okay.  So if it were to be intercepted in between the

3  sending cell phone and the receiving cell phone, it would just

4  be gibberish?

5  A.   It's just gibberish.  You wouldn't be able to make out

6  what it is.

7  Q.   Okay.  Now, have you run across WhatsApp in your prior

8  forensic searches?

9  A.   Yes, that's probably the most popular app that I see all

10 the time.

11 Q.   Okay.  So does WhatsApp have the capability of performing

12 live calls between users?

13 A.   It does have, yes.  Voice over IP can make phone calls.

14 Q.   Okay.  Now, would any data, other than the fact of the

15 call itself, be recorded on the user's phone?

16 A.   No.  Because that would just take too much data, too much

17 space.

18 Q.   So any kind of live either video call or just audio call,

19 the only thing that's going to be recorded is just going to be

20 the fact of the transmission?

21 A.   Yes.  Yes.

22 Q.   Okay.  Now, does it also serve as a chat or text message

23 application?

24 A.   Yes.  Yes.

25 Q.   Okay.  And does it --

1    THE COURT:  Sergeant, I'm going to ask you to wait

2  until Mr. Ake finishes his question before you answer --

3         THE WITNESS:  Yes, Your Honor.

4         THE COURT:  -- even though you're anticipating it --

5         THE WITNESS:  Yes, Your Honor.

6         THE COURT:  -- so that the record is clear.

7         THE WITNESS:  Yes, Your Honor.

8         THE COURT:  Okay.  Thank you.

9  BY MR. AKE:

10  Q.   And for the bodies of chat messages, as well as any

11  attachments, are those stored on the phones of the recipient

12  and the sender?

13  A.   Yes.

14  Q.   Okay.  Presuming that they don't delete it?

15  A.   I'm sorry, I didn't --

16  Q.   Unless they delete it?

17  A.   Yes.

18  Q.   Okay.  Okay.  So just going back to what we're seeing on

19  the screen.  Are all the accounts in this particular phone

20  associated with some variance of Gavino Perez?

21  A.   Yes.

22  Q.   Okay.  So I believe we read into the record, but just for

23  the record, could you read the phone number associated with

24  this particular phone?

25  A.   It's 1(317)625-1728.

1   Q.   Okay.  Thank you.  Now, I'm just going to show you -- I'm

2   going to switch to Trial Director here and I'm going to show

3   you what's been marked as Government's Exhibit 6B.

4        And just for the record can you confirm that that's a

5   screenshot of the user account data that we just saw from M1?

6   A.   Part 1, yes.

7   Q.   Or part of -- not every row, but part of it, right?

8   A.   Yes.

9   Q.   Okay.  Okay.  Now, I'm going to show you what's been

10  marked as Government's Exhibit 7B.  Okay.  Now, this is

11  different from what I just showed you, but do you recognize

12  what this is?

13  A.   Yes.

14  Q.   And what is that?

15  A.   This is the M2, the second Samsung cell phone.

16  Q.   Okay.  And that's associated with which exhibit?

17  A.   Exhibit 7.

18  Q.   Okay.  And what is -- there's a Gmail account that's used

19  several times on this user account information.  What's the

20  Gmail account?

21  A.   The Gmail account is AS9706153@gmail.com.

22  Q.   Okay.  And over on the right-hand panel, based on the row

23  that was selected, some account information is showing.  What

24  does that show over on the right?

25  A.   It shows the name of the Gmail.

1  Q.   And what's the service that this user name and password is
2  associated with?
3  A.   Well, the password's encrypted, so you won't be able to
4  see it.  But the user name is the actual Gmail account.
5  Q.   So the Google -- it's the Google account?
6  A.   Yes, ma'am -- yes, sir.
7  Q.   Is that fair enough?  Okay.  And what's the name
8  associated with that Google account on this phone?
9  A.   It's Alexander Sanchez.
10 Q.   Okay.  Now, there's -- above the Alexander Sanchez
11 entries, there's also reference to other names on this user
12 account; is that correct?  Looking in line 11 and line 10?
13 A.   Yes.
14 Q.   What's that name?
15 A.   Aldo Aguilar.
16 Q.   Okay.  But I would ask in both those cases, when you look
17 over to the other entries, what's the Gmail account associated
18 with that name?
19 A.   The Gmail account is AS9706153@gmail.com.
20 Q.   Okay.  And how does that compare to the registered Gmail
21 account for this phone?
22 A.   It's identical.  It's the same Gmail.
23 Q.   Okay.  All right.  I'm going to show you now Government's
24 Exhibit 8B.  Pulling that up on the screen.  Okay.  What are we
25 looking at here?

*Direct Examination - J. Lee (by Mr. Ake)*

96

1  A.   So this is the M3, which is the second Samsung A10.

2  Q.   Okay.  I would ask, looking down to the Google account,

3  what Gmail account is registered with the Google service?

4  A.   The Gmail is AS97061538@gmail.com.

5  Q.   Okay.  And what's the name associated?

6  A.   The name is Alexander Sanchez.

7  Q.   All right.  And how does that compare with the user

8  registration for the Google account associated with M2?

9  A.   They're identical.

10 Q.   Okay.  Okay.  Going back to Exhibit 6 alpha.  Here we go.

11      So 6 alpha, back in extraction summary, there are --

12 there's also tiles for SMS messages, MMS messages and chats,

13 correct?

14 A.   Yes.

15 Q.   Okay.  And first off, what's the difference between chats,

16 SMS and MMS?

17 A.   So SMS is the oldest chat system, chat application, when

18 you used to just chat text back and forth.  But as we started

19 sending pictures and videos, multimedia messaging system had

20 come along, which is MMS.  So SMS is just a text message for,

21 like, your iMessage and your Android, just the built-in

22 messaging system.

23 Q.   Okay.  So those typically would use the default messaging

24 system that comes with the cell phone?

25 A.   Yes.

*Direct Examination - J. Lee (by Mr. Ake)*

1  Q.   Okay.  Now, MMS, though, will -- can carry additional
2  files in addition to the pure text body?
3  A.   Yes.  Yes, it was designed to go beyond the SMS because
4  SMS is restricted to 160 characters, and even the smallest
5  picture is beyond 160 characters --
6  Q.   Okay.
7  A.   -- so they had to create MMS.
8  Q.   Now, then what would chats be?
9  A.   So chats is one below -- actually, one above that.  Chats
10  like Facebook Messenger, WhatsApp, all those popular ones,
11  those are considered chats.  They're categorized as chats by
12  Cellebrite.
13  Q.   Okay.  So is it fair to say that anything that requires an
14  installed application on the phone to communicate gets
15  categorized as a chat?
16  A.   Yes.
17  Q.   Okay.  And that could vary, again, from Facebook Messenger
18  to Instagram or Snapchat?
19  A.   Yes.
20  Q.   All those would count as chat --
21  A.   Yes.
22  Q.   -- applications?
23      Okay.  Now, when you're using the Cellebrite viewer like
24  this, can you ask it to export data that you've customized the
25  parameters for?

Ronda J. Thomas, RMR, CRR - Federal Official Reporter
**JA334**

1  A.   Yes, you could select line by line item data that might be
2  of interest per the case and you could export in different
3  formats.
4  Q.   Okay.  I'm going to go down to a different type of
5  information here.  There's a tile here for device locations.
6  Let me click on that.  So what's a device location?
7  A.   So when enabled, the cell phone -- in this particular case
8  the iPhone -- keeps track of all the locations where the cell
9  phone is actually connected to the network, either internet or
10 GPS.  It keeps a GPS coordinates, latitude and longitude of
11 each location.
12 Q.   Okay.  And so there's a couple different icons.  All the
13 ones here under this inverted teardrop seem to show, like, a
14 satellite.  What type of reading is that indicating that it's
15 basing its location data from?
16 A.   So that particular icon is for GPS, but there are four
17 major connectivity, iPhone.  There's your wireless network,
18 that's one.  Your cell tower.  Anytime you call or connect to
19 the cell for data transmission, that also keeps track.
20 Q.   Okay.  And if you could just look at the screen right now,
21 is that the cell tower --
22 A.   Yes.
23 Q.   -- that you're referring to?
24 A.   That's the --
25 Q.   The icon for it?

*Direct Examination - J. Lee (by Mr. Ake)*

99

1    **A.**    -- cell tower.

2    **Q.**    Okay.  And then you mentioned --

3    **A.**    That's Wi-Fi, wireless.

4    **Q.**    Okay.  And then what's the other type of -- of way that

5    it'll figure out where it is or it'll record?

6    **A.**    So anybody who uses iPhone have come across this question,

7    do you want the iPhone to keep the data location.

8        So when you take a picture, you can either have the

9    iPhone track the exact location where you took the picture.

10   **Q.**    Okay.  And that would be this type of icon here with

11   the --

12   **A.**    Yes, yes, yes.

13   **Q.**    So where the camera captured a particular image or movie,

14   it'll record on the metadata --

15   **A.**    Yes.

16   **Q.**    -- where the location -- okay.

17       Now, did you assist with downloading and the presentation

18   of evidence -- or -- oh, excuse me.  Let me back up.

19       So for location data in Cellebrite, does this version of

20   the Cellebrite viewer have something that you can click on to

21   show where that position is on a map of the United States or a

22   map of the world?

23   **A.**    Does this have that capability?

24   **Q.**    Within the application.

25   **A.**    There is.

*Direct Examination - J. Lee (by Mr. Ake)*

1  **Q.**  Within this viewer or within this --

2  **A.**  Oh, not in this viewer, no.

3  **Q.**  Okay.  So if you wanted to be able to look at the data

4  that is stored in this projected on a map, how would you have

5  to do that?

6  **A.**  So you would have to export all the positions, all the

7  latitudes and longitude, the data would have to be copied and

8  exported out.  We are right now the Cellebrite 7.54.  That's

9  for almost two years, which is infinity in Cellebrite -- in

10  forensic world.

11      So the newer system has the capability, but this

12  particular version, you would actually have to export into,

13  like, Google Maps or Google Earth.

14  **Q.**  Okay.  Now, did you assist with exporting some data at my

15  request --

16  **A.**  Yes.

17  **Q.**  -- for this?

18      And I'm going to -- or was one of the search parameters to

19  restrict location information from July 8th to 15th from this

20  phone?

21  **A.**  Yes.

22  **Q.**  Okay.  I'm going to display on Google Earth what's being

23  submitted as a digital exhibit, Exhibit 27.  Do you recognize

24  this exhibit?

25  **A.**  Yes.

```
 1   Q.   Okay.  Now, there's a slider up here that allows me to
 2   further restrict that data.  Now, I'm going to try to do this
 3   fancy-like.  So I'm going to slide this over time.
 4        So generally speaking, when I do that, what does this
 5   position location appear to show in terms of travel?
 6   A.   So what you see is movement of the mobile device from --
 7   looks like Los Angeles, California, all the way to somewhere
 8   in -- east coast somewhere.  Looks like Ohio or Indiana
 9   somewhere.
10        So what you see is every time an action was taken, like,
11   take products or connected to, you know, a cell tower, it keeps
12   track and puts it into this yellow pin.
13   Q.   Okay.  Now, so I'm going to go back up and show all the
14   plots here and make sure it didn't winnow out data artificially
15   here.
16        But then I'm going to show you what's been previously
17   marked as Government's Exhibit 28 on Trial Director here.
18        So -- okay.  So I realize this is changing gears quickly,
19   but do you recognize this exhibit?
20   A.   Yes.
21   Q.   And what are we looking at here?
22   A.   We are looking at a selfie.
23   Q.   Okay.  And what phone was this taken from?
24   A.   I believe this was --
25   Q.   Okay.  You're -- yes, and just for the record, did you
```

1  bring notes today?

2  **A.**   Yes.

3  **Q.**   Okay.  And we showed those notes ahead of time to the

4  defense counsel?

5  **A.**   Yes.

6  **Q.**   Okay.  And just for the jury's understanding, what are the

7  notes that you're referring to?

8  **A.**   The notes I'm referring to are the images that was taken

9  with the cell phones.

10  **Q.**   Okay.  And these are notes that you took.  And you

11  verified which of the selected exhibits -- which phones they

12  came from --

13  **A.**   Yes.

14  **Q.**   -- and some of the metadata associated with those --

15  **A.**   Yes.

16  **Q.**   -- in order to answer my questions?  Okay.

17       So going back to Exhibit 28, does the metadata that was

18  associated with this file on M3, or Exhibit 8, does that show

19  where the file was stored on the phone, the metadata?

20  **A.**   Can you repeat the question, please?

21  **Q.**   Sorry, that might have been a compound question.

22       So can you tell where -- what the original filename was

23  and when the image was created?  Let's ask that.

24  **A.**   Yes, that's in the file information.

25  **Q.**   So that's in the metadata associated with the file; is

*Direct Examination - J. Lee (by Mr. Ake)*

1  that right?

2  **A.**    Yes.

3  **Q.**    Okay.  And, again, looking at Exhibit 28, what phone was

4  this taken from?

5  **A.**    This was the second Samsung which had the cracked back.

6  **Q.**    Okay.  And does this appear to have -- does this image

7  actually appear to have been taken by that phone?

8  **A.**    Yes, the metadata indicates the picture was taken with

9  that Samsung model number.

10  **Q.**    Okay.  And was it stored in a way that also made you --

11  would make you believe -- in a location that would make you

12  believe that it was taken with the phone?

13  **A.**    So it was in a DCIM folder, which is a digital camera

14  image folder.  It's the default folder for if you take a

15  picture with the cell phone.

16  **Q.**    Okay.  And so within the metadata, does it tell you when

17  this file was taken?

18  **A.**    Yes.

19  **Q.**    When was the picture created?

20  **A.**    So the way Samsung stores data is the date and time that

21  photo was taken is used as the filename.  So in this particular

22  case the filename is 20200505, which indicates this was taken

23  on May 5th, 2020.

24  **Q.**    Okay.  Now, I'm going to show you Exhibit 28 alongside

25  what's previously been admitted as Exhibit 24 on the right-hand

*Direct Examination - J. Lee (by Mr. Ake)*

1  side.  Now, I just ask that you look at the cord and the braid

2  there.  How do those two compare?

3  **A.**  They look similar.

4  **Q.**  Okay.  All right.  I'm going to show you what's been

5  marked as Government's Exhibit 29.

6      And you said the last exhibit, 28, that had been taken on

7  May 5th, 2020; is that correct?

8  **A.**  Yes.

