No. 22-4477

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

Appellee,

v.

ALEXANDER JUAREZ-SANCHEZ

Appellant.

*Appeal from the United States District Court for the
District of Maryland, Northern Division
Honorable Julie J. Rubin, District Judge*

BRIEF OF APPELLEE
UNITED STATES OF AMERICA

**Erek L. Barron**
*United States Attorney*

**Adam K. Ake**
*Assistant United States Attorney*
**6500 Cherrywood Lane, Suite 200
Greenbelt, Maryland 20770
(301) 344-4433**

**March 28, 2023**                     *Attorneys for the Appellee*

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION..............................................................1

STATEMENT OF THE ISSUES...............................................................1

STATEMENT OF THE CASE...................................................................2

STATEMENT OF FACTS ........................................................................3

    I.      MARYLAND STATE POLICE TRAFFIC STOP ..............................3

    II.     MOTIONS HEARINGS ......................................................................7

    III.    TRIAL .................................................................................................10

         A.    Government's Case in Chief....................................................10

         B.    Closing Argument ....................................................................22

SUMMARY OF ARGUMENT ................................................................23

ARGUMENT ............................................................................................25

    I.      THE DISTRICT COURT CORRECTLY DENIED JUAREZ-SANCHEZ'S MOTION TO SUPPRESS THE WARRANTED SEARCH OF HIS CELL PHONES...................................................25

         A.    Standard of Review..................................................................25

         B.    The District Court Properly Denied Juarez-Sanchez's Motion to Suppress Cell Phone Evidence because the Warrant was Supported by Probable Cause. ................................................26

         C.    At Minimum, the Good Faith Exception Applies in this Case. 31

i

II.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION
      BY ALLOWING TROOPER MILLER TO TESTIFY AS BOTH
      A FACT AND EXPERT WITNESS DURING TRIAL. ...................33

      A.   Standard of Review.................................................................33

      B.   Trooper Miller's Credentials were More than Adequate to
           Support Expert Qualification for the Limited Testimony he
           Provided. ...................................................................................33

      C.   The District Court Took Appropriate Steps to Avoid Jury
           Confusion. .................................................................................37

      D.   Any Alleged Errors Were Harmless. .........................................40

III.  THE PROSECUTOR'S ARGUMENT THAT TEXT MESSAGE
      REFERENCES TO "TACOS" ACTUALLY REFERRED TO
      ILLEGAL DRUGS WAS NOT ERROR, MUCH LESS
      REVERSIBLE ERROR ......................................................................41

      A.   Standard of Review.................................................................41

      B.   The Prosecutor's Argument was not Improper........................41

      C.   Regardless, The Comments Were Harmless and Did Not
           Prejudice Juarez-Sanchez.........................................................44

CONCLUSION.....................................................................................46

STATEMENT WITH RESPECT TO ORAL ARGUMENT ................................47

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ii

# TABLE OF AUTHORITIES

## Cases

*Illinois v. Gates*, 462 U.S. 213 (1983) ....................................................25

*Maryland v. Pringle*, 540 U. S. 366 (2003) ............................................31

*United States v. Allen*, 631 F.3d 164 (4th Cir. 2011)...............................27

*United States v. Baptiste*, 596 F.3d 214 (4th Cir. 2010)..........................37

*United States v. Bosyk*, 933 F.3d 319 (4th Cir. 2019) .............................30

*United States v. Chorman*, 910 F.2d 102 (4th Cir. 1990)........................41

*United States v. Garcia*, 752 F.3d 382 (4th Cir. 2014)................................. *passim*

*United States v. Gibbs,* 680 F. Appx 184 (4th Cir. 2017*)*...........................7

*United States v. Gray*, 491 F.3d 138 (4th Cir. 2007)................................27

*United States v. Johnson*, 114 F.3d 435 (4th Cir. 1997)...........................25

*United States v. Leon*, 468 U.S. 897 (1984) .............................................8

*United States v. Moody*, 931 F.3d 366 (4th Cir. 2019)............................28

*United States v. Orozco*, 41 F.4th 403 (4th Cir. 2022) ............................29

*United States v. Saint Louis*, 889 F.3d 145 (4th Cir. 2018)....................41

*United States v. Scheetz*, 293 F.3d 175 (4th Cir.), ..................................... 42, 44, 45

*United States v. Smith*, 919 F.3d 825 (4th Cir. 2019),.............................. 38, 39

*United States v. Wellman*, 663 F.3d 224 (4th Cir. 2011)........................26

iii

*United States v. Wilhelm*, 80 F.3d 116 (4th Cir. 1996)...........................................25

*United States v. Wilson*, 484 F.3d 267 (4th Cir. 2007)................................... 33, 37

**Statutes**

8 U.S.C. § 1326..............................................................................................2

18 U.S.C. § 3231 ...........................................................................................1

21 U.S.C. § 841 .............................................................................................2

21 U.S.C. § 846 .............................................................................................2

28 U.S.C. § 1291 ...........................................................................................1

**Other Authorities**

Fed. R. Evid. 702 ........................................................................... 33, 43

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this federal criminal case under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.  Whether the district court correctly found that sufficient probable cause existed to support warranted searches of cell phones taken from a vehicle holding two kilograms of fentanyl, one kilogram of heroin, and nearly $47,000 in U.S. currency discovered in hidden compartments pursuant to a traffic stop initiated by one of the Maryland State Police's most senior drug trafficking interdiction officers, whose training and experience counseled that the two occupants were likely involved in drug trafficking.

II. Whether the district court acted within the scope of its proper discretion in permitting the arresting officer, who testified to the circumstances of the stop and vehicle search as a fact witness, to be recalled later in the trial to testify as an expert in the areas of the source, manufacture, and transportation of fentanyl into the United States; and if so, whether it was harmless.

III. Whether a prosecutor's argument in closing that the use of the term "taco" in text messages between Appellant and a Mexico-based correspondent, to

1

whom Appellant had transferred nearly $12,000 over the preceding week via aliases and intermediaries, actually referred to fentanyl and heroin rather than food was improper when no witness had formally opined that it was coded language; and if it was improper, whether it was harmless in light of other evidence of guilt.

## STATEMENT OF THE CASE

On August 5, 2020, Appellant Alexander Juarez-Sanchez was arrested in Washington County, Maryland, following a traffic stop by Maryland State Police ("MSP") on Interstate 81 ("I-81") near Hagerstown, which yielded approximately two kilograms of fentanyl, one kilogram of heroin, and nearly $47,000 in U.S. currency.  On May 19, 2021, a grand jury sitting in the District of Maryland returned an indictment charging Juarez-Sanchez with Conspiracy to Distribute Controlled Substances (including 400 grams or more of fentanyl and 100 grams or more of heroin) in violation of 21 U.S.C. § 846 in Count One; Possession with Intent to Distribute the same amounts of heroin and fentanyl in violation of 21 U.S.C. § 841(a) in Count Two; and Illegal Reentry in violation of 8 U.S.C. § 1326 in Count Three. JA 13-15.

Juarez-Sanchez ultimately proceeded to trial on May 27, 2022. JA 7.  After a four-day trial, on May 31, 2022, the jury returned guilty verdicts on all counts and made special verdict findings on all alleged drug quantities.

On July 25, 2022, the district court sentenced Juarez-Sanchez to imprisonment of 210 months on Counts One and Two and a concurrent sentence of 120 months on Count Three.  JA 8.  Juarez-Sanchez timely appealed his conviction.  JA 9.