9  **Q.**  Okay.  Now, looking at Exhibit 29, what does that appear

10  to show, just for the record?

11  **A.**  So according to the filename, this image was taken on

12  May 26, 2020.

13  **Q.**  Okay.  And who does it appear to depict?

14  **A.**  It appears to be the same person as on 28.

15  **Q.**  Okay.  And to be clear, who are you referring to?

16  **A.**  To the Defendant.

17  **Q.**  Okay.  All right.  Just for the record, are you referring

18  to the man sitting in the striped shirt at defense table?

19  **A.**  Yes.

20  **Q.**  Okay.  And that was the same as the person that was

21  pictured in Exhibit 28 as best you can tell?

22  **A.**  Yes.

23  **Q.**  Okay.  And you said this one was taken May 26, 2020 --

24  **A.**  Yes.

25  **Q.**  -- Exhibit 29?  Okay.

1   A.   Yeah, May 26, 2020.

2   Q.   Okay.  I'll show you Exhibit Number 30.  Who does that

3   appear to show?

4   A.   It appears to be the Defendant.

5   Q.   Okay.  And what date was this taken?

6   A.   It was June 7th, 2020.

7   Q.   And this is also from Exhibit 8 or M3?

8   A.   Yes.

9   Q.   Okay.  Again, I just ask you to compare the braid or cord

10  that appears in Exhibit 30 to the braid or cord shown on

11  Exhibit 24.  How do those compare?

12  A.   It appears to be a similar cord.

13  Q.   Okay.  All right.  And that was June 7th, 2020, was the

14  date of Exhibit 30; is that right?

15  A.   It was, yes, June 7, 2020.

16  Q.   Okay.  Showing you Exhibit 31.  Another image that was

17  taken off of M3; is that correct?

18  A.   Yes.

19  Q.   And what was the date on this image?

20  A.   It is June 13th, 2020.

21  Q.   Okay.  And just for the record, who does it appear to

22  show?

23  A.   Appears to be the same as the previous three, the

24  Defendant.

25  Q.   Okay.  And does this also appear to be a selfie?

1    **A.**    Yes.

2    **Q.**    Okay.  Showing you Exhibit 32.  Do you recognize this

3    exhibit?

4    **A.**    Yes.

5    **Q.**    Okay.  Also from M3 or Exhibit 8?

6    **A.**    Same from M3.

7    **Q.**    Okay.  What's the date on this photograph?

8    **A.**    It's June 29th, 2020.

9    **Q.**    Okay.  And just for the record, what does it appear to

10   show?

11   **A.**    Appears to be the Defendant with sunglasses.

12   **Q.**    Okay.  And is that at a range that would appear to be a

13   self-portrait or a selfie?

14   **A.**    It's a selfie, yes.

15   **Q.**    Okay.  All right.  And finally I'm going to show you

16   Exhibit 33.  Do you recognize this exhibit?

17   **A.**    Yes.

18   **Q.**    And what does this appear to show?

19   **A.**    It appears to be a selfie laying down on the carpet.

20   **Q.**    Okay.  And what was the date on this file?

21   **A.**    July 4th, 2020.

22   **Q.**    All right.  So just to summarize, these last six files are

23   all taken off of M3, the cell phone with the cracked case, over

24   a period between May 5th and July 4th, 2020?

25   **A.**    Yes.

1  Q.   Okay.  All right.  Shifting gears a bit, using

2  Cellebrite -- we talked about SMS and MMS messages -- can you

3  extract records relating to particular threads between two

4  parties or more, like a group text history?

5  A.   Yes.

6  Q.   Okay.  Now, I'm going to show you what's been --

7  actually -- so I'm going to pull up Government's Exhibit 34.

8  So showing you what's been marked as Government's Exhibit 34.

9  Hopefully.  There we go.

10      Okay.  So do you recognize this display or what we're

11  looking at on the screen?

12  A.   Yes.

13  Q.   Okay.  And what are we looking at here?

14  A.   So we're looking at what Cellebrite has collected from

15  WhatsApp chat with this particular person, Pariente 2.

16  Q.   Okay.  And this is taken from M3; is that correct?  This

17  was extracted from --

18  A.   Oh, yes, I'm sorry.  Yes, yes.

19  Q.   -- Exhibit M3 --

20  A.   Yes, yes.

21  Q.   -- or Exhibit 8, what you refer to as Exhibit M3?

22  A.   Yes.

23  Q.   Okay.  Now, who is the counterparty in this thread here?

24  A.   So this message is between the user of the phone, the cell

25  phone, the Samsung phone, and the party named Pariente 2.

1  **Q.**   Okay.  So I'm highlighting cell B3 at the moment.  What's

2  where the cursor's on.  What's the account name of the

3  counterparty, the WhatsApp account name?

4  **A.**   So the WhatsApp -- the account name is actually the digits

5  in the front, which is 5214426838910, so -- which is the

6  account of the person you're talking -- you're --

7  **Q.**   Okay.  So that the counterparty's user account, right?

8  **A.**   Yes.

9  **Q.**   Okay.  And are WhatsApp user accounts typically associated

10  with the cell phone's assigned number?

11  **A.**   Yes.  When you create WhatsApp, you have to put your cell

12  phone number in.

13  **Q.**   Okay.  So scrolling down, looking at cell B5, what's that

14  account number?

15  **A.**   13177423078.

16  **Q.**   Okay.  And was that the assigned ISDN or MSISDN of this

17  cell phone, M3?

18  **A.**   Yes.

19  **Q.**   Okay.  So you said that the 1 is the country code?

20  **A.**   Yes.

21  **Q.**   Okay.  Are you familiar with what the 52 country code is?

22  **A.**   52 is Mexico.  The 50s are all Central America.

23  **Q.**   Okay.  But 52 is Mexico?

24  **A.**   Yes, 52 is Mexico.

25  **Q.**   Okay.  And then there's a name -- going back to B3,

1  there's a name at the end of the user account, the WhatsApp

2  user account.  Where does that name come from?

3  **A.**   So Cellebrite will see that account name, which is a phone

4  number, and compare that to the contact information.  If

5  there's a match, it will display a name.  In this case,

6  Pariente 2.  So if Pariente 2 is in his contacts, contact

7  folder, it will display that.

8  **Q.**   Okay.  So this -- Cellebrite is not pulling from any kind

9  of, like, official record or subscriber information --

10 **A.**   No.

11 **Q.**   -- right?

12    It's just relying on what's in that particular phone's

13 contacts --

14 **A.**   Yes.

15 **Q.**   -- list?

16    And if the phone has not named a particular contact, does

17 anything show up there?

18 **A.**   No.  If this phone number was named Mickey Mouse, then

19 Mickey Mouse will show up.

20 **Q.**   Okay.  So it's just driven entirely by what's in this --

21 what the user has done?

22    (Overlapping speakers.)

23 **A.**   The input, yes.

24 **Q.**   Okay.  All right.  So looking at column F over here, what

25 is that showing?  Just generally, what are we seeing there?

1   **A.**   That's the actual body of the message.

2   **Q.**   Okay.  And is that writing in English?

3   **A.**   No, it's not in English.

4   **Q.**   Okay.  Do you know what language it appears to be?

5   **A.**   It appears to be in Hispanic, Spanish.

6   **Q.**   Okay.  And we'll come back to that in a moment.

7        And then over in column M, what are we looking at there?

8   **A.**   That's the -- the in time when the message was initiated.

9   **Q.**   Okay.  Now, particularly, the time there, there's a code

10  behind the PM.  It says UTC minus 4.  What does that mean?

11  **A.**   UTC is a time zone minus 4.  Eastern Standard Time is

12  minus 4.

13  **Q.**   Is that Eastern Daylight Time?

14  **A.**   Yeah, I'm sorry, Eastern Daylight Time.

15  **Q.**   Come on, Navy guy.

16       (Laughter.)

17  **A.**   So UTC is the universal time, which is in Greenwich up in

18  England somewhere was zero hours, and you subtract four hours

19  to Eastern Standard Time.

20  **Q.**   Okay.

21  **A.**   Yeah.

22  **Q.**   So does that mean -- the fact that it says UTC-4 there,

23  does that mean that this particular text message -- that

24  somebody was in the Eastern Time zone at the time this was sent

25  or received?

*Direct Examination - J. Lee (by Mr. Ake)*

1  **A.**  When the cell phone was -- the last place --

2  **Q.**  Could you answer my question, though?  Does that mean --

3  just the fact that it says UTC-4 here, does that mean that the

4  person that sent it or received it was in the -- anywhere in

5  the Eastern Time zone?

6  **A.**  No, no.

7  **Q.**  Okay.  What does it actually mean in the context of --

8  your second response there?

9  **A.**  So instead of giving wherever the phone is, there's

10  different time zones, we use one time zone and you can subtract

11  and add from that.  Since we are at Eastern Daylight Time,

12  that's when the -- how the cell phone time zone is set.

13  **Q.**  So, in other words, you're saying that because you perform

14  the extraction when the phone was here --

15  **A.**  Yes.

16  **Q.**  -- and in the Eastern Daylight Time, because it was the

17  summertime, that all of the data that this phone is producing

18  in response to various extractions is all going to show up as

19  UTC minus 4 --

20  **A.**  Yes.

21  **Q.**  -- or Eastern Daylight Time?

22  **A.**  Yes, yes.

23  **Q.**  Irrespective of where in the world the data was being

24  generated?

25  **A.**  Yes.

*Direct Examination - J. Lee (by Mr. Ake)*

1  Q.   Okay.

2  A.   Network time is not adjustable.  It's wherever the cell

3  phone connects, it sees the network time, and that's the time

4  it gives me.

5  Q.   Okay.  So scrolling down a bit and focusing on column R

6  here, what's the heading on column R?

7  A.   If you send a picture, it's an attachment folder.

8  Q.   Okay.  So column R contains any attachments.  So if it's

9  blank, what does that mean?

10  A.   That none was sent or received.

11  Q.   Okay.  Now, starting with line 15, there's some rows that

12  show some attachments.  What's an Opus file extension?

13  A.   It's actually -- that's an audio file.

14  Q.   Okay.  And going down to line 20, what kind of file would

15  line 20 contain?

16  A.   A jpeg is an image file.

17  Q.   Okay.  All right.  So as we noted Exhibit 34 is in

18  Spanish, did -- are you aware that the DEA sent this file and

19  others out to be translated so that the body could be displayed

20  in English?

21  A.   Yes.

22  Q.   All right.  I'm going to show you Exhibit 34A.  All right.

23  So going to the top and going to the left.

24       So is Exhibit 34A just a version of Exhibit 34 that has a

25  new column?

*Direct Examination - J. Lee (by Mr. Ake)*

113

1   **A.**   It appears that way.

2   **Q.**   Okay.  Just jump back.  All right.  So what does column G

3   now have in it?

4   **A.**   Column G is translated into English --

5   **Q.**   Okay.

6   **A.**   -- from column F.

7   **Q.**   Now, there are some gaps apparently between G and L.  Does

8   that mean we're hiding some columns here?

9   **A.**   No.  Everything you need to know is right here.

10  **Q.**   Right, but -- so this version also has some hidden

11  columns; is that correct?

12  **A.**   Yes, yes.

13  **Q.**   Okay.  Is that just for ease of reading here?

14  **A.**   Yes.

15  **Q.**   Okay.  All right.  So what's the earliest -- the date --

16  looking at line 3, what's the date of the earliest chat on this

17  particular file?

18  **A.**   This particular chat was initiated on July 9th, 2020 at

19  12:18 p.m.

20  **Q.**   Okay.  And I'm going to ask you to read the -- so on the

21  screen, just for the record, you can -- we can see which

22  counterparties were involved.  And what are the two parties

23  involved in this text chain?

24  **A.**   So it's from the user of the cell phone to Pariente 2.

25  **Q.**   Okay.  So Pariente 2.  And then -- so column D will show

1  whether it was an incoming or outgoing message; is that right?

2  **A.**   Yes.

3  **Q.**   Okay.  So I'm going to ask you to start with an outgoing

4  text in row 7.  Could you read the English translation?

5  **A.**   "I'm on my way.  I will be arriving in Denver in a few" --

6  **Q.**   Sorry.

7  **A.**   -- "few hours."

8  **Q.**   Okay.  And what time was that message sent?

9  **A.**   It was July 9, 2020 at 12:18 p.m.

10  **Q.**   All right.  I'm going to go to Exhibit 27.  And, again,

11  that was 12:18 on July 9th; is that right?

12  **A.**   Yes.

13  **Q.**   So I'm going to go to a position -- and what's the time

14  shown there on image 2701?

15  **A.**   July 9, 2020 at 1:17 p.m.

16  **Q.**   Okay.  So that's about an hour later?

17  **A.**   Yes.

18  **Q.**   Okay.  And so backing back out.  What state does that

19  appear to be in?

20  **A.**   Looks like Colorado.

21  **Q.**   Okay.  All right.  I'm going to show you Exhibit 35.

22      Do you recognize Exhibit 35?

23  **A.**   Yes.

24  **Q.**   Okay.  And what phone is that taken from?

25  **A.**   From M3.

*Direct Examination - J. Lee (by Mr. Ake)*

1  Q.    Okay.  So the same one with the text with Pariente?

2  A.    Yes.

3  Q.    Okay.  And just for the record, what does the picture

4  appear to show?

5  A.    Looks like it shows the mountains.

6  Q.    Okay.  And what was the original image filename?

7  A.    It's 20200709.

8  Q.    Okay.  So what --

9  A.    So that's --

10  Q.    July 9th?

11  A.    July 9th, 2020.

12  Q.    Okay.  Now, going back to Exhibit 34A.  Could you read the

13  next few lines starting with line 10, incoming text at

14  12:19 p.m.?

15  A.    12:19 says "Be careful."

16  Q.    Keep going.

17  A.    "Things are hot.  Many dogs."

18  Q.    And was that an outgoing or incoming?

19  A.    That is an outgoing.

20  Q.    Okay.  All right.  And then there's a response at line 12?

21  A.    Yes.  "I imagine so."

22  Q.    Okay.  And then going down to an outgoing text at 16, what

23  does that say?

24  A.    "We're already here in Colorado."

25  Q.    All right.  And the time of that outgoing text?

1  **A.**   Is July 9, 2020 at 2:36 p.m.

2  **Q.**   Okay.  And I'll ask you to go down to the -- or line 25,

3  an outgoing text at 6:01 p.m.  Can you read that, please?