## STATEMENT OF FACTS

### I.      MARYLAND STATE POLICE TRAFFIC STOP

This case began with a routine traffic stop on the morning of August 5, 2020. That morning, Master Trooper Craig Miller, a 28-year MSP veteran assigned to a trafficking interdiction team, was observing the northbound lane of I-81 outside of Hagerstown.  JA 90-93.  Just before 9:07 a.m., Trooper Miller saw a white Honda Accord sedan closely following the vehicle ahead of it.  JA 93-94.  Trooper Miller initiated a traffic stop.  JA 93-94.  The Accord, driven by Juarez-Sanchez's co-defendant, Domingo Ramirez-Roblero ("Roblero"), pulled over and Trooper Miller approached the driver's side window.  JA 98.  After Trooper Miller asked Roblero for his driver's license and vehicle registration, Roblero stated he did not have his license and did not know who the vehicle was registered to.  JA 98. Juarez-Sanchez, sitting in the front passenger seat, remained silent during this exchange.  JA 99.

3

Trooper Miller asked Roblero to exit the vehicle and stand in front of his cruiser, which was equipped with a dash camera and voice recorder. As Trooper Miller continued questioning Roblero, he became increasingly suspicious. Roblero hesitated to provide his passenger's (Juarez-Sanchez) name, nervously snapping his fingers before stating it was "Miguel" without providing a last name. JA 100-01. Roblero also provided a stumbling answer to where he had been and where he was going, and he was visibly nervous, trembling, and sweating. JA 101.

Trooper Miller requested a K-9 scan of the Accord. JA 102. Before the K-9 scan began, Juarez-Sanchez was removed from the vehicle and brought back with Roblero to wait in front of Trooper Miller's cruiser. JA 103. At that time, Juarez-Sanchez was carrying a black Samsung A10 cell phone (ultimately admitted into evidence as Gov't's Exh. 7) and actively texting and placing voice calls. JA 103-04, JA 455. Approximately fifteen minutes into the stop, at 9:22 a.m., the K-9 handler notified Trooper Miller that the dog had alerted for the presence of narcotics. JA 104-05.

Trooper Miller, assisted by another trooper, began searching the Accord for drugs. Within a few minutes, Trooper Miller found a kilogram-sized "brick" wrapped in black tape inside a McDonald's brown paper bag in a void between the glove compartment and the vehicle's front right quarter panel (in the front passenger

4

area of the vehicle, where Juarez-Sanchez had been seated). JA 55, 106-07, 286. Subsequently, Trooper Miller and his fellow officer discovered a second black-wrapped kilogram-sized "brick" under the console between the driver's and passenger seats, JA 56, and a red-wrapped "brick" directly under Juarez-Sanchez's seat cushion, JA 57. *See also* JA 108-09, 291. In voids behind the plastic trim adjacent to the folding rear seatback cushion, Trooper Miller discovered $46,810 in cash in plastic grocery bags. JA 60. In a backpack in the vehicle's trunk, officers found a "grim reaper" statuette and latex gloves. JA 112. Trooper Miller also located another black Samsung A10 (ultimately admitted at trial as Gov't's Exh. 8) inside the car. JA 310.

Trooper Miller arrested both men, who provided false names at booking. Juarez-Sanchez provided his name as "Juan Florez" and an Indianapolis address, but little else. JA 72, 113. The narcotics were presumptively tested by a forensic chemist and preliminarily determined to be fentanyl (in the two black-wrapped "bricks") and a heroin/fentanyl mixture (in the red-wrapped "brick").[1] Each "brick" package contained just under 1 kilogram of narcotics.

---

[1]    Later confirmatory tests revealed the red package only contained heroin.

5

Five days after the arrest, Trooper Miller obtained search warrants from a state judge for the contents of the three seized phones. JA 58-71. In each warrant affidavit, Trooper Miller recounted the circumstances of the traffic stop, the results of the presumptive drug test, and recounted his experience that drug traffickers' cell phones typically contain evidence of drug sales and delivery coordination. JA 60, 67. He gained this experience, he explained, from his training, his prior investigations, and his conversations with other law enforcement officials, concerned citizens, and people engaged in criminal activity. JA 59, 66. He also explained that Juarez-Sanchez was a passenger in the vehicle and that officers had recovered kilograms of suspected narcotics in the passenger area of the vehicle. JA 59-60, 66-67. In his warrant applications, Trooper Miller requested permission to search all three cell phones for such evidence in voice messages, photographs, contacts, text messages, call logs (incoming, outgoing, and missed calls), and GPS location information. JA 61, 68.

On September 13, 2021, Juarez-Sanchez's counsel moved to suppress evidence recovered from the two Samsung A10 cell phones pursuant to the warrants. JA 23-26. In the motion, Juarez-Sanchez argued that Trooper Miller's affidavits did not establish sufficient cause to believe evidence of a crime would be found on the devices. JA 24.

## II.   MOTIONS HEARINGS

At the April 25, 2022, pretrial motions hearing, the district court took up Jua-rez-Sanchez's motion to suppress the cell phone search results, along with challenges to the validity of the traffic stop, the warrantless vehicle search, and the voluntariness of Juarez-Sanchez's post-arrest statements.[2]  JA 84.  During that hearing, Trooper Miller testified about the events consistent with how he conveyed them in the affidavits, and the government also played the recording of the stop, which Trooper Miller elucidated.  JA 88-125.  Following Trooper Miller's testimony, the district court heard arguments, then ruled on the issues presented.  Specifically regarding Juarez-Sanchez's challenge to the cell phone search, the district court observed:

> It's abundantly clear to me that the affidavits in question provided sub-stantial grounds to support Judge Bean's finding that there was proba-ble cause that investigators would discover evidence of drug trafficking based upon the lawful search of the car and almost $47,000 that was seized, as well as the narcotics that were located.
>
> There's simply no basis to suppress the searches of those two Samsung phones.  The three components of the Fourth Circuit's warrant require-ment have been satisfied.  And it's well established, as most recently as by the Fourth Circuit in *United States v. Gibbs*, [680 F. App'x 184 (4th Cir. 2017)], that a cell phone is a recognized tool of the trade in drug

---

[2]   Juarez-Sanchez informed the district court that he would submit to deciding the motion to suppress statements on the court filings, so no evidence or argument was taken on that motion.  JA 87.

dealing. And the particularity requirement was certainly satisfied with respect to the information provided.

In any event, we haven't, we haven't discussed this, but in terms of any good faith exception, if necessary, there's no indication that these affidavits were literally falsified, or that Judge Bean was biased in some way. And the [*United States v.*] *Leon*[, 468 U.S. 897 (1984),] exception would certainly apply, if necessary, although we don't even need to get that far with it.

So, accordingly, for those reasons, the … defendant's motion to suppress tangible and digital and digital and derivative evidence as to the cell phone searches, Paper Number 25, will be denied.

JA 147-52. The district court issued a written memorandum order to the same effect the following day, April 26, 2022. JA 158-72.

On May 11, 2022, after learning that the government planned to call Trooper Miller twice during trial, once as a fact witness and then a second time as an expert witness on fentanyl and heroin trafficking, Juarez-Sanchez filed a motion *in limine* to preclude such recall, making arguments like those in his opening brief. JA 173-76, Def.'s Brief at 12-14. The government replied on May 14, 2022, informing the district court that the government planned to call Trooper Miller using a bifurcated testimony method to clearly delineate fact and expert testimony to avoid the pitfalls identified by this Court in *United States v. Garcia*, 752 F.3d 382, 391 (4th Cir. 2014). JA 177-83.

8

At a May 25, 2022, hearing on these motions, the district court heard argument on the expert and bifurcated testimony issues. JA 184, 207-10. Juarez-Sanchez's counsel clarified that he did not oppose the substance of what the government planned to have Trooper Miller offer expert testimony on, only "the witness himself." JA 207. The district court denied Juarez-Sanchez's request so long as the government agreed to put multiple witnesses between Trooper Miller's fact testimony and his expert testimony and took other measures to prevent confusion among members of the jury. JA 208.