4  **A.**   "Buddy, get me a car.  The one we're driving in is

5  breaking down."

6  **Q.**   Okay.  And this is 6:01 on July 9th?

7  **A.**   Yes.

8  **Q.**   Okay.  And what's the response?

9  **A.**   "Let me check."

10  **Q.**   And another response?

11  **A.**   "With whom?"

12  **Q.**   Okay.  All right.  I'm going to go down to line 31.  Could

13  you read the outgoing text?

14  **A.**   "Okay.  We're about to enter Las Vegas."

15  **Q.**   And I'm just going to have you keep reading through line

16  42.  Could you -- just as you do this, could you note if that's

17  an outgoing or incoming text before each one?

18  **A.**   That is an outgoing message.

19  **Q.**   Okay.  Keep going.

20  **A.**   "Okay."

21  **Q.**   Incoming?

22  **A.**   Incoming.  Another incoming, "Let me know where you guys

23  are."

24  **Q.**   Okay.  Keep going.

25  **A.**   "You didn't get me a car.  I'm talking to a friend.  Wait

1  until he gets it for me.  If not then a rental.  I'm almost

2  there.  I think I will arrive in two and a half hours.  Okay.

3  Okay.  All right.  We'll be in touch along the way."

4  **Q.**  Okay.  Now, I'm going to turn to Exhibit 36.

5     Do you recognize this photo?

6  **A.**  Yes.

7  **Q.**  Okay.  What -- what's it appear to depict?

8  **A.**  It looks like the entrance to a casino.

9  **Q.**  Okay.  And where was this image -- or what phone was this

10  image taken from?

11  **A.**  Same phone, M3.

12  **Q.**  Okay.  And what's the date and time?

13  **A.**  The date and time is July 10th, 2020.

14  **Q.**  Okay.  And is that early in the morning or --

15  **A.**  That's at 01 hours, so 1:00 in the morning, 1:33.

16  **Q.**  Okay.  All right.  And I'm going to show you Exhibit 37.

17     All right.  Where is this image taken from or what phone?

18  **A.**  So this is the old Las Vegas casino.

19  **Q.**  Okay.  And what phone is it taken from?

20  **A.**  M3.  Same phone.

21  **Q.**  Okay.  And what's the date and time it was taken?

22  **A.**  It was July 10th, 2020 at 6:36 a.m.

23  **Q.**  So about five hours after the last photo?

24  **A.**  Yes.

25  **Q.**  Okay.  And just for the record, who does it appear to

*Direct Examination - J. Lee (by Mr. Ake)*

1  show?

2  **A.**   It appears to show the Defendant.

3  **Q.**   Okay.  Does it appear to be a self-portrait?

4  **A.**   Yes.

5  **Q.**   Okay.  Now, going to turn to some data that was obtained

6  from Exhibit 6, the Apple iPhone, or you can confirm.  Showing

7  you Exhibit 38.

8      Is this just a still capture of the data that we've

9  already looked at with the KML data, which is location data

10 from the phone, in Government's Exhibit 27?

11 **A.**   Yes.

12 **Q.**   Okay.  All right.  And some of these appear to be files

13 that are HEIC.  Are those -- what's HEIC file extension?

14 **A.**   So HEIC file is a default Apple high-definition image.

15 Most people change that to jpeg so you could see it in other

16 places, but in this particular phone, it wasn't changed.

17 **Q.**   Okay.  So that's the native photos that are taken by

18 iPhones?

19 **A.**   Yes, sir.

20 **Q.**   Okay.  So I'm going to show you Exhibit 39.

21     Okay.  Do you recognize the picture before I blow it up?

22 **A.**   Yes.

23 **Q.**   Okay.  And which phone was this taken from?

24 **A.**   This was taken with the iPhone.

25 **Q.**   Okay.  All right.  I'm blowing up the sign.  What does it

1 read?

2 A.   A road sign that indicates Grand Junction and Ft. Collins

3 is the next exit.

4 Q.   Okay.  And what was the image filename associated with

5 this phone?

6 A.   Image file is 2708.

7 Q.   Okay.  Okay.  And showing you digital Exhibit 27 on Google

8 Earth.  And when I zoom in does that show -- and I apologize

9 for the super slow internet connection.  I'm reduced to using

10 the Wi-Fi on my iPhone.  So does that -- as it slowly builds,

11 does that appear to show where that picture was taken?

12 A.   I can't tell from that particular image, but it's the same

13 I-70.

14 Q.   It's along I-70?

15 A.   Yes.

16 Q.   Okay.  All right.  And outside of Denver; is that fair?

17 A.   Yes, yes.

18 Q.   Okay.  And what's the time that this was taken?

19 A.   It's 2:20 p.m. on July 9th.

20 Q.   Okay.  And I'm going to show you Exhibit 40.  Do you

21 recognize this picture?

22 A.   Yes.

23 Q.   Is this also taken from M1 or Exhibit 6?

24 A.   Yes, it was extracted from M1.  Yes.

25 Q.   Okay.  And what's the name on that building there?

*Direct Examination - J. Lee (by Mr. Ake)*

120

1  **A.**    Denver Coliseum.

2  **Q.**    Okay.  And I'm going to show you Exhibit 41.  Do you

3  recognize this exhibit?

4  **A.**    Yes.

5  **Q.**    Okay.  Based on your participation in this investigation,

6  do you recognize who the man standing in front of the car is?

7  **A.**    No, I do not.

8  **Q.**    Okay.  And you haven't seen pictures of this man before?

9  **A.**    Well, there's pictures on M1.

10 **Q.**    Are you saying you've never seen the man in person?

11 **A.**    No.

12 **Q.**    Okay.  Have you seen pictures on -- other pictures of this

13 gentleman?

14 **A.**    Yes, I have.

15 **Q.**    Okay.  And without -- you don't know his name offhand, do

16 you?

17 **A.**    It doesn't say his name.

18 **Q.**    Okay.  But does it -- does it look like other pictures

19 that you found on M1?

20 **A.**    Yes, there are other pictures on there, yes.

21 **Q.**    Scale-wise, could you -- are they -- have you seen dozens

22 of pictures, hundreds of pictures of this individual on this

23 cell phone?

24 **A.**    They're predominantly made up of this individual in the --

25 the selfies and pictures.

1  Q.   Okay.  Do they number in the hundreds, would that be fair?

2  A.   Yes, that would be fair.

3  Q.   Okay.  All right.  And what kind of car does this appear

4  to be?

5  A.   Looks like an Infiniti two-door coupe.

6  Q.   Okay.  And what was the image filename on the phone

7  itself?

8  A.   IMG_2736.

9  Q.   2736.  So going back to Exhibit 27.  And does Google Earth

10  show where image 2736 was taken?  At least when it resolves

11  here.  Appear to be a rest stop in Colorado?

12  A.   Yes.

13  Q.   Okay.

14  A.   Yes.

15  Q.   And what time was that picture taken?

16  A.   7/9/2020 at 3:17 p.m.

17  Q.   So a couple hours after --

18  A.   Yes.

19  Q.   -- the last pictures?  Okay.

20  A.   Yes.

21  Q.   Now, showing you Exhibit 42.  Do you recognize this --

22  this photo?

23  A.   Yes.

24  Q.   Okay.  And which phone was this taken from?

25  A.   Same iPhone, M1.

1   Q.   Okay.  And what's the image file and name on the phone?

2   A.   IMG_2791.

3   Q.   Okay.  And what time was that taken according to --

4   A.   7/9/2020 at 7:11 p.m.

5   Q.   Okay.  All right.  So then going back to show you

6   Exhibit 43.  And what are we looking at there?

7   A.   Picture of a front of a casino.

8   Q.   Okay.  And this -- but this photo was taken from M1,

9   correct?

10  A.   Yes.

11  Q.   Okay.  And that has a -- what was the name of the image on

12  the phone?

13  A.   IMG_2844.

14  Q.   Okay.  Now, I'm going to show you what's been previously

15  entered as Government's Exhibit 36, which we established -- you

16  testified was taken from M3.  How do those two photos compare?

17  A.   Looks identical, but looking at the people standing there.

18  Q.   Okay.  And going back to Exhibit 27.  That was, you said,

19  image 2844?

20  A.   2844.  Yes.

21  Q.   So what time was this image taken?

22  A.   At -- July 10th at 1:33 a.m.

23  Q.   Okay.  All right.  I'm going to go back to Exhibit 34

24  alpha, translated Pariente 2 text.  I'm going to start down at

25  line 46.  Can you read the outgoing text and then the following

1   text messages starting at 9:00 o'clock a.m. on July 10th?

2   **A.**   "Buddy, where are the tacos?  The ones you mentioned?"

3   **Q.**   Okay.  And then there's incoming missed call; is that

4   right?

5   **A.**   Yes.

6   **Q.**   Okay.  And then keep reading.

7   **A.**   "Buddy, Alejandra Trejo.  Indianapolis, Indiana."

8   **Q.**   Okay.  Then incoming call, and then an outgoing text at

9   10:20 a.m.?

10  **A.**   10:20 a.m. "(317)965-3554.  The number in case they ask

11  for it."

12  **Q.**   Incoming text, keep going?

13  **A.**   "Coordinate the other trip blaka.

14         "Yes, as soon as my buddy answers me.

15         "Okay.

16         "Okay.  We're here at your service, buddy.  All right,

17  buddy.  They're going to call you.

18         "Okay.  I'll wait for the call."

19         Another outgoing.  "Buddy."

20  **Q.**   Okay.  Okay.  And then down to 72.

21  **A.**   "Send me that."

22  **Q.**   And then 73 has a symbol on it.  What's the symbol?

23  **A.**   A dollar symbol.

24  **Q.**   Okay.  Keep going.

25  **A.**   "Send me that.  I don't have," the dollar symbol.

| | |
|---|---|
| 1 | **Q.**   Okay. |
| 2 | **A.**   "How am I going to do?  Tell me." |
| 3 | **Q.**   Okay.  Then there's a missed call.  And then -- continue. |
| 4 | **A.**   "Buddy, did you already send me that?  I can't move. |
| 5 | Buddy.  Okay.  All right.  Coordinate that for me, seriously. |
| 6 | I'm telling you, let's work hard.  Let's see if it's true he'll |
| 7 | bring it just like that.  Seriously, what it is." |
| 8 | **Q.**   Okay.  And this time in this last text is July 10th at |
| 9 | what time? |
| 10 | **A.**   5:51 p.m. |
| 11 | **Q.**   Okay.  So I'm going to show you Exhibit 45.  This is |
| 12 | another Excel file here.  So do you recognize this file? |
| 13 | **A.**   Yes. |
| 14 | **Q.**   All right.  What is it? |
| 15 | **A.**   It's a WhatsApp chat between the user and Viuda Negra. |
| 16 | **Q.**   And what phone was this taken from? |
| 17 | **A.**   M3, the Samsung. |
| 18 | **Q.**   Or Exhibit 8?  Okay.  And so the same phone as the chats |
| 19 | with Pariente? |
| 20 | **A.**   Yes. |
| 21 | **Q.**   And are the body of these chats also in Spanish? |
| 22 | **A.**   Yes, they appear to be in Spanish. |
| 23 | **Q.**   Okay.  Outside of a system message there, I should |
| 24 | clarify? |
| 25 | **A.**   Yes. |

*Direct Examination - J. Lee (by Mr. Ake)*

1  Q.   And similarly to Exhibit 34, were these text messages

2  translated into English in a similar document?

3  A.   Yes.

4  Q.   I'm going to show you what's been marked as Government's

5  Exhibit 45A.  Okay.  So are we looking at the same text

6  messages, just translated into English, or the same series?

7  A.   Yes.

8  Q.   All right.  So that last time that we referred to was

9  5:51 p.m. on July 10th, when we finished reading that text

10 chain.  I'll draw your attention to column AD of the first row

11 of texts.  So when is the first message in this thread?

12 A.   It's July 10, 2020 at 8:04 p.m.

13 Q.   Okay.  So approximately two and a half hours later, little

14 bit more than two hours later from 5:51?

15 A.   Yes.

16 Q.   Okay.  And I'm going to have you start reading it at line

17 three here.

18 A.   "900 West Burbank Boulevard, Burbank, California."

19 Q.   Keep going.

20 A.   "This is the location."

21 Q.   And about an hour later, there's another --

22 A.   "Are you" --

23 Q.   Keep going, yes.

24 A.   "Are you coming?"

25 Q.   Keep going.

1   A.   "I'm already on my way.  Don't you worry.  I'll be there

2   shortly.  Either way I'll give you a call.

3        "Okay.  Hey, how long before you make it here?"

4        Outgoing call.  "Hello, good evening.  I'm almost there.

5   It's just that there was an accident on the road.  I'm going to

6   call you from a different number when I get there."

7   Q.   Okay.  And the time on this is -- is what?

8   A.   1:04 a.m. the next day, 7/11/20.

9   Q.   Okay.  But if this was in pacific time, that would be

10  three hours earlier, right?

11  A.   Yes.

12  Q.   Or about?

13  A.   10:00 o'clock.

14  Q.   10:00 o'clock on the 10th?

15  A.   Yes.

16  Q.   Okay.  Now, I'm going to show you Exhibit 44.  Do you

17  recognize this photo?