Juarez-Sanchez also moved to preclude any attempt by the government to tie his client to the Sinaloa Cartel. JA 204. Although Juarez-Sanchez's phone contained multiple pictures of money transfer receipts documenting $950-$1,000 payments to various nominee recipients in Sinaloa and a second Mexican state which Juarez-Sanchez had been ordered to send by a Mexican-based correspondent dubbed "Pariente" in his phone,[3] Juarez-Sanchez sought to exclude this evidence as prejudicial ("I would argue that…it's not relevant where the money was sent in Mexico.

---

[3]    Juarez-Sanchez used two black Samsung A10 phones, one of which (Gov't's Exh. 8) had started to fail during his first California trip. In Gov't's Exh. 8, Juarez-Sanchez named the user of phone number 5214426838910 "Pariente 2." In the replacement phone, Gov't's Exh. 7, Juarez-Sanchez labeled the same number as "Compa Neto." JA 390-91. For simplicity, this brief refers to both "Pariente 2" and "Compa Neto" as "Pariente."

9

We would concede it was sent to Mexico….Even though it's the truth that it [was sent to Sinaloa] I don't think it's relevant. I think that it can be excluded even if it's admissible but potentially prejudicial."). JA 204-05. The government responded that it would not argue that Juarez-Sanchez was working for the Sinaloa Cartel based on this evidence, which satisfied the district court. JA 205.

## III. TRIAL

### A. Government's Case in Chief

Following jury selection, the government began presenting its case on May 25, 2022. Outside of the August 5, 2020, traffic stop, the government's primary source of evidence were the contents of the three phones: Juarez-Sanchez's two black Samsung phones, and Roblero's Apple iPhone. As introduced during opening statements, the phones provided a wealth of information regarding Juarez-Sanchez's two trips to California in July 2020 to retrieve narcotic drugs, as well as his communications with Pariente, who provided Juarez-Sanchez with instructions on where to pick up the drugs in California on both trips, where to transport the drugs to buyers in the Midwest, and how to remit payment to nominee recipients located in the Mexican states of Sinaloa and Queretaro. JA 258-68. In contrast to Juarez-Sanchez's extensive communications with a Mexican counterparty on the subjects above, Roblero's iPhone contained minimal contacts with Mexican phone numbers, and

10

none of the text threads with such parties included money transmissions outside of small remittances he sent to family members.[4]  Roblero's iPhone, unlike Juarez-Sanchez's phones, however, contained extensive location data, which the government presented during trial to show the men's locations at the time of various text messages during the two trips.

Trooper Miller gave his fact testimony on the first day of trial.  JA 273.  Following his testimony, which largely elaborated the same facts regarding the traffic stop that he had testified to during the April 2020 pretrial motions hearing as well as introducing video and audio recordings of the stop and the drugs and cash seized as a result, the government spent most of the remainder of its case-in-chief introducing evidence from the phones.

That evidence established that, beginning in July 2020, Juarez-Sanchez, who had recently returned to the United States from Mexico after his third removal, began corresponding via the WhatsApp application with Pariente, who had a Mexican phone number. JA 345.  Juarez-Sanchez, who had no car or driver's license, recruited

---

[4]    As it emerged during cross-examination, Roblero had been dealing small quantities of cocaine to customers in Indiana and Michigan to defray the costs of his own cocaine habit, but cell phone evidence showed his source of supply was a local dealer from whom he purchased ounce or half-ounce-level quantities for further distribution.

11

Roblero to drive him from where the men lived in Indianapolis, Indiana, to California. JA 493-94. On July 9, 2020, Juarez-Sanchez and his co-defendant departed and drove nearly non-stop to Los Angeles, California. JA 350-360.

At 6:30 a.m. (PDT)[5] on July 10, Juarez-Sanchez texted Pariente and asked "Buddy, where are the tacos?  The ones you mentioned?"  JA 360.  At 7:20 a.m., Juarez-Sanchez sent Pariente a message asking him to "coordinate the other trip blaka."  Pariente responded: "Yes, as soon as my buddy answers me."  Juarez-Sanchez replied "Okay, We're here at your service, buddy."  Pariente responded a minute later "They're going to call you", and Juarez-Sanchez responded "Okay, I will wait for the call."  JA 359-60.

Following a message that referenced sending "$," in the mid-afternoon, Juarez-Sanchez sent Pariente messages imploring him to "[c]oordinate that for me, seriously.  I'm telling you, let's work hard.  Let's see if it's true he'll bring it just like that." JA 361.  Immediately afterward, Juarez-Sanchez began a WhatsApp message thread with a contact he named "Viuda Negra" (translated "Black Widow") in his phone.  JA 361-62.  Viuda Negra sent Juarez-Sanchez a message containing a

---

[5]  The government's forensic witness explained to the jury that all times on the cell phones message extraction exhibits showed times in Eastern Daylight Time, so all transcript phone extract time references were in EDT unless noted otherwise.

Burbank, California, street address and, after a while, inquired whether Juarez-Sanchez was still coming, but Juarez-Sanchez claimed to be delayed due to a traffic accident.  JA 362-63.

A photo from Roblero's phone taken the next morning, which location data revealed was taken in Burbank, showed the Infiniti coupe in which the two men had been traveling sitting atop a jackstand at a repair shop.  JA 363.  In a text message with Pariente, Juarez-Sanchez also reported to be having problems with his phone, but he told Pariente he was "already here."  JA 377.  Pariente related that, apparently due to Juarez-Sanchez's delayed arrival, "the people here no longer want to deliver. They're freaking out and angry."  JA 367-68.

Subsequent texts suggested Pariente intervened to get the transaction back on track.  JA 368-71.  At 7:42 p.m. (PDT), Juarez-Sanchez advised Viuda Negra he was near a McDonalds and a bar called El Criollo, which was confirmed by location data from Roblero's phone.  JA 372-74.  At 8:37 p.m. (PDT), Juarez-Sanchez sent Pariente a message saying "You know it, buddy.  It's here.  Not there.  We'll stay in touch" and immediately started driving east.  JA 374-77.

By mid-day on July 13, Juarez-Sanchez messaged Pariente, telling the latter he'd arrive at his destination in "Four and 50 minutes."  JA 378.  Apparently discussing the planned drug delivery, which he did not want Roblero to witness, Juarez-

13

Sanchez added that "I'll call [the buyer] shortly. I'll tell him to take me from there to his house to avoid taking this guy. You know, there is always one." JA 378. At approximately 3:17 p.m. (CDT), Juarez-Sanchez texted Pariente saying "the guy already answered me. Almost there….Two hours and 40 minutes." JA 379. Contemporaneous location information from Roblero's phone showing it was in Skokie, Illinois, corroborated a text message Juarez-Sanchez sent Roblero with a Skokie address on Karlov Avenue, suggesting that was the meet location. JA 380-83. Just afterwards, Pariente sent Juarez-Sanchez a message containing a name and address in Queretaro, Mexico saying: "through Elektra….[p]lease try before 10:00 please." JA 383-84. Juarez-Sanchez responded "I'll send you those 300 tomorrow. 500." The following day, July 14, 2020, Juarez-Sanchez sent Pariente a photo of a money transfer receipt for $470, which had been sent to that recipient through the Elektra network from an Indianapolis store. JA 384-86.

Four days after their return, on July 18, 2020, Juarez-Sanchez sent Roblero a text message saying "What's up? Where are you? We need to work buddy. Wake up because the money doesn't come by itself." JA 394. On July 21, 2020, Juarez-Sanchez texted Roblero "Let's take care of the car situation." JA 394.