18  A.   Yes.

19  Q.   All right.  And what are we looking at here?

20  A.   Looks like the Infiniti on a jack with the wheel missing.

21  Q.   Okay.  And what phone did this come from?

22  A.   This had come from M1.

23  Q.   Okay.

24            THE COURT:  Mr. Ake --

25            THE WITNESS:  The iPhone.

1    THE COURT:  Sorry, I'm not trying to interrupt you
2  deliberately, but I think our jury could use a stretch.
3    MR. AKE:  Oh, yeah, absolutely.
4    THE COURT:  So why don't we take a --
5    MR. AKE:  Thank you, Your Honor.
6    THE COURT:  -- 10-minute recess and we'll resume with
7  the sergeant.
8    MR. AKE:  Thank you, Your Honor.
9    THE COURT:  All right.
10    THE CLERK:  All rise.  This Honorable Court is now in
11  recess.
12    (Jury exits.)
13    THE COURT:  All right.  Thank you, everybody.  Please
14  be seated.  Sorry, Mr. Ake.
15    MR. AKE:  Oh, no, no.  I lost track of time.  Thank
16  you, Your Honor.
17    THE COURT:  I was looking for a sweet spot, but it's
18  just -- it's dense and so I could just see that they were
19  flagging.
20    MR. AKE:  Oh, absolutely.  This is a slog, I will
21  totally --
22    THE COURT:  Yeah.
23    MR. AKE:  -- acknowledge.
24    THE COURT:  No, no.  No problem.  All right.  So just
25  10 minutes.

```
 1            THE CLERK:  This Honorable Court is now in recess.
 2       (Whereupon, a recess was taken from 2:56 p.m. to
 3  3:08 p.m.)
 4            THE CLERK:  All rise.  This Honorable Court now
 5  resumes in session.
 6            MR. AKE:  Your Honor, we just have one issue that
 7  arose during the break.  So one of our -- the witnesses that we
 8  plan to call tomorrow that's only going to be testifying as to
 9  the immigration matters came in without either counsel for the
10  Government noticing and he self-identified after we finished
11  with the last bit.  But just wanted to let the Court know that
12  we violated the rule.
13            THE COURT:  I appreciate that and that it was
14  accidental.  I would suppose there really wasn't much of what
15  was testified to that would bear upon that witness's testimony.
16       (Overlapping speakers.)
17            MR. GUILLAUME:  We don't have any issue with it.  I
18  appreciate the disclosure.  We don't have any issue.  Thank
19  you.
20            THE COURT:  Yeah.  I appreciate your candor.  Yeah.
21  It's not a problem.
22            MR. AKE:  Okay.  Thank you, Your Honor.  Just wanted
23  to let the Court know.
24            THE COURT:  Thanks.  I appreciate it.
25       (Jury enters.)
```

*Direct Examination - J. Lee (by Mr. Ake)*

129

1          THE CLERK:  Your Honor, one juror is in the restroom.

2          THE COURT:  Of course.

3          THE CLERK:  And so a few minutes.

4          THE COURT:  That's no problem.  Everybody can have a

5   seat.  Thank you.

6       And, Mr. Ake, about how much longer with the sergeant do

7   you think you have?

8          MR. AKE:  I think it's going to be the rest of the

9   afternoon, Your Honor.

10          THE COURT:  All right, everyone, thank you very much.

11       Sergeant Lee, you remain under oath.

12       And, Mr. Ake, you may continue.

13                         - - -

14   BY MR. AKE:

15   Q.   Okay.  Sergeant Lee, when we took a break, I had just

16   showed you Government's Exhibit 44.  Could I get the image

17   number that was associated with this file?

18   A.   It's IMG_2864.

19   Q.   Okay.  I'm going to go to the Exhibit 27, Google Earth.

20   Okay.  That was image 2864.  All right.  And what's the time

21   this picture was taken?

22   A.   July 10th, 2020 at 2:33 p.m.

23   Q.   So that's July 11th?

24   A.   I'm sorry, July 11th, 2020.

25   Q.   Okay.  And as this populates here, can you tell from the

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

**JA366**

1  map what location name -- I'll ask you to look over to the

2  right there -- what location that was taken?

3  **A.**   This would be Burbank, California.

4  **Q.**   Okay.  Now, I'm going to show you -- back to Exhibit 34

5  alpha.  I guess start at -- with line 105.  Again, just for the

6  record, this is exchange with Pariente 2.  I'll have you start

7  with text message -- outgoing text message at -- on July 11th,

8  2020 at 12:46 a.m.  Can you read that series?

9  **A.**   "My phone is not charging.  I'm already here.  Call this

10  one if my phone turns off."

11  **Q.**   Okay.

12  **A.**   Phone number is 1(317)625-1728.

13  **Q.**   Okay.  Just briefly, do you recall if that's the same

14  number as for Exhibit 6, the white iPhone?

15  **A.**   Yes.

16  **Q.**   Okay.  All right.  And I'm going to here pull up both

17  Exhibit 34 alpha and Exhibit 45 alpha, which was the Viuda

18  Negra chats.  And I'm going to hide a few columns here.

19      All right.  Make these visible next to each other.

20      Okay.  So looking first at Exhibit 34A on the left and ask

21  you at -- start reading at line 111.  All right.  So line 111

22  starting with an incoming chat at 7/11 -- or 10:39 a.m. on

23  July 11th?

24  **A.**   "Good morning."  Missed call.  "Buddy, I'm calling you,

25  but nothing.  What happened now?

1      "Honestly, the people here no longer want to deliver.

2 They're freaking out and angry.

3      "Buddy, I've been calling over and over the other number,

4 but nothing.  What's up, buddy?

5      "Honestly, people here are already angry."

6 **Q.**   Okay.  And the time of that -- that last chat in that

7 thread at 1:20 was what time here?

8 **A.**   11:36 a.m --

9 **Q.**   Okay.

10 **A.**   -- July 11th.

11 **Q.**   July 11th, 11:36.  Okay.  So does the user of M3 respond

12 to that, that question mark?

13 **A.**   Question mark, no.

14 **Q.**   So the question mark was incoming and then there's an

15 outgoing call, correct --

16 **A.**   Yes.

17 **Q.**   -- at 12:11?

18 **A.**   Yes.

19 **Q.**   Okay.  And what does he say after that?

20 **A.**   "The phone is not charging well and in this buddy's phone

21 he has not received any calls.  We're here waiting.  Call me."

22 **Q.**   Then there's an incoming chat at 12:20 p.m.?

23 **A.**   "Yes.  I'm talking to Viejon.  Give me a chance."

24 **Q.**   Okay.  And then an outgoing?

25 **A.**   "Okay."

*Direct Examination - J. Lee (by Mr. Ake)*

132

1  Q.    Okay.  At 12:20?  Okay.  Now, turning to Exhibit 45 alpha.

2  So an outgoing call.  And going to the same day, July 11th.  So

3  I'll ask you to look at July 11th at 12:56.  Sorry.  July 11th.

4  Let's go -- sorry.  Go back to line 13 here.  July 11th, here,

5  at 12:56.  Is there an outgoing call then?

6  A.    Yes.

7  Q.    Okay.  Now, start reading from line 14 at 12:57.

8  A.    "Hello, good morning, I'm calling you."

9  Q.    Okay.  And then --

10  A.    Two outgoing call.

11  Q.    So this was at 12:56, the outgoing call on 45 alpha.  So

12  going back to 34 alpha.  At 12:59 there's an outgoing text.

13  Can you start reading that?

14  A.    Yes.

15      "He's not answering.  He has it turned off."

16  Q.    Keep going.

17  A.    "We have to wait until he turns it on.

18      "Okay.  Did he tell you anything?

19      "We have to wait.  There is no other way.

20      "Okay."

21  Q.    All right.  And that last message was at 3:57 p.m.; is

22  that right?

23  A.    Yes.

24  Q.    Okay.  So going back to Exhibit 45 alpha.  Going to line

25  18 at 4:55 p.m.  It's about an hour later.  Go ahead and read

1  the text.

2  **A.**   "I'm here.  Since yesterday."

3  **Q.**   Okay.  And then what's the next thing there?

4  **A.**   Call declined.

5  **Q.**   Okay.  Keep going.

6  **A.**   "I have to confirm."

7  **Q.**   Okay.

8  **A.**   "Okay.  I talked to them a while ago.  They're going to

9  call you shortly."

10  **Q.**   All right.  So that's 7/11 and that's a outgoing chat --

11  or outgoing chat from 317 --

12  **A.**   Yes.

13  **Q.**   -- phone?

14       Okay.  So that was at 4:58 p.m. July 11th.  So going back

15  to 34 alpha, one minute later at 4:59, there's an outgoing

16  text -- or, sorry, reading from line 157, 4:59, what's the text

17  message there?

18  **A.**   "She says she has to wait for your confirmation."

19  **Q.**   And there's a response at 5:00 p.m.?

20  **A.**   Outgoing, "Okay."

21  **Q.**   So back to 45 alpha, picking up the conversation at 6:35.

22  **A.**   "They told me to call him.  I already got confirmation,

23  honestly."

24  **Q.**   Okay.  And that was a outgoing chat; is that right, from

25  M3?

1    A.    Yes.

2    Q.    And then another outgoing chat?  Or sorry.  So then the

3    next -- at line 25, what's it say?

4    A.    "Hey.  I'm busy right now.

5          What's that?  At around what time?

6          The guy who will see you is not available.  Wait a little

7    while, please.  Okay.  And communicate through here, not to the

8    cell phone, but only WhatsApp, please.  I'll text you, please.

9          Okay.  All right.  I'll wait here.  Okay."

10   Q.    Okay.  So that one, the "okay" was at 6:36 p.m.?

11   A.    Yes.

12   Q.    Okay.  And then it looks like there's no chats for about

13   four hours; is that right?  Between line 34 and line 35?

14   A.    Yes.

15   Q.    Okay.  So just pick up the thread again at line 35.

16   A.    "Good afternoon.  You can come right away.  Good evening.

17   What did you tell me?"

18   Q.    So it says, "Where did you tell me"?

19   A.    I'm sorry, "Where did you tell me?  But before the sun

20   goes down completely."

21   Q.    Okay.  And we're just going to have you read through line

22   58 here.

23   A.    "Yes.  Here where you told me.

24          "He'll follow you from there, okay?

25          "Yes.

1      "Please.

2      "Here by McDonald's.

3      "Go to McDonald's.

4      "Yes, I'm here.

5      "We'll move from there.  You'll follow someone.

6      "Are you there or what?

7      "I don't understand you.

8      "He's here.  Bring him.

9      "I'll call you.

10     "No.

11     "Don't call me.

12     "Okay.

13     "I'm here at the address you told me but I'm next to

14     McDonald's.

15     "Where is there?

16     "A bar called El Criollo.

17     "A sports store."

18  **Q.**   Okay.  And the time on that?

19  **A.**   Is 7/11/2020 at 10:42 p.m.

20  **Q.**   Okay.  So going back to 34 alpha, what's the time on

21  line 169?

22  **A.**   10:44.

23  **Q.**   Okay.

24  **A.**   7/11/2020 at 10:44.  "Okay."

25  **Q.**   Okay.  Go ahead and read.  Or, actually, back to -- sorry.

1  To line 167.

2  **A.**    "Buddy, that thing will be done shortly.

3         "Okay.

4         "I'm just waiting on her."

5  **Q.**    Okay.  And that was sent at approximately 10:44 p.m.?

6  **A.**    Yes.

7  **Q.**    Okay.  So go back to Exhibit 45 at 10:45 -- or 10:44 p.m.,

8  line 60.

9  **A.**    "Okay.  Hey, have you been there for a while?

10         "Yes, already.

11         "Not for long.

12         "I'll call you shortly.

13         "Okay."

14  **Q.**    Okay.  And then there's two incoming calls after that?

15  **A.**    Yes.

16  **Q.**    Now, are those the last texts exchanged, looking over the

17  timestamp, in early July?

18  **A.**    Yes.

19  **Q.**    And when are the next text messages between those parties?

20  **A.**    Is August 1st.

21  **Q.**    Okay.  Now, I'm going to show you a Google Earth plot.

22  And we're back on digital Exhibit 27.  I'm going to type in

23  "El Criollo, West Burbank" and hitting search.

24         And is that close to where image 2864 was taken?

25  **A.**    Yes.

*Direct Examination - J. Lee (by Mr. Ake)*

137

1   **Q.**   Okay.  And I'm going to expand the time aperture here

2   And does Exhibit 27 show plots from M1 and specifically

3   Exhibit 27 on the evening of July 11th, going into the evening

4   of July 12th?

5   **A.**   Yes.

6   **Q.**   And what's the -- just for the record, what's that top

7   plot up there, top -- up by the hand?

8   **A.**   It's the --

9   **Q.**   What's the time associated with it?

10  **A.**   July 11th, 2020 at 9:06 p.m.

11  **Q.**   Okay.  And are there -- they continue to show plots

12  through the early morning?

13  **A.**   Yes, July 12th at 1:50 a.m.

14  **Q.**   Okay.  All right.  Going back to Exhibit 34 alpha.

15       So looking at line 177, what time is -- is there an

16  outgoing text message on line 177?

17  **A.**   It's July 11, 2020, 11:37 p.m.

18  **Q.**   Okay.  And what's the body of the text message?

19  **A.**   "Yes.  You know it, buddy.  It's here.  Not there.  We'll

20  stay in touch.

21       "All right, buddy.

22       "All right.

23       "All right then.

24       "How are you doing, buddy?"

25       "We're doing good, buddy."

1    Emoji at the end.

2  **Q.**   Okay.  Sorry, let me...

3    So what was the emoji there that you noted?

4  **A.**   A thumbs-up.

5  **Q.**   Okay.  What time was that thumbs-up?

6  **A.**   At July 12, 2020 at 1:20 a.m.

7  **Q.**   Okay.  All right.  Are there still plots -- going back to

8  Exhibit 27, are there still plots around that time?

9  **A.**   Yes.

10  **Q.**   Okay.  At the -- near the El Criollo Cuban Bar & Grill

11  near West Burbank?

12  **A.**   Yes.

13  **Q.**   So going back to the 34 alpha.  So I'm going to ask you to

14  look at line 189.  Okay.  So go ahead.  Incoming text at -- on

15  July 12th at 9:00 a.m.  What's that read?

16  **A.**   "How are we doing?

17    "Fine.  I'm in Colorado.

18    "Oh, okay."

19  **Q.**   So that's about eight hours after the last location plot

20  in West Burbank; is that correct?

21  **A.**   Yes.

22  **Q.**   Okay.  Okay.  Keep reading.

23  **A.**   "Be careful.

24    "Yes.

25    "I'll call upon arriving, buddy."

1    **Q.**    Okay.

2    **A.**    "Where are you buddy," question mark.

3         "Yunta."

4    **Q.**    Okay.  And then about three hours later, July 12th at

5    3:00 p.m., can you go ahead and read those?

6    **A.**    "Hey.

7         "Everything is fine, buddy.

8         "What's up.

9         "How are we doing?

10        "Fine, buddy."

11   **Q.**    Okay.  And that was about an hour and a half later from

12   that last set?

13   **A.**    Yes.

14   **Q.**    Okay.  Okay.  And then at 6:24 another incoming text, line

15   209?

16   **A.**    "What's up.

17        "We're here dealing with traffic.

18        "We're just here, buddy.

19        "You know how it is, buddy.

20        "I already text that one in the winds."

21   **Q.**    Okay.

22   **A.**    "He needs to get on the ball because you have his

23   address."