Roblero testified as a cooperating witness. JA 490. During his testimony, Roblero related that the two men had experienced mechanical trouble with Roblero's

14

Infiniti during the first trip that limited its speed. JA 496-97. Between the two trips, Roblero obtained a Honda Accord, and Juarez-Sanchez had a mechanic look at it to explore the possibility of finding traps/voids in which to hide controlled substances. JA 502.

On July 28, 2020, Juarez-Sanchez texted Roblero "What's up dude? I'm calling you. Are you going?" At 1:00 a.m. on July 29, Roblero reported "sorry, but I promised the boss to finish a job by tomorrow and despite working all day today, I could not finish it. I just arrived at my place. I worked 16 hours today. I don't know if you already left or we should do it tomorrow. What do you think?". JA 395. Juarez-Sanchez responded at "We need to go already….at 8:00 a.m. in a little bit."

Beginning the morning of July 30, Pariente sent Juarez-Sanchez a series of messages with eight names and addresses located in Queretaro and Sinaloa, Mexico, all of which Juarez-Sanchez responded to over the following hours with photo receipts showing that money transfers of either $950 or $1000 had been made to each of the designated recipients via the Elektra network. JA 397-415. Four of the receipts also appeared on Roblero's phone, and Roblero testified that Juarez-Sanchez had provided him cash and asked him to recruit his girlfriend and her friends to send money for them, and that he collected up pictures of the four receipts and forwarded them on to Juarez-Sanchez. JA 504-05.

15

By the morning of August 1, Juarez-Sanchez reported to Pariente that he was nearing Los Angeles. JA 418. After Juarez-Sanchez sent Pariente three more wire transfer receipts showing two transmissions of $940 and one for $990 [two of which receipts were physically found with Juarez-Sanchez upon his arrest], Pariente sent Juarez-Sanchez a WhatsApp message containing a screenshot. JA 433-37.

This screenshot was perhaps the most significant evidence introduced at trial. In it were instructions to call a number—the same number on which Juarez-Sanchez had previously contacted Viuda Negra—and to pick up seven things: "4 W2/3 pal pollo", "2 W2" and "1 rata para la n." The screenshot also instructed to communicate with Viuda Negra only via WhatsApp—no texts. JA 438-39.

Text message and location data evidence showed that, the evening of this text message exchange, Juarez-Sanchez and Viuda Negra met a Mexican restaurant in Burbank, after which Juarez-Sanchez and Roblero immediately began their return drive east. JA 440-41. By late the morning of August 2, 2020, Juarez-Sanchez reported to Pariente that they were nearly through Nevada. JA 442. A few hours later, Juarez-Sanchez wrote Pariente saying "There are tacos. We have some here for you."[6] The morning of August 3, Juarez-Sanchez similarly reported to Pariente that

---

[6]    The "tacos" text message here was displayed to the jury immediately on Gov't's Exh. 51A below the "almost leaving Nevada" message but was not read into the

they were nearing Nebraska. JA 444-45. The following morning, August 4, Juarez-Sanchez texted Pariente, asked him to "send me the phone number," reported that he would "arrive in three and a half hours" to what turned out to be Lexington, Kentucky, and asked Pariente to "[t]ell me the flavors." JA 445.

Pariente sent Juarez-Sanchez a phone number with a Kentucky area code and instructed him to provide "four…of the brand w2/3," for which Juarez-Sanchez would receive "papel" (money) in the amount of "44." JA 445. Text messages from Juarez-Sanchez's older phone (Gov't's Exh. 7) showed that he contacted the Kentucky buyer and agreed to meet at a Lexington Wal-Mart parking lot around noon that day, which was verified by location data from Roblero's phone. JA 446-50. Just before the deal, Pariente messaged Juarez-Sanchez reminding him again to provide "4 w2/3." JA 450.

Roblero testified at trial that, once at the Wal-Mart parking lot, Juarez-Sanchez had taken a backpack with the drugs from their vehicle to another parked car. JA 510. After Juarez-Sanchez returned, they stopped to get the Honda's engine oil changed and, afterwards, Roblero assisted Juarez-Sanchez in hiding the remaining drugs inside the dashboard, under the passenger seat, and under the center

---

record at that time. SAUSA Schwartz displayed an extract of Gov't's Exh. 51A containing the note during her closing argument. JA 775.

console.  JA 510-12.  They then proceeded to a Mexican grocery store in Winchester, Kentucky, where Juarez-Sanchez sent three money transfers (two successfully) totaling $1,940 to two individuals in Mexico that Pariente had directed, before continuing their drive east.  JA 451-454.

The next morning the men were pulled over by Trooper Miller with three packages of drugs – the heroin was labeled "RATA" and the bricks of fentanyl were each labeled "W2."  JA 305-06.  Assuming that the four "W2/3" packages were sold in Lexington for "44" ($44,000) the day before, this would account for all seven items Pariente had directed Juarez-Sanchez to collect from Viuda Negra in Burbank four days earlier and for the source of most of the cash found in the vehicle.

Immediately before trial, Juarez-Sanchez had stipulated to the drug analysis of the Maryland State Police chemist, admitting that the W2 packages each contained just under 1 kilogram of fentanyl at a purity level exceeding 50%, and that the RATA package contained just under 1 kilogram of heroin.  JA 305-07.  Juarez-Sanchez also stipulated to the testimony that the government planned to have the chemist give regarding fentanyl's potency, namely that ingestion of just 5-7 grains of it constituted a potentially fatal dose.  JA 306.

Following presentation of evidence regarding Juarez-Sanchez's illegal reentry charge, the government, on the third day of trial, re-called Trooper Miller to give

18

expert testimony on fentanyl and heroin trafficking.  JA 649-85.  Trooper Miller testified that he had focused on trafficking interdiction for approximately half of his 28 year career and had been assigned to a specialized enforcement team since 2015. JA 650-51.  His formal training had included classes on fentanyl and carfentanyl, and he reported participating in monthly drug trafficking intelligence teleconferences that discuss trends on the East Coast and throughout the country, whereby he maintained familiarity with methods of distribution and transportation—including hidden compartments and intra-vehicle concealment—terminology, and dosage quantities.  JA 651-59.  Trooper Miller also testified that he had arrested at least 500 individuals involved in drug trafficking or use, and obtained information from some of those during de-briefs. JA 653.  Trooper Miller also reported previously testifying as an expert witness in the area of drug interdiction.  JA 655.  Following initial *voir dire* and the government's offer of Trooper Miller as an expert in these areas, Juarez-Sanchez objected to Trooper Miller's testimony on grounds similar to those raised earlier and in Juarez-Sanchez's opening brief.  JA 659-63.

While the district court rejected Juarez-Sanchez's requests to deny expert qualification and to deny the government's motion to accept Trooper Miller as an expert witness following his prior fact testimony, the district court did find that the government had insufficiently established Trooper Miller's expertise in the area of

19

wholesale and retail pricing for fentanyl and heroin.  JA 663-65.  The district court allowed the government to further develop Trooper Miller's basis of knowledge for such drug pricing.  Trooper Miller's response to the government's additional questions established that he largely relied on Drug Enforcement Administration and Homeland Security intelligence updates and reports.  JA 665-71.  After additional objection from Juarez-Sanchez, the district court found that Trooper Miller's basis of knowledge was sufficient for him to testify in the area of "illicit drug trafficking as a general proposition" including on the specific topics of "drug production of synthetic opioids, including transportation and routes of supply" as well as "wholesale and resale pricing, which…is subject to a month-to-month change."  JA 673-74.

Prior to Trooper Miller's expert testimony, the Court informed the jury that he was no longer testifying to facts of this particular case, but rather offering a different type of testimony:

> I want to just be clear that the Court is accepting Master Trooper Miller as an expert in the field of illicit drug trafficking, and you are instructed to listen to his testimony and to consider his testimony as an expert in that field.  I also want to be especially clear about what I'm about to tell you.  Obviously, you've heard before from Master Trooper Miller earlier this week.  Master Trooper Miller is here today to offer his opinion in the field of his expertise, which is illicit drug trafficking.