24   **Q.**    Okay.  And then at 8:25 p.m. the same day, line 215, what

25   does that say?

1    A.    "Where are you.

2          "I'll get the 80 in about an hour."

3    Q.    Okay.  Going to show you Exhibit 27, Google Earth exhibit.

4    I'm zooming out here.

5          And so that last text was sent around July 12th at between

6    8:00 and 9:00 p.m.  And what road do they appear to be on at

7    9:28 p.m. on July 9th?

8    A.    Looks like Interstate 76.

9    Q.    Okay.  And where my hand -- that hand designator is, what

10   interstate is that?

11   A.    Interstate 80.

12   Q.    Okay.  Now, just scrolling back out again, so looking at

13   the -- the plots going back to the westbound trip, is the --

14   was the westbound trip taken on the same interstate, 75 and 80,

15   or was it taken on the southern route?

16   A.    The southern route.

17   Q.    Okay.  Okay.  So back to Exhibit 34 alpha.  Going to have

18   you start at line 220 here, with a outgoing text at 12:07 a.m.

19   on July 13th.  Go ahead and start reading.

20   A.    "I'm here getting gas and resting.

21          "Buddy, things are hot.

22          "Oh, okay.

23          "Yes, all right.

24          "Better.

25          "We'll see you tomorrow.  God willing."

*Direct Examination - J. Lee (by Mr. Ake)*

1  Q.   Okay.  And I'm just going to have you keep reading these.

2  A.   "Get some rest."

3       Incoming call.

4       "All right.

5       "What's up buddy.

6       "Good morning.

7       "Good morning, we're heading out the now.

8       "That's good.

9       "We're here.

10      "Yeah man, okay.

11      "Okay.  It's good time because the cars are moving.

12      "Yes, there are move than yesterday.

13      "What's up?  How's the traffic?

14      "Yes, light."

15 Q.   Okay.  And then down 2:43, what's that say?

16 A.   "We're on our way to the winds."

17 Q.   Okay.  And then at 1:46 p.m. on July 13th, outgoing text.

18 Go ahead.

19 A.   "Four and 50 minutes."

20 Q.   And then another outgoing text at 1:47.  Keep going.

21 A.   "I'll call him shortly.  I'll tell him to take me from

22 there to his house to avoid taking this guy.  You know, there

23 is always one."

24 Q.   All right.  So that text is a text from M3 to Pariente 2

25 at 1:47 p.m.?

*Direct Examination - J. Lee (by Mr. Ake)*

1  **A.**   Yes.

2  **Q.**   Could you just read that second sentence again in there,

3  after the "I'll calm him shortly"?

4  **A.**   "Yeah man, there's one hour left but either way tell him

5  I'll call him shortly."

6  **Q.**   Well, that's actually the third sentence, but what's the

7  second sentence say?

8  **A.**   "Yeah man."

9  **Q.**   No.  Am I reading this wrong?

10      Just go ahead and read the whole thing again.  I'm sorry.

11 **A.**   I'm sorry, I'm sorry.  My apologies.

12      "I'll tell him to take me from there to his house to avoid

13 taking this guy."

14 **Q.**   Okay.  Okay.  I'm going to show you -- actually, so -- go

15 ahead and start reading again at 250.

16 **A.**   "This guy isn't answering, buddy."

17 **Q.**   Go ahead.

18 **A.**   "Tell me."

19 **Q.**   Uh-huh.

20 **A.**   "The guy already answered me.  Almost there.

21      "Oh, okay.

22      "How much longer?

23      "Okay.

24      "Time.

25      "Two hours and 40 minutes."

1  Q.  Okay.  And that's sent at 4:17 p.m.; is that right?

2  A.  Yes.  July 13th at 4:17 p.m.

3  Q.  Okay.  Keep going.

4  A.  "I'll get there shortly.

5      "Oh, okay.  How long?

6      "How long?

7      "Forty minutes."

8  Q.  Okay.  And that one is sent at 6:33 p.m.; is that right?

9  A.  Yes.

10 Q.  All right.  Okay.  Keep going.  Start with line 267.

11 A.  "What's up buddy, are you close.

12     "I am.

13     "I'll arrive shortly.

14     "The guy says he will arrive in 15 minutes.

15     "Did he answer you?

16     "Yes.

17     "Okay.

18     "I'll give you a call once I'm with him.

19     "Okay.

20     "There were only two.

21     "Give me 2 minutes.

22     "And I'll call you.  I'm talking to El Viejon Culiacán."

23 Q.  Okay.  And the time of that chat?

24 A.  Is 7/13/2020, 8:01 p.m.

25 Q.  All right.  Okay.  I'm going to show you Government's

*Direct Examination - J. Lee (by Mr. Ake)*

1  Exhibit 46, which we haven't looked at yet.

2      Now -- do you recognize this exhibit?

3  **A.**   Yes.

4  **Q.**   All right.  What are we looking at here, just looking

5  up -- starting at the top?

6  **A.**   Just a text message.

7  **Q.**   Okay.  And who are the parties to this text message

8  thread?

9  **A.**   That is from the iPhone 7, M1.

10  **Q.**   And how do you recognize that?

11  **A.**   By the phone number.

12  **Q.**   Okay.  What's the name associated by the --

13  **A.**   Haveen.

14  **Q.**   Okay.  And who's the counterparty?  Is it M3 user?  Are

15  these taken from M3?

16  **A.**   Yes.

17  **Q.**   Okay.

18  **A.**   I'm sorry, that's 3171728.

19  **Q.**   3078?

20  **A.**   Yeah, that's M1.  It's from, to.

21  **Q.**   So 1728 is the M1 and the 3078 is M3, correct?

22  **A.**   Yes.  3078 is M3, yes.

23  **Q.**   Okay.  Now, scrolling over to column O, do those texts

24  appear to be in English?

25  **A.**   No.

1  Q.   Okay.  So similar to the other exhibits, were these sent

2  out for translation to a DEA contract linguist?

3  A.   Yes.

4  Q.   Okay.  Going to show you Exhibit  -- sorry -- Exhibit 46

5  alpha.  So 46 alpha.  Okay.  Is this the same as what we just

6  looked at except for the translate column?

7  A.   Yes.

8  Q.   All right.  So going to start with -- draw your attention

9  down to lines 122 and 123.  What are the -- or 120 -- yeah,

10  122, 123, what are the times associated -- or, excuse me --

11  sorry.  Line 123, I'm sorry.

12  A.   123 is July 13, 2020 at 8:16 p.m.

13  Q.   Okay.  And is that approximately the same time as what we

14  were just looking at on the text with Pariente 2?  I'll --

15  A.   Yes.

16  Q.   -- pull that back up -- at 34A?

17  A.   Yes.

18  Q.   So that was July 13th at 8:01 --

19  A.   Yes.

20  Q.   -- is that last text?  Okay.

21       So looking here on 46 alpha, again, these are texts

22  between the users of M1 and M3, the white iPhone and the

23  cracked black Samsung.  So between line 122 and 123, are there

24  any text messages exchanged between those two numbers between

25  July 10th and July 13th?

1   **A.**   Yes.

2   **Q.**   Well, like, on the days July 11th or July 12th, are there

3   any text messages?

4   **A.**   No, there's none between the 10th and the 13th.

5   **Q.**   Okay.  And then what's the body of the text in line 123 at

6   8:16 p.m. on July 13th?

7   **A.**   Looks like a Google Map with an address.

8   **Q.**   Okay.  And what's the address there.

9   **A.**   7456 Karlov Avenue, Skokie, Illinois.

10  **Q.**   Okay.  I'm going to go back to Exhibit 27.  Google Earth.

11  I'm going to paste that address in.

12      Okay.  Just generally speaking, do there appear to be

13  plots around that address, that Karlov Avenue address at --

14  between 8:00 and 9:00 p.m. on July 13th?

15  **A.**   Yes.

16  **Q.**   Okay.  I'm going to show you Government's Exhibit 47.

17      So is this a still of what we were just seeing depicting

18  the data from Exhibit 27 on Google Earth?

19  **A.**   Yes.

20  **Q.**   With better resolution?

21  **A.**   Yes.

22  **Q.**   Okay.  Now, returning to Exhibit 34 alpha, looking at line

23  287.  There is a -- there's a name.  What's the name there?

24  **A.**   "Ernesto Lopez Vargas."

25  **Q.**   Okay.  Continue.

*Direct Examination - J. Lee (by Mr. Ake)*

147

```
1   A.   "Querétaro, Mexico."

2   Q.   Keep going.

3   A.   "Through Elektra."

4   Q.   Okay.  And when were those -- what time were those

5   messages?

6   A.   July 13th, 2020 at 10:33 p.m.

7   Q.   Okay.  And keep reading after the "okay" response.  What's

8   it say?

9   A.   "Please try before 10:00 please.

10       "I need to pay some things.

11       "I'll get a ride for tomorrow."

12  Q.   Okay.  Just keep going here.  I'll keep scrolling.

13  A.   "Okay.  Thank you."

14       "I just arrived, buddy."

15       "Thank God, seriously."

16       "I'll send you those 300 tomorrow.

17       "500.

18       "All set, buddy.

19       "We'll give them to the guy once we get the money.

20       "I'll call you right back.

21       "I'm talk to my friend.

22       "Okay.

23       "What's up, buddy.

24       "What's up.

25       "I just woke up.
```

1    "I'll get a ride.

2    "Yes, buddy, I'll get someone to do it shortly.

3    "Please.

4    "Yes."

5    Incoming call.

6    "Buddy, did the girl already arrive," question mark.

7    "Not yet.  I'm still waiting for her."

8  Q.   Okay.  And then the next -- there's an outgoing text

9  message at 319.  What's the time that that attachment was sent?

10  A.   July 14, 2020 at 1:10 p.m.

11  Q.   Okay.  And what's the filename associated with that

12  attachment?

13  A.   It's IMG20200714, which indicates a picture taken on

14  July 14th, 2020.

15  Q.   Okay.  And it ends in 07; is that right?

16  A.   Yes.

17  Q.   Okay.  I'm going to show you Government's Exhibit 48.

18  Okay.  Going to zoom in on this a little bit, but do you

19  recognize this exhibit?

20  A.   Yes.

21  Q.   What are we looking at there?

22  A.   We are looking at a receipt, a money transaction

23  receipt --

24  Q.   Okay.

25  A.   -- conducted in Indianapolis, Indiana.

*Direct Examination - J. Lee (by Mr. Ake)*

1   Q.   Okay.  And just drawing your attention to -- what's that
2   say with the payer?  What's that say there?
3   A.   Yes, "payer."
4   Q.   After "payer"?
5   A.   "Elektra."
6   Q.   Uh-huh.  Okay.
7   A.   "Banco."
8   Q.   Is it Banco Azteca there?
9   A.   Yes.
10  Q.   Okay.  And who's the beneficiary?
11  A.   It's Ernesto Lopez Vargas.
12  Q.   Okay.  And is that the same as what we just looked at
13  with -- in the conversation with -- with Pariente 2 at line --
14  on Exhibit 34 alpha at line 287?
15  A.   Yes.
16  Q.   Okay.
17  A.   Same thing, yes.
18  Q.   Okay.  All right.  And what's the amount that was sent?
19  A.   Amount sent is $470 plus the 10-dollar fee associated with
20  it.
21  Q.   Okay.  And where is this sent from?
22  A.   Sent from TRS supermarket located in Indianapolis,
23  Indiana.
24  Q.   Okay.  And who's the sender here?
25  A.   Sender is Jose Fernando Alonso Hernandez.

*Direct Examination - J. Lee (by Mr. Ake)*

150

1  Q.   Okay.  And so this -- that receipt is sent by the user of
2  M3 to Pariente 2, right?  That receipt in that image file --
3  A.   Yes.
4  Q.   -- was sent -- okay.
5  A.   Yes.
6  Q.   Now, I'm going to show you Exhibit 49.  Do you recognize
7  this exhibit?
8  A.   Yes.
9  Q.   All right.  And which -- what phone was this taken from?
10  A.   That is from M3.
11  Q.   Okay.  Now, that last file was sent on July 14th; is that
12  correct, July 14, 2020?
13  A.   Yes.
14  Q.   Okay.  Now, this image file, does this have a filename
15  associated with it?
16  A.   Yes.
17  Q.   What's the filename?
18  A.   Filename is 20200715, which indicates it was taken on
19  July 7 -- July 15th, 2020.
20  Q.   Okay.  And start over here on the right.  Does that appear
21  to show at least two 100-dollar bills --
22  A.   Yes.
23  Q.   -- and some additional cash?
24       Okay.  And then there's a keychain there.  What does the
25  keychain say?

1  A.   "I Love Colorado."

2  Q.   All right.  And then what are we looking at in that blowup

3  there?

4  A.   The Grim Reaper.

5  Q.   A Grim Reaper, okay.  And is there a small roll of money

6  in its arm?

7  A.   Yes.

8  Q.   Okay.  All right.  I'm going to pull up Exhibit 49 as well

9  as Government's Exhibit 14.  So how do these two compare?

10 A.   With the exception of the money rolled up in a different

11 fashion, they look to be identical statue.  You can tell by the

12 sickle, the rust spots on the sickle are identical.

13 Q.   Okay.  All right.  And I'm going to show you Exhibit 50.

14 Do you recognize this image?

15 A.   Yes.

16 Q.   Okay.  Is this taken from the M3 phone?

17 A.   Yes.

18 Q.   Okay.  And the filename on this image?

19 A.   The filename is 20200716, July 16, 2020, when the image

20 was taken.

21 Q.   Okay.  So this was taken two days after that last -- the

22 remittance picture --

23 A.   Yes.

24 Q.   -- and then one day after seeing the Grim Reaper statue,

25 correct?