20

> He is not here today to testify about his personal observations or his personal role in the traffic stop about which you heard on Wednesday. So I do want you to differentiate his testimony about his personal experience with the traffic stop and his expert opinion that he's offering today in the field of illicit drug trafficking.

JA 675.

In his brief expert testimony, Trooper Miller related that fentanyl is a synthetic opioid currently almost exclusively produced in China or Mexico, which is transported into the United States across the southern borders of Texas, California, and Arizona, and that it is primarily transported within the United States by commercial and passenger vehicles. JA 676-78. Trooper Miller testified that fentanyl is typically diluted when sold to users and either pressed into a pill or into a digestible plastic capsule for consumption. JA 680-82. Trooper Miller also testified that one kilogram of pure fentanyl would be enough to create 800,000 user doses, and that near the Mexican border a kilogram of it could be obtained for around $10,000. JA 682-84.

At that point, the government rested its case. Juarez-Sanchez indicated that he would not put on a defense case and made his motion for acquittal under Rule 29. JA 684-87. After hearing argument from both sides, the district court denied the acquittal motion, finding that the "evidence in the light most favorable to the

21

government [would allow] a rational trier of fact [to] find the defendant guilty be-
yond a reasonable doubt as to each essential element of the three charges that he is
facing." JA 688.

B.    Closing Argument

During its closing argument, the government summarized much of the evi-
dence above, arguing that Juarez-Sanchez's messages with Pariente, including the
attached receipts showing immediate compliance with Pariente's payment instruc-
tions to nominee recipients in Queretaro and Sinaloa, eliminated any doubt that he
was the person in the car primarily responsible for the fentanyl and heroin that
Trooper Miller had discovered on August 5, 2020.

As the prosecutor went through some of the text messages taken from Juarez-
Sanchez's phone, she pointed out an exchange on August 2, after Pariente had sent
the instructions to pick up the seven parcels from Viuda Negra, Juarez-Sanchez had
met the latter on the evening of August 1, and was returning east. The message
Juarez-Sanchez sent read "I took it buddy. I'm almost leaving Nevada. There are
tacos. We have some here for you." JA 775. The prosecutor stated "Now, if anyone
thinks that the defendant has gotten some carryout tacos to send to Mexico, that's
just not what's going on. Tacos, I don't need to tell you, are code words for the
drugs." JA 775. Juarez-Sanchez objected, and the district court sustained the

22

objection.  JA 776.  The prosecutor rephrased, stating "That's the defendant updating his colleague.  You can draw your own conclusion about what he meant" and she continued to argue that the four "W2/3" that Pariente directed Juarez-Sanchez to distribute to the Lexington buyer was likely a mix of fentanyl and another substance, based on the fact that "W2" was later determined to indicate pure fentanyl.  JA 776.

Neither immediately after the conclusion of the government's closing argument, nor after the government's rebuttal argument did Juarez-Sanchez request a curative instruction from the district court, make any record for the basis of his earlier objection or ask the Court to do so, or make a motion for a mistrial based on the alleged error.  JA 783, 808-11.  The district court dismissed the jury for lunch and deliberations at approximately 1:10 p.m.  Approximately 90 minutes later, the jury notified the court that they had reached their verdict.  JA 811.

## SUMMARY OF ARGUMENT

I.     The Court should affirm the district court's denial of Juarez-Sanchez's motion to suppress the warranted search of his cell phones.  The state court that issued the warrant correctly found that probable cause existed to search the phones based on the circumstances of the phones' discovery related in the warrant affidavit – namely that they were recovered from a vehicle containing what was then believed to be two kilograms of fentanyl, one kilogram of a heroin/fentanyl mixture, nearly

23

$47,000 in cash stuffed in the rear seats, and what little information the occupants had provided was false. This, combined with the arresting officer's extensive training and experience in drug trafficking interdiction, provided probable cause to search all phones seized for evidence of drug trafficking.

II.    The Court should reject Juarez-Sanchez's argument that the district court abused its discretion in allowing Trooper Miller to testify as a fact witness at the beginning of the government's case and then as an expert witness on fentanyl and heroin trafficking at its conclusion. The district court and government adhered to Circuit law regarding safeguards to prevent jury confusion in this type of circumstance. Even then, any error was harmless.

III.    The Court should also reject Juarez-Sanchez's argument that references to "tacos" in Juarez-Sanchez's texts with his Mexican supply coordinator referred to narcotics rather than food was improper without a witness previously having opined that it was coded language. Such quasi-expert testimony has been previously discouraged by this Court and the argument was nothing more than asking the jury to make a reasonable inference based on facts already in evidence. Even then, any error was harmless.

24

# ARGUMENT

## I.    THE DISTRICT COURT CORRECTLY DENIED JUAREZ-SANCHEZ'S MOTION TO SUPPRESS THE WARRANTED SEARCH OF HIS CELL PHONES.

### A.    Standard of Review.

In reviewing the denial of a suppression motion, this Court reviews a district court's factual findings for clear error and its legal conclusions *de novo*. *See United States v. Johnson*, 114 F.3d 435, 439 (4th Cir. 1997). And, in so doing, it accords "great deference" to an issuing judge's determination of probable cause for the issuance of a search warrant. *See United States v. Wilhelm*, 80 F.3d 116, 119 (4th Cir. 1996) (citing *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).

Even if a search warrant is found to be unsupported by probable cause, the fruits of that search will not be suppressed unless at least one of four factors is present: (1) when the affiant based his application on knowing or reckless falsity; (2) when the judicial officer wholly abandoned his role as a neutral and detached decision maker and served merely as a "rubber stamp" for the police; (3) when the affidavit supporting the warrant was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) when the warrant was so facially deficient that the executing officers could not reasonably have presumed

25

that the warrant was valid.  *See United States v. Wellman*, 663 F.3d 224, 228-29 (4th Cir. 2011).

> B.    The District Court Properly Denied Juarez-Sanchez's Motion to Suppress Cell Phone Evidence because the Warrant was Supported by Probable Cause.

The warrants were supported by abundant probable cause.  The affidavits relayed ample information that the occupants were trafficking drugs—namely, that law enforcement had stopped the vehicle, that Roblero had identified himself by a false name, that multiple people were in the vehicle, that a canine alerted to the presence of drugs, that law enforcement had recovered kilogram-amounts of narcotics from various places inside the vehicle, and that law enforcement had also recovered the phones.  JA 59-60, 66-67.  The affidavit also included several pieces of information tying the phones to the crimes under investigation—namely, that drug traffickers typically communicate with customers and co-conspirators to setup transactions, and that evidence of that activity can typically be found in the photographs, text messages, and other storage areas of the phones.  JA 60, 67.  These facts more than established more than a fair probability that evidence would be found on the phones.

In his brief, Juarez-Sanchez argues that while there was probable cause articulated in Trooper Miller's warrant sufficient to search the driver's cell phone, there

26

was insufficient probable cause to search his cell phone because Trooper Miller had not related any unusual activities of Juarez-Sanchez in the affidavit. Def's Br. at 11-12. But the probable cause analysis does not focus on individual people to the exclusion of all else. It focuses on the nexus between the crime and the "particular place" to be searched. *United States v. Allen*, 631 F.3d 164, 175 (4th Cir. 2011). The affidavits here contained sufficient information to tie the crime (drug trafficking in the car) to the particular places to be searched (phones seized on scene).