*Direct Examination - J. Lee (by Mr. Ake)*

152

```
 1   A.   Yes.
 2   Q.   All on the same phone?
 3   A.   Yes.
 4   Q.   Okay.  And what is -- just for the record, what does this
 5   appear to show?
 6   A.   An identification card issued by State of Indiana.
 7   Q.   And whose pictures are on the ID card?  Do you recognize
 8   the individual?
 9   A.   Appears to be the Defendant.
10   Q.   Okay.  Going back to Exhibit 34A.  And I'm looking at text
11   messages.  So after the receipt is sent on July 14th, just want
12   to go down, there's a text sent on July 15th at line 325.
13   Could you read that?
14   A.   "I'm here at the doctor's office picking up some pincitas
15   I have.  What did Moreno tell you?"
16   Q.   Okay.  And go ahead and read the next one.
17   A.   "I'm in doctor's appointment for the pain in my damn
18   waist.  I don't know what's wrong with it.  I think it could be
19   my kidneys.
20        "I don't know about the man, but I believe the material is
21   fine.  It looks fine.  It even smells fine.  That fucker had
22   better not give excuses.  Give him a call later.  I'm going to
23   call him later to see what he says, to see how we're going to
24   coordinate this octopus."
25   Q.   Okay.  And this was sent July 15th, 2020?
```

Ronda J. Thomas, RMR, CRR - Federal Official Reporter
**JA389**

*Direct Examination - J. Lee (by Mr. Ake)*

153

1    A.    Yes, July 15, 2020 at 12:15 p.m.

2    Q.    Okay.  Now, I'm going to show you what's been marked as

3    Exhibit 51.

4          So Exhibit 51, what are we looking at here?

5    A.    We are looking at the instant messages.

6    Q.    Okay.  So who are the -- can you tell what application

7    these messages were sent over?

8    A.    The application is WhatsApp.

9    Q.    Okay.  And who are the participants?

10   A.    The participants are that phone number, 1(317)723-2541,

11   associated with evidence M2.

12   Q.    M2?  Okay.

13   A.    Yes.

14   Q.    And what is the counterparty named in the M2 contacts

15   list?

16   A.    Compa Neto.

17   Q.    Okay.  Now, I'm going to just pull up Exhibit 34A.

18         Okay.  So in 34A, Pariente 2 -- so 34A comes from M3,

19   right, or Exhibit 8?

20   A.    Yes.

21   Q.    Okay.  And then this new exhibit, 51, is coming from

22   Exhibit 7, correct, M2?

23   A.    Yes.

24   Q.    Okay.  So how do the numbers for -- how do the numbers for

25   Compa Neto on M2 and Pariente 2 on 34 alpha, how do those

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

**JA390**

1  compare?

2  **A.**   They look to be identical.

3  **Q.**   Okay.  So they both end in 8910?

4  **A.**   Yes.

5  **Q.**   So going back to your earlier testimony about how the

6  names are assigned, what, again, drives the name that's

7  associated with the number?

8  **A.**   Gets the information from contacts.

9  **Q.**   Okay.  Based on the difference here, what would the user

10  of M2 have named this particular counterparty?

11  **A.**   Named that particular number Compa Neto.

12  **Q.**   Okay.  But they appear to -- it's really the same WhatsApp

13  account on the other end, right?

14  **A.**   Yes.

15  **Q.**   Okay.

16       **THE COURT:**  Mr. Ake, I'm just going to interrupt for

17  one second.

18    Counsel, I just want to ask you to satisfy yourselves that

19  there is no violation of the rule on witnesses currently.

20       **MR. AKE:**  This is another attorney from our office,

21  Your Honor.

22       **THE COURT:**  Very good.  Okay.  Please continue.  Thank

23  you.

24       **MR. AKE:**  He does kind of look like an agent, though.

25       (Laughter.)

1  BY MR. AKE:

2  **Q.**   Okay.  So with Exhibit 51, was this also sent out to be

3  translated by a contractor?

4  **A.**   Yes.

5  **Q.**   Okay.  So I'm going to show you Exhibit 51 alpha.  Okay.

6  So is 51 alpha also the same text with Compa Neto from M2?

7  **A.**   Yes.

8  **Q.**   Okay.  And just for demonstration purposes only, I'm going

9  to show you what's previously -- or what we've referred to for

10  identification only as Exhibit 7 alpha, which is the M2

11  extraction summary.  And within that, in the device info,

12  what's shown as the phone activation date and time?

13  **A.**   July 18th, 2020.

14  **Q.**   Okay.  So July 18, 2020 is when M2 was put into service?

15  **A.**   Yes.

16  **Q.**   Okay.  So going back to Exhibit 51 alpha.  What's the date

17  on the first chat message between M2 and Compa Neto?

18  **A.**   July 18th, 2020.

19  **Q.**   Okay.  So please just go ahead and read, starting with

20  line three there.

21  **A.**   "That one, buddy.

22       "I'm pechis."

23  **Q.**   Okay.  Keep going.

24  **A.**   "What's up, buddy."

25       Outgoing call.

```
 1        "What's up, buddy.

 2        "Just chilling.

 3        "Did you already talk to your friend?

 4        "I talked to Moreno yesterday."

 5   Q.   Okay.  And was there reference to Moreno in that other

 6   text series with Pariente that you just read from --

 7   A.   Yes.

 8   Q.   -- July 15th?

 9   A.   Yes.

10   Q.   Okay.  Keep going.  On July -- starting with July 20th.

11   Keep going.

12   A.   "What's up, buddy.

13        "I already took the car to be serviced.

14        "To be on the safe side.

15        "Okay.  To see if he can do me a favor of going there and

16   get me one.

17        "I'll call you shortly."

18   Q.   Okay.  Sorry, scroll down here.

19   A.   "I already text Moreno to ask what time I should I stop

20   by.  All right buddy.

21        "Okay.

22        "Okay, all right, waiting for the green light buddy.

23        "Okay, I'll take care of that for you today.

24        "Okay.

25        "Good morning buddy.
```

1      "Did you already leave?

2      "I'm already on my way.  I'll call that guy once I

3  arrive."

4  Q.   Okay.  And that is July 29th at 7:55 p.m.?

5  A.   Yes.

6  Q.   Okay.  Now, I'm going back to Exhibit 46 alpha.  And these

7  are texts between the users of M1 and M3, the white iPhone

8  and the cracked Samsung.

9      I'm going to start with line 132.  Can you read on

10  July 18, 2020, outgoing text message.

11  A.   "What's up?  Where are you?  We need to work, buddy.  Wake

12  up because the money doesn't come by itself."

13  Q.   Okay.  And keep going.

14  A.   "Call me.

15      "So?

16      "The people wouldn't let me go, buddy.

17      "As soon as I'm free."

18  Q.   Okay.  And going down to text from July 21st -- sorry, go

19  ahead.  Line 147 there.

20  A.   "Let's take care of the car situation."

21  Q.   Okay.  Looks like it was sent twice; is that correct?

22  A.   One sent six seconds later.

23      "Let's care of the car situation."

24  Q.   Okay.  And going down to line 175 on July 28th.

25      Go ahead and read that outgoing text message.

*Direct Examination - J. Lee (by Mr. Ake)*

1  **A.**   "What's up, dude?  I'm calling you.

2      "Are you going?

3  **Q.**   Okay.  And then the incoming text message, July 29th at

4  1:00 in the morning?  Go ahead.

5  **A.**   "Buddy, I'm sorry, but I promised the boss to finish a job

6  by tomorrow and despite working all day today, I could not

7  finish it.  I just arrived at my place.  I worked 16 hours

8  today."

9  **Q.**   Okay.  Keep going.

10  **A.**   "I don't know if you already left or we should do it

11  tomorrow.  What do you think?"

12  **Q.**   Okay.  And then a outgoing text about five hours later,

13  what does it say?

14  **A.**   "We need to go already.

15      "What time tomorrow?

16      "At 8:00 a.m. in a little bit."

17  **Q.**   Okay.  So the "what time tomorrow" was sent on -- by the

18  user of M1 -- or, excuse me, of M3 to M1; is that right?

19  **A.**   Yeah, can you scroll to the --

20  **Q.**   So this outgoing text?

21  **A.**   Yeah.

22  **Q.**   So it's from the user of M3 to M1; is that right, to

23  Gavino?

24  **A.**   Yes.

25  **Q.**   Okay.  Thanks.  Okay.  So Gavino then writes back at line

*Direct Examination - J. Lee (by Mr. Ake)*

1  181 at 4:30 in the morning, or in this case -- well, maybe one

2  hour behind in Indiana.  The response is "at 8:00 a.m. in a

3  little bit"; is that right?

4  A.   Yes.

5  Q.   Okay.  All right.  Now, looking in between line 183 and

6  184, is there a several-day gap in any text messages?

7  A.   Yes, there's a four to five days' gap.

8  Q.   Okay.  All right.  Going back to Exhibit 34 alpha, these

9  are texts with Pariente 2, pick back up on July 29th.  So

10 July 29th looking at line 350, so start there.

11      So this is July 29th, 11:00 p.m.  The outgoing text, what

12 does it say?

13 A.   "I'll call you once I arrive.

14      "Okay.

15      "All right then.

16      "I'm stuck in traffic."

17 Q.   And that "I'm stuck in traffic" was sent when?

18 A.   On July 30, 2020 at 2:30 in the morning.

19 Q.   Okay.

20 A.   "An hour away.

21      "Okay.

22      "Everything is fine.

23      "Send me a message then.

24      "I'll be waiting for it.

25      "Okay, buddy."

*Direct Examination - J. Lee (by Mr. Ake)*

160

```
 1  Q.   And the date and time of that last text there?
 2  A.   It's July 30, 2020 at 2:30 a.m.
 3  Q.   Okay.  All right.  Moving down to the next morning at
 4  9:00 o'clock, go ahead and start reading there at 9:20 -- let's
 5  go 9:20 there?
 6  A.   "Call me."
 7  Q.   Okay.  And then at line 366, what are we seeing there?
 8  A.   "Antonio Lopez Vargas.  Querétaro, Mexico, through
 9  Elektra."
10  Q.   Okay.  Now, skipping down a little bit, there's an
11  attachment in line 372, image file ending in WA0003.  Correct?
12  A.   Yes.
13  Q.   Okay.  I'm going to show you Government's Exhibit 52.
14       All right.  Okay.  What does that read right there?
15  A.   "Beneficiary Antonio Lopez Vargas."
16  Q.   Okay.  And how much is sent?
17  A.   $1,000, plus 10-dollar transfer fee.
18  Q.   Okay.  And just to be clear, Exhibit 52, is that the same
19  jpeg that was attached to that last outgoing chat from 34A
20  at --
21  A.   Yes, it has the same filename.
22  Q.   And you've got that in your notes?
23  A.   Yes.
24  Q.   Okay.  All right.  So -- and how does that compare with
25  this instruction here between 366 because 368?
```

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

**JA397**

1  **A.**   Same city, same country and same Elektra.

2  **Q.**   Okay.  And --

3  **A.**   Payer.

4  **Q.**   What's the name of the sender?

5  **A.**   Juan Manuel Flores.

6  **Q.**   Okay.  And pulling up Exhibit 50.

7        What's the name on this ID card?

8  **A.**   Juan Manuel Flores.

9  **Q.**   And on the ID card, what's the address?

10  **A.**   It's 2772 Medford Street, Lafayette, Indiana.

11  **Q.**   Okay.  Showing back to Exhibit 52.  Is that the address

12  that matches that ID card?

13  **A.**   Yes, same -- 2772 Medford Street, Lafayette, Indiana.

14  **Q.**   Okay.  I'm also going to show you -- on the ELMO here --

15  show you what's been marked as -- and previously entered into

16  evidence as Government's Exhibit 52 alpha.

17        Right.  So looking at 52 alpha, how does that compare to

18  what we were seeing on the screen beforehand?  What's the name

19  of the sender?

20  **A.**   Juan Manuel Flores.

21  **Q.**   And what's the name of the beneficiary?

22  **A.**   Antonio Lopez Vargas.

23  **Q.**   Okay.  And I'll just ask, look at the pin at the top where

24  it says "clave pin."  What are the last four digits of that?

25  **A.**   5957.

1  **Q.**   Okay.  And how does that compare with the PIN on this

2  remittance receipt?

3  **A.**   Same.

4  **Q.**   Okay.  Now, I'm going to show you -- or go back to

5  Exhibit 40 -- 34 alpha, after the Antonio Lopez Vargas

6  instruction and I'm skipping down one.  There's a instruction.

7  What's the instruction or name and address in line 370?

8  **A.**   David Ullses Torres Gomez, Culiacán, Sinaloa.

9  **Q.**   Okay.  And then there's a number there and then it says

10  "Elektra"; is that right?

11  **A.**   Yes.

12  **Q.**   Okay.  And going down to image -- or line 373, there's an

13  outgoing text at 10:27 a.m.?

14  **A.**   Yes.

15  **Q.**   So that's about 30 minutes, 40 minutes after the incoming

16  text with that information that you just read, right?

17  **A.**   Yes.

18  **Q.**   Okay.  All right.  So that file ends in 0005; is that

19  correct?

20  **A.**   Yes.

21  **Q.**   Okay.  All right.  I'm going to show you what's been

22  marked as Government's Exhibit 53.

23       All right.  Do you recognize this file?

24  **A.**   Yes.

25  **Q.**   What's the filename on the phone that it came from?

1   A.   It's ING20200730-WA0005.

2   Q.   So is that the same as the attachment that we were just

3   looking at on 34 alpha?

4   A.   Yes.

5   Q.   WA0005.  Okay.

6        And just looking at the beneficiary information, does that

7   match the information I just showed on you Exhibit 34A?

8   A.   Yes.

9   Q.   All right.  And what's the amount sent here?

10  A.   The amount sent is $950 plus 10-dollar transfer fee.

11  Q.   Okay.  And I'm going to show you Exhibit 53 alpha, which

12  has been previously admitted.  I'll show that on the ELMO.

13       Oh, before I do that.  What's the last four of the PIN on

14  this one?

15  A.   It is 3786.

16  Q.   Okay.  All right.  Showing you on the document camera

17  Exhibit 53 alpha.  How does the PIN number at the top of this

18  compare?

19  A.   Pin number appears to be the same.

20  Q.   Okay.  And does all the other information appear to be the

21  same?