Undermining Juarez-Sanchez's argument are two more points. First, all other evidence confirms that law enforcement had even more probable cause than what they included in the affidavits. When "later proceedings confirm the correctness of the district court's findings," this Court "can affirm a pre-trial suppression ruling based on such evidence." *United States v. Gray*, 491 F.3d 138, 148 (4th Cir. 2007). Other testimony showed that (1) Juarez-Sanchez was sitting in the car in the area where law enforcement found the drugs, JA 107, 109, 286, 291, 294; (2) he was actively using one Samsung phone during the stop, JA 103-04, 283, 285; (3) officers retrieved the other Samsung phone from inside the car, JA 310; (4) Roblero lied about who Juarez-Sanchez was, JA 100-01; and (5) Juarez-Sanchez gave officers a false name, JA 72, 113. The use of one device during the offense, the proximity of both devices to the contraband, and the efforts to hide Juarez-Sanchez's identity,

27

erase any doubt that investigators had probable cause to search the phones. In this way, Juarez-Sanchez complains more about how the affidavits were written. But he cannot defeat probable cause on that ground. "[W]arrant affidavits are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *United States v. Moody*, 931 F.3d 366, 372 (4th Cir. 2019) (citation and internal quotation marks omitted). "They must be interpreted in a commonsense manner, neither held to the standard of what judges or lawyers feel they would have written if given the opportunity nor judged as an entry in an essay contest." *Id.* (citation and internal quotation marks omitted).

Second, when investigators obtained the warrants, there was no evidence that Juarez-Sanchez ever clearly asserted ownership of, or that Trooper Miller had any reason to ascribe ownership to Juarez-Sanchez over, the Samsung phone that was left in the car, later admitted at trial as Gov't Exh. 7. Although *after* the search warrants on the phones were executed it became clear that both black Samsung A10 phones were Juarez-Sanchez's, at the time Trooper Miller requested the search warrants, he had no basis to know which man was the user of Gov't Exh. 7, which was ultimately found to contain nearly all the inculpatory text messages with Pariente admitted at trial. The priority was linking the device to the offense, not to a particular person.

28

Juarez-Sanchez cites to just one case, *United States v. Orozco*, 41 F.4th 403 (4th Cir. 2022), for the proposition that the cell phone search warrant here was unsupported by probable cause. *Orozco* however, affirmed a district court's denial of a search warrant suppression motion, so it hardly stands for the proposition that its facts constitute the minimum standard against which other cell phone search warrants must be judged.

But regardless, the instant facts are in important ways stronger than those in *Orozco* for supporting searches of the phones for evidence of drug trafficking. Significantly, in *Orozco*, the defendant was transporting a large amount of cash, but no actual narcotics were found in the car—a K9 alert on the car had only led to the discovery of cash apparently tainted with drugs. *See* 41 F.4th at 406. Here, in contrast, the issuing judge considered a case where police had already discovered both a large amount of drugs—reported to him as two kilograms of fentanyl and one kilogram of a heroin/fentanyl mixture—and more than $46,000 in cash. And the issuing judge was informed that all three phones had been taken from the car where the drugs and cash had been discovered, indicating that ownership of the phones was

29

indeterminate and increasing the need to search all three for evidence of the source of the drugs and cash.[7]

Even allowing that Trooper Miller should have included the fact that that one of the black Samsung phones had been taken directly from Juarez-Sanchez, his argument that there was no probable cause to support the search of that phone because the issuing judge had no cause to believe he was involved with the transportation of the fentanyl and heroin is specious. The affidavits succinctly communicate that drugs were recovered from his area of the car, including under the seat cushion on which he had been sitting. JA 59. That's enough to draw "a reasonable inference" of his involvement, and "officers need not rule out a suspect's innocent explanation for suspicious facts to obtain a warrant." *United States v. Bosyk*, 933 F.3d 319, 325

---

[7] Although Juarez-Sanchez has never accused Trooper Miller of purposefully omitting the fact that the phone ultimately admitted at trial as Gov't Exh. 8 was almost certainly seized directly from Juarez-Sanchez rather than taken from the vehicle, had the district court found that Trooper Miller's omission of that fact material and intentional and so vital to the magistrate's determination of probable cause such that it vitiated the search warrant, its suppression would have had minimal impact on the government's evidence. The only significant exhibit entered from that phone that was not duplicated from another source was a partial text thread between Juarez-Sanchez and Pariente/Compa Neto beginning after the August 1 drug pickup from Viuda Negra. The thread's primary import was its discussions about the Lexington, Kentucky, sale and transmission of receipt photos of the three cash transfers attempted at the Mexican grocery in Winchester, Kentucky, though the physical receipts of those transfers recovered from the Honda Accord were also admitted.

(4th Cir. 2019) (citations and internal quotation marks omitted).  Although a defend-

ant has no affirmative burden to explain away suspicious facts like those facing the

officer here, the absence of any proffered innocent explanation for his presence in

such circumstances is a factor that may be considered as part of the totality of the

circumstances in determining probable cause exists.  *See Maryland v. Pringle*, 540

U. S. 366, 367 (2003) (upholding probable cause arrests of all three vehicle occu-

pants when none acknowledged responsibility for drugs and money found inside).

As the district court found below, given the circumstances surrounding the

discovery of such large amounts of drugs and cash, combined with Trooper Miller's

extensive experience in recognizing indicia of drug trafficking, the issuing judge had

ample probable cause to search phones that had been co-located with the drugs for

evidence of their origin.  Even a phone belonging to a completely innocent passenger

in the car has the potential to provide such evidence, particularly photos or location

evidence, such as the affidavit sought.  JA 61.  That Juarez-Sanchez himself might

have remained calm and silent during the stop and search had no bearing on whether

phones that had been in the car were likely to contain relevant evidence.

C.    At Minimum, the Good Faith Exception Applies in this Case.

Even assuming, arguendo, that the district court incorrectly determined that

Trooper Miller's affidavit provided sufficient grounds on which a detached and

31

neutral magistrate could find probable cause existed to support the requested cell phone searches, the district court properly found that the good faith exception would have applied in this instance.  JA 169.

During the April 24, 2022, suppression hearing, the district court found Trooper Miller acted in good faith.  In its memorandum opinion denying Juarez-Sanchez's motion to suppress, the district court observed that Juarez-Sanchez made no allegation "that that the affidavits contained deliberately falsified information or that the issuing judge was biased in some manner."  JA 169.  And while Juarez-Sanchez had alleged that the affidavits were "'so deficient that no objectively reasonable officer' could have relied in good faith on them," the district court similarly found that Juarez-Sanchez "offers no support for that bald declaration."  JA 169. Finally, though not expressly found by the district court during the hearing or in its subsequent memorandum opinion, there is no suggestion in the record that the warrants were so facially deficient such that it the items to be searched were wrongly identified or in some other way rendered it obviously invalid.

\*     \*     \*

This Court should affirm the district court's finding that the warranted search of Juarez-Sanchez's cell phones was supported by probable cause.  In the alternative,

this Court should still affirm the district court's factual finding that no factors existed

that would vitiate a good faith belief in the validity of the warrant.

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY ALLOWING TROOPER MILLER TO TESTIFY AS BOTH A FACT AND EXPERT WITNESS DURING TRIAL.

### A. Standard of Review.

This Court reviews a district court's decision to qualify an expert witness, as

well as the admission of such testimony, for abuse of discretion. *United States v.*

*Garcia*, 752 F.3d 382 (4th Cir. 2014).

### B. Trooper Miller's Credentials were More than Adequate to Support Expert Qualification for the Limited Testimony he Provided.

During trial, Trooper Miller testified that the chemicals used to make fentanyl

come from Asia and that finished fentanyl enters the United States through vehicles

crossing the southern border into Texas, California, and Arizona.  JA 677-78.  The

district court appropriately qualified him as an expert on those topics.