22  A.   Yes.

23  Q.   Okay.  All right.  Going back to Exhibit 34 alpha.

24  Looking at line 381.  There's another attachment now sent at

25  10:34 a.m.; is that right?

```
 1   A.   Yes.
 2   Q.   Okay.  That ends in 0007?
 3   A.   Yes.
 4   Q.   Okay.  And just to be clear, so that's at 10:34 a.m. and
 5   the last one was sent at 10:27 a.m.; is that right?
 6   A.   Yes.
 7   Q.   So seven minutes later?
 8   A.   Yes.
 9   Q.   All right.  I'm going to show you Government's Exhibit 54.
10   So pulling up 54.  Do you recognize this exhibit?
11   A.   Yes.
12   Q.   All right.  What time was this exhibit -- what time does
13   this receipt appear to have been sent -- or the money have been
14   sent that's codified by the receipt?
15   A.   July 30th, 2020 at 10:29 a.m.
16   Q.   Okay.  And I'll come back to the PIN.  The beneficiary of
17   this?
18   A.   Is Jose Heberto Peiro Nuñez.
19   Q.   Okay.  And who's the sender here?
20   A.   It's Gavino Perez, Perez, Aguilar.
21   Q.   Okay.  Okay.  And what's the amount?
22   A.   $950, plus 10-dollar transfer fee.
23   Q.   Okay.  Now, go back to line 34 alpha [sic] and just before
24   we -- so just to give you a chance here, so Jose Heberto Peiro
25   Nuñez appears to be the beneficiary.  And going back to line
```

*Direct Examination - J. Lee (by Mr. Ake)*

1    34 -- or Exhibit 34 alpha, line 369.

2        How does the body of that text message compare with the

3    beneficiary information?

4    **A.**    Appears to be the same.

5    **Q.**    And I'm going to show you what's been marked as

6    Government's Exhibit 54 alpha on the document camera, physical

7    exhibit seized out of the car.

8        Does this appear to be the same receipt that was depicted

9    in Exhibit 54?

10   **A.**    Yes.  It's a little faded, but it looks like the numbers

11   match.

12   **Q.**    Okay.  And the sender is -- is that the same sender,

13   Gavino Perez Perez Aguilar?

14   **A.**    Yes.

15   **Q.**    Okay.  All right.  Showing you the -- do you remember what

16   the registration information on M1 was of the -- I'll just pull

17   up Government's Exhibit 6 bravo.

18       So for Government's Exhibit 6, there were accounts

19   associated with what name?

20   **A.**    It's the iPhone.

21   **Q.**    Right.  The iPhone.  Which -- what -- the iPhone

22   accounts were associated with what personal name?

23   **A.**    Gavino Perez.

24   **Q.**    Okay.  Okay.  Going back to Exhibit 34 alpha.  There's an

25   incoming chat from Pariente 2.  So there's an incoming chat at

*Direct Examination - J. Lee (by Mr. Ake)*

1   11:05 on line 385.  What's that say there?

2   **A.**   It says, "Buddy, we're missing here the one for

3   Monserrat."

4   **Q.**   Okay.  And then that's followed by an incoming call and an

5   outgoing call; is that right?

6   **A.**   Yes.

7   **Q.**   And then at 390, what's that say?

8   **A.**   "The wrong one is one for David."

9   **Q.**   Keep reading.

10  **A.**   David Ullses Torres Gomez.

11       "That's how you write it."

12  **Q.**   And then there's another attachment sent at line 396 at

13  11:17; is that right?

14  **A.**   Yes.

15  **Q.**   And the filename on that?

16  **A.**   It's 20200730 at WA0015.

17  **Q.**   Okay.  Showing you what's been marked as Government's

18  Exhibit 55.  Okay.  Do you recognize this?  And can you tell me

19  if this is the filename that that was referring to in line --

20  **A.**   Yes.

21  **Q.**   -- in that previous line?

22  **A.**   Yes.

23  **Q.**   Okay.  So this is the jpeg that ends in 0015?

24  **A.**   Yes.

25  **Q.**   Okay.  And what does it show?

*Direct Examination - J. Lee (by Mr. Ake)*

1  A.   This shows the PIN number, the sender and the receiver and

2  the amount.  It's a money transfer receipt.

3  Q.   Okay.  And this is -- this is actually -- where's the --

4  the place that this is sent from?

5  A.   It's sent from --

6  Q.   Well, what city?

7  A.   Indianapolis, Indiana.

8  Q.   Okay.  At what time?

9  A.   At 11:16 a.m. on July 30th, 2020.

10 Q.   Okay.  And I'm just going to show you one more exhibit,

11 physical exhibit here, 55 alpha.

12      Does that appear to be the same as Exhibit 55?

13 A.   Yes.  Pin numbers match.

14 Q.   Pin number 7866?

15 A.   Yes.

16 Q.   And the sending time is 11:16 a.m. on July 30th?

17 A.   Yes.

18 Q.   Okay.  Now, going back to Exhibit 34 alpha.  Could you

19 read the outgoing text message at 399?

20      **MS. SCHWARTZ:**  Counsel, it's not on the screen.

21      **MR. AKE:**  Ah, that would be harder.  Thank you.

22 BY MR. AKE:

23 Q.   At line 399.

24 A.   "Check all the names carefully.  The ones receiving.  No

25 mistakes."

1  Q.   Okay.  And just out of -- sorry.  And 399, I think I cut

2  off of a word there by making it.  So go back and read 399

3  again?

4  A.   "Check all the names carefully.  The once receiving, the

5  money."

6  Q.   Okay.  And just in the original Spanish -- what was the --

7  this ends in el Papel; is that right, in the original Spanish

8  there?

9  A.   Can you ask the question again, please.

10  Q.   So in 399 on the -- in the body text with the Spanish, the

11  untranslated Spanish --

12  A.   Yes.

13  Q.   -- that sentence ends in el Papel; is that right?

14  A.   Yes.  Yes.

15  Q.   Okay.  All right.  Now, skipping down to line 412.  There

16  are five attachments starting at July 30th, 2020 at 7:00 p.m.;

17  is that right?  Or five outgoing attachments?

18  A.   Yes.

19  Q.   Okay.  And I'm going to show you Exhibit 56 first.

20       Okay.  And who's the beneficiary in this?

21  A.   It's Joanna Monserrat Romero Nuñez.

22  Q.   And what -- it says Culiacán, Sin., Mexico; is that right?

23  A.   Yes.

24  Q.   Okay.  And how much for?

25  A.   $950 plus 10-dollar transfer fee.

*Direct Examination - J. Lee (by Mr. Ake)*

169

```
 1   Q.   Okay.  And go back to Exhibit 34A, so scrolling back up to
 2   lines 378.  How does that compare to 378 there?
 3   A.   The name matches and --
 4   Q.   Okay.
 5   A.   -- the city matches?
 6   Q.   Okay.  Culiacán, Sinaloa; is that right?
 7   A.   Yes.
 8   Q.   Okay.  And going back to that just for a moment, just back
 9   to Exhibit 56.  Who's the sender here?
10   A.   Alejandra Trejo Morra.
11   Q.   Okay.  And the time of this receipt?
12   A.   It's July 30th, 2020 at 6:57 p.m.
13   Q.   Okay.  I'm going to show you Government's Exhibit 57.
14        So start -- do you recognize what this is here?
15   A.   Yes.  Where are we?  It's a text message.
16   Q.   So text message and, it's between which phones?
17   A.   46431.
18   Q.   So --
19   A.   The number is not associated with any number.
20   Q.   So this is -- do you know which phone this was taken from?
21   A.   No, I do not.
22   Q.   Exhibit 57?
23        All right.  Looking over --
24   A.   It's the Android 3078.  It's M3.
25   Q.   So can you say that confidentially?
```

1  A.   I'm sorry?

2  Q.   Can you say that confidently?  It's taken from M3?

3  A.   Yes.

4  Q.   Okay.  All right.  So are these messages in Spanish or

5  English?

6  A.   They're in Spanish.

7  Q.   Okay.  So was -- and is there any name associated with the

8  telephone number that's pulled -- that Cellebrite was able to

9  pull from --

10  A.   No.

11  Q.   -- the context?  Okay.

12       And I'll show you Exhibit 57A.  All right.  So is this the

13  same thing, just with English translations at column P?

14  A.   Yes.

15  Q.   Okay.  Now, going to July 30th at 6:15 p.m.  And this is

16  running newest to oldest here.  But looking at line 76, there's

17  a name and an address there?

18  A.   Yes.

19  Q.   Does that match the name and address that was on the

20  receipt that I just showed you on --

21  A.   Yes.

22  Q.   -- Government's Exhibit 56?

23  A.   Yes.

24  Q.   Okay.  So what's the date -- or the time that this text

25  message was sent as an outgoing text?

1  **A.**   July 30th, 2020 at 6:15 p.m.

2  **Q.**   Okay.  And going back, what's the time it was sent?

3  **A.**   July 30th, 2020 at 6:57 p.m.

4  **Q.**   Okay.  All right.  So just reading up from the -- upwards

5  here, starting with line 75 and going up.  After the

6  information is sent, what's the response?

7  **A.**   "Okay.  I'll take care of it shortly, okay.

8      "Okay, thank you."

9  **Q.**   Okay.  And what was that -- what time was that last one?

10  **A.**   It's July 30th, 2020 at 6:52 p.m.

11  **Q.**   Okay.  All right.  So just a couple minutes before it was

12  sent?

13  **A.**   Yes.

14  **Q.**   Okay.  Okay.  Going back to Exhibit 34A.

15      What time was the picture, at Exhibit 56, associated with

16  line -- on line 412, that image we were just looking at with

17  Exhibit 56 in it?

18  **A.**   July 30th.

19  **Q.**   What time was that --

20  **A.**   July 30th, 2020 at 7:00 p.m.

21  **Q.**   Okay.  So just a few minutes later; is that --

22  **A.**   Yes.

23  **Q.**   Okay.  And that was -- again, this is 34 alpha, that was

24  sent from the user of M3 to Pariente 2, correct?

25  **A.**   Yes.

*Direct Examination - J. Lee (by Mr. Ake)*

172

1  Q.   And moving to the next row, the date changes to July 31st,
2  correct?
3  A.   Yes.
4  Q.   To 12:00 p.m.
5       And then there's an image file associated with that that
6  ends in 000; is that correct?
7  A.   Yes.
8  Q.   Okay.  Showing you what's been marked as Government's
9  Exhibit 58.  All right.  That was sent at 12:00 p.m. on
10  July 31st to Pariente 2.  What time is this?
11  A.   July 30, 2020 at 11:06 a.m.
12  Q.   Okay.  And just -- I skipped over this part, but is this
13  that same jpeg, the one ending in 0000?
14  A.   It is a jpeg.
15  Q.   It is that?  Okay.  Okay.  And this -- the beneficiary.
16  A.   Is Joana Monserrat Romero Nuñez.
17  Q.   All right.  And this is -- just what city is this sent
18  from?
19  A.   Indianapolis, Indiana.
20  Q.   Okay.  All right.  And just for the record, how much was
21  sent?
22  A.   $950 plus 10-dollar transfer fee.
23  Q.   Okay.  And going back to 34A, line 388.  How does that
24  compare with the information sent by Pariente 2?
25  A.   It appears to be the same.

*Direct Examination - J. Lee (by Mr. Ake)*

173

1  Q.   Okay.  All right.  Staying on Exhibit 34A, moving to the

2  next attachment.  And just to be exact here, so the image files

3  that were sent, these five image files, the ones sent on

4  July 31st, did these appear to be sent simultaneously in line

5  414, 415, 416 -- sorry -- 413 through 416?

6  A.   Yes, all four has the same sent time.

7  Q.   Okay.  So is it fair to read that those are four

8  attachments sent on a single chat message?

9  A.   Yes.

10 Q.   Okay.  All right.  Now, just referring back to the second

11 one here on July 31st at -- so W- -- the one ending in 03, I'm

12 going to show you Government's Exhibit 59.

13     Is that the jpeg ending in 0003?

14 A.   Yes.

15 Q.   Okay.  And what time is this sent?

16 A.   This was sent on July 31st, 2020 at 9:53 a.m.

17 Q.   In what city?

18 A.   In Indianapolis, Indiana.

19 Q.   Okay.  And who's it sent by?

20 A.   It was sent by Eleazar Gonzalez Caro.

21 Q.   Okay.  And who's it sent to?

22 A.   Mirna Nuñez, Nuñez.

23 Q.   Okay.  In what city?

24 A.   Culiacán, Mexico.

25 Q.   Okay.  With the same Sin. state abbreviation?

1   A.   Yes.

2   Q.   Okay.  Okay.  And just for the record, how much was sent

3   here?

4   A.   $950 plus 10-dollar transfer fee.

5   Q.   Okay.  And going back to Exhibit 34A, line 376.

6        How does that compare with the recipient information that

7   was provided by Pariente?

8   A.   Appears to be the same.

9   Q.   Okay.  Moving now to the third attachment.  I'm sorry this

10  is taking -- this is painful, I realize.  Going down to the

11  third attachment that ends in WA0002.  I'm going to show you

12  Government's Exhibit 60.  Is that the same jpeg ending in 0002?

13  A.   Yes.

14  Q.   Okay.  And what time was this sent?

15  A.   July 31st, 2020 at 11:18 a.m.

16  Q.   Okay.  And it was sent from what city?

17  A.   Indianapolis, Indiana.

18  Q.   Okay.  And the recipient?

19  A.   The beneficiary is Maria De Jesus Nuñez.

20  Q.   Okay.  And from -- in Culiacán, Sin., Mexico?

21  A.   Yes.  Culiacán, Sin., Mexico.  Yes, same.

22  Q.   Okay.  All right.  Going back to 34A, line 380.

23       How does that compare with the beneficiary information on

24  Exhibit 60?

25  A.   It appears to be the same.

1  Q.   Okay.  Going to the fourth attachment, the one ending in

2  0001.  I'm going to show you Government's Exhibit 61.

3       Okay.  Is that the same jpeg ending in 0001?

4  A.   Yes.

5  Q.   Okay.  And what time's this sent?

6  A.   7/31/2020 at 9:55 a.m.

7  Q.   Okay.  And who's the sender?

8  A.   Lucero Quiros Peña.

9  Q.   And the beneficiary?

10 A.   Beneficiary, Abigail Nuñez Quinenez --

11 Q.   Okay.

12 A.   -- at Culiacán, Sin., Mexico.

13 Q.   Okay.  And, again, that's -- it's the same amount as the

14 other ones?

15 A.   Yes, 950 plus 10.

16 Q.   Okay.  All right.  Going back to Exhibit 34A, line 379.

17      How does that compare with the highlighted information

18 sent by Pariente 2?

19 A.   Appears to be the same.

20 Q.   Okay.  Now, did you also help with downloading location

21 data from the iPhone, Exhibit 6, for the period of July 30th to

22 August 5th?

23 A.   Yes.

24 Q.   Okay.  Going back to Google Earth and now switching from

25 Government's Exhibit 27 to Exhibit -- Government's Exhibit 62

1  alpha.