A witness may qualify as an expert based on his "knowledge, skill, experi-

ence, training, or education."  Fed. R. Evid. 702.  District courts enjoy "considerable

leeway" and "broad latitude" when determining who qualifies as an expert.  *United*

*States v. Wilson*, 484 F.3d 267, 273-74 (4th Cir. 2007).  As such, district courts

33

routinely find that officers with extensive drug experience are qualified to give expert testimony on various aspects of drug trafficking.

The district court appropriately did so here. Importantly, the district court qualified Trooper Miller as an expert on the sources, manufacture, transportation of fentanyl through the southern border *only after* directing the government to do additional *voir dire* on those topics.

Initially, Trooper Miller summarized his extensive interdiction experience. He had been a police officer for 28 years, the latter half of which involved using traffic stops to interdict drug trafficking crimes. JA 274, 649-50. He testified about his numerous courses and training in interdiction. JA 275, 651. He had participated in several hundred narcotics cases, arresting between 500 and 1,000 people. JA 653. He was part of about 200 teams who arrested people who had recently purchased fentanyl. JA 657. He had spoken to many of his arrestees about the details of their drug trafficking. JA 653. He had been credentialed as a Homeland Security task force officer. JA 651. He trained other law enforcement officers on methods of concealing narcotics in cars. JA 654. And he had previously served in court as an expert in drug interdiction. JA 655.

At that point, the district court wanted more information Trooper Miller's basis for the sources, manufacture, transportation of fentanyl from the southern border:

34

"You may do additional *voir dire* of him . . . .  I think it would be helpful for me to hear him specifically talk about the bases of his expertise with respect to 702(a) on transportation, on wholesale pricing for trafficking, and these sources of fentanyl manufacturing."  JA 665.

That's when Trooper Miller provided the basis that Juarez-Sanchez believes lacking.  Specifically, Trooper Miller frequently received training on current trends in opioid production through the State police, local task forces, Homeland Security Investigations, the DEA National Drug Intelligence Center, and the El Paso Intelligence Center.  JA 666-67, 669.  He was communicating with those counterparts at least once a month.  JA 671.  Only following that specific *voir dire*, did the district court qualify Trooper Miller as an expert on those topics: "I did hear him testify that he has gained training through intelligence updates on a weekly update basis as well as monthly meetings on drug production of synthetic opioids, including transportation and routes of supply through Maryland State Police, local task forces, DEA, and HSI."  JA 673.  This was more than enough to qualify him as an expert.

Unlike the expert witness in *Garcia*, the government did not call Trooper Miller as an expert witness to offer his opinion on the meaning or significance of any of the evidence introduce in the instant case.  Rather, the government called Trooper Miller to provide context—(1) information on current trends of synthetic narcotics

35

production and distribution, pricing, and dosing that would help the jury assess the

significance of the quantities of fentanyl and heroin the Juarez-Sanchez possessed at

the time of his arrest; (2) information to be better positioned to determine what the

"4 W2/3" likely consisted of; and (3) information on how those packages and the

text reference to "44" in return for their sale squared with the recovery of the $46,800

in cash discovered in the car.

The facts that Trooper Miller testified to were relatively anodyne and non-

contentious, but still outside the experience of the jury and were based on his spe-

cialized knowledge and familiarity with the drug trade.  Specifically, he testified to

the increasing prevalence of opioid, and particularly fentanyl, trafficking in Mary-

land, JA 675-76; that illicit fentanyl is manufactured from chemical precursors and

the U.S. supply is almost exclusively trafficked through Mexico, JA 676-77; that it

is usually transported by commercial or passenger vehicles, JA 677-78; the indicia

distinguishing drug users, street-level dealers, and volume traffickers, JA 678-80;

that user doses of fentanyl are diluted with other substances and pressed into pills or

poured into capsules that sell for as low as $4 in Baltimore or ten times that amount

in rural areas of the state, JA 682; and that fentanyl is cheaper than heroin and sells

36

wholesale for approximately $10,000/kilogram near the southwest U.S. border and gets more expensive the further north and east one travels.  JA 683-84.

Trooper Miller's approximately 14 years of drug interdiction focus, his participation in monthly drug intelligence fora put on by the DEA and DHS, and his frequent debriefs of users and other individuals he encountered during interdiction stops and arrests provided him with more than adequate foundation to testify to recent facts and trends of illicit fentanyl distribution into the United States and Maryland specifically.

C.    The District Court Took Appropriate Steps to Avoid Jury Confusion.

The district court also took appropriate steps to separate Trooper Miller's fact and expert testimony.  In *United States v. Baptiste*, 596 F.3d 214 (4th Cir. 2010), and *Wilson*, this Court affirmed the government's use of a single law enforcement witness in a dual role of both fact and expert witness, so long as adequate safeguards were in place to avoid jury confusion.  In *Wilson*, this Court found a district court's safeguards adequate when it had a witness testify first as to percipient facts and issued a cautionary instruction to the jury.  484 F.3d at 278.  In *Baptiste*, where the district court had failed to require the government to clearly distinguish which questions were being asked based on the law enforcement witness's expert credentials from those asked of him as a fact witness, this Court opined that the district court

37

should have "done more to ensure that [the witness'] lay and expert testimony were demarcated more clearly in order to prevent juror confusion and to prevent jurors from giving undue weight to [his] lay testimony." 596 F.3d at 225. Even there, this Court declined to find this failure plain enough error to warrant reversal. *Id.*

In this case, the district court imposed all the of requisite safeguards and the government asked no questions that muddied the waters to confuse the jury on which basis Trooper Miller was testifying. The district court insisted pretrial that the government put as much temporal distance as possible in the case presentation between Trooper Miller's fact testimony and his expert testimony, which the government heeded by calling him as its first and last witness in a three-day government case. JA 239, 426, 562. After accepting Trooper Miller as an expert, the district court instructed the jury that Trooper Miller was no longer testifying as to facts he personally observed, but as an expert in illicit drug trafficking, and that they should "differentiate" between the two types of testimony. JA 675.

Juarez-Sanchez argues that, unlike in *United States v. Smith*, 919 F.3d 825 (4th Cir. 2019), the district court's instruction here was insufficient. In *Smith*, the district court, like here, gave a "cautionary instruction emphasizing the importance of separating fact testimony from expert opinions." *Id.* at 833. This "insulat[ed] it from the risk of confusion." *Id.* at 839. This case is much closer to *Smith* than

38

Juarez-Sanchez's thinks.  In *Smith*, the government, like here, narrowed the scope of the expert testimony.  *Smith*'s witness focused on a single incident out of many. *Id.* at 838.  Trooper Miller did not testify about anything involving Juarez-Sanchez. In *Smith*, the government, like here, called the witnesses twice, at separate times.  *Id.* Trooper Miller testified twice, first as a fact witness and again as an expert witness, several days apart.  In *Smith*, the district court, like here, allowed defense counsel to use cross-examination to "probe his expert opinions." *Id.*  *Smith*'s defense counsel "declined that opportunity." *Id.*  Juarez-Sanchez's counsel did the same.  JA 685.

In this way, the district court did what this Court has always asked it to do: "requiring the witness to testify at different times, in each capacity; giving a caution-ary instruction to the jury regarding the basis of the testimony; allowing for cross-examination by defense counsel; establishing a proper foundation for the expertise; or having counsel ground the question in either fact or expertise while asking the question." *Garcia*, 752 F.3d at 392 (citation omitted).

Perhaps most significantly, and unlike most other reported cases considering this issue, at no point during its questioning of him as an expert did the government ask Trooper Miller to opine directly on any facet of the instant case or interpret the defendants' communications or actions.  Although the government elicited facts from him that it then argued clarified aspects of the communications between Juarez-

Sanchez and his Mexican correspondent, the money amounts involved, and Juarez-Sanchez's apparent role in the distribution chain—among other things—at no point did it ask him to offer his opinion on how the facts he testified to as an expert applied to Juarez-Sanchez's case. As a result, there was no chance the jury would be confused between his fact and expert testimony.

D.    Any Alleged Errors Were Harmless.

Given that Trooper Miller's expert testimony only provided helpful context, the alleged errors were harmless. Absent his expert testimony, there was overwhelming evidence of Juarez-Sanchez's guilt. All of the drugs found in the car were within Juarez-Sanchez's reach. All of the inculpatory communications regarding the various drug deal coordination and money transmission instructions came from his cell phones. And Roblero, his co-conspirator, directly implicated him in the crime. In contrast, Trooper Miller never testified as an expert about Juarez-Sanchez's drugs or communications. Explanations about the origin and cost of similar drugs, as well as about similar kinds of communication, several days apart from the fact testimony, do not overcome the significant, direct evidence of Juarez-Sanchez's guilt.

*    *    *

40

Because the district court took the appropriate steps to ensure that the jury would not conflate Trooper Miller's fact and expert testimony and would consider them separately, and because the government both temporally and topically demarcated its questions between his role in the case and his role as an expert in drug trafficking, this Court should find no abuse of discretion. In the alternative, any error was harmless.

## II. THE PROSECUTOR'S ARGUMENT THAT TEXT MESSAGE REFERENCES TO "TACOS" ACTUALLY REFERRED TO ILLEGAL DRUGS WAS NOT ERROR, MUCH LESS REVERSIBLE ERROR

A.    Standard of Review.

This Court reviews "rulings on objections to closing arguments for abuse of discretion." *United States v. Saint Louis*, 889 F.3d 145, 156 (4th Cir. 2018).

B.    The Prosecutor's Argument was not Improper.

The prosecutor's "taco" reference during closing was not improper. "[R]eversible prosecutorial misconduct generally has two components: that (1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." *United States v. Chorman*, 910 F.2d 102, 103 (4th Cir. 1990) (internal quotations omitted). In evaluating whether a prosecutor's closing remarks were sufficient prejudicial to warrant reversal, this Court has noted

41

a number of relevant factors, namely: "(1) the degree to which the prosecutor's remarks had a tendency to mislead the jury and to prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the defendant; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; (5) whether the prosecutors remarks were invited by improper conduct of defense counsel; and (6) whether curative instructions were given to the jury." *United States v. Scheetz*, 293 F.3d 175, 185-86 (4th Cir.), *cert. denied*, 537 U.S. 963 (2002).

Here, the government simply made plain what the jury already knew from the context: "Tacos, I don't need to tell you, are code words for the drugs." JA 775. Although Juarez-Sanchez argues that the prosecutor's comment that Juarez-Sanchez's message to Pariente regarding "tacos" was not actually about edible tacos was improper, he provides no authority for the proposition that arguing an inculpatory meaning for a communication in evidence absent a prior witness providing expert opinion on the subject is improper. Far to the contrary, in *Garcia*, this Court expressly discouraged calling an expert witness to decipher non-standard drug code when it was obvious from the context what the coded language referred to. *Garcia*, 752 F.3d at 393 ("For this, the Government need not have called a "decoding" expert at all: simply pointing to the seizure of 145 grams of heroin, and then the repeated

mention of "145" in this call clearly would have been enough for any juror to make the connection. But cloaking this connection in the guise of expert testimony goes beyond what is contemplated under Federal Rule of Evidence 702, which requires an expert to "reliably appl[y] the principles and methods" for which she was qualified as an expert.").

It would be a dangerous precedent if prosecutors who followed this Court's admonition in *Garcia* were then barred from arguing that the jury should draw common sense inculpatory inferences from evidence rather than having to take obviously coded language literally just because the government put on no expert witness on to opine that communications in evidence were coded.

And contrary to Juarez-Sanchez's assertion that there was no evidence of coded language introduced at trial (Def's Br. at 17-18), there had been ample evidence presented of Juarez-Sanchez's use of coded language, including the two times "tacos" was used immediately before or after drug transactions. The government introduced WhatsApp message evidence that, during Juarez-Sanchez's first trip to Burbank on July 10, 2020, he had asked Pariente "where are the tacos?" as he approached Los Angeles to prompt the latter to set up the first meeting with Viuda Negra. JA 360. And shortly before Juarez-Sanchez had sent the "There are tacos. We have some for you" message that Ms. Schwartz commented on, Juarez-Sanchez

had completed a transaction at the Pariente's direction to pick up from Viuda Negra four "W2/3", two "W2", and one "RATA"—all obvious codes. By closing arguments, the jury was fully apprised that the two W2 and RATA packages were fentanyl and heroin, respectively, since those had been recovered from the vehicle stop; that Juarez-Sanchez had been sitting on one of them; and that most of the nearly $47,000 in cash seized was proceeds from the sale of the four "W2/3" in Lexington for which Pariente told Juarez-Sanchez he would receive "44" for. Given that context, and the implausibility that Juarez-Sanchez, while racing through eastern Nevada and corresponding with Pariente in Mexico, would literally be offering to share tacos he currently had in hand, it was no stretch for Ms. Schwartz to ask the jury to infer that "tacos" meant the drugs Juarez-Sanchez had just picked up at Pariente's direction rather than food.

C.    Regardless, The Comments Were Harmless and Did Not Prejudice Juarez-Sanchez.

Any error fails to constitute reversible error since Juarez-Sanchez was not prejudiced by the isolated remark. Looking at the factors this Court articulated in *Scheetz*, none further Juarez-Sanchez's arguments. 293 F.3d at 185-86. The comment was not made to mislead the jury or intentionally mischaracterize evidence; the remarks were isolated; absent the "tacos" remarks, the rest of the evidence from

44

Juarez-Sanchez and co-defendant's phones, when combined with the results of the drug and cash seizure, provided an independent narrative of Juarez-Sanchez's guilt in the drug trafficking crimes such that the "tacos" comment would have little impact; and the comments were not meant to divert attention from the core issues of the case. Of the other two *Scheetz* factors, namely, whether the prosecutor's remarks were invited by improper conduct of defense counsel and whether curative instructions were given to the jury, the first would only be in Juarez-Sanchez's favor if the comments had actually been improper—which they were not—and the second was not requested by Juarez-Sanchez when he had a chance to clarify the grounds of his objection and request relief.

*    *    *

This Court should reject Juarez-Sanchez's challenge to Ms. Schwartz' closing comment regarding the meaning of the term "tacos" in a text message because she was properly asking the jury to make a reasonable inference based on evidence in the record and the totality of the circumstances that the term referred to illicit drugs. Any error was also harmless.

45

## CONCLUSION

For the reasons stated above, the Court should affirm Juarez-Sanchez's

conviction.

Respectfully submitted,

Erek L. Barron
United States Attorney

Adam K. Ake
Assistant United States Attorney

March 28, 2023

46

**STATEMENT WITH RESPECT TO ORAL ARGUMENT**

The United States respectfully suggests that oral argument is not necessary in this case.  The legal issues are not novel, and oral argument likely would not aid the Court in reaching its decision.

# CERTIFICATE OF COMPLIANCE

1.    This brief has been prepared using Microsoft Word, Times New Roman, 14-point font.

2.    Exclusive of the table of contents; table of citations; statement with respect to oral argument; any addendum containing statutes, rules, or regulations, and the certificate of service, the brief contains 10,197 words.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

Adam K. Ake
Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 28, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF user:

Alfred Guillaume, III
LAW OFFICES OF ALFRED GUILLAUME III
6305 Ivy Lane, Suite 700
Greenbelt, MD 20770
301-377-2158
ag3law@gmail.com

Adam K. Ake
Assistant U.S. Attorney