2      All right.  Now, looking at those, those look like the

3  plots were associated with Exhibit 62 alpha for the period --

4  which was an extract from the period of July 30th to

5  August 5th --

6  A.    Yes.

7  Q.    -- location data?  Okay.

8      All right.  So just going back on 34 alpha, those four --

9  those simultaneous four text messages were sent all just after

10  noon on July 31st, correct?

11 A.    Yes.

12 Q.    Okay.  So going to July 31st and there's a plot right

13 before noon on July 31st.  All right, as that was zooming in,

14 could you tell what state that was going to?  Approximately

15 what state was...

16 A.    Colorado.

17 Q.    Okay.  All right.  And then in -- looking down here just a

18 little bit on the left on the Google Earth, this is

19 Government's Exhibit 62 again.

20      There's a time associated with an image file 3033.  What's

21 the time associated with that?

22 A.    July 31st, 2020 at 6:00 p.m.

23 Q.    Okay.  All right.  And that's -- just zooming out a little

24 bit here.  Can you tell what state that is at this point?

25 A.    Is that Utah?  Yes.

1  Q.   Okay.  And now I'm going to show you Government's

2  Exhibit 63.  So is Government's Exhibit 63, is that image

3  3033HEIC?

4  A.   Yes.

5  Q.   Okay.  And that was located on M1?

6  A.   Yes.

7  Q.   Okay.  I'm showing you Government's Exhibit 64.  Is this

8  also found on M1?

9  A.   Yes.

10 Q.   Okay.  Now, showing you side by side Exhibit 64 that you

11 just told me came from M1 and then what we previously showed as

12 Exhibit 60 found on M3, are those the same?

13 A.   Yes, they appear to be identical.

14 Q.   Okay.  So that was on Exhibit 60.  It was sent to

15 Pariente 2 from the Samsung phone, right?

16 A.   Yes.

17 Q.   Okay.  And then in Exhibit 64 it's on the iPhone?

18 A.   Yes.

19 Q.   Okay.  Now, showing you Exhibit 65 on the left.  Is this

20 also an exhibit that was found on M1, the iPhone?

21 A.   What's the exhibit number?

22 Q.   This is 65.

23 A.   65, yes.

24 Q.   Okay.  And then on the right I'm going to show you

25 Exhibit 60 found -- that wasn't it.

1        Sorry.  Exhibit 65 and -- sorry.  Let's do that again.

2   Exhibit 61 on the right.

3        So Exhibit 61 taken from M3, which you testified to a

4   moment ago, and then Exhibit 65 taken from M1; is that correct?

5   **A.**    Yes.

6   **Q.**    Okay.  Okay.  Again, showing you on the left -- I'm going

7   to show you Government's Exhibit 66.

8        And this was found on M1, the iPhone?

9   **A.**    Yes.

10  **Q.**    Okay.  And then on the right, I'm going to show you

11  Government's Exhibit 59.

12       And are those the same?  Are those the same?

13  **A.**    Yes.

14  **Q.**    And Exhibit 59 was taken from M3, the Pariente -- sent to

15  Pariente?

16  **A.**    Yes.

17  **Q.**    Okay.  Finally on this, showing you on the left

18  Government's Exhibit 67, which, again, is taken from M1; is

19  that correct, the white iPhone?

20  **A.**    Yes.

21  **Q.**    All right.  And on the right, Exhibit 58, which you

22  previously identified as coming from M3 on a -- that it was

23  sent to Pariente 2; is that right?

24  **A.**    Yes.

25  **Q.**    Okay.  Now, based on its location data that we were just

*Direct Examination - J. Lee (by Mr. Ake)*

179

1  looking at with a noon plot in Colorado and a Utah plot at

2  6:00 p.m., is it fair to say that the white iPhone was in

3  Indianapolis that day?  So if the white iPhone was in Denver at

4  12:00 p.m. and in Utah at 6:00 p.m. on a road trip.  Okay.  So

5  I'm going to show you Government's --

6          THE COURT:  I'm sorry.  Did the witness answer the

7  question or are you moving on?

8          THE WITNESS:  Yes, no.

9  BY MR. AKE:

10 Q.   So you said your answer was no --

11 A.   No.

12 Q.   -- it would not appear to have been --

13 A.   No.

14 Q.   -- in Indianapolis on the day those images were taken?

15 A.   Not within those hours, no.

16 Q.   Okay.  Going to show you Government's Exhibit 68.

17      Now, what does this show?

18 A.   An image of a -- looks like a four-door Honda Accord,

19 white.

20 Q.   Okay.  And does this correspond with a image that was

21 taken from one of the phones in this case?

22 A.   M1, yes.

23 Q.   Okay.  M1, which is the white iPhone?

24 A.   White iPhone.

25 Q.   Okay.  Showing you Government's Exhibit 69 -- or,

*Direct Examination - J. Lee (by Mr. Ake)*

1  actually -- so do you have the creation date for this picture,

2  for 68, before I go on?

3  **A.**   No, I do not.

4  **Q.**   Okay.  All right.  Showing you Government's Exhibit 69.

5     Okay.  What is that -- does that come from the white

6  iPhone as well?

7  **A.**   Yes.

8  **Q.**   Okay.  Do you have the date of creation for this one?

9  **A.**   I do not have that with me.

10 **Q.**   Okay.  All right.  And just for the record, what does this

11 appear to show?

12 **A.**   It shows -- appears to show selfie.

13 **Q.**   Or -- would this be a selfie or would this be taken by

14 somebody else?

15    (Overlapping speakers.)

16 **A.**   I'm sorry, not -- but a photo taken --

17 **Q.**   Does this appear to be the user of phone M1?

18 **A.**   Yes.

19 **Q.**   Okay.  Showing you Government's Exhibit 70.

20    Okay.  Is this also taken from M1?

21 **A.**   Yes.

22 **Q.**   Okay.  And do you recognize what that --

23 **A.**   Looks like --

24 **Q.**   Or just describe what it shows.

25 **A.**   Yeah, looks like tall build- -- sky towers --

*Direct Examination - J. Lee (by Mr. Ake)*

1  **Q.**   Okay.

2  **A.**   -- skyscrapers.

3  **Q.**   And do you have the creation date for this one?

4  **A.**   No.

5  **Q.**   Okay.  All right.  Well, going to Government's Exhibit 62,

6  which is now the Google Earth plot on August 1st.

7      So early in the morning, where does M1 appear to be?

8  **A.**   On August 1st, 2020 at 2:58 a.m.

9  **Q.**   Yeah, I'll zoom back out a little bit.

10  **A.**   It's in -- just outside -- looks like in Nevada.

11  **Q.**   Okay.

12  **A.**   Just before --

13  **Q.**   And then expanding the timeline out.  Do we start seeing

14  tracks around Los Angeles area --

15  **A.**   Yes.

16  **Q.**   -- later that day?  Okay.

17      Now, back to Exhibit 34 alpha.  These are the texts with

18  Pariente 2.  There's an incoming message on July 31st at lines

19  418, 419.  Can you read that?

20  **A.**   Dulce, looks like a name.

21  **Q.**   Yeah, like Dulce; is that --

22  **A.**   Yeah.  "Dulce Felix Zazueta."

23  **Q.**   Okay.  Read that down -- or next --

24  **A.**   "Send 1,000 to this name."

25  **Q.**   Okay.  And then outgoing text at 6:46 on July 31st?

*Direct Examination - J. Lee (by Mr. Ake)*

| | |
|---|---|
| 1 | **A.**   "It's in Culiacán, isn't it?" |
| 2 | **Q.**   Okay.  And then at 10:15 there's another outgoing text? |
| 3 | **A.**   "Buddy, I'm here." |
| 4 | **Q.**   And about 45 minutes or 50 minutes later, outgoing text at |
| 5 | line 424? |
| 6 | **A.**   "I was coming here to Los Angeles.  It's 30 minutes away." |
| 7 | THE COURT:  Counsel, can we have a sidebar for a |
| 8 | second. |
| 9 | **(Whereupon, the following conference was held at the** |
| 10 | **bench:** |
| 11 | THE COURT:  Can you hear me?  And Mr. Sanchez, is -- |
| 12 | I'm inquiring about the anticipated duration of the |
| 13 | remainder of the examination, only because our jury is |
| 14 | downright withered. |
| 15 | And I don't want to cut you off if you're about to finish |
| 16 | up.  But if you are, like, really not so much about to finish |
| 17 | up, I would say let's resume tomorrow because they just look |
| 18 | exhausted. |
| 19 | MR. AKE:  Yes, Your Honor, we can finish up tomorrow |
| 20 | morning. |
| 21 | THE COURT:  How much longer do you think you have?  I |
| 22 | mean, and I'm not going to hold you to it.  I'm just trying to |
| 23 | get an idea. |
| 24 | MR. AKE:  Oh.  Honestly, it's probably another hour or |
| 25 | so.  We're not going to finish up by 5:00. |

183

1          THE COURT:  Very good.  Then I think it would be
2  appropriate to recess if you feel that you are at a spot that
3  you -- if there's somewhere -- if there's another few questions
4  that you want to get out or if you're at a good spot to stop.
5  I'm not trying to break your neck on it.  I just want to let
6  them get some rest.
7          MR. AKE:  This isn't necessarily a bad place to stop.
8          THE COURT:  Okay.
9          MR. AKE:  It's about to get a little bit more
10  interesting, but...
11          THE COURT:  I'll promise them that.  Okay.  All right.
12  Thank you.
13      (Laughter.)
14  **(Whereupon, the bench conference was concluded.)**
15          THE COURT:  All right, ladies and gentlemen, we are
16  going to recess for the day, and we will resume tomorrow again
17  at 9:00 a.m.
18      And, Mr. Ake, I understand you have approximately another
19  hour with Sergeant Lee?
20          MR. AKE:  Hopefully a little less, but I hate to --
21          THE COURT:  I'm not going to hold you to it.  I just.
22          MR. AKE:  -- overpromise and underdeliver.
23          THE COURT:  No, no, no.  Just a little housekeeping.
24      Okay.  So we will see you all tomorrow at 9:00.  And I'm
25  just going to just remind you about the rules on no discussions

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

**JA420**

1  or research until your verdict is complete.

2      And with that I will wish you a safe and pleasant evening,

3  and I appreciate your attention during this afternoon's

4  testimony.  Thank you.

5          **THE CLERK:**  All rise for the jury.

6      (Jury exits.)

7          **THE COURT:**  Thank you.  Everyone can have a seat.

8      Mr. Ake, I hope I didn't offend.  I just know that the --

9          **MR. AKE:**  No, no.

10          **THE COURT:**  -- the content of the testimony is dense.

11          **MR. AKE:**  This is brutally boring, Your Honor, so I --

12          **THE COURT:**  I didn't mean to suggest that your

13  presentation is boring.

14          **MR. AKE:**  No, no.  No offense taken.

15          **THE COURT:**  It's just that it's a dense and repetitive

16  series of questions, and I want to be sure that they're as

17  attentive as they can be expected to be.

18          **MR. AKE:**  Yes, Your Honor.

19          **THE COURT:**  So I just thought they needed a rest.

20          **MR. AKE:**  Fortunately we're through the very dull part

21  and so there's -- it gets a little bit more interesting for the

22  finish here.

23          **THE COURT:**  Okay.  All right.  Very good.  Is there

24  anything you need from me?

25      Now, what's the scoop on jury instructions?

 1          **MR. GUILLAUME:**  Your Honor, I don't have anything to

 2  add, and I almost finished reading through those.  I don't

 3  anticipate having any objections, Your Honor.  If I could just

 4  listen to it tomorrow morning.

 5          **THE COURT:**  That's fine.

 6          **MR. GUILLAUME:**  And also, Your Honor, just out of

 7  curiosity, every judge is different, but most send back the

 8  jury instruction.  I didn't know if Your Honor had a practice

 9  if you were going to send them back as well.

10          **THE COURT:**  I always send them back.

11          **MR. GUILLAUME:**  Okay.  Wonderful.  I was going to make

12  a request.

13          **THE COURT:**  Yeah.  I mean, you just can't possibly be

14  expected to remember all that stuff.  Yeah.

15          **MR. AKE:**  So, Your Honor, we have a paper copy of the

16  jury instructions if you want to start making any handwritten

17  notes and then we can make any changes and certainly

18  incorporate anything that later gets changed, but --

19          **THE COURT:**  That would be fine.  That would be fine.

20  This is a work in progress at this point, I understand, right?

21          **MR. GUILLAUME:**  Yes.  And I'll raise it tomorrow

22  morning if I have an issue.  It may not be an issue at all, but

23  I just thought of something, but I'll talk to the Government,

24  that's fine.

25          **THE COURT:**  Do you think it's best that I wait, then?

```
 1   I mean, and I'm not trying to -- I don't want to review it if
 2   you think -- but most of it's not --
 3        (Overlapping speakers.)
 4        MR. GUILLAUME:  No, no, I wasn't talking about jury
 5   instructions, I was talking about something else.
 6        THE COURT:  Oh, okay.  Well, then, I'll take the jury
 7   instructions.
 8        MR. AKE:  We think it would be rather surgical to any
 9   changes.
10        THE COURT:  Great.  Thanks.  I appreciate it.
11     If you would be able to email them to me as well, that
12   would be great.  Otherwise, Mr. Guillaume, is there anything
13   you want to address now?
14        MR. GUILLAUME:  No, no.
15        THE COURT:  You seemed a little maybe --
16        MR. GUILLAUME:  No.  I'll talk to the Government
17   and -- it's not a big deal, Your Honor.
18        THE COURT:  Okay.
19        MR. GUILLAUME:  Thank you.
20        THE COURT:  Very good.  All right.  Court's in recess.
21   I'll see you at 9:00.
22        (Court adjourned at 4:43 p.m.)
23
24
25
```

```
 1              CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4       I, Ronda J. Thomas, Registered Merit Reporter, Certified

 5  Realtime Reporter, in and for the United States District Court

 6  for the District of Maryland, do hereby certify, pursuant to 28

 7  U.S.C. § 753, that the foregoing is a true and correct

 8  transcript of the stenographically-reported proceedings held in

 9  the above-entitled matter and the transcript page format is in

10  conformance with the regulations of the Judicial Conference of

11  the United States.

12

13                      Dated this 2nd day of November 2022.

14

15              Ronda J. Thomas

16              Ronda J. Thomas, RMR, CRR
                Federal Official Reporter
17

18

19

20

21

22

23

24

25
```

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

**JA424